**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): 20-2400 _____ Caption [use short title] _____

Motion for: Emergency Administrative Stay and Stay Pending Appeal

Uniformed Fire Officers Association, et al.

v.

DeBlasio, et al.

Set forth below precise, complete statement of relief sought:

Appellants seek (1) an administrative stay by July 30, 2020 at 10:34 a.m. to allow the parties to brief the stay issue, and (2) a stay of the District Court's July 28, 2020 order pending appeal

MOVING PARTY: Pease see attached

☑ Plaintiff ☐ Defendant
☑ Appellant/Petitioner ☐ Appellee/Respondent

OPPOSING PARTY: Please see attached

MOVING ATTORNEY: Anthony P. Coles

OPPOSING ATTORNEY: Please see attached

[name of attorney, with firm, address, phone number and e-mail]

DLA Piper US LLP, 1251 Avenue of the Americas, 27th Fl

New York, NY 10020

(212) 335-4500; anthony.coles@dlapiper.com

Court-Judge/Agency appealed from: U.S. District Court for the Southern District of New York; Hon. Katherine Polk Failla

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain): _____

Opposing counsel's position on motion:
☐ Unopposed ☑ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☑ Yes ☐ No ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUNCTIONS PENDING APPEAL:**

Has request for relief been made below? ☑ Yes ☐ No
Has this relief been previously sought in this Court? ☐ Yes ☑ No
Requested return date and explanation of emergency: The District Court stayed

its decision for 24 hours from the time the Court's law clerk emailed counsel

on July 29, 2020, at 10:34 a.m.

Therefore, Plaintiffs-Appellants respectfully request an administrative stay order

that is urgently needed to protect the safety of New York City police officers.

Is oral argument on motion requested? ☑ Yes ☐ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set? ☐ Yes ☑ No  If yes, enter date: _____

**Signature of Moving Attorney:**
/s/ Anthony P. Coles _____ Date: July 29, 2020    Service by: ☑ CM/ECF ☑ Other [Attach proof of service]

**Form T-1080** (rev. 12-13)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

No. 20-2400

UNIFORMED FIRE OFFICERS ASSOCIATION, *et al.*,

*Plaintiffs-Appellants*,

v.

BILL DE BLASIO, in his official capacity
as Mayor of the City of New York, *et al.*,

*Defendants-Appellees.*

## DECLARATION IN SUPPORT OF APPELLANTS' EMERGENCY
## MOTION FOR A STAY PENDING APPEAL

On Appeal from the United States District Court for the
Southern District of New York, No. 20-cv-05441-KPF

Date by which a Court ruling is requested on
request for administrative stay: July 30, 2020 at 10:34 a.m.

| | |
|---|---|
| Anthony P. Coles | Courtney G. Saleski |
| DLA Piper LLP (US) | DLA Piper LLP (US) |
| 1251 Avenue of the Americas | 1650 Market St., Suite 5000 |
| New York, NY 10020 | Philadelphia, PA 19103 |
| (212) 335-4500 | (215) 656-3300 |

*Attorneys for Uniformed Fire Officers Association, Uniformed Firefighters
Association of Greater New York, Police Benevolent Association of the City of New
York, Inc., Correction Officers' Benevolent Association of the City of New York,
Sergeants Benevolent Association, Lieutenants Benevolent Association Inc.,
Captains Endowment Association, Detectives' Endowment Association*

July 29, 2020

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiffs-Appellants Police Benevolent Association of the City of New York, Inc., Correction Officers' Benevolent Association of the City of New York, Captains Endowment Association, Detectives' Endowment Association, Sergeants Benevolent Association, and Lieutenants Benevolent Association Inc. are nonstock, non-profit corporations; none of these entities has a parent corporation or a publicly held corporation that owns 10% or more of its stock. Plaintiffs-Appellants Uniformed Fire Officers Association and Uniformed Firefighters Association of Greater New York are not corporations.

# DECLARATION

I, Anthony P. Coles, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am counsel for Plaintiffs-Appellants Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York, Correction Officers' Benevolent Association of the City of New York, Police Benevolent Association of the City of New York, Inc., Sergeants' Benevolent Association, Lieutenants' Benevolent Association, Captains' Endowment Association, and Detectives' Endowment Association (collectively, the "Unions").  I submit this declaration in support of the Unions' emergency motion for: (a) an administrative stay to allow the parties to brief the issue of a stay pending appeal; and (b) a stay of the District Court's July 28, 2020 modification to its preliminary injunction. Defendants oppose the Unions' motion for an emergency stay and oppose the Unions' request for an emergency administrative stay.  They state they intend to file responses to the Unions' emergency stay motion and emergency administrative stay request.

# PROCEDURAL HISTORY

2.    The procedural history of this case is explained in more detail in the Unions' supporting memorandum of law.  In brief summary, the Unions filed suit to stop the indiscriminate dissemination of hundreds of thousands of police records in

violation of contractual and constitutional rights. The Unions' Verified

Petition/Complaint explains:

> 4.      Although the repeal of Civil Rights Law § 50-a eliminates a categorical prohibition to the public review of law enforcement records, it does not obliterate pre-existing contractual rights or constitutional and common law protections that all citizens, including the Petitioners, share, which forbid Respondents from promoting unproven, defamatory allegations to the world at large.

> 5.      **Collective Bargaining Agreements/CPLR Article 75:** Each of the Petitioners has entered into a Collective Bargaining Agreement ("CBA") with their respective agencies and the City governing the terms and conditions of their employment.  The CBAs protect Petitioners against the release of Unsubstantiated and Non-Final Allegations.  The Respondents have no lawful right to unilaterally violate those terms, and render them null and void, or to impose new terms, without following the provisions of the NYC Collective Bargaining Law, including those laws relating to the arbitration of grievances. In addition, at least some of the Petitioners have filed (or will be filing) grievances under their respective CBAs.  Pending final determination of those grievances through the collective bargaining process, Respondents must be enjoined under Article 75 of the CPLR.

> 6.      **Due Process and Equal Protection:** The indiscriminate disclosure on the internet of unproven allegations without due process of law is functionally irreversible, and will create unfair, unlawful, and limitless notoriety for the Petitioners, with substantial impact to their future employment prospects. Such a release would destroy the reputations and imperil the safety of those firefighters and officers and their families forever—all while the Respondents treat other City employees fairly by protecting their privacy.  The release of Unsubstantiated and Non-Final Allegations constitutes a violation of the Due Process and Equal Protection Clauses of the United States and New York State Constitutions, and treats law enforcement officers different than other city employees for whom unsubstantiated allegations are maintained as private.

> 7.      **Contract Rights for Past Settlements:** The data dump will also include accusations that resulted in settlement agreements.  Such disclosure will breach those settlement contracts.  Any settlement agreement entered into before June 2020—when Civil Rights Law § 50-a, which shielded disclosure of disciplinary records, was repealed—necessarily incorporated § 50-a's

2

protections against disclosure of this very type of information. New York's recent repeal of § 50-a does not alter these existing contracts, nor was it ever intended to do so.

8. **CPLR Article 78:** In addition, release of such Unsubstantiated and Non-Final Allegations would also constitute errors of law and be arbitrary and capricious agency action as an unwarranted and irreversible invasion of the right to privacy. Respondents themselves have asserted for decades that release of Unsubstantiated and Non-Final Allegations would be an unwarranted invasion of privacy. It is an error of law and arbitrary and capricious for the Respondents to change decades of agency practice on the protections afforded Unsubstantiated and Non-Final Allegations under the pretext of the repeal of § 50-a. Thus, Respondents' actions violate Article 78 of the CPLR.

Dist. Ct. Dkt. No. 5-1.

3. The Honorable Katherine Polk Failla originally granted the Unions' motion for a Temporary Restraining Order ("TRO") (Ex. B (July 22, 2020 Tr.)) and enjoined the New York Civil Liberties Union ("NYCLU") from disseminating 81,000 disciplinary records it had received. After briefing, (Exhibits C, D), the Judge modified her injunction, but stayed the modification for 24 hours to allow the present stay request. (Exhibit E (July 28, 2020 Tr.)).

4. As explained in the accompanying memorandum of law, the District Court's modification of its TRO on July 28, 2020, has the practical effect of being a denial of the Unions' request in the District Court for a preliminary injunction preventing disclosure of the records. If the July 28, 2020 modification is not stayed and reversed, the records will be publicly released and any preliminary injunctive relief will be in significant part moot.

3

5.    The Unions appealed the District Court's modification of the injunction.  *See* Notice of Appeal (July 28, 2020, Dist. Ct. Dkt. No. 39).

6.    The following documents are attached as exhibits to this declaration:

A.    **Exhibit A:** District Court Docket, including relevant Minute Orders

B.    **Exhibit B:** July 22, 2020 Transcript

C.    **Exhibit C:** NYCLU's letter requesting modification of the TRO (Dist. Ct. Dkt. No. 16)

D.    **Exhibit D:** The Unions' letter opposing the modification (Dist. Ct. Dkt. No. 22)

E.    **Exhibit E:** July 28, 2020 Transcript

F.    **Exhibit F:** Emails between Corporation Counsel and Unions' Counsel dated July 13–14, 2020

G.    **Exhibit G:** Initial letter briefing and attached exhibits (Dist. Ct. Dkt. No. 12)

H.    **Exhibit H:** Corporation Counsel letter in support of NYCLU's request to modify TRO (Dist. Ct. Dkt. No. 23)

I.    **Exhibit I:** NYCLU reply letter in support of motion to modify TRO (Dist. Ct. Dkt. No. 32)

J.    **Exhibit J:** CCRB's July 29 motion to lift TRO in light of July 28 Order (Dist. Ct. Dkt. No. 36)

## A STAY OF THE MODIFICATION OF THE PRELIMINARY INJUNCTION IS REQUESTED

7.    For the reasons explained in the attached memorandum of law, the Unions respectfully request that the Court enter an administrative stay by July 30,

4

2020 at 10:34 a.m. to allow the parties to brief the stay issue.  The Unions request the opportunity to file a stay motion that is prepared with less haste as well as a reply brief.  Once fully briefed, the Unions request a stay pending appeal to prevent the irreparable harm to their members that will occur if the documents are disclosed.

Dated:      New York, New York
             July 29, 2020

                               Respectfully submitted,

                               _____
                               Anthony P. Coles
                               DLA Piper LLP (US)
                               1251 Avenue of the Americas
                               New York, NY 10020
                               (212) 335-4500

# Exhibit A

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CIVIL DOCKET FOR CASE #: 1:20-cv-05441-KPF**

Uniformed Fire Officers Association et al v. DeBlasio et al
Assigned to: Judge Katherine Polk Failla

Case in other court:    State Court - Supreme, 154982-2020E

Cause: 28:1331 Fed. Question

Date Filed: 07/15/2020
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

| | | |
|---|---|---|
| **Uniformed Fire Officers Association** | represented by | **Anthony Paul Coles**<br>DLA Piper US LLP (NY)<br>1251 Avenue of the Americas, 27th Floor<br>New York, NY 10020<br>(212) 335-4500<br>Email: anthony.coles@dlapiper.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Robert Hepworth**<br>DLA Piper US LLP (NY)<br>1251 Avenue of the Americas, 27th Floor<br>New York, NY 10020<br>212-530-4466<br>Email: michael.hepworth@dlapiper.com<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Uniformed Firefighters Association of Greater New York** | represented by | **Anthony Paul Coles**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Robert Hepworth**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Police Benevolent Association of the City of New York, Inc.** | represented by | **Anthony Paul Coles**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Robert Hepworth**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

| | | |
|---|---|---|
| **Correction Officers' Benevolent Association of the City of New York, Inc.** | represented by | **Anthony Paul Coles**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| | | **Michael Robert Hepworth**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Plaintiff**

**Sergeants Benevolent Association**                     represented by   **Anthony Paul Coles**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Michael Robert Hepworth**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Lieutenants Benevolent Association**                   represented by   **Anthony Paul Coles**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Michael Robert Hepworth**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Captains Endowment Association**                       represented by   **Anthony Paul Coles**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Michael Robert Hepworth**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**Detectives' Endowment Association**                    represented by   **Anthony Paul Coles**
                                                                         (See above for address)
                                                                         *LEAD ATTORNEY*
                                                                         *ATTORNEY TO BE NOTICED*

                                                                         **Michael Robert Hepworth**
                                                                         (See above for address)
                                                                         *ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**Bill de Blasio**
*in his official capacity as Mayor of the City of New York*

represented by **Dominique F. Saint-Fort**
New York City Law Depart. Office of the Corporation
Counsel
100 Church Street
New York, NY 10007
212-356-2444
Fax: 212-356-2349
Email: dosaint@law.nyc.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
NYC Law Department, Office of the Corporation Counsel
(NYC)
100 Church Street
New York, NY 10007
(212) 788-0303
Fax: (212) 788-8876
Email: kbarker@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
New York City Law Department
100 Church Street
New York, NY 10007
(860)-508-4861
Email: rquinn@law.nyc.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**City of New York**

represented by **Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Fire Department of the City of New York**

represented by **Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel A. Nigro**
*in his official capacity as the Commissioner of the Fire Department of the City of New York*

represented by

**Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City Department of Correction**

represented by

**Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cynthia Brann**
*in her official capacity as the Commissioner of the New York City Department of Correction*

represented by

**Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dermot F. Shea**
*in his official capacity as the Commissioner of the New York City Police Department*

represented by

**Dominique F. Saint-Fort**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kami Zumbach Barker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rebecca Gibson Quinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**New York City Police Department**                     represented by    **Dominique F. Saint-Fort**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Kami Zumbach Barker**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Rebecca Gibson Quinn**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Frederick Davie**                                     represented by    **Dominique F. Saint-Fort**
*in his official capacity as the Chair of the Civilian Complaint*          (See above for address)
*Review Board*                                                            *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Kami Zumbach Barker**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Rebecca Gibson Quinn**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Civilian Complaint Review Board**                     represented by    **Dominique F. Saint-Fort**
                                                                          (See above for address)
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Kami Zumbach Barker**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

                                                                          **Rebecca Gibson Quinn**
                                                                          (See above for address)
                                                                          *ATTORNEY TO BE NOTICED*

**Intervenor Defendant**

**Communities United for Police Reform**                represented by    **Alex V. Chachkes**
                                                                          Orrick, Herrington & Sutcliffe LLP (NYC)
                                                                          51 West 52nd Street
                                                                          New York, NY 10019
                                                                          212 506 5000
                                                                          Fax: 212 506 5151
                                                                          Email: achachkes@orrick.com
                                                                          *LEAD ATTORNEY*
                                                                          *ATTORNEY TO BE NOTICED*

**Amicus**

**New York Civil Liberties Union**

represented by **Christopher Thomas Dunn**
New York Civil Liberties Union
125 Broad Street, 17th floor
New York, NY 10004
(212) 344-3005
Fax: (212) 344-3318
Email: cdunn@nyclu.org
*ATTORNEY TO BE NOTICED*

**Jordan Laris Cohen**
New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10024
212-607-3343
Email: jlariscohen@nyclu.org
*ATTORNEY TO BE NOTICED*

**Molly Knopp Biklen**
New York Civil Liberties Union
125 Broad St.
New York, NY 10004
212-607-3380
Email: mbiklen@nyclu.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**The Legal Aid Society**

represented by **Roger Allen Cooper**
Cleary Gottlieb
One Liberty Plaza
New York, NY 10006
(212) 225-2283
Fax: (212) 225-3999
Email: racooper@cgsh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| # | Docket Text | Date Filed |
|---|---|---|
| 1 | FILING ERROR - PDF ERROR - NOTICE OF REMOVAL from State of New York Supreme Court, County of New York. Case Number: 154882/2020E. (Filing Fee $ 400.00, Receipt Number ANYSDC-20694801).Document filed by CITY OF NEW YORK, New York City Police Department, Frederick Davie, Dermot F. Shea, Daniel A. Nigro, Fire Department of the City of New York, Cynthia Brann, New York City Department Of Corrections, Bill DeBlasio, Civilian Complaint Review Board. (Attachments: # 1 Exhibit Complaint).(Quinn, Rebecca) Modified on 7/16/2020 (jgo). (Entered: 07/15/2020) | 07/15/2020 |
| 2 | NOTICE OF APPEARANCE by Anthony Paul Coles on behalf of Captains Endowment Association, Correction Officers Benevolent Association, Inc., Detectives Endowment Association of New York City, Lieutenants Benevolent Association of the City of New York, Inc., Police Benevolent Association, Sergeants Benevolent Association of the City of New York, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Coles, Anthony) (Entered: 07/15/2020) | 07/15/2020 |
| 3 | NOTICE of of Entry of State Court Order re: 1 Notice of Removal,. Document filed by Captains Endowment Association, Correction Officers Benevolent Association, Inc., Detectives Endowment Association of New York City, Lieutenants Benevolent Association of the City of New York, Inc., Police Benevolent Association, Sergeants Benevolent Association of the City of New York, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Coles, Anthony) (Entered: 07/15/2020) | 07/15/2020 |
| 4 | NOTICE OF APPEARANCE by Dominique F. Saint-Fort on behalf of Cynthia Brann, CITY OF NEW YORK, Civilian Complaint Review Board, Frederick Davie, Bill DeBlasio, Fire Department of the City of New York, New York City Department Of Corrections, New York City Police Department, Daniel A. Nigro, Dermot F. Shea..(Saint-Fort, Dominique) (Entered: 07/16/2020) | 07/16/2020 |
|  | ***NOTICE TO ATTORNEY REGARDING DEFICIENT PLEADING. Notice to Attorney Rebecca Gibson Quinn to RE-FILE Document No. 1 Notice of Removal. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the pleading is not correct; the incorrect party role was listed for Plaintiffs on the PDF case caption. Re-file the pleading using the event type Notice of Removal found under the event list Complaints and Other Initiating Documents - attach the correct signed PDF - select the individually named filer/filers - select the individually named party/parties the pleading is against. If the deficiency/deficiencies are not corrected within five (5) days per Amended Standing Order 15-mc-00131 this case will be administratively closed. Initial Pleading due by 7/21/2020. (jgo) (Entered: 07/16/2020) | 07/16/2020 |
| 5 | NOTICE OF REMOVAL from Supreme Court of the State of New York, County of New York. Case Number: 154982/2020E..Document filed by CITY OF NEW YORK, New York City Police Department, Frederick Davie, Dermot F. Shea, Daniel A. Nigro, Fire Department of the City of New York, Cynthia Brann, New York City Department Of Corrections, Bill DeBlasio, Civilian Complaint Review Board. (Attachments: # 1 Exhibit Complaint).(Quinn, Rebecca) (Entered: 07/16/2020) | 07/16/2020 |

| # | Docket Text | Date Filed |
|---|---|---|
| | ***NOTICE TO ATTORNEY TO ELECTRONICALLY FILE CIVIL COVER SHEET. Notice to Attorney Rebecca Gibson Quinn. Attorney must electronically file the Civil Cover Sheet. Use the event type Civil Cover Sheet found under the event list Other Documents. (jgo) (Entered: 07/17/2020) | 07/17/2020 |
| | ***NOTICE TO ATTORNEY REGARDING REMOVAL OF PARTY. Notice to attorney Rebecca Gibson Quinn. The following party/parties has been removed from this case: Captains Endowment Association. The party was added to the case in error. (jgo) (Entered: 07/17/2020) | 07/17/2020 |
| | ***NOTICE TO ATTORNEY REGARDING PARTY MODIFICATION. Notice to attorney Rebecca Gibson Quinn. The party information for the following party/parties has been modified: Sergeants Benevolent Association of the City of New York; Uniformed Fire Officers Association; Uniformed Firefighters Association of Greater New York; Police Benevolent Association; Correction Officers Benevolent Association, Inc.; Lieutenants Benevolent Association of the City of New York, Inc.;Captains Endowment Association; Detectives Endowment Association of New York City; Bill DeBlasio;CITY OF NEW YORK; Fire Department of the City of New York; Daniel A. Nigro; New York City Department Of Corrections; N.Y.C. D.O.C. Comm. Cynthia Brann; Dermot F. Shea; New York City Police Department; Frederick Davie; Civilian Complaint Review Board. The information for the party/parties has been modified for the following reason/reasons: party name contained a typographical error; party name was entered in all caps; party role was entered incorrectly; party text was omitted;. (jgo) (Entered: 07/17/2020) | 07/17/2020 |
| | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Katherine Polk Failla. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(jgo) (Entered: 07/17/2020) | 07/17/2020 |
| | Magistrate Judge Robert W. Lehrburger is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (jgo) (Entered: 07/17/2020) | 07/17/2020 |
| | Case Designated ECF. (jgo) (Entered: 07/17/2020) | 07/17/2020 |
| 6 | CIVIL COVER SHEET filed..(Saint-Fort, Dominique) (Entered: 07/17/2020) | 07/17/2020 |
| 7 | LETTER MOTION for Conference addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 17, 2020. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit State Court Order, # 2 Exhibit PBA Collective Bargaining Agreement). (Quinn, Rebecca) (Entered: 07/17/2020) | 07/17/2020 |
| 8 | LETTER addressed to Judge Katherine Polk Failla from Christopher Dunn dated July 17, 2020 re: Request to Participate as Amicus Curiae. Document filed by New York Civil Liberties Union..(Dunn, Christopher) (Entered: 07/17/2020) | 07/17/2020 |
| 9 | LETTER addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 7/17/2020 re: Response to Defendants/Respondents July 17, 2020 letter. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Exhibit 1 - TRO issued by State Supreme Court Justice Carol R. Edmead on July 15, 2020, # 2 Exhibit 2 -Order on Motion, State Troopers Fraternal Assoc. v. State of New Jersey, et al., Superior Court of New Jersey, Appellate Div.).(Coles, Anthony) (Entered: 07/17/2020) | 07/17/2020 |
| 10 | NOTICE of of State Court Papers Filed by Petitioners/Plaintiffs Prior to Removal. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Petitioners/Plaintiffs' Proposed Order to Show Cause, # 2 Petitioners/Plaintiffs' Verified Petition/Complaint, # 3 Exhibit 1 to Petitioners/Plaintiffs Verified Petition/Complaint (Grievances), # 4 Exhibit 2 to Petitioners/Plaintiffs Verified Petition/Complaint (SBA), # 5 Exhibit 3 to Petitioners/Plaintiffs Verified Petition/Complaint (PBA), # 6 Exhibit 4 to Petitioners/Plaintiffs Verified Petition/Complaint (LBA), # 7 Exhibit 5 to Petitioners/Plaintiffs Verified Petition/Complaint (CEA), # 8 Exhibit 6 to Petitioners/Plaintiffs Verified Petition/Complaint (DEA), # 9 Exhibit 7 to Petitioners/Plaintiffs Verified Petition/Complaint (COBA), # 10 Exhibit 8 to Petitioners/Plaintiffs Verified Petition/Complaint (UFA), # 11 Exhibit 9 to Petitioners/Plaintiffs Verified Petition/Complaint (UFAO), # 12 Memorandum of Law in Support of Verified Petition/Complaint and Proposed Order to Show Cause Seeking Temporary Restraining Order and Preliminary Injunction, # 13 Affirmation in Support of Emergency Relief, # 14 Rule 202.7(f) Affirmation of Notice of Application for a Temporary Restraining Order, # 15 UCS-840, Request for Judicial Intervention;, # 16 Summons).(Coles, Anthony) (Entered: 07/17/2020) | 07/17/2020 |
| 11 | LETTER REPLY to Response to Motion addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 20, 2020 re: 7 LETTER MOTION for Conference addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 17, 2020. . Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit Exhibit A).(Saint-Fort, Dominique) (Entered: 07/20/2020) | 07/20/2020 |

| # | Docket Text | Date Filed |
|---|---|---|
| 12 | LETTER RESPONSE to Motion addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/20/2020 re: 7 LETTER MOTION for Conference addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 17, 2020. . Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Exhibit A - Justice Edmead's July 15 Order, # 2 Exhibit B - July 8, 2020 Letter from Police Benevolent Association of the City of New York, Inc., # 3 Exhibit C - Order on Motion, No. A- 003950-19T4 (N.J. Super., App. Div. July 8, 2020)). (Coles, Anthony) (Entered: 07/20/2020) | 07/20/2020 |
| 13 | LETTER REPLY to Response to Motion addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 21, 2020 re: 7 LETTER MOTION for Conference addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 17, 2020. . Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio..(Saint-Fort, Dominique) (Entered: 07/21/2020) | 07/21/2020 |
| 14 | ORDER granting 7 Letter Motion for Conference. The parties in this matter are hereby ORDERED to appear for a videoconference on July 22, 2020, at 4:00 p.m. The conference will proceed via videoconference, with audio access as follows: Dial-in: (917) 933-2166; Conference ID: 801588117. The Court will provide instructions for accessing the conference for video participants separately. SO ORDERED. Telephone Conference set for 7/22/2020 at 04:00 PM before Judge Katherine Polk Failla.. (Signed by Judge Katherine Polk Failla on 7/22/2020) (kv) (Entered: 07/22/2020) | 07/22/2020 |
|  | NOTICE OF CONFERENCE DIAL-IN re: 14 Order on Motion for Conference: The dial-in information for the oral ruling with regard to the oral arguments presented today in this matter is (888) 363-4749, access code 5123533. ***No PDF is attached to this entry. (tn) (Entered: 07/22/2020) | 07/22/2020 |
|  | Minute Entry for proceedings held before Judge Katherine Polk Failla: Temporary Restraining Order hearing held on 7/22/2020. Plaintiffs' motion for TRO granted in part per oral decision. NYCL is found to be acting in concert with Defendants and is ordered to not disclose documents further, internally or externally. Plaintiff's request for discovery is granted on the limited basis as set forth on the record. Supplemental briefing, and amicus brief, if any are due by 8/14/2020. Preliminary Injunction hearing is set for 8/18/2020 at 2:00 p.m. (Court Reporter Andrew Walker) (tn) (Entered: 07/23/2020) | 07/22/2020 |
|  | Set/Reset Hearings: Preliminary Injunction Hearing set for 8/18/2020 at 02:00 PM before Judge Katherine Polk Failla. (tn) (Entered: 07/23/2020) | 07/22/2020 |
| 15 | NOTICE OF APPEARANCE by Michael Robert Hepworth on behalf of Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Hepworth, Michael) (Entered: 07/23/2020) | 07/23/2020 |
| 16 | LETTER addressed to Judge Katherine Polk Failla from Christopher Dunn dated July 23, 2020 re: Letter Motion by NYCLU to Modify Temporary Restraining Order. Document filed by New York Civil Liberties Union. (Attachments: # 1 Affidavit of Christopher Dunn).(Dunn, Christopher) (Entered: 07/24/2020) | 07/24/2020 |
| 17 | MEMO ENDORSEMENT on re: 16 Letter, filed by New York Civil Liberties Union. ENDORSEMENT: The Court is in receipt of the above-letter from NYCLU. (Dkt. #16). As discussed at the hearing on July 22, 2020, Plaintiffs are ordered to respond by today, July 24, 2020. (Signed by Judge Katherine Polk Failla on 7/24/2020) (tn) (Entered: 07/24/2020) | 07/24/2020 |
| 18 | NOTICE OF APPEARANCE by Christopher Thomas Dunn on behalf of New York Civil Liberties Union..(Dunn, Christopher) (Entered: 07/24/2020) | 07/24/2020 |
| 19 | NOTICE OF APPEARANCE by Molly Knopp Biklen on behalf of New York Civil Liberties Union..(Biklen, Molly) (Entered: 07/24/2020) | 07/24/2020 |
| 20 | NOTICE OF APPEARANCE by Jordan Laris Cohen on behalf of New York Civil Liberties Union..(Cohen, Jordan) (Entered: 07/24/2020) | 07/24/2020 |
| 21 | LETTER MOTION for Discovery addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/24/2020. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Coles, Anthony) (Entered: 07/24/2020) | 07/24/2020 |
| 22 | LETTER addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/24/2020 re: in response to Christopher Dunns letter to the Court of July 23, 2020. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Coles, Anthony) (Entered: 07/24/2020) | 07/24/2020 |

| # | Docket Text | Date Filed |
|---|---|---|
| 23 | LETTER addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 25, 2020 re: Response to Anthony Coles's Letter in Response to Christopher Dunn's Letter to the Court of July 23, 2020. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio..(Quinn, Rebecca) (Entered: 07/25/2020) | 07/25/2020 |
| 24 | LETTER RESPONSE to Motion addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 25, 2020 re: 21 LETTER MOTION for Discovery addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/24/2020. . Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B).(Saint-Fort, Dominique) (Entered: 07/25/2020) | 07/25/2020 |
| 25 | LETTER addressed to Judge Katherine Polk Failla from Anthony P. Coles dated July 26, 2020 re: Reply Letter in response to Defendants Letter of July 25 concerning discovery. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Coles, Anthony) (Entered: 07/26/2020) | 07/26/2020 |
| 26 | LETTER addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 27, 2020 re: Plaintiffs' Letter Dated July 26, 2020 Dkt # 25. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Quinn, Rebecca) (Entered: 07/27/2020) | 07/27/2020 |
| 27 | NOTICE OF APPEARANCE by Kami Zumbach Barker on behalf of Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio..(Barker, Kami) (Entered: 07/27/2020) | 07/27/2020 |
| 28 | ORDER: The parties in this matter are hereby ORDERED to appear for a videoconference on July 28, 2020, at 2:00 p.m. The conference will proceed via videoconference, with audio access as follows: Dial-in: (888) 363-4749; Conference ID: 5123533. The Court will provide instructions for accessing the conference for video participants separately. (Telephone Conference set for 7/28/2020 at 02:00 PM before Judge Katherine Polk Failla.) (Signed by Judge Katherine Polk Failla on 7/27/2020) (jwh) (Entered: 07/27/2020) | 07/27/2020 |
| 29 | LETTER addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/27/2020 re: Supplemental authority in support of Plaintiffs' motion for a preliminary injunction.. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Exhibit A - Buffalo Police Benevolent Assn et al. v. Byron W. Brown et al., No. 807664/2020 (July 24, 2020)).(Coles, Anthony) (Entered: 07/27/2020) | 07/27/2020 |
| 30 | LETTER addressed to Judge Katherine Polk Failla from Anthony P. Coles dated 07/28/2020 re: Supplemental authority in support of Plaintiffs' motion for a preliminary injunction. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. (Attachments: # 1 Exhibit A - July 27, 2020 New York State Committee on Open Government Advisory Opinion).(Coles, Anthony) (Entered: 07/28/2020) | 07/28/2020 |
| 31 | LETTER addressed to Judge Katherine Polk Failla from Dominique Saint-Fort dated July 28, 2020 re: Discovery. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit Exhibit A).(Saint-Fort, Dominique) (Entered: 07/28/2020) | 07/28/2020 |
| 32 | LETTER addressed to Judge Katherine Polk Failla from Christopher Dunn dated July 28, 2020 re: NYCLU letter about motion to modify temporary restraining order. Document filed by New York Civil Liberties Union..(Dunn, Christopher) (Entered: 07/28/2020) | 07/28/2020 |
| 33 | LETTER MOTION to File Amicus Brief addressed to Judge Katherine Polk Failla from Roger A. Cooper and Corey Stoughton dated July 28, 2020. Document filed by The Legal Aid Society. (Attachments: # 1 Attachment A - June 5, 2018 Transcript, # 2 Attachment B - February 19, 2020 Memorandum of Support, # 3 Attachment C - June 15, 2020 Letter).(Cooper, Roger) (Entered: 07/28/2020) | 07/28/2020 |
| 34 | FILING ERROR - NO ORDER SELECTED FOR APPEAL - NOTICE OF INTERLOCUTORY APPEAL. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York. Filing fee $ 505.00, receipt number ANYSDC-20895063. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Coles, Anthony) Modified on 7/29/2020 (tp). (Entered: 07/28/2020) | 07/28/2020 |

| # | Docket Text | Date Filed |
|---|---|---|
| | Minute Entry for proceedings held before Judge Katherine Polk Failla: Oral Argument held on 7/28/2020 re: 36 FIRST LETTER MOTION for Conference or to lift the TRO against defendant, as it applies to the CCRB database addressed to Judge Katherine Polk Failla from Kami Zumbach Barker, for defendants dated July 29, 2020 filed by Cynthia Brann, Dermot F. Shea, Fire Department of the City of New York, New York City Police Department, New York City Department of Correction, Civilian Complaint Review Board, City of New York, Bill de Blasio, Daniel A. Nigro, Frederick Davie: the temporary restraining order entered by the Court on July 22, 2020 is modified such that it no longer applies to NYCLU. Discovery disputes were resolved as set forth on the record. (Court Reporter Raquel Robles) (tn) (Entered: 07/29/2020) | 07/28/2020 |
| 35 | ORDER granting 33 Letter Motion to File Amicus Brief. Application GRANTED. The Court will permit Legal Aid to file a brief on the same timeline as the parties to this action, due by August 14, 2020, and will hear from Legal Aid as appropriate at the August 18, 2020 hearing. (Signed by Judge Katherine Polk Failla on 7/29/2020) (rro) (Entered: 07/29/2020) | 07/29/2020 |
| | ***NOTICE TO ATTORNEY REGARDING DEFICIENT APPEAL. Notice to attorney Coles, Anthony to RE-FILE Document No. 34 Notice of Interlocutory Appeal. The filing is deficient for the following reason(s): the order/judgment being appealed was not selected. Re-file the appeal using the event type Corrected Notice of Appeal found under the event list Appeal Documents - attach the correct signed PDF - select the correct named filer/filers - select the correct order/judgment being appealed. (tp) (Entered: 07/29/2020) | 07/29/2020 |
| 35 | ORDER granting 33 Letter Motion to File Amicus Brief. Application GRANTED. The Court will permit Legal Aid to file a brief on the same timeline as the parties to this action, due by August 14, 2020, and will hear from Legal Aid as appropriate at the August 18, 2020 hearing. (Signed by Judge Katherine Polk Failla on 7/29/2020) (rro) (Entered: 07/29/2020) | 07/29/2020 |
| 36 | FIRST LETTER MOTION for Conference or to lift the TRO against defendant, as it applies to the CCRB database addressed to Judge Katherine Polk Failla from Kami Zumbach Barker, for defendants dated July 29, 2020. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit A). (Barker, Kami) (Entered: 07/29/2020) | 07/29/2020 |
| 36 | FIRST LETTER MOTION for Conference or to lift the TRO against defendant, as it applies to the CCRB database addressed to Judge Katherine Polk Failla from Kami Zumbach Barker, for defendants dated July 29, 2020. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio. (Attachments: # 1 Exhibit A). (Barker, Kami) (Entered: 07/29/2020) | 07/29/2020 |
| 37 | LETTER addressed to Judge Katherine Polk Failla from Rebecca Quinn and Dominique Saint-Fort dated July 29, 2020 re: Correction to Letter to Plaintiffs Dated July 28, 2020. Document filed by Cynthia Brann, City of New York, Civilian Complaint Review Board, Frederick Davie, Fire Department of the City of New York, New York City Department of Correction, New York City Police Department, Daniel A. Nigro, Dermot F. Shea, Bill de Blasio..(Quinn, Rebecca) (Entered: 07/29/2020) | 07/29/2020 |
| 38 | ORDER: For the reasons stated in open court during the hearing on July 28, 2020, the temporary restraining order entered by the Court on July 22, 2020 is modified such that it no longer applies to non-party New York Civil Liberties Union. SO ORDERED. (Signed by Judge Katherine Polk Failla on 7/29/2020) (rro) (Entered: 07/29/2020) | 07/29/2020 |
| 39 | CORRECTED NOTICE OF APPEAL re: 34 Notice of Interlocutory Appeal,, 38 Order,. Document filed by Captains Endowment Association, Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Police Benevolent Association of the City of New York, Inc., Sergeants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York..(Coles, Anthony) (Entered: 07/29/2020) | 07/29/2020 |
| 40 | NOTICE OF APPEARANCE by Alex V. Chachkes on behalf of Communities United for Police Reform..(Chachkes, Alex) (Entered: 07/29/2020) | 07/29/2020 |
| | Appeal Fee Paid electronically via Pay.gov: for 39 Corrected Notice of Appeal. Filing fee $ 505.00. Pay.gov receipt number ANYSDC-20895063, paid on 7/28/2020. (tp) (Entered: 07/29/2020) | 07/29/2020 |
| | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 39 Corrected Notice of Appeal. (tp) (Entered: 07/29/2020) | 07/29/2020 |
| | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 39 Corrected Notice of Appeal, filed by Police Benevolent Association of the City of New York, Inc., Correction Officers' Benevolent Association of the City of New York, Inc., Detectives' Endowment Association, Lieutenants Benevolent Association, Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York, Captains Endowment Association, Sergeants Benevolent Association were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/29/2020) | 07/29/2020 |
| 41 | EMERGENCY MOTION to Intervene as Defendant. Document filed by Communities United for Police Reform..(Chachkes, Alex) (Entered: 07/29/2020) | 07/29/2020 |
| 42 | MEMORANDUM OF LAW in Support re: 41 EMERGENCY MOTION to Intervene as Defendant. . Document filed by Communities United for Police Reform..(Chachkes, Alex) (Entered: 07/29/2020) | 07/29/2020 |
| 43 | DECLARATION of Alex V. Chachkes in Support re: 41 EMERGENCY MOTION to Intervene as Defendant.. Document filed by Communities United for Police Reform. (Attachments: # 1 Exhibit A, # 2 Exhibit B).(Chachkes, Alex) (Entered: 07/29/2020) | 07/29/2020 |

| # | Docket Text | Date Filed |
|---|---|---|
| 44 | DECLARATION of Joo-Hyun Kang in Support re: 41 EMERGENCY MOTION to Intervene as Defendant.. Document filed by Communities United for Police Reform..(Chachkes, Alex) (Entered: 07/29/2020) | 07/29/2020 |

# Exhibit B

K7MKUFOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNIFORMED FIRE OFFICERS
ASSOCIATION, et al.,

                Plaintiffs,

        v.                     20 CV 5441 (KPF)
                                Telephone Conference
BILL de BLASIO, et al.,

                Defendants.

------------------------------x
                                New York, N.Y.
                                July 22, 2020
                                4:25 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                District Judge

                        APPEARANCES

DLA PIPER LLP
      Attorneys for Plaintiffs
BY:  ANTHONY PAUL COLES
      COURTNEY SALESKI

JAMES E. JOHNSON
      Corporation Counsel of the City of New York
BY:  DOMINIQUE F. SAINT-FORT
      REBECCA GIBSON QUINN
      Assistant Corporation Counsel


NEW YORK CIVIL LIBERTIES UNION
      Amicus
BY:  CHRISTOPHER DUNN

K7MKUFOC

1          (The Court and all parties appearing telephonically)

2          (Case called)

3          MR. COLES:  Your Honor, this is Anthony Coles, of

4     DLA Piper.  Good afternoon.

5          THE COURT:  Sir, good afternoon.  Thank you very much.

6          And representing defendants this afternoon?

7          MR. COLES:  And, your Honor, I'm with Courtney

8     Saleski, also with DLA Piper.

9          THE COURT:  Thank you very much, Ms. Saleski.  I do

10    see that you're a little bit further along in my pantheon of

11    lawyers today.

12          Mr. Coles, should I be directing questions, in the

13    first instance, to you or to Ms. Saleski?

14          MR. COLES:  To me, please, your Honor.  Thank you.

15          THE COURT:  Thank you.

16          Now that I know one side, let me hear who's here on

17    behalf of the other side.

18          MS. SAINT-FORT:  Good afternoon, your Honor.

19    Dominique Saint-Fort, from the New York City Law Department,

20    for defendant.

21          THE COURT:  All right.  Thank you.

22          MS. QUINN:  I am sorry.  Good afternoon.  Rebecca

23    Quinn, from the New York City Law Department, for defendant.

24          THE COURT:  Okay.  And thank you.

25          And as between Ms. Saint-Fort and Ms. Quinn, to whom

K7MKUFOC

1   should I be directing questions?

2                MS. SAINT-FORT:  To me, your Honor, Ms. Saint-Fort.

3                THE COURT:  Thank you very much.

4                Do I also have Mr. Dunn on the line somewhere?

5                MR. DUNN:  Yes, your Honor.  This is Christopher Dunn,

6   with the New York City Civil Liberties Union.  I apologize, I'm

7   not on the video, but I am here appearing as a proposed amicus.

8   Thank you.

9                THE COURT:  Okay.  Thank you very much.

10               We have begun a lot later than I expected we would,

11  and I think we were confronting certain technological hiccups

12  along the way.  I still, as much as possible, would like to see

13  people rather than hear them, but we'll see if we do this

14  again.

15               Because of the nature of this conference, and because,

16  as well, of the circumstances under which it's being held, we

17  do have a court reporter who is present.  Mr. Coles, I am going

18  to expect that you're going to get the transcript anyway, but

19  I'm just asking you, to be sure that someone is asked, and I

20  would ask each of you who speaks, given the fact that there is

21  a reporter, to be as slow and as clear as you can, so that the

22  record is clear.

23               I also want to begin by welcoming you to this virtual,

24  but necessary, proceeding and by wishing to each of you, and to

25  your families, and those you hold dear continued safety and

K7MKUFOC

1    good health during this pandemic.

2            Let me, then, please begin.

3            Mr. Coles, there's a lot of discussion in the

4    submissions that I have reviewed about the import or the

5    significance of the state court's actions in this case

6    immediately prior to its removal.  It would seem to me that I

7    don't really need to get into the weeds of that with you today

8    because, either way, what was done is something that I can

9    continue, or undo, or modify.  And so, in my estimation, it's

10   not we're talking about whether it was a stay, or a TRO, or a

11   something because here we are today before me, and I think the

12   clock starts again, but let me hear from you on that point.

13           MR. COLES:  Your Honor, thank you very much.  And good

14   afternoon, and thank you for those kind words at the beginning.

15           I entirely agree with you, I think if you look at

16   Justice Edmead's order, it clearly restrains the city from

17   doing something, so I think it is a TRO.  On the other hand,

18   the case is now in your hands, and you have the authority,

19   under Rule 65, to extend the TRO, which is something we want to

20   ask you to do today or not, but I think how you just

21   articulated the position makes total sense to me.  I don't

22   think we have to get into the weeds on that either.

23           THE COURT:  Okay.  Thank you.

24           Ms. Saint-Fort, do you hold a different view?

25           MS. SAINT-FORT:  Slightly, your Honor.  Defendants

1   believe that a TRO was not entered by Justice Edmead, that it

2   was a stay until the federal court could hear the TRO, and,

3   hopefully, that is what the Court will hear today, so that the

4   stay will end, as was imposed by the state court.

5          Additionally, because there has been a passage of time

6   since that stay was entered, the city was essentially

7   restrained from releasing these records, and that time frame

8   should be taken into consideration when determining the

9   remainder of the time that we would be working toward the

10  hearing on this issue.

11         THE COURT:  Well, now I'm confused, because I think

12  you just said to me, in the same breath, that there wasn't a

13  TRO, but, if there was, I ought to consider that time already

14  in whatever schedule I set today.  So, was there a TRO or was

15  there not?

16         MS. SAINT-FORT:  No, there was not a TRO; however, the

17  defendants were stayed from releasing the records that

18  plaintiffs are contesting should not be released during the

19  time between the state court issuing the stay and your Honor

20  hearing the case today.  And that has been about a week.

21         So, because there has been that passage of time, we do

22  not call it a TRO, but I do want your Honor to recognize, in

23  determining what we're doing going forward, in terms of time

24  frame, that we have already -- there has already been this

25  one-week period where defendants have not been able to release

K7MKUFOC

1    the records that plaintiffs are contesting should not be

2    released.

3              THE COURT:  I see.

4              I heard you earlier in your answer to indicate to me

5    that it was your belief today that we should go forward with

6    the TRO application.  And I believe, as well, in other written

7    submissions that you have made, that one of the complaints you

8    have levied is that the defendants did not have an adequate

9    opportunity, really, to push back on the need for a TRO, if,

10   indeed, a TRO was imposed.  So, I'm understanding that today

11   you are ready to go forward with that proceeding.

12             Is that correct?

13             MS. SAINT-FORT:  Correct, your Honor.

14             THE COURT:  Thank you.

15             I think, Ms. Saint-Fort, that my original point

16   remains.  I don't much care how Justice Edmead described what

17   she did or how you interpreted what she described, because

18   today it begins again, and I am either going to enjoin, or not,

19   the disclosure.  So I think my point remains, which is, I don't

20   see why it's worth it to get into the weeds of what she was

21   saying because right now, we start again.

22             Do you have any dispute on that point?

23             MS. SAINT-FORT:  No, your Honor.

24             THE COURT:  Okay.  Thank you.

25             Mr. Coles, let me hear from you, please, sir:  Is

K7MKUFOC

1    there a proposed amicus?  Mr. Dunn, who's on the line, I

2    received a letter that is docket entry number 8 regarding the

3    participation of the New York Civil Liberties Union in this

4    proceeding.  May I have your position, please, as to whether or

5    not they should participate?

6              MR. COLES:  Our position is we do not have an

7    objection with them participating as an amicus, but we don't

8    actually believe that also includes them acting essentially as

9    a party appearing at conferences or, for instance, speaking

10   today.  But to the extent that they want to put in amicus

11   briefs and submissions in that vein, we don't have any

12   objection to that.  However, I think there's a distinction

13   between the role of the parties.  The defendants are properly

14   represented by the Corp. Counsel, and there is no reason for

15   essentially a second set of attorneys for the defendants.

16             THE COURT:  Fair enough.  But if, along the journey

17   with you, I feel that they may provide some assistance, you

18   wouldn't oppose my offering them an opportunity to speak,

19   correct?

20             MR. COLES:  I would not, your Honor, that is correct.

21             THE COURT:  Okay.

22             And, Ms. Saint-Fort, what is the position of the

23   defendants in this regard?

24             MS. SAINT-FORT:  The defendants have no objection to

25   their participation, of the New York Civil Liberties Union.

K7MKUFOC

1          THE COURT:  Okay.

2          Mr. Dunn, still listening in?

3          MR. DUNN:  I am, indeed.

4          THE COURT:  All right.

5          Actually, let me please ask Mr. Coles and

6     Ms. Saint-Fort one other thing:

7          Mr. Coles, would you agree -- I can recite into the

8     record, if it makes anyone happy, the standards for the

9     appointment of an amicus, which also is a little bit amorphous

10    because there aren't really many standards on the issue, but if

11    you believe that you and Ms. Saint-Fort understand the

12    standards, and I can just simply decide the issue, I'd proceed

13    to that.

14          Mr. Coles?

15          MR. COLES:  Yes, I leave that to your discretion

16    subject to the remarks I made a few minutes ago.

17          THE COURT:  Of course.

18          And Ms. Saint-Fort?

19          MS. SAINT-FORT:  I agree, your Honor.

20          THE COURT:  Okay.  Thank you.

21          Mr. Dunn, knowing that you are listening, I will tell

22    you this:  Your application to participate as an amicus in this

23    matter is granted to this extent:  I don't want to hear from

24    you today, sir, because I really want to hear from the folks

25    who have made written submissions to me in this case, but there

K7MKUFOC

1    will be, I'm confident, a schedule set in the future.  You will

2    certainly be permitted to participate in the written briefing.

3    Whether you participate in the oral argument is something that

4    I am going to be taking on a case-by-case basis.

5         Do you understand, sir?

6         MR. DUNN:  I do, your Honor.  And thank you.

7         THE COURT:  I thank you very much.  That issue is now

8    resolved.

9         I guess, Ms. Saint-Fort, one of the issues that I have

10   had is not understanding fully what has been disclosed, what's

11   about to be disclosed, and the logistics by which such

12   disclosures are being made.  For example, there were

13   discussions about certain things being released by the CCRB or

14   certain things being released in FOIL requests.  To the extent

15   that your adversaries are going to say that there is

16   irreparable harm by any such disclosure, could you let me know,

17   please, to the extent you're able to speak to it today, what

18   has been disclosed since June 12th, or perhaps even before

19   June 12th, just in the ordinary course, and what you're

20   proposing or what you contemplate is going to be disclosed?

21        MS. SAINT-FORT:  Of course, your Honor.

22        Historically, the disciplinary determinations

23   involving firefighters as well as correction officers who are

24   part of the unions that are represented by plaintiffs have gone

25   before the New York City Office of Administrative Trials and

K7MKUFOC

1    Hearings.  Those disciplinary determinations, for a number of

2    years, have been public, including both findings on the charges

3    that they are substantiated, charges that they are

4    unsubstantiated, and, consequently, where an individual has

5    been exonerated of the charges against them.  Those have been

6    public for years.  The report and recommendation are available

7    online that the public can peruse at their leisure.

8               THE COURT:  Ms. Saint-Fort, thank you very much.

9               Just a follow-up question on that point:  These are

10   the determinations or the proceedings that make their way to

11   OATH.  Are there other proceedings that just don't graduate to

12   that level?

13              MS. SAINT-FORT:  There could be proceedings that don't

14   graduate to that level.

15              THE COURT:  For example -- go ahead, please, finish

16   your thought.

17              MS. SAINT-FORT:  I'll stop there.  There are

18   proceedings that cannot graduate to that level.

19              THE COURT:  Could you let me know, please, if you

20   know, at what point does it make it to an OATH hearing?

21              MS. SAINT-FORT:  I believe when there are charges and

22   specs, specifications that are served, they would be heard by

23   OATH.

24              THE COURT:  I see.

25              I'll let you continue as to other things that have

K7MKUFOC

1    been disclosed in the past.

2              MS. SAINT-FORT:  Those are primarily what has been

3    disclosed in the past.  Since the repeal of 50-a, there have

4    been a number of records that have been disclosed by the CCRB.

5    In particular, there are records of about 81,000 officers that

6    have already been released to -- that have already been

7    produced pursuant to a FOIL request.

8              THE COURT:  They've been produced to whom, if you

9    know, pursuant to that FOIL request?

10             MS. SAINT-FORT:  My understanding is they have been

11   produced to the New York Civil Liberties Union.

12             THE COURT:  I see.

13             That's, of course, because they've asked under FOIL.

14   Are you aware of any other FOIL requests from the media or

15   otherwise for this information?

16             MS. SAINT-FORT:  I believe there have been other FOIL

17   requests in the interim that have been responded to.  I cannot

18   say specifically, but I am aware that there have been -- to

19   whom they have been made by and to whom the information was

20   disclosed, but there have been other FOIL requests and

21   responses.

22             THE COURT:  Okay.  One moment, please.

23             (Pause)

24             THE COURT:  Ms. Saint-Fort, in connection with the

25   submissions of the plaintiff -- and I believe specifically it

K7MKUFOC

1    is a submission that is dated, I want to say, June 20th --

2    nope, I am mistaken.  Hold on, let me find it.  What I'm

3    thinking of is there was a document that I understood to have

4    been sent by the Patrolmen's Benevolent Association to the

5    CCRB, I believe it was authored by a Michael Murray, and it was

6    a listing of putative bases for exemptions under FOIL.

7              Have you seen that document?

8              MS. SAINT-FORT:  I have.

9              THE COURT:  Okay.

10             Are you aware of whether, when this production of

11   81,000 documents was made to the New York Civil Liberties

12   Union, any exemptions were invoked?

13             MS. SAINT-FORT:  I'm sorry, your Honor, could you

14   please repeat that question?

15             THE COURT:  Of course.  Let me just ask a broader

16   question, then.

17             In my lifetime, I've gotten FOIA requests in past jobs

18   that I have had, and at least in FOIA requests, and I believe

19   in FOIL requests as well, there are exemptions, and sometimes

20   certain documents aren't produced because they fall into one or

21   more exemptions.

22             When the decision was made by the CCRB to produce

23   81 -- the records of 81,000 -- are they police officers or is

24   it something else?

25             MS. SAINT-FORT:  Police officers.

K7MKUFOC

1              THE COURT:  Thank you.

2              Are they records of 81,000 CCRB complaints, or are

3    they 81,000 officers to whom these complaints refer?

4              MS. SAINT-FORT:  Officers to whom those complaints

5    refer.

6              THE COURT:  Thank you.  All right.

7              With respect to that production, were any materials

8    withheld from production because of exemptions under FOIL?

9              MS. SAINT-FORT:  Meaning information contained in the

10   record or --

11             THE COURT:  Yes.

12             MS. SAINT-FORT:  Okay.  So, certainly, there was

13   information -- there are no factual information about the

14   underlying complaints that was released, only the category of

15   conduct and disposition, as well as brief identifying

16   information about the officer, I believe his name, rank -- and

17   that's it, their name and rank.

18             THE COURT:  May I have a sense, if you could, as to

19   the vehicle by which these were produced?  For example, is it a

20   big spreadsheet saying type of complaint, disposition, officer

21   name, officer rank, or is it individual documents that are sort

22   of a precis of each, or something else?

23             MS. SAINT-FORT:  My understanding is that they are

24   into a spreadsheet form that was uploaded to a cloud-based

25   service.

K7MKUFOC

1        THE COURT:  I see.

2        Were they done in a spreadsheet format because no one

3   asked for the underlying documents, or is that the next shoe

4   that's going to drop?

5        MS. SAINT-FORT:  I don't know if that is -- I can't

6   necessarily speak for what CCRB intends to do going forward,

7   but I believe that that was the information that they were

8   willing to disclose, and that was the most efficient way to

9   produce it.

10        THE COURT:  And I should be asking this:  Do you

11   represent the CCRB chairman today?

12        MS. SAINT-FORT:  Yes.

13        THE COURT:  Okay.

14        So I can be asking you these questions because you can

15   speak meaningfully to them?

16        MS. SAINT-FORT:  Yes.

17        THE COURT:  Okay.

18        Were there other materials that were withheld from

19   production, if you're aware?

20        MS. SAINT-FORT:  That is -- in terms of what was

21   included in those records?

22        THE COURT:  Indeed.

23        MS. SAINT-FORT:  Yes, that is my understanding of what

24   was included.

25        I'm sorry, I just want to correct, I believe they were

K7MKUFOC

1    actual documents and not a spreadsheet that was created.  I

2    just want to clarify.

3            THE COURT:  Okay.  No, and that actually does matter.

4            I guess what I'm asking is --

5            MS. SAINT-FORT:  Also --

6            THE COURT:  Yes, go ahead.

7            MS. SAINT-FORT:  -- there were no open allegations

8    that were included as well.

9            THE COURT:  Okay.  But I guess I'm trying to

10   understand the format in which these materials were produced.

11   Are we talking about -- I've seen CCRB complaints in electronic

12   form.  Were those being produced with certain categories

13   blocked out?  Because what I'm seeing, and I'm seeing

14   everything, but for the things that were produced to the

15   New York Civil Liberties Union, was it the very complaint

16   document with certain things blacked out or something else?

17           MS. SAINT-FORT:  No, it was something else.  It is an

18   officer history form, I believe is what it may be referred

19   to -- I'm not sure of the exact name, excuse me, your Honor --

20   but it would detail the complaints that were made, the category

21   of the complaints, none of the underlying information of the

22   complaint or factual information of the complaint, and just the

23   officer's name, precinct, as well as their rank.

24           THE COURT:  I see.

25           Do you happen to know when this production was made?

K7MKUFOC

1     MS. SAINT-FORT:  Yes, I do.  It was made on July 13th.

2     THE COURT:  Thank you.

3     Other than that particular production, and the OATH

4     documents that you mentioned earlier, are there other materials

5     that have been disclosed?

6     MS. SAINT-FORT:  There may have been other materials

7     that were disclosed earlier through individual FOIL requests,

8     but I don't know the specifics of when those disclosures were

9     made or who the requester was.

10     THE COURT:  Okay.  I understand.

11     Tell me, please, about what is contemplated.  What I'm

12     trying to understand -- I don't want to beat around the bush

13     about this -- I'm trying to understand whether productions will

14     be reactive in the sense that someone has to ask in order to

15     get these materials, or, more proactive, for example, is

16     someone setting up a website with all of the materials that are

17     the subject of this lawsuit.

18     MS. SAINT-FORT:  It is contemplated that certain

19     disclosures will be proactive and that there will be a website

20     that can be accessed by the public.  The type of information

21     that will be included differs depending on the agency.

22     THE COURT:  Well, tell me, please:  Have decisions

23     been made, or are these still subject to discussion?

24     MS. SAINT-FORT:  There is still some discussion that

25     is being -- there's still some discussion about it, as to how

K7MKUFOC

specifically -- or, excuse me, what specifically will be
disclosed.

THE COURT:  Okay.

You said to me, Ms. Saint-Fort, earlier, in your
written submissions -- I don't want to suggest that you said
this to me orally -- that at times, the claims of the
petitioners, or plaintiffs, are unduly speculative, there has
been a suggestion they might not even have standing, but
happening at the same time with that, and something I'm having
difficulty resolving, is an argument that there's no need for
discovery in this case because these are purely legal issues.

I'm just not sure how these arguments all coexist, so
I think I want to understand your view as to whether there is a
standing issue for these plaintiffs or whether, at least for
purposes of this TRO application, I don't have to think about
it, or something else.

MS. SAINT-FORT:  I think in terms of discovery of
whether there is -- we do believe that this is a purely legal
question as to whether the repeal of 50-a permits the city to
disclose the type of records that plaintiffs believe should not
be disclosed; namely, unsubstantiated or unfounded, nonfinal
allegations or exonerated determinations.  That, we believe,
because of the repeal of 50-a, and there being a presentation
to the legislature about whether there should be some sort of
carve-out for these particular types of determinations and the

K7MKUFOC

1    legislature determining that it shouldn't be, that's a purely

2    legal question, and, therefore, discovery is not required.

3             THE COURT:  Okay.

4             At least I thought I was understanding Mr. Coles'

5    argument to be a little bit different than that.  I think the

6    argument was that irrespective of what 50-a permitted or

7    forbade, its repeal doesn't necessarily permit the wholesale

8    disclosure of these documents because of, for example,

9    provisions in collective bargaining agreements, or provisions

10   in settlement documents, or perhaps -- and, by the way, I'm not

11   agreeing or disagreeing, I'm simply stating them -- due process

12   or equal protection claims that are being made.  You framed the

13   question as a pure legal question as to 50-a's repeal, and I

14   thought what Mr. Coles was saying was that even without 50-a,

15   there are these other bases that prevent disclosure.

16            So, do you think that that is an incorrect statement

17   of the issues that I must consider?

18            MS. SAINT-FORT:  I don't disagree that's an incorrect

19   statement of the issue that you must consider, but I do believe

20   that plaintiffs are wrong on their perspective about what

21   protections they believe apply here.  In particular, reading

22   plaintiffs' papers, I don't see what particular interest they

23   have that is being infringed upon here in terms of equal

24   protection or due process.

25            Additionally, their arguments regarding settlement

K7MKUFOC

1   agreements and the protections that should apply outside of

2   50-a, they haven't been clear, in our view of the papers, as to

3   what protections they're specifically referring to.  In

4   general, to go into the equal protection claims that plaintiffs

5   have made, there are a number of employees that they compare

6   themselves to that they are not similarly situated to.

7   Specifically, they say that there is an Office of the

8   Professions for the state that prohibits the disclosure of

9   certain unsubstantiated complaints or charges against certain

10  licensed professionals.  As an initial matter, plaintiffs are

11  not licensed professionals.  Two, they are not employees of the

12  state, they're employees of the city.

13          So, any determination by the state Office of the

14  Professions as to what they decide to exclude from their

15  production as to the employees who are in their employ is very

16  different than what the city can decide.  So they are not

17  similarly situated to those plaintiffs, and they haven't

18  identified why they should be considered so.

19          The difference -- the employees that they actually are

20  similarly situated to are the public employees of the City of

21  New York, whose disciplinary records, through OATH and

22  otherwise, have been disclosed for years.  In fact, there

23  are -- including firefighters and correction officers, in fact,

24  there's police officers who have actually been treated

25  differently because their records were not disclosed.  So now

1    they're actually being put on an equal footing with other city

2    employees, and that flies in the face of their equal protection

3    argument.

4                THE COURT:  All right.

5                Ms. Saint-Fort, having listened to you, I actually do

6    want to just step back a moment because there was another issue

7    that I should have addressed more fully, and I will do that

8    now.

9                I think one of the reasons that you believe discovery

10   is not warranted is because you believe that, again, these are

11   pure legal issues.  For me, one of the challenges of not having

12   discovery was not knowing entirely what the playing field was

13   and what the issues were.  And so that's why, when I began one

14   segment of our discussion this afternoon, I was asking you

15   specifically about what's been produced and what remains to be

16   produced.  Part of that, I think, might obviate some or all of

17   the need for discovery by Mr. Coles and his clients.

18               The question I should also have asked is:  I think

19   you've identified the real nub of the dispute, which is what

20   does one do with the unresolved, or unsubstantiated, or, one

21   might say, unfounded complaints?  And should those be produced?

22   And just so that I'm clear, what you're saying to me today is

23   that you fully contemplate, your clients contemplate, that

24   these complaints will be produced, because, of course, if you

25   said to me they will not, then perhaps Mr. Coles doesn't have

K7MKUFOC

1     quite the argument he once did.  But you're telling me that

2     there is -- is there no category of information with respect to

3     complaints that you would be withholding from production?

4               MS. SAINT-FORT:  Well, yes.  Let me clarify.

5               THE COURT:  Please.

6               MS. SAINT-FORT:  There are categories.  Depending on

7     the agency, there are categories of information that are being

8     withheld.

9               THE COURT:  Okay.

10              MS. SAINT-FORT:  Specifically for the NYPD, the only

11    information they intend to release are the charges and specs of

12    adjudicated cases.

13              THE COURT:  Wait, wait, wait.

14              MS. SAINT-FORT:  I'm sorry.

15              THE COURT:  No, no, thank you.  And, again, it's the

16    problem of being by video, that we have to have these

17    occasional stops and starts.

18              The charges and specifications that have been

19    adjudicated?

20              MS. SAINT-FORT:  Yes.

21              THE COURT:  Okay.  So let's figure out what that

22    doesn't include.

23              For example, if I call 311 right now and complain

24    about a random police officer, and that exists, I suppose you

25    would say that's an open charge that won't be disclosed, but

K7MKUFOC

1    the 311 charges that go nowhere, that's not being disclosed?

2              MS. SAINT-FORT:  That's correct.

3              THE COURT:  Okay.

4              The anonymous emails to CCRB or to elsewhere saying, I

5    don't like this police officer or this firefighter, they're not

6    being disclosed, it's something that makes its way to charges

7    and specifications that get to the CCRB or to internal affairs?

8              MS. SAINT-FORT:  Well, as to NYPD.

9              THE COURT:  Yes, of course.

10             MS. SAINT-FORT:  Yes, but it's different from CCRB and

11   NYPD.

12             THE COURT:  Okay.  Thank you.  I really appreciate the

13   clarification.

14             So, for the NYPD, the charges and specifications that

15   have been adjudicated by whom?

16             MS. SAINT-FORT:  That have been adjudicated by the

17   NYPD, by their internal --

18             THE COURT:  Thank you.  And that, I now understand.

19             With respect to CCRB, please?

20             MS. SAINT-FORT:  So, as I mentioned earlier, CCRB has

21   released the complaints, the officer history that includes

22   complaints against the officer, the category of complaints --

23   as well as the category of complaints.

24             THE COURT:  Okay.  Thank you.

25             With respect to the fire department?

K7MKUFOC

1        MS. SAINT-FORT:  The fire department does not have any

2    intentions, as I'm aware, of releasing any information beyond

3    what is already in the OATH determinations that have been

4    public for years, as I explained earlier.

5        THE COURT:  Thank you.

6        Correction officers, please?

7        MS. SAINT-FORT:  The Department of Corrections intends

8    to create a website where they can release only substantiated

9    determinations against its officers.  So, that will not include

10   any open investigations, no unsubstantiated allegations, and no

11   unfounded allegations.

12       THE COURT:  Thank you.  I appreciate that.

13       That's been very helpful for me, but I hope, as well,

14   it's helpful for Mr. Coles because I think he understands

15   better what is worth fighting over and what is not.

16       MR. COLES:  Your Honor, I don't mean to -- there's a

17   lack of clarity on what she said that I would just think it

18   would be useful for all of us to understand.

19       THE COURT:  All right.  And perhaps I wasn't asking

20   the right questions, but let me understand what you need

21   clarification of, please.

22       MR. COLES:  Okay.  It's when defendants' counsel said

23   adjudication of charges and specifications, I take it what she

24   means is final adjudication and determination by the police

25   commissioner, so you have a final ruling on that particular

K7MKUFOC

1   disciplinary charge.  Is that correct?

2          MS. SAINT-FORT:  That is correct.

3          THE COURT:  Okay.  And thank you for letting me know.

4          Mr. Coles, given the discussions that I've just been

5   having with Ms. Saint-Fort -- and I appreciate, by the way,

6   first of all, all of you making yourselves available today, but

7   I also appreciate you coming prepared factually and legally --

8   Mr. Coles what, then, is your current complaint?

9          MR. COLES:  Oh, your Honor, thank you for asking that

10  question.

11         First, I want to come back and say I'm startled that

12  the CCRB released 81,000 names of officers after receiving

13  Mr. Murray's letter.  We actually had conversations with

14  Corporation Counsel for two days before we filed our papers on

15  July 15th, and they never actually mentioned that the CCRB had

16  made the disclosure, and we specifically raised the CCRB in

17  discussions with them.  So, I actually think discovery as to

18  what happened there and how that took place is very

19  significant.

20         I'd like to come back to that when I talk about

21  discovery generally, and just so you know, because I think

22  Ms. Saint-Fort didn't have an opportunity to raise it, is this

23  afternoon, we proposed expedited document discovery to the

24  city, and we sent them a document request with eight proposed

25  requests and asked them for a meet-and-confer on that.  The

K7MKUFOC

1    scope of the discovery was to determine what has been produced,

2    what form it's been produced in, specifically what are they

3    planning to produce, because I can tell you what Ms. Saint-Fort

4    said is actually different from what we've been told by the

5    police department and different from what the mayor has said

6    publicly in press conferences.  The mayor has said publicly in

7    press conferences that he is releasing all records.  And the

8    police department has actually made claims of relief that go

9    well beyond what Ms. Saint-Fort said, which is why I wanted

10   that clarification on the record.

11        The discovery also focused on what is the core of our

12   case, which is the positions that the city has taken in the

13   past with regard to the protection of documents separate and

14   apart from 50-a.  What I heard the Corp. Counsel say is they

15   just want to close their eyes to the history's past practice of

16   treating large swathes of documents, unsubstantiated, unfinal,

17   exonerated documents, they just want to produce those under

18   50-a and -- under the 50-a repeal, and that would be completely

19   inappropriate, and arbitrary, and capricious, and inconsistent

20   with what the city has been doing for years.  And as your Honor

21   knows, in our papers, we gave you examples of withholdings of

22   confidential information, information that will damage the

23   reputation of our clients, that have been withheld by the

24   agencies, including the CCRB, on grounds other than 50-a.

25        So, we are looking for discovery on that as well.  We

K7MKUFOC

1    actually think, in order to give you the context of exactly
2    what the city is planning to do, to try to work through these
3    inconsistent statements that we're getting from the city almost
4    every day, discovery is absolutely necessary.  In our view,
5    there are clear collective bargaining issues that the city has
6    simply ignored.  The CCRB, if, in fact, they actually put out
7    81,000 records, clearly violated the collective bargaining
8    agreement of my plaintiffs who actually have the right to have
9    unsubstantiated allegations removed from their personnel files
10   and certain types of allegations expunged.  If, in fact, the
11   CCRB released this information, promoted it on the internet,
12   that is going to create eternal and irreversible damage to my
13   clients, and I really need to know what happened over there.
14   That is a very concerning circumstance.
15         In addition, as your Honor knows from our papers,
16   there are very significant due process issues as to what should
17   be produced, as well as issues about the contract rights.
18   Ms. Saint-Fort --
19         THE COURT:  I'm sorry, Mr. Coles, you're fading out,
20   please.  I need you to perhaps adjust the equipment you're
21   using.  Thank you.
22         MR. COLES:  Okay.  Can you hear me better?
23         THE COURT:  That's much better.  Thank you, sir.
24         MR. COLES:  Okay.  Good, good.  I usually have a loud
25   voice, so it breaks through anything, but I hope this is fine.

K7MKUFOC

1    I also want to address the issue of the contract life.

2  I don't know that Ms. Saint-Fort put it forward in the way that

3  we put forward in our papers.  It is prior to the repeal of

4  50-a, there were many settlements of disciplinary targets.

5  Those settlements were done under the then existing law of 50-a

6  in place.  There is compelling contract case law, going back to

7  Riverstone, that the law at the time was included and

8  incorporated in the contracts.  And so producing those

9  settlement agreements that were made prior to the June 12th,

10  2020 repeal of 50-a would actually be a violation of

11  confidentiality.

12    So, in any event, we are concerned we don't know

13  what's going to be released, when it's going to be released, or

14  how it's going to be released, but it's very clear that based

15  on what Ms. Saint-Fort said, the city has already, it appears

16  to me, breached, or threatened to breach, the collective

17  bargaining agreements as well as the due process rights of our

18  clients.

19    THE COURT:  Mr. Coles, let me follow up on that.

20  Thank you.

21    Just looking at the different organizations that I was

22  addressing with Ms. Saint-Fort, with respect to the Department

23  of Corrections, there is a proposal to create a website that

24  would release only substantiated complaints.  What problem

25  would you have with that?

K7MKUFOC

1          MR. COLES:  Well, there are two issues to that.

2          First, I believe that if a correction officer's

3  discipline, if it was substantiated, they may determine to

4  be --

5          THE COURT:  I guess that's what I'm understanding.

6          Ms. Saint-Fort, please help me on this.  When you say

7  substantiated, is there a process, some sort of internal review

8  process, that leads to substantiated/unsubstantiated and

9  unfounded determinations?

10         MS. SAINT-FORT:  Yes.  There would be generally a

11 hearing or some sort of internal determination that would lead

12 to the substantiation.

13         THE COURT:  Okay.

14         So, Mr. Coles, what's wrong with that?

15         MR. COLES:  Well, if the only thing that is being

16 produced are adverse findings at the conclusion of the

17 disciplinary process, then I don't think that our papers

18 capture that.  They do seek to preclude findings at the

19 conclusion of the disciplinary process that exonerate officers,

20 because once an officer is exonerated, he has the right to have

21 his personnel file updated and exonerated result removed from

22 the personnel file.

23         THE COURT:  Okay.  Finish your thought, Mr. Coles.

24         MR. COLES:  No, I think that's fine.

25         Again, I need to make sure that Ms. Saint-Fort is

K7MKUFOC

1    focusing on the same thing that I am.  If all she is saying is

2    adverse findings at the conclusion of the process, that is not

3    within the scope of our papers.

4              THE COURT:  Okay.

5              Ms. Saint-Fort, isn't that what you were saying?

6              MS. SAINT-FORT:  Yes.  As far as I understand, the

7    information regarding the Department of Correction, what they

8    plan to do, that is what I was saying.

9              THE COURT:  Okay.  And, Ms. Saint-Fort, if I may --

10   you'll please excuse my lack of diplomacy -- I am accepting

11   everything that you're telling me this afternoon as an officer

12   of the court, and I am aware that you work with other people,

13   that you are sharing information with other people, and that

14   the whole goal is to present to me the best information that

15   you have as of the moment of this hearing, but please

16   understand how sad I will be if it turns out that DOCCS

17   actually had something else completely in mind.

18             So, what I'm saying is, I'm accepting what you're

19   saying right now, but if you go back to -- I won't say your

20   office, but you're probably working from home -- if someone

21   from your team tells you later on that they have a different

22   view, you need to let me know.  Don't let me be in the dark

23   about this because I'm making my decisions based on the

24   information that you give me.  Do you understand?

25             MS. SAINT-FORT:  Yes, your Honor.  And I'm answering,

K7MKUFOC

1    to the best of my ability, my understanding of the latest

2    information I have.

3              To that end, I do want to clarify.  I changed my

4    answer to the form of the document that the New York Civil

5    Liberties Union received from CCRB.  It was, in fact, a

6    spreadsheet, not individual documents.

7              THE COURT:  Okay.  So it's not the -- I've seen the

8    officer history reports.  I think I know what you're talking

9    about because I think I've gotten them in cases of my own as

10   prosecutor and as judge.  It was a spreadsheet that was put

11   together with some subset of the information from the officer

12   history reports?

13             MS. SAINT-FORT:  Yes, that is correct.

14             THE COURT:  I see.

15             And do you know anything, by the way, about -- or were

16   you involved in discussions with Mr. Coles or his colleagues or

17   Mr. Murray and his colleagues and the Office of Corporation

18   Counsel regarding CCRB materials?

19             MS. SAINT-FORT:  I was not involved in any

20   conversations with Mr. Murray and his colleagues.  In terms of

21   the conversations that they were having with CCRB, me

22   personally, I was not.

23             THE COURT:  Let me ask the question a little bit

24   differently, and you'll excuse me if it sounds glib.  Mr. Coles

25   is surprised that disclosure was made.  Are you surprised that

K7MKUFOC

Mr. Coles is surprised?  And, if so, why?

            MS. SAINT-FORT:  I'm not necessarily surprised, given

the repeal of 50-a.  I think following that, I think many

agencies started to formulate ways to provide this information

to the public.  So that doesn't necessarily surprise me.

            THE COURT:  Then, I'm sorry, you've misperceived my

question.

            MS. SAINT-FORT:  Okay.

            THE COURT:  Mr. Coles was saying to me that, given his

dialogue right before the filing of his case, which was at or

about the time this disclosure was made, and given the fact

that the folks with whom this dialogue was held were being

asked specifically about CCRB, he's quite surprised to learn

that CCRB made the disclosure.

            Is it wrong for him to feel that way?  And, if so,

why?

            MS. SAINT-FORT:  I think so.  In our discussions with

Mr. Coles prior to the filing of his papers, we repeatedly told

him that we could not give any assurances as to what was being

disclosed during that time.  And we didn't give any assurances

about that information at all.

            THE COURT:  Okay.  Just one moment, please.

            (Pause)

            THE COURT:  Ms. Saint-Fort, to the extent that others

on your team have other information that is relevant to the

K7MKUFOC

1    questions that I've been asking you, am I correct that you're

2    getting, perhaps, realtime updates by email or by text in case

3    there's anything you need to correct with me?

4              MS. SAINT-FORT:  That would be correct, your Honor,

5    the best as I can.

6              THE COURT:  Of course.

7              And normally, when we are in court, I would be sad if

8    you were looking at your phone throughout, but in this context,

9    and given the seriousness of what's going on, I appreciate

10   that.

11             Mr. Coles, returning to you, and looking at the FDNY

12   materials, I am told by Ms. Saint-Fort that they don't intend

13   to release anything beyond the materials that are already

14   publicly available through the OATH hearings.  Any problems

15   with that?

16             MR. COLES:  The FDNY collective bargaining agreement

17   actually allows -- requires exonerated or not-guilty findings

18   be removed from a fire officer's personnel file.  So, to the

19   extent that they are seeking now to release documents that

20   would include exonerated findings after the disciplinary

21   process, our view is that should not be allowed.

22             To be clear, so everyone is on the same page, as to

23   what we're asking to be barred by the TRO pending a hearing

24   determining a preliminary injunction are unsubstantiated

25   claims, unfounded claims, exonerated -- or not guilty sometimes

K7MKUFOC

1    is the term for exonerated -- and pending claims.

2              THE COURT:  Well, I did not hear from Ms. Saint-Fort

3    that any pending "anything" was getting released.  Nothing

4    older was getting released.

5              But, Ms. Saint-Fort, am I correct?

6              MS. SAINT-FORT:  Right.  Well, FDNY doesn't

7    contemplate sending anything out, but not from DOC and not from

8    NYPD either, no open claims.

9              MR. COLES:  I can tell you, your Honor, the NYPD told

10   my clients a couple of days before we filed our motion that

11   they were going to release all pending claims.  And that is

12   actually what triggered us to reach out to Ms. Saint-Fort and

13   Ms. Quinn and tell them we were making a motion.

14             So, I don't know whether their view has changed or

15   whether it's malleable, but there is absolutely no question --

16   and it's set forth, I believe, in Ms. Quinn's emergency

17   affidavit in the state court -- that the police department

18   unequivocally said it was releasing all pending -- in other

19   words, by definition, not final, not fully substantiated

20   claims.

21             THE COURT:  Ms. Saint-Fort, what do you know about

22   that?

23             MS. SAINT-FORT:  My understanding from NYPD is that

24   there are no pending investigations or charges that are being

25   released.

K7MKUFOC

1          THE COURT:  Ms. Saint-Fort, is there a way -- do you

2     have friends at the NYPD, are there people that you can call

3     and confirm that what you're saying to me remains true, that

4     you don't go home tonight and all of this stuff gets released?

5          MS. SAINT-FORT:  I don't have friends, but I have

6     colleagues.  I can certainly confirm.

7          THE COURT:  I appreciate the clarification.  Please

8     confirm.

9          All right.  But right now, to your understanding,

10    nothing pending anywhere is being released, correct?

11         MS. SAINT-FORT:  That's correct.

12         THE COURT:  Can you talk to me a little bit about the

13    OATH process?  I've seen it only from a distance.  How are OATH

14    materials made available to the public?

15         MS. SAINT-FORT:  There is a website, which we included

16    as a link in, I believe, our July 17th letter to your Honor,

17    that lists a way to search through the reports and

18    recommendations of the OATH ALJs.

19         THE COURT:  Okay.  But you're telling me that that's

20    been in existence irrespective of, and before, 50-a or its

21    repeal?

22         MS. SAINT-FORT:  Yes.

23         THE COURT:  All right.

24         Mr. Coles, what about that?

25         MR. COLES:  Your Honor, that is a website that I can't

K7MKUFOC

| | |
|---|---|
| 1 | imagine anybody has a lot of knowledge about.  And sending |
| 2 | someone to an OATH website -- and I'm not even sure how many |
| 3 | people on this call can identify who the head of OATH is -- is |
| 4 | entirely different than promoting and publishing thousands of |
| 5 | disciplinary records on the internet.  The Supreme Court of the |
| 6 | United States has dealt with this specifically, and it's cited |
| 7 | in our papers.  There is a difference between having to go |
| 8 | through county archives or, in this case, rarely used -- I |
| 9 | don't know if you can use "dusting" in the context of a |
| 10 | website -- and, actually, what the city has told us they're |
| 11 | planning to do and what the mayor has said, which is an |
| 12 | indiscriminate release of all disciplinary records.  And so the |
| 13 | fact that, on occasion, some disciplinary records have been |
| 14 | released in OATH does not nearly rise to the level of the type |
| 15 | of reputational damage and injury that the city is talking |
| 16 | about now. |
| 17 | I will also say that the NYPD does not go through the |
| 18 | OATH process.  The NYPD has its own internal discipline |
| 19 | process, as I'm sure your Honor knows, and so OATH doesn't |
| 20 | apply to the NYPD. |
| 21 | THE COURT:  No, sir, I'm working in reverse order with |
| 22 | what I thought was the least controversial to the most |
| 23 | controversial. |
| 24 | Ms. Saint-Fort, to Mr. Coles' point, is the idea, or |
| 25 | does the FDNY have the idea, of setting up a website, something |

K7MKUFOC

1    where all of this material will be housed, basically copying

2    what's in the OATH link and making it publicly available?

3              MS. SAINT-FORT:  As far as I know, there is no

4    intention to do that.

5              THE COURT:  There is no intention -- I see.

6              I want to be very clear here.

7              MS. SAINT-FORT:  Sure.

8              THE COURT:  When I asked you the question about the

9    FDNY, you said there's no intention to release any information

10   beyond what's contained in the OATH materials.  You've now told

11   me how I can, if I wanted to, access the OATH materials.

12   Mr. Coles has come back and said, sure, Failla, that's fine,

13   but there's one thing between having the OATH website, or the

14   link that you've given me, and having the FDNY make it

15   available for -- or to promote it in some way.

16             To the best of your understanding, is there an

17   intention to make or to craft a new repository for this

18   information, if you know?

19             MS. SAINT-FORT:  As far as I know, there is no

20   intention to create a website, a new website, that would house

21   that information.

22             THE COURT:  If you know, is there any intention by the

23   FDNY to promote, to basically say, hey, if you're wondering

24   about our firefighters, you can look them up over here?

25             MS. SAINT-FORT:  No, your Honor, as far as I know,

K7MKUFOC

1    there's no intention to do that.

2         THE COURT:  Okay.

3         I understand, again, the glibness of my questions, but

4    I am trying to get at some of the issues that Mr. Coles is

5    raising.

6         Mr. Coles, given the exchange I've had with

7    Ms. Saint-Fort, what is your beef with the FDNY materials?

8         MR. COLES:  If the only thing that the FDNY is

9    releasing are final concluded disciplinary rulings that are

10    adverse to the firefighter, that is not captured by our request

11    for an injunction.

12         THE COURT:  Fair enough.  Although I think

13    Ms. Saint-Fort told me that it was however they resolve

14    themselves, they were out there, both the exonerated and the --

15    you know, the ones where they win and the ones where they lose.

16         Ms. Saint-Fort, am I correct, or is there only one

17    category of information that's on the OATH website?

18         MS. SAINT-FORT:  Oh, in terms of what's on the OATH

19    website, it's the determination whether they win or they lose.

20    If it's unsubstantiated or substantiated, that's the

21    determination that's available, whatever is determined by the

22    ALJ.

23         THE COURT:  Right.  So our choices include, the

24    continuum includes, unsubstantiated, unfounded, substantiated,

25    exonerated?

K7MKUFOC

| | |
|---|---|
| 1 | MS. SAINT-FORT:  That's correct, your Honor. |
| 2 | THE COURT:  Okay.  The only thing that ain't there is |
| 3 | the pending? |
| 4 | MS. SAINT-FORT:  Correct. |
| 5 | THE COURT:  Okay.  All right. |
| 6 | So, Mr. Coles, your problem is with the OATH materials |
| 7 | that are exonerated? |
| 8 | MR. COLES:  Yes. |
| 9 | THE COURT:  And -- |
| 10 | MR. COLES:  Yes, and unsubstantiated.  And there are a |
| 11 | number of grounds for that.  The first is that the |
| 12 | firefighters, in their -- |
| 13 | THE COURT:  One moment, sir.  I'm sorry. |
| 14 | Ms. Saint-Fort was about to say something. |
| 15 | Ms. Saint-Fort, I may have misspoken, so I want you to |
| 16 | correct me, please. |
| 17 | MS. SAINT-FORT:  No, your Honor, I just wanted to say |
| 18 | that material has been out for years, and the repeal of 50-a |
| 19 | has absolutely no effect on the existence of that material. |
| 20 | THE COURT:  I understand what you're saying.  Okay. |
| 21 | Although what about what Mr. Coles was saying to me |
| 22 | earlier, which was that the collective bargaining agreement for |
| 23 | the firefighters actually requires the sealing or the removal |
| 24 | from their personnel files of exonerated complaints? |
| 25 | MS. SAINT-FORT:  On that question, I'm just going to |

K7MKUFOC

1    allow Ms. Quinn to answer that.

2                THE COURT:  Ms. Quinn, welcome.  Thank you.

3                MS. QUINN:  Thank you.

4                Can everybody hear me okay?

5                THE COURT:  We can.  Thank you.

6                MS. QUINN:  Okay.  Thank you, your Honor.

7                I believe that the provision in the CBAs that

8    plaintiffs are referring to provides the officers with the

9    right to seek expungement from their personnel files of

10   exonerated -- adjudicated disposition two years after the

11   disposition.  They seek in writing to the NYPD, for example,

12   and a board of people hear the request, and they decide and

13   make a recommendation to the commissioner.  There is no

14   guarantee or right in the collective bargaining agreement that

15   these records will be expunged.

16               Furthermore, they can still seek the expungement from

17   their personnel records, and other city employees that are

18   subject to CBAs, collective bargaining agreements, and were not

19   protected by 50-a also bargained for this right, to seek

20   expungement of exonerated dispositions.  But it is not a right

21   that's guaranteed by the CBA, it is an option that is provided

22   to them.

23               THE COURT:  All right.

24               One moment, please.  Ms. Quinn, are you saying --

25   let's say they seek expungement, and it goes to the board, and

K7MKUFOC

1    the board agrees with them, that doesn't mean -- or does it

2    mean -- that that particular report is being removed from the

3    OATH database of which your colleague just spoke?

4            I'm sorry, you're muted.  I can't say, although I'm

5    now reading your lips.

6            Nope, nope.

7            MS. QUINN:  Now?

8            THE COURT:  Yes.  Thank you.

9            MS. QUINN:  Okay.  I don't know what happened there.

10   Pardon me.

11           Pursuant to the collective bargaining agreement, the

12   exonerated dispositions can be removed, expunged from the

13   personnel file.  It doesn't seek to -- the OATH website,

14   personnel files.

15           THE COURT:  Thank you.  Okay.

16           MS. QUINN:  There's no broad guarantee within the

17   collective bargaining agreement that these dispositions will be

18   confidential.  It's just that they have the right to seek that

19   they be removed from their personnel files.

20           THE COURT:  Thank you.

21           Mr. Coles, do you want to be heard further on the

22   point?

23           MR. COLES:  Well, I just wanted to point out, in the

24   record before you and what was before Judge Edmead, all,

25   actually, the collective bargaining agreements, and I'm simply

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7MKUFOC

1    going to read you the first sentence of Article 17, Section 9,

2    of the CBA of the Uniformed Firefighters Association.  It says,

3    and I quote, "If an employee is found not guilty in a

4    disciplinary hearing, the record of the proceedings shall not

5    become part of that employee's personnel record."

6         And that is completely different from what the

7    corporation counsel just articulated to you.  So, I can't

8    actually bridge that gap, but --

9         THE COURT:  I can now.  It's not in their personnel

10   file, it happens to be on this website, and, apparently, it's

11   been on the website for years, and years, and years, and no one

12   has said anything about it.

13        MR. COLES:  The issue of what is on the OATH website

14   strikes me of a completely different category of issue than

15   what the city is talking about now.

16        THE COURT:  Why?

17        MR. COLES:  And --

18        THE COURT:  You're going to stop interrupting me,

19   thank you.

20        I'm being told that with respect to the firefighters,

21   there's nothing beyond what's on the OATH website, they're not

22   setting up a competing website or even a complementary website,

23   there's no sort of link on their website saying, please, if you

24   want to see firefighters who have gone bad, you can go to this

25   website.

K7MKUFOC

1    So, I don't understand how it is within the scope of

2    the injunctive relief you currently seek.

3    MR. COLES:  To the extent there is material on the

4    OATH website that is violating the rights of the firefighters

5    under the CBA, and that has been brought to light by the city's

6    statements that it's now going to do this indiscriminate data

7    dump, I think there was a real question as to whether or not

8    the type of information that is violative of the CBA on the

9    OATH website should be there.  It is clearly an area of

10   discovery that we would want to take.  So what's on the OATH

11   website, when does it go up, how does it go up, and I would

12   tell -- and so I think that is an area --

13   THE COURT:  I'm sorry, someone -- maybe someone had

14   their phone on speaker then, and they're repeating themselves.

15   Let me hear you again, Mr. Coles.

16   MR. COLES:  So that certainly would be an area of

17   discovery that we would want to focus on.

18   If, in fact, the city's conduct in a statement that

19   it's now going to release all these records has brought to

20   light an issue that is violative of the firefighters' rights,

21   then I think we have to address this in this hearing as well.

22   THE COURT:  Mr. Coles, I don't see how 50-a has

23   anything to do with this, or its repeal.  It may be unfortunate

24   that no one was paying attention to it, but you have a very

25   tough row to hoe in convincing me that something that's been

K7MKUFOC

1   out there for far longer than this litigation, or even the

2   decision to repeal 50-a, is something that I get to address or

3   need to address in this litigation as irreparable harm, but

4   I'll let you continue.  Keep going.

5            MR. COLES:  Okay.  My point was that we should be able

6   to investigate what is being put on OATH and whether or not

7   that is consistent with the agreements that the city has

8   entered into with the firefighters.

9            THE COURT:  All right, all right.

10           Now, CCRB, you've spoken at some length about your

11   concerns, and I understand that you're concerned.  But, again,

12   the information went out before me -- I'm not sure how many

13   days -- the complaint was filed when, please?

14           MR. COLES:  The TRO was on the 15th.

15           THE COURT:  And your complaint was filed on the 14th?

16   It's dated the 14th?

17           MR. COLES:  It's dated the 14th, yes.

18           THE COURT:  Okay.

19           So, according to Ms. Saint-Fort, materials were

20   disclosed on the 13th, so I feel like the cat may be out of the

21   bag, but I'll hear from you on that point.

22           MR. COLES:  Sure.

23           First of all, it's not clear what was produced.  We've

24   heard two or three different descriptions as to what was

25   produced by Ms. Saint-Fort today.  So, I think the first thing

K7MKUFOC

1    I'd like to do is determine what, in fact, has been produced.

2              Secondly, if it was produced in the manner described,

3    just an indiscriminate document dump of information that the

4    city for years has determined is private and includes

5    unsubstantiated, unfounded allegations, and the documents

6    haven't gone any further than the recipient, I guess it's the

7    NYCLU -- if, in fact, that's true -- I would also like to

8    explore whether or not those documents should be recaptured.

9    And, certainly, any further dissemination of those documents

10   should be restrained pending the resolution of the issues in

11   this lawsuit.

12             I can tell you that I was totally surprised that they

13   were produced, that they have not been made public.  I can't

14   speculate as to why that is.  It was clearly -- I don't think

15   they should have been produced at all, but to the extent that

16   they haven't been made public allows us still to perhaps

17   capture them, recapture them, and protect the reputations and

18   due process rights of the officers at issue.

19             THE COURT:  Well, one moment, please.

20             Is Mr. Dunn and his organization, I guess, not

21   considered the public?

22             MR. COLES:  They have not gone further than that.

23             THE COURT:  I see.  Okay.

24             MR. COLES:  And the order entered by Justice Edmead,

25   that we're asking you to continue, enjoins the city and those

K7MKUFOC

1    acting in concert with the city from disseminating the

2    documents that we're talking about.

3          It seems to me that the communications between the

4    city and Mr. Dunn's organization surrounding the delivery of

5    these documents, in whatever form they were delivered, is

6    something I'm entitled to have.

7          THE COURT:  Sir, one moment, please.

8          You just said "those acting in concert."  Are you

9    suggesting that somehow there's some coordinated campaign

10   between the NYCLU and the defendants in this case?

11         MR. COLES:  No.  I don't know.  I find it very unusual

12   that Mr. Murray writes his letter on July 8th; on July 12th or

13   13th, I first begin speaking to the Corporation Counsel, and I

14   ask them has the CCRB released any documents, and they don't

15   say that the CCRB has done that.  They basically say we're not

16   giving you any promises or representations.

17         So, I am concerned about the manner in which these

18   documents were made available.  I don't want to jump to any

19   conclusions, but I think it's an appropriate area for

20   discovery.

21         And I certainly don't think it affects the importance

22   of the injunctive relief that we're seeking over here.  I think

23   the injunctive relief that we're seeking over here should

24   certainly include the documents that, in whatever form they

25   were sent, were sent by the city in response to this FOIL.

K7MKUFOC

1          And, by the way, I have never -- I've been in the city

2     for many years.  I have never seen -- I don't know how quickly

3     this FOIL request came in, I don't know if it came in the same

4     day that the documents went out, but, in my experience,

5     including at one point, believe it or not, as a record access

6     officer, I have never seen 81,000 documents go out in a short

7     time frame without any type of review, without any type of

8     analysis, without a particularized determination as to what is

9     protected and not protected.  So, yes, I am very suspicious

10    about that.

11          THE COURT:  All right.  One moment.  Thank you.

12          Mr. Dunn, are you still there?

13          MR. DUNN:  Yes, your Honor, I am.

14          THE COURT:  Thank you.

15          Mr. Dunn, did you, in fact, receive a spreadsheet or

16    something other than a spreadsheet with CCRB materials?

17          MR. DUNN:  We received a spreadsheet.

18          THE COURT:  About how long is this spreadsheet, sir?

19    It's an electronic document that covers 81,000 officers?

20          MR. DUNN:  That's correct.

21          THE COURT:  I see.

22          Sir, was it in response to a FOIL request?

23          MR. DUNN:  Yes, it was.

24          THE COURT:  Do you know the date of the FOIL request,

25    sir?

K7MKUFOC

1          MR. DUNN:  I do.  It was July 9th.

2          THE COURT:  July 9th?  Okay.

3          When, if you recall, did you receive it?

4          MR. DUNN:  I believe we received the response to the

5     official city portal late in the morning of the 14th.

6          THE COURT:  Okay.

7          Sir, this is the part where you might be telling me

8     you're unable to answer me.  Were you the point person for this

9     FOIL request?

10          MR. DUNN:  I was.

11          THE COURT:  Did you have conversations with folks at

12     CCRB, or the Corporation Counsel's Office, or the City of New

13     York prior to filing your formal request on the 9th of July?

14          MR. DUNN:  There was a process that happened on that,

15     your Honor.

16          THE COURT:  Okay.

17          MR. DUNN:  The CCRB had a public board meeting on

18     Wednesday, July 8th.  I routinely attend CCRB board meetings.

19     I've done so for many, many years.

20          THE COURT:  Yes.

21          MR. DUNN:  The CCRB did a demonstration of essentially

22     a portal it was going to create and make public, and they did a

23     sort of screen sort of exercise about that.  And there were

24     hundreds of people -- I think there were a couple of hundred,

25     150, people participating in that meeting.  I don't know if

K7MKUFOC

1    Mr. Coles was there for that meeting or Mr. Murray.  PBA

2    representatives typically are at those representatives.

3              THE COURT:  Yes.

4              MR. DUNN:  When I saw that database, and I saw what

5    was happening, I, the next day, sent the FOIL request to the

6    CCRB.

7              THE COURT:  I see.

8              In terms of the speed with which that request was

9    answered, do you surmise that it's because the thing was

10   already kind of in a beta format by the time you saw it?

11             MR. DUNN:  Your Honor, I can't honestly answer that.

12   Here's what I can tell you:  I know, from many years of

13   experience both with FOIL requests and with the CCRB, the CCRB

14   has a very well-established database.  They call it a case

15   tracking system.

16             THE COURT:  Yes.

17             MR. DUNN:  They produce reports very easily and

18   datasets very easily from that.  So, I was not the least bit

19   surprised I was able to get a response quickly.  And the

20   written requests that I made emphasized the importance of

21   getting the information quickly, given the current public

22   debate about this misconduct and the repeal of 50-a.

23             So, I am not a technical person, but my guess is it

24   probably didn't take somebody more than an hour to process a

25   particular request.  This is not something where when we, for

K7MKUFOC

1    instance, asked for documents from city agencies, that can take

2    forever, and I'm sure you've had some litigation around the

3    slownesses of the federal government producing paper.  This was

4    not a paper production; this was a very straightforward Excel

5    spreadsheet.  I didn't think there was anything unusual about

6    how long it took them to do it, particularly because we made a

7    point of emphasizing the importance of getting it as quickly as

8    possible.

9              THE COURT:  All right.

10             But just to that point, sir, you said to me that -- so

11   this was basically a Zoom call or a Skype call instead of an

12   actual meeting in person?

13             MR. DUNN:  That's correct.

14             THE COURT:  And anybody could participate in it, sir?

15             MR. DUNN:  Anybody could.

16             THE COURT:  And you were part of the anybody.  So, you

17   and 150 others participated in this meeting.

18             And the sharing, the screen-sharing, which I

19   understand to be a concept, was something that was done for

20   everybody who was in attendance at that meeting?

21             MR. DUNN:  That's correct, your Honor.  At least as

22   far as I could tell, I was one of the participants, but the

23   screen was full of this demonstration, and it was introduced by

24   the CCRB staff, as we are now going to do a demonstration for

25   the public, of this tool that we are creating.

K7MKUFOC

1          THE COURT:  Recognizing that I'm not asking you to

2     give the final word on this, sir, was the thing that you

3     received on the morning of the 14th similar to the thing that

4     had been shared on the screen during that meeting?

5          MR. DUNN:  It was not, your Honor, in the sense that

6     what we got was an Excel spreadsheet.

7          THE COURT:  Yes.

8          MR. DUNN:  What was shown was a tool the CCRB

9     apparently created that pulled data from the spreadsheet and

10     made it more usable, if you will, for somebody who was looking

11     at it.

12          THE COURT:  Understood.  All right.  Thank you.  And I

13     appreciate the clarifications that you've provided me.

14          Mr. Coles, I'll let you continue, sir.

15          MR. COLES:  First of all, just to talk about the

16     chronology on the CCRB production, Mr. Dunn said the FOIL was

17     July 9th, which was a Thursday.  According to the letter that

18     the Corporation Counsel submitted, the production of the CCRB

19     documents was made as of July 13th, which was the Monday.

20          THE COURT:  Okay.

21          MR. COLES:  So, in any event, there is no question in

22     my mind that what was produced to the CCRB -- what was produced

23     by the CCRB in response to that FOIL, the differences between

24     the beta testing that was shown to the public and what was

25     actually sent to NYCLU is something that we ought to be able to

K7MKUFOC

1      take discovery on, and, certainly, to the extent that this was

2      rushed out knowing that there was an injunction pending raises

3      real questions, I believe.

4                  THE COURT:  Sir, sir, how did they know there was an

5      injunction pending?

6                  MR. COLES:  Because we --

7                  THE COURT:  Did they know on the 9th?

8                  MR. COLES:  We spoke to the city on the 13th.

9                  THE COURT:  Right, okay.

10                 MR. COLES:  The 14th.

11                 THE COURT:  But the request was made on the 9th?

12                 MR. COLES:  Yes.  But the production was made as of

13     July 13th, after we had already been speaking to the city,

14     according to the Corp. Counsel's letter, specifically raising

15     the issue of the CCRB and not getting a straight answer.

16                 THE COURT:  Okay.  All right.

17                 Sir, working backwards still, I am advised by

18     Ms. Saint-Fort, who I will listen to in just a moment -- I know

19     she wanted to speak to me earlier -- that with respect to the

20     NYPD, all that they plan to disclose are the charges and

21     specifications that have been adjudicated by the NYPD.

22                 And, Ms. Saint-Fort, may I please have the

23     confirmation:  Would these just be the substantiated and not

24     the unsubstantiated, the unfounded, the exonerated, or the

25     pending, those don't count, it's just the stuff that's been

K7MKUFOC

1   adjudicated?

2           MS. SAINT-FORT:  As to the NYPD, my understanding is

3   that it is the charges and specs, and the determination on

4   those charges and specs, and any charges and specs that have

5   been already served.

6           THE COURT:  So, any adjudicated, any served -- the

7   served are pending, are they not?  Or am I misunderstanding the

8   meaning of the term "served"?

9           MS. SAINT-FORT:  Right.  After -- charges and specs

10  that are served following an investigation.

11          THE COURT:  Tell me, then, what that means, please.

12          MS. SAINT-FORT:  That would be prior to a

13  determination on the charges and specs.

14          THE COURT:  I see, okay.  Because, first --

15          MS. SAINT-FORT:  I want to clarify that point.

16          THE COURT:  Well, that's a big clarification.  Perhaps

17  you want to restate for me what specifically you understand the

18  NYPD plans to disclose.

19          MS. SAINT-FORT:  My understanding is that they plan to

20  disclose charges and specs, as well as the adjudication, if

21  there is, on the charges and specs.

22          THE COURT:  Okay.  We're going to try this again.

23          MS. SAINT-FORT:  Okay.

24          THE COURT:  The NYPD plans to disclose charges and

25  specifications that have been adjudicated internally by the

K7MKUFOC

1  department, correct?

2                MS. SAINT-FORT:  Yes.

3                THE COURT:  Okay.

4                They also plan to disclose charges and specifications

5  that have been served, but not fully adjudicated, finally

6  adjudicated, by the department internally?

7                MS. SAINT-FORT:  I believe that is correct.  Charges

8  and specs served following a final investigation.

9                THE COURT:  Now, after those charges and

10  specifications are served following a final investigation, is

11  it normally the next step that there is a hearing at which they

12  are adjudicated?

13                MS. SAINT-FORT:  Yes.  So, there would be an

14  adjudication or there may be a plea negotiated through the

15  settlement.

16                THE COURT:  Okay.  My point is a little bit different,

17  and that is, we've talked about pending charges.

18                MS. SAINT-FORT:  Right.

19                THE COURT:  It sounds like something that has been

20  served following a final investigation would, in some sense,

21  really be pending until it's been formally adjudicated.

22                So, could you help me understand if there's a

23  disconnect there?

24                MS. SAINT-FORT:  Right.  So I do want to clarify my

25  present understanding of what the plan is to do now, and to the

1    extent that it differs with what I said earlier, I do want to

2    clarify for your Honor.

3              So, the intention is that what would be disclosed

4    would be nonadjudicated, but final charges and specs following

5    an investigation.  So they are substantiated charges and specs,

6    as well as charges and specifications following an adjudication

7    and there being a determination as to those charges.

8              THE COURT:  Okay.  So, it sounds like with respect --

9    I'm sorry, say that again, please?

10             MS. SAINT-FORT:  Right.  So where there are charges

11   and specs that -- following an investigation, that would be

12   substantiated; the adjudication part of it would be guilty or

13   not guilty following a hearing.

14             THE COURT:  Okay.

15             So, with respect to the ones that are served following

16   a final investigation, just the substantiated ones would be

17   disclosed?

18             MS. SAINT-FORT:  Yes.  Those would be substantiated,

19   yes.

20             THE COURT:  Thank you.

21             With respect to the charges and specifications that

22   have been adjudicated internally by the NYPD, are those being

23   disclosed irrespective of how they get resolved, whether they

24   are resolved as substantiated, unsubstantiated, exonerated, or

25   is it only the substantiated charges and specifications that

K7MKUFOC

1    are being disclosed?

2                MS. SAINT-FORT:  My understanding is that after -- the

3    adjudication determination following final charges and specs is

4    whether there is a finding of guilty or not guilty.  So that

5    would be what is disclosed.

6                THE COURT:  But the not guilties get disclosed?

7                MS. SAINT-FORT:  Yes.

8                THE COURT:  Okay.

9                Mr. Coles, with that clarification, let me hear from

10   you, please.

11               MR. COLES:  Well, it's completely -- it is a reversal

12   from what we heard ten minutes ago.  So I don't know if this is

13   happening in realtime, but it's very concerning to me that

14   policy is being made during a court hearing on a TRO.

15               MS. SAINT-FORT:  If I may clarify, I don't want to say

16   that -- I want to address it's my understanding of what the

17   NYPD has already done.  I'm just trying to fill the gaps as

18   it's coming in.  So I do want to make clear that there is no

19   changes that are happening in realtime during this conference.

20               MR. COLES:  Okay.

21               THE COURT:  Mr. Coles, continue.

22               MR. COLES:  Yes.

23               So, I had understood that pending matters were not

24   going to be made public, were not going to be promoted and

25   published on the internet.  We do not believe that pending

1    matters, that have not been determined, can be promoted and

2    published on the internet without violating the rights of my

3    clients.

4           When we had a conversation about a half hour ago, I

5    thought our understanding was that those would not be made

6    public.  If what she just said is that, in fact, those pending

7    matters are going to be made public, that should be enjoined

8    pending determination of the issues in this lawsuit because

9    that will create irreparable and immediate injury to the

10   officers because none of those have been proven.  She used the

11   word "substantiated."  I mean, that is a word that I think

12   requires a little bit of focus because that is something very

13   different than proven.  It is simply an allegation that hasn't

14   been proven.  And that's exactly at the core of what we're

15   seeking to enjoin, things that have not been proven, things

16   that can destroy forever the reputation of my clients, things

17   that will destroy the collective bargaining rights.

18          So, as she just --

19          THE COURT:  Sir, you yourself noted, about 15 minutes

20   ago, you were making a distinction about things that you did

21   not want disclosed, and your list included unsubstantiated,

22   unfounded, exonerated, and pending.

23          MR. COLES:  Yes.

24          THE COURT:  This is pending, but substantiated.

25   That's not one of the things that you told me a few moments ago

K7MKUFOC

1  that you were concerned about.  So why are you now concerned

2  about it?

3          MR. COLES:  Actually, your Honor, I thought I was

4  clear when I said that pending matters should not be disclosed.

5  And I understand those to be a core pending matter.  I was

6  actually quite relieved that Ms. Saint-Fort had said that

7  pending matters would not be produced because I think that

8  actually is the right call, and now I see that she's taking a

9  slightly different position.  But to produce pending matters

10  where there's been no final determination strikes at the core

11  of our lawsuit and creates injury to our clients that can't

12  be -- that will be eternal.  These are unproven, pending

13  matters.

14          MS. SAINT-FORT:  But they are final substantiated

15  allegations.

16          THE COURT:  Ms. Saint-Fort, it's probably, because I

17  don't practice in this space, and I, perhaps, am conversant,

18  but not fluent in the terms that you are using, but I'm trying

19  to figure out:  These substantiated specifications, is that it

20  for them, they're going nowhere, they're not going to be going

21  to a hearing or something else?

22          MS. SAINT-FORT:  They could go to a hearing, yes.

23          THE COURT:  Okay.  So they're not quite done?

24          MS. SAINT-FORT:  Correct.

25          I just wanted to clarify what the position is to the

K7MKUFOC

1    extent that Mr. Coles is characterizing.  I just want to be

2    clear.

3              THE COURT:  Okay.  I think he understands that what is

4    proposed to be disclosed would be matters that are

5    substantiated, to some degree, distinguished from proven, but

6    not yet final.  Correct?

7              MS. SAINT-FORT:  That's correct, there's no final

8    adjudication.

9              THE COURT:  Okay.

10             Are there other clarifications or details that you

11   want to tell me about with respect to what your clients propose

12   to disclose, just so that Mr. Coles and I are not making

13   arguments that are unwarranted or not arguing things that ought

14   to be argued?

15             MS. SAINT-FORT:  Sure.  I think as to the fire

16   department, I think all are clear on what is happening there.

17   There's no intention to produce anything.  As to the Department

18   of Corrections, there would only be final determinations that

19   are substantiated and that are founded that would be produced.

20   We just walked through the New York Police Department, and we

21   are clear what CCRB has already produced.

22             THE COURT:  Yes, okay.

23             Mr. Coles, I'll hear from you now.

24             MR. COLES:  Okay.

25             The position that we take is the one laid out in our

1    papers, that to the extent that the city is going to -- as you

2    articulated, your Honor, going to produce, wants to produce,

3    unsubstantiated, unfounded, exonerated, or pending claims, that

4    should be enjoined pending a determination of the merits of our

5    action.

6         Based on what Ms. Saint-Fort just said, it appears to

7    me that the fire department is not going to produce

8    unsubstantiated, unfounded, exonerated, or pending documents.

9    If that is true, that solves our problem with regard to the

10   fire department.

11        THE COURT:  Well, I thought, actually, that it was the

12   Department of Corrections where you had your best shot.  They

13   were --

14        MR. COLES:  I'm going -- okay.  I'm going to the

15   Department of Corrections, too, yes.

16        THE COURT:  Okay.  Because the fire department is not

17   doing anything other than allowing the OATH website to continue

18   its existence.

19        MR. COLES:  Insofar as the Department of Corrections

20   is concerned, Ms. Saint-Fort said they are only producing

21   final -- as I understood it, final proven findings, in other

22   words, disciplinary charges that are proven after a hearing,

23   and a trial, and whatever the process is.  They are not

24   producing unproven charges, and they are not producing

25   exonerated final charges.

K7MKUFOC

1          THE COURT:  One moment, please.

2          Ms. Saint-Fort, just so that I'm clear, the words I

3   wrote next to DOCCS are substantiated, founded, final.  Are

4   those the correct adjectives to be describing those materials?

5          MS. SAINT-FORT:  As far as I know, yes.

6          THE COURT:  Yes.  And you will let me know right away

7   if you find out something else?

8          MS. SAINT-FORT:  I will, your Honor.

9          THE COURT:  Thank you so much.

10          So, Mr. Coles, I don't have to worry about the DOCCS

11   materials, correct?

12          MR. COLES:  That's what it appears to be, yes.

13          THE COURT:  I don't have to worry about the fire

14   department materials, also, correct?

15          MR. COLES:  I don't know whether or not they're going

16   to produce exonerated materials.

17          THE COURT:  Well, they told me -- the OATH materials

18   contain however the hearing was resolved, so whether the person

19   won or lost, it's there.

20          MR. COLES:  Well, no, that's not entirely true because

21   OATH is not the final determinant.  After OATH, it goes to the

22   fire commissioner, and the fire commissioner makes a final

23   determination.

24          THE COURT:  Okay.

25          Ms. Saint-Fort, am I correct that the OATH hearing --

K7MKUFOC

1   whose determination makes it to the website, Ms. Saint-Fort?

2              MS. SAINT-FORT:  It's the determination of the OATH

3   ALJ.

4              THE COURT:  The ALJ.  Okay, okay.

5              So, Mr. Coles, you're not totally happy with the

6   FDNY's position, but I understand that.

7              And then NYPD, I guess you have two concerns about it:

8   You're concerned about the CCRB stuff in its entirety, and

9   you're concerned about the internal stuff to the extent the

10  specs that have been served and that are substantiated, but not

11  founded, may be out there, correct?

12             MR. COLES:  That is exactly correct, your Honor.

13  Thank you.

14             THE COURT:  Okay.  I understand.

15             Now, I've had the pleasure of your all company for the

16  last 90 minutes, and I can be here all night, it's fine, I just

17  want to make sure, now that I have a better sense of the facts,

18  Mr. Coles, I'll hear from you on the arguments, but, also, I

19  have your arguments in writing, so if you'd rather just say,

20  Failla, look at this section of my brief, I can do that, too.

21             MR. COLES:  Okay.  No, your Honor, I know you read our

22  brief, and you've also read our letters, so -- our July 20th

23  letter, so I don't want to repeat anything that's there, but if

24  we just want to use the police department as an example --

25             THE COURT:  Please.

K7MKUFOC

1    MR. COLES:  -- the documents that the police

2    department is considering dumping indiscriminately on the

3    public violate the CBA rights of the police unions, the right

4    to remove unsubstantiated, unfounded material from their

5    personnel files.  That material is not public now in the way

6    that OATH material is public.  And if unsubstantiated, unproven

7    allegations are promoted on the internet, that will not only

8    violate the collective bargaining agreement, but it will also

9    damage the reputation of hundreds, maybe thousands, of

10   officers, depending on how many documents they're putting out.

11        Now, I should tell you, on the collective bargaining,

12   each -- four of the five city unions, the police unions, have

13   actually moved for a grievance and filed grievances with the

14   city, claiming that the threat that the police department has

15   made to release these documents is a violation of the

16   collective bargaining agreement and renders that provision of

17   the collective bargaining null and void.  In the papers that we

18   filed in state court, we asked, under Article 75 of the CPLR,

19   but it would be the equivalent of federal Rule 65, for an

20   injunction of any production of unsubstantiated, unproven

21   documents pending the CBA arbitration, which is now underway.

22        That arbitration for each of the unions is supposed to

23   be lined up within the next 20 days under the collective

24   bargaining contracts they have.  Sometimes it takes longer to

25   appoint an arbitrator and so on and so forth, but the process

K7MKUFOC

1    is supposed to move ahead in 20 days.  If these documents are

2    released now, that whole process, the collective bargaining

3    process, will be an empty ritual.  In fact, this entire lawsuit

4    would be an empty ritual because everything would have been

5    public already.

6         We also believe, for the reasons that we put in our

7    papers, that promoting and publishing unproven, unfounded

8    allegations by the NYPD will stigmatize officers, will affect

9    their future employment, if they ever want to look for jobs

10   elsewhere, it will subject their reputations to unfair calumny,

11   and none of these documents ought to be produced to the extent

12   that they contain unproven allegations.  The damage would be

13   eternal.  Once it's out on the internet, you can't ask for the

14   information back.  If unproven allegations go out, and then the

15   officer wins at the trial room, he hasn't actually saved his

16   reputation.  His reputation was damaged by the release by the

17   city.

18        The same is true with the settlement agreements that I

19   mentioned earlier.  The settlement agreements before June 12,

20   2020, kind of have baked into them, as a matter of law, the

21   confidentiality provisions that were in effect at that time.

22   The expectation was that those would remain confidential, and I

23   think as a matter of contract law, the city cannot release

24   those at this point in time.

25        And then, finally, when the city removed the petition

K7MKUFOC

1    to the federal court, there's also an Article 78 -- I know

2    sometimes the federal courts are reluctant to take on

3    Article 78s -- but, in fact, it was removed, so at least for

4    the time being, it's before your Honor.  And our position on

5    the Article 78 -- and it also affects the due process claim --

6    is the city can't close its eyes to the protections that it

7    provided to the reputations, and privacy, and safety of

8    officers separate and apart from 50-a that still exist despite

9    the repeal of 50-a.  And we have cited, in the letter we sent

10   to you, as well as in our brief, examples where even the CCRB

11   has taken the position that unfounded, unproven allegations

12   cannot be produced separate and apart from the rule in 50-a.

13          So, what we are asking for, your Honor, is a

14   continuation of the temporary restraining order that the state

15   court entered; we are asking for a limited, expedited

16   discovery -- we have already started the meet-and-confer

17   process with Corp. Counsel, they refused to engage, but they

18   actually have a proposed set of document requests -- and then

19   we would like to have the documents that we've asked for and

20   the discovery we've asked for that may require a deposition or

21   two, based on what we've learned during the hearing today,

22   scheduled; and then, ultimately, a preliminary injunction

23   hearing scheduled maybe 30 or 45 days after the city has

24   completed discovery.

25          THE COURT:  But I would have thought, under the TRO

K7MKUFOC

1   provisions, it goes out for two weeks unless the other side

2   consents.  They're not consenting.

3           MR. COLES:  Or unless you extend it, your Honor.

4           THE COURT:  Yes, okay.

5           MR. COLES:  And so, what we are asking for is an

6   extension -- under the circumstances here, an extension of the

7   TRO pending the hearing on the preliminary injunction motion.

8   It is the only fair thing to do, because if the TRO isn't

9   extended, all of this becomes, as I said, essentially

10  irretrievable from my clients' point of view.  They've already

11  been damaged, and it doesn't matter how well they can convince

12  you of that damage two or three months down the road.

13          THE COURT:  All right.

14          Ms. Saint-Fort, I'll hear from you in opposition.

15          MS. SAINT-FORT:  Yes, your Honor.

16          Primarily, plaintiffs have failed to identify any

17  irreparable harm here.  The information -- as we've discussed

18  at length throughout this entire conference, much of this

19  information is already available to the public.

20          THE COURT:  But what about that that is not, please?

21  You've already seen me push back with Mr. Coles as to the stuff

22  that's out there.  What about the stuff that isn't?

23          MS. SAINT-FORT:  The things that aren't out there,

24  there are equivalents that already are.  For example, if we're

25  talking about the OATH determinations that demonstrate that a

1    firefighter or a correction officer was -- the charges against

2    them were unsubstantiated or that they were ultimately

3    exonerated following a hearing, there has been no example given

4    by plaintiffs that those individuals have suffered any harm by

5    that information already being out there.  So, the equivalent

6    information now coming out from a different agency doesn't

7    directly indicate that there's some sort of harm that would

8    occur.  Primarily, plaintiffs have failed to identify the

9    particular interests that are being infringed here.  They

10   contend it's their reputation and chance at future employment,

11   but the courts are clear that that's not sufficient as a harm,

12   such that there should be a temporary restraining order in

13   these circumstances.

14        Plaintiffs have pointed to the potential for physical

15   harm against officers, and while we are certainly cognizant and

16   sensitive to that particular issue, as I've said before, this

17   information has already been public for many similarly situated

18   correction officers and firefighters, and plaintiffs have

19   failed to point to any particular instance where there has been

20   such a result based on that information that's already public.

21   In fact, I would like the Court to be aware that these

22   arguments that have been raised by plaintiffs were raised to

23   the legislature.  There were hearings where the legislature

24   considered whether it would create a carve-out for

25   unsubstantiated, or exonerated, or otherwise -- the types of

K7MKUFOC

1    claims that plaintiffs believe should not be disclosed and

2    whether they can determine that it wasn't going to make a

3    carve-out.

4         So, it's clear that these arguments have been

5    considered by the legislative body, and it was determined that

6    there would be no such carve-out because this information is

7    already made public as concerns other similar situated

8    officers, but also other public employees.  There are child

9    welfare officers from ACS who have the job of removing children

10   from their home, who arguably, I believe plaintiffs would say,

11   would be at as much risk, potentially, as police officers from

12   individuals who are upset about their involvement, their

13   disciplinary records are public as well.

14        So, in fact, the repeal of 50-a has put police

15   officers on equal footing with correction officers and other

16   city employees, and that directly goes to the merits of

17   plaintiffs' equal protection claims, that they are being now

18   treated similar to other public employees when they had not

19   been before.

20        In terms of other protections that are being taken, I

21   do want the Court to know that there were two provisions of the

22   public officers law that were enacted along with the repeal of

23   50-a to protect against the disclosure of certain personal

24   identifying information of these officers when records are

25   being disclosed, including any residential information, any

K7MKUFOC

1     personal identifying numbers, as well as any mental health

2     information, any visits to an employee assistance program.

3     That information, the legislature made clear to ensure that

4     that information would be withheld and protect the

5     confidentiality of those types of information.  With the repeal

6     of 50-a, there is no legal reason to further protect or keep

7     confidential these types of disciplinary records that have been

8     public for so many other employees for years.

9          I'm going to just ask -- Ms. Quinn has some arguments

10    on the Article 75 and Article 78 due process, so I'll turn to

11    her.

12         THE COURT:  Thank you.

13         Ms. Quinn?

14         MS. QUINN:  Good evening, your Honor.  Can you hear me

15    okay?

16         THE COURT:  I can.  Thank you.

17         MS. QUINN:  Okay.  Thank you.

18         I just wanted to raise another point on the

19    irreparable harm argument – that plaintiffs have not connected

20    a specific harm associated with these types of records, the

21    unsubstantiated, exonerated records that they seek to enjoin

22    the release of, by not challenging the release of substantiated

23    allegations, or guilty charges, or charges that are adjudicated

24    guilty, for example.  So they fail to identify specific harm

25    that comes from the release of these records, in particular, to

K7MKUFOC

1    either a reputational harm, which I'll get to in a minute --
2    there is no reputational protection afforded by the
3    Constitution -- or their physical safety.  There is no
4    specified difference between substantiated allegations being
5    released and an unsubstantiated allegation being released.

6          Now, the second prong of whether or not they would be
7    entitled to a temporary restraining order is whether or not
8    they're going to be likely to succeed on the merits of their
9    claims.  Plaintiffs have raised the breach of the collective
10   bargaining agreement.  As I stated before, there is no -- at
11   least, as you know, I can read to you from the police officers'
12   collective bargaining agreement -- there is no right in the
13   collective bargaining agreement to have these records expunged.
14   They may seek that, and it will be reviewed by a board, and a
15   determination be made, but they can only seek two years after
16   the exoneration.  I don't believe that they would be likely to
17   succeed on the merits of their arbitration in that regard.

18         I hate to -- and Article 75, CPLR Section 75.02, gives
19   a state supreme court the right to provide a TRO in need of
20   arbitration.  I'm not going to press that point because,
21   obviously, we removed this case to federal court, but the
22   important thing is I don't think that they are likely to
23   succeed on the merits of their arbitration claim, so there's no
24   right to expungement created in the CBA -- excuse me, the
25   collective bargaining agreement.

K7MKUFOC

1          As to the likelihood of success on a due process

2     claim, there is no constitutional right to be prevented from

3     infringing on reputational harm.  The plaintiffs have to come

4     forward with some other tangible state-enacted harm or loss

5     that they suffered in addition to an alleged harm to their

6     reputation.  Here, they say, in their memorandum of law that

7     they filed in the state court action, which has been filed here

8     as well, that there is a potential harm to future employment

9     endeavors.  That's simply not enough to create a constitutional

10     right subjecting them to due process in this regard.

11          Again, I think it's important to consider that how is

12     their reputation going to be harmed or their employment

13     prospects going to be harmed by the release of unsubstantiated

14     records versus the substantiated records that they're not

15     challenging the release of?

16          I will just point out that the cases that plaintiffs

17     cite to you in the complaint are cases dealing with people's

18     inclusion on child abuse databases and DWI databases.  These

19     are not individuals that are similarly situated to plaintiffs;

20     these are members of the public, these are criminal charges

21     that are being posted, they're not disciplinary proceedings.

22     And in those cases, the courts found that there was a stigma

23     plus, not just a harm to reputation, but a harm to something

24     substantive.  In child abuse cases, for example, foster parents

25     had children removed or a child psychologist had his license

K7MKUFOC

1    taken away; it's more than just a harm to someone's reputation.

2    Potential harm to future employment endeavors is not enough.

3         Plaintiffs simply cannot establish that they have a

4    constitutional right that needs to be protected by due process

5    here.

6         MS. SAINT-FORT:  Finally, I will --

7         THE COURT:  Let me just say to the two of you:

8    Ms. Saint-Fort, you misled me because you indicated that

9    Ms. Quinn was going to focus on something specific, and she

10   ended up just echoing a lot of what you said.  No, no, that's

11   actually not something to smile about.  If you had divided it

12   up, you should have divided it up.  I did not intend to have

13   Mr. Coles double-teamed in argument.  So, please, one of you

14   speak to a point, not both of you.

15        MS. SAINT-FORT:  Understood, your Honor.

16        I just want to -- as to two more -- two claims that

17   plaintiffs have in terms of their likelihood of success on the

18   merits, their breach of contract claim as to the settlement

19   agreements, one, plaintiffs seem to suggest that the settlement

20   agreements -- the release, excuse me, of unsubstantial and

21   nonfinal allegations would be a breach of settlement

22   agreements.  That is a very confusing argument because, if

23   there is a settlement agreement, there is necessarily a final

24   allegation, and, generally, if there is a settlement, there

25   would be a plea to the substantiated nature of the charges.

K7MKUFOC

1    So, it's unclear to defendants how at all settlement agreements

2    would be violated by the release of any unsubstantiated or

3    nonfinal allegations.

4           Finally, as to plaintiffs' claims under the New York

5    State constitution, New York law is clear that there is no

6    private right of action under the New York State constitution

7    where there is an alternative remedy and plaintiffs have

8    brought equivalent due process and equal protection claims

9    under Section 1983.  So, there is no likelihood of success on

10   the merits of those claims as well.

11          THE COURT:  All right.  Thank you.

12          Mr. Coles, I'll hear from you.  It's your application,

13   so you get the last word.

14          MR. COLES:  Thank you very much.  I appreciate it.

15          I want to start with what Ms. Quinn said, which I

16   thought was startling, from my clients' perspective.  It is

17   there's no difference between a release of a substantiated and

18   an unsubstantiated allegation.  From our point of view, nothing

19   could be further from the truth.  The release of the

20   unsubstantiated allegations, that haven't been released under

21   50-a for 40 years, and they're rushing to release them now,

22   will have immediate and irreparable impact on my clients.  They

23   will have due process impacts.  And the cases that Ms. Quinn

24   just articulated don't stand for the proposition that she says

25   they stand for, but the cases say that if you have a due

1      process violation such as this and a potential future

2      disclosure to future employers, you actually do meet the due

3      process standard.  There is no prejudice to the city by

4      continuing the TRO for another few months after these documents

5      have been confidential for 40 years.

6              And this goes beyond the invasion of privacy as well.

7      As we point out in our petition, at paragraphs 74 and 75, this

8      also has tremendous implications for the safety of police

9      officers.

10             THE COURT:  Sir, to that point, and to be clear,

11     everyone should be concerned about the safety of law

12     enforcement officers and the safety of the citizens they serve

13     and protect, but I have no reason to believe that the exemplars

14     that you gave to me were harmed and came to their unfortunate

15     end because of the disclosure of a substantiated or

16     unsubstantiated complaint.  So I think I'm having some

17     difficulty tying that particular argument to the claims that

18     you're making in this case.

19             MR. COLES:  Well, the case law does that exactly.  The

20     case law says that unproven claims that are promoted and

21     published on the internet immediately affect the reputation of

22     the afflicted involved officer, and that that creates an

23     immediate due process violation, a stigma for the officer.  And

24     the stigma plus is that information, now that it's been made

25     public, will be made available to future employers.  And that's

1     what you need as the standard for the due process allegation.

2              It's also true -- and this is a very simple way of

3     approaching the first issue -- the collective bargaining

4     provisions protect the officers from exactly what the city is

5     trying to do, and there is now an arbitration as to whether or

6     not the city can render those protections null and void, and it

7     can't.

8              So, our view is, the immense potential harm to the

9     officers by allowing a release of this information before a

10    full adjudication on the merits is substantial and

11    overwhelming.  The prejudice to the city on having a short stay

12    or short TRO so all of these issues could be fully explored is

13    de minimis.

14             So I would ask you, your Honor, as I said earlier, the

15    TRO should be extended by the Court, you should direct the

16    parties to meet and confer as to a discovery schedule, and

17    setting a date consistent with your Honor's schedule for

18    preliminary hearing.  But in the meantime, the rights of my

19    officers should not be rendered nugatory by the type of

20    disclosures that the city intends to do.  Those have to be

21    restrained.

22             THE COURT:  Let's do this:  We've now been speaking

23    for almost two hours, and I've had the benefit that Skype

24    offers, but I want -- if we were in a courtroom now, I'd tell

25    you that I was getting off the bench to think about all the

K7MKUFOC

1    issues that were raised, and I want the virtual opportunity to

2    do that.  So let's do this:  It is now, by my clock, 6:13.  In

3    one hour, I would like you to call this number, please:

4    (888)363-4749.  You're going to be asked for an access code.

5    That access code is:  5123533.  Please be on there at 7:13, and

6    we will resume, and I will give you a decision at that time.

7              All right.  Thank you very much.  I am adjourning the

8    Skype component of this proceeding, and I thank you all again

9    for your very fine argument today.

10             And, Ms. Saleski, next time you get to talk, too.

11             MS. SALESKI:  Thank you, your Honor.

12             THE COURT:  We are adjourned.  Thank you.

13             COUNSEL:  Thank you, your Honor.

14             (Recess)

15             MR. COLES:  Good evening.  This is Anthony Coles, for

16   the plaintiffs, your Honor, here with Courtney Saleski, who I

17   know may be on mute, but Courtney is here, too.

18             THE COURT:  Okay.  Thank you.

19             And representing the defendants?

20             MS. SAINT-FORT:  Good evening, your Honor.  This is

21   Dominique Saint-Fort, New York City Law Department, for the

22   defendants.

23             MS. QUINN:  And good evening, your Honor.  This is

24   Rebecca Quinn, also from the New York City Law Department, for

25   the defendants.

K7MKUFOC

1          THE COURT:  Thank you very much.

2          Ms. Quinn, as I was printing out my notes, I was told

3     that there was information you wanted to provide to me.  Please

4     provide it.

5          MS. QUINN:  Your Honor, this is Rebecca Quinn

6     speaking, and I apologize at the outset for two reasons:  One,

7     that this is last-minute information being conveyed to you and,

8     also, that both Ms. Saint-Fort and I are speaking.

9          I am informing the Court of this because CCRB called

10    my cell phone and shared this information with me.

11         THE COURT:  Yes.

12         MS. QUINN:  So, before the repeal of 50-a, CCRB had on

13    its website their upcoming trial calendar, and what that showed

14    was the date of the trial, the precinct of the occurrence of

15    the incident, and the allegations.  It did not contain a name

16    of the officer.

17         The allegations -- the CCRB allegations fall under

18    different categories.  They're referred to as FADO, F-A-D-O.  F

19    for force, A for abuse of authority, D for discourtesy, O for

20    offensive language.  So that is what appeared on the CCRB trial

21    calendar pre-repeal of 50-a.

22         THE COURT:  Excuse me, please.  Tell me again what

23    FADO stands for?

24         MS. QUINN:  Sure.  F is force, A is abuse of

25    authority --

K7MKUFOC

1           THE COURT:  Thank you.

2           MS. QUINN:  -- D is discourtesy, and O is offensive

3    language.

4           THE COURT:  Thank you very much.

5           You may continue.

6           MS. QUINN:  Those are the types of allegations --

7    those are how CCRB categorizes allegations that they

8    investigate.

9           So, post repeal of 50-a, the trial calendar is

10   available online, as it was before, but now it says the date of

11   occurrence, the name of the officer, the precinct, the command,

12   and not the FADO allegations, but the charges as listed as

13   sections of the patrol guide.  So, for example, a violation

14   like a false arrest, what would be listed is the patrol guide

15   section that was violated, the page, the paragraph, and the

16   title of the violation.

17          THE COURT:  I see.

18          And right now, today, that continues?  That's on the

19   website right now?

20          MS. QUINN:  That is on the website right now.

21          THE COURT:  Okay.

22          That's a pretty big thing, though, to tell me, don't

23   you think?

24          MS. QUINN:  Yes.

25          THE COURT:  Yes.  The short answer is yes.

K7MKUFOC

1          Ms. Quinn, is there other information you want me to

2     be aware of?

3          MS. QUINN:  That is all that I'm aware of.

4          THE COURT:  Okay.

5          Did you make Mr. Coles aware of this before you told

6     me?  Is this the first time both of us are hearing this

7     information?

8          MS. QUINN:  This is the first time.  Unfortunately, I

9     just received this information now, not -- moments before the

10    call.

11         THE COURT:  Of course.  All right.  Thank you.

12         Let me, then, please go forward.  It's interesting.  I

13    had started -- in the hour that we were apart, I typed up some

14    notes for a decision, and I'm going to read it into the record

15    now, but I began the whole thing by noting that my focus was

16    based, in large measure, on the representations of Corporation

17    Counsel, that I have been, and, indeed, we have been, focusing

18    on the NYPD materials.

19         Let me just pause for a moment.  You're hearing both

20    demonstrators outside the courthouse and lightning and thunder

21    going on right now.  So, if I am occasionally interrupted, that

22    is why.

23         In any event, I've been focusing on the NYPD materials

24    because I understand, and I continue to understand, that the

25    FDNY materials are matters that are OATH matters that already

1    are, and have been previously, accessible by a website to which

2    I have been referred.  And I understood, as well, that the

3    focus of the DOCCS materials were substantiated, founded, and

4    final resolutions of complaints and that there was no problem

5    with those.  So, that leaves the NYPD materials.

6         And, as plaintiffs' counsel have described them for me

7    specifically, complaints that are unsubstantiated or unfounded,

8    those in which the officer has been exonerated, and those that

9    are, I'll say, pending -- we could also say nonfinal, as

10   well -- there was some discussion in the papers and a little

11   bit of discussion today about settlement agreements that were

12   entered into prior to June 12th of 2020, and as to those

13   materials, I am granting the temporary restraining order, and I

14   am enjoining the defendants and anyone acting in concert with

15   them from publicly disclosing those materials.

16        Now, we have this problem, because I initially noted

17   that there was a tranche of CCRB materials that falls within

18   the definition that I've just outlined that has been turned

19   over to the New York Civil Liberties Union, and it was my hope

20   that Mr. Dunn would consent, in the short term at least,

21   voluntarily to refraining from disclosing them any further than

22   they've already been disclosed internally or externally, and

23   that the New York Civil Liberties Union would agree that they

24   would not disclose them further.

25        Mr. Dunn, are you willing to make such a

K7MKUFOC

1    representation, or do I need to actually have findings on the

2    matter and an actual order of injunction?

3            MR. DUNN:  Your Honor, we are not prepared to agree to

4    that.

5            THE COURT:  Okay, fine.

6            Then, given what I've heard at this hearing, which

7    includes the rather curious timing and the remarkable speed of

8    the filing of your FOIL request and its response while they

9    were in discussion, hoping to forestall litigation, I am

10   ordering you not to disclose those materials any further than

11   you have internally or externally.  And I am ordering you to

12   advise those to whom you have disclosed them to not disclose

13   them further.  And if we have to have additional proceedings on

14   that, that's fine; you can write more substantial papers, and

15   we'll have a proceeding for that.  For now, that is the

16   temporary injunction.

17           Proceeding now to the law which explains what I have

18   just done:

19           A party seeking a temporary restraining order or a

20   preliminary injunction must show irreparable harm and either a

21   likelihood of success on the merits or sufficiently serious

22   questions going to the merits to make them a fair ground for

23   litigation and a balance of hardships tipping decidedly toward

24   the party requesting the preliminary relief.  I am quoting here

25   from Cacchillo v. Insmed, a Second Circuit decision reported at

1      638 F.3d 401.  Another example would be Waldman Publishing

2      Company v. Landoll, Incorporated, using the standard in the

3      context of a temporary restraining order.

4              Many courts have found, and have identified, the

5      showing of irreparable harm as the single most important

6      prerequisite for the issuance of a temporary restraining order.

7      And such harm must be shown to be imminent and not remote or

8      speculative and the alleged injury must be one incapable of

9      being fully remedied by monetary damages.  As one example of

10     that, I cite Local 1814, International Longshoremen's

11     Association v. New York Shipping Association, 965 F.2d 1224

12     (2d Cir. 1992).  And likelihood of success on the merits does

13     not require that the party demonstrate that it is an absolute

14     certainty, only that the probability of prevailing is better

15     than 50 percent.  On that last point, I am citing to and

16     quoting from Abdul Wali v. Coughlin, 754 F.2d 1015 (2d Cir.

17     1985).  To me, this particular motion rises and falls on the

18     irreparable harm element, and as I read through the papers of

19     both sides, which were very well written, especially given the

20     time crunches each side had, I was reminded of metaphors which

21     kept coming to mind involving horses, and barns, and milk that

22     is spilled and bells that have been rung, but the point of the

23     metaphors, and the reason they have relevance to this analysis,

24     is that if I don't stay -- at least enter a temporary

25     restraining order -- it would seem to me that the case is over.

K7MKUFOC

And it also, I've now been told, would have a dramatically
deleterious impact on the related arbitration.

Defendants don't actually really engage on this point.
They argue, instead, that any such harm would not be
irreparable or that it would be speculative, but accepting as
true the well-pleaded allegations of plaintiffs' pleading, and
reviewing the materials that I have received, and talking to
counsel today, I can't agree with that proposition.  I believe
there to be serious issues that transcend reputation, that
affect employment, that affect safety, and I am accepting those
harms as not speculative and imminent for purposes of today's
proceeding.  I'm not going to say that all of plaintiffs'
claims have equal traction, but I am going to say that they
have raised sufficiently serious questions going to the merits,
particularly on the contractual claims, and perhaps less so on
the constitutional claims, that a TRO is warranted.

Conversely, I do believe the public interests are not
disserved by any such TRO, and I don't believe that the
defendants are harmed by a brief delay in implementing the
disclosures that they've contemplated making post repeal of
50-a if, indeed, we ultimately conclude that the plaintiffs
have alleged a viable claim.

The next issue for me is that of discovery.  But,
actually, before I get to that, I do have to, I suppose, speak
about injunctive relief.  So, it was easy enough to say don't

K7MKUFOC

1    disclose anything further, but now I understand that the CCRB

2    has done just that.  So, I'm going to have to order them to

3    change their trial calendars to go back to the way that it was

4    prior to the repeal, where there was a date, a precinct, and an

5    incident as described using the FADO, F-A-D-O, metric, without

6    reference to the name of the officer.  And I'm sure they will

7    be able to do that promptly.

8         So then the next issue is that of discovery, and I

9    must say my initial inclination was not to schedule discovery,

10   but given what has become evolving answers to questions that

11   I've posed during this proceeding, including an evolution of an

12   answer while I was on a break writing this opinion, and

13   accepting, as well, plaintiffs' counsel's assertion that he

14   received still different answers when he asked the questions of

15   affected parties, and when folks affiliated with his clients

16   made those requests of the affected parties, I'm going to allow

17   limited discovery over the next approximately two weeks, to

18   conclude on August 7th of 2020.  To my mind, the areas of

19   discovery that matter include the following:  A final answer

20   from each of the organizational defendants concerning precisely

21   what materials are contemplated to be disclosed, in what

22   format, where they will be disclosed, and when that disclosure

23   is to take place.  And I believe, as well, there can be limited

24   discovery into the timing or the circumstances of the CCRB's

25   response to the FOIL request.  I'm candidly less interested in

K7MKUFOC

1    Mr. Dunn's request inasmuch as he basically has given me an

2    explanation of it today.  I am trying to figure out how the

3    CCRB broke land speed records in order to provide an answer to

4    it.  If the plaintiffs want additional discovery -- I

5    understand they've already propounded certain requests -- they

6    are invited to meet and confer with defendants, and they can

7    come to me with disputes, but, of course, that's got to be done

8    very quickly.

9           So the issue, then, is how long is this TRO to last?

10   Under Rule 65 of the Federal Rules of Civil Procedure, the

11   order expires at the time after entry not to exceed 14 days

12   that the Court sets unless before that time, the Court, for

13   good cause, extends it for a like period or the adverse party

14   consents to a longer extension, and the reasons for extension

15   must be entered on the record.

16          I am going out slightly longer.  The preliminary

17   injunction hearing in this case will take place on Tuesday,

18   August 18, at 2:00 p.m.  I'm going out slightly longer than the

19   14 days, for several reasons, but principally two.  The first

20   is the fact that I have allowed discovery, limited discovery,

21   in this case.  The second is that I can already foresee delays

22   and difficulties in getting that discovery and getting the

23   materials together for the preliminary injunction hearing

24   occasioned by the COVID-19 pandemic and folks who have issues

25   in getting to their offices.  So, for those reasons, I'm going

1      out slightly beyond the 14 days.

2              Now, the parties have made their cases to me orally

3      and in writing.  It may be that supplemental briefing is

4      necessary after discovery.  I suspect both sides will feel that

5      it is.  If you feel the need to submit additional briefing to

6      me, I'd ask you to keep it as simple as possible, not to repeat

7      yourself, and to submit it by August 14th of 2020.

8              Mr. Dunn, I did want to hear from you, sir, as well,

9      in connection with this proceeding.  Just looking at the

10     calendar, perhaps the 14th may not give you sufficient time,

11     but let me talk to you on that point.  It seems to me,

12     Mr. Dunn, that you don't need to consult with the parties as

13     much as to provide your organization's thoughts on the law and

14     how it should be applied to the facts of this case.

15             So, may I ask for your amicus brief, as well, on the

16     14th, or is that an impossibility?

17             MR. DUNN:  Your Honor, that is fine, of course.  But I

18     would -- if you would allow, I do ask that you give me an

19     opportunity to address the order that you have directed towards

20     us.  I did not have any opportunity to address it during the

21     arguments.  There's no briefing on this, and we are not a party

22     to this action.  The Court doesn't have any jurisdiction over

23     us.  I would like to at least be able to address to you my

24     considerations around that because I don't believe there's any

25     basis for this Court to order any relief against NYCLU at this

K7MKUFOC

1    point.

2            THE COURT:  Sir, I actually would welcome the

3    opportunity to have briefing on that.  I suspect that you're

4    not going to have any disputes with defendants.

5            Can I ask you to work with plaintiffs' counsel to put

6    together a highly expedited briefing schedule that works for

7    both of you?  And can I ask you, at least for now, to abide by

8    my instructions, even if later, I agree with you that I don't

9    have the jurisdiction to issue them?

10           MR. DUNN:  Well, your Honor, frankly, I've appeared in

11   this court -- I have not appeared before you -- I'm very

12   mindful of a request like that, but I'm sure, as you

13   appreciate, we are not a party to this litigation.

14           THE COURT:  All right.

15           MR. DUNN:  I don't think it's a novel thought to

16   say -- I say this with all due respect -- the Court doesn't

17   have any jurisdiction over the NYCLU as a nonparty, and so I

18   would submit to you that I understand what you're saying and

19   the request, but I don't believe there's any basis for any

20   valid order, given we're simply not a party.

21           THE COURT:  I'm going to ask you, please, to never use

22   the construction "with all due respect" whenever speaking with

23   me because that always is followed by some expression of

24   disrespect.  So just don't do it.

25           MR. DUNN:  Okay.

K7MKUFOC

1       THE COURT:  Give me something tomorrow, and I'll get

2   something from plaintiffs, if plaintiffs want to say anything

3   within a day, and I'll rule on it.  I do want to hear from you

4   on it, sir, most definitely.

5       MR. DUNN:  Okay.  Well, I will do that, of course, but

6   I guess what I am saying to you is, right now, the Court, as

7   far as we are concerned, has no jurisdiction over us

8   whatsoever.

9       THE COURT:  Okay.

10       MR. DUNN:  And an order from you, I don't believe

11   there's any basis for that to have any legal effect since we

12   are a stranger in terms of being a party to the Court.

13       THE COURT:  I do understand your position, sir.  I

14   want to see it executed in writing.  Are you willing to do

15   that?

16       MR. DUNN:  Of course.

17       THE COURT:  All right.

18       I know, and you're going to keep telling me, we're

19   going to get into an infinite loop here, sir.  I appreciate

20   your view that I have no jurisdiction -- I might even come to

21   agree with you -- I want to see something, I want to have

22   something other than an hour or two of oral argument on things

23   that don't quite necessarily touch on this issue, sir.

24       MR. DUNN:  I understand completely.  I'm put in a very

25   awkward position because you are issuing something you are

K7MKUFOC

1    describing as an order that binds the NYCLU and -- well, you

2    understand our position.  So I hear what you're saying.  We

3    will, of course, submit something tomorrow, but I must say, in

4    all my years of practice, I've never faced this situation where

5    we have a Court directing us to do something when we are not a

6    party to a litigation or a case that is actually before the

7    Court.

8         THE COURT:  No, sir, sure.  I guess the issue is

9    earlier on in my decision, I did make a factual finding that

10   you were acting in concert with the defendants, and I thought

11   that would have been enough.

12        MR. DUNN:  I see.  Okay.  I didn't understand you to

13   be making that finding.

14        THE COURT:  Oh, no, I am, I am.  It is made.  And if

15   that changes your arguments, that's fine, too.

16        So, are you technically a party to this litigation,

17   sir?  You are not.  Did I making a finding that you are acting

18   in concert with the defendants on disclosure of this

19   information?  I did.

20        MR. DUNN:  Okay.

21        THE COURT:  All right.  But if you want to write me

22   about why that's absolutely wrong, sir, it's not my intention

23   to get things wrong, it's my intention to get things right, but

24   I certainly would like to hear from you before making any

25   further decision.

K7MKUFOC

1          MR. DUNN:  Okay.  I appreciate that.  We will submit

2     something tomorrow.

3          THE COURT:  Thank you.

4          On the larger issue, the amicus brief by the 14th of

5     August, that is still something that works for you, sir?

6          MR. DUNN:  Yes, your Honor.

7          THE COURT:  Okay.  Thank you.

8          Moving along, Mr. Coles, is there anything that

9     remains open?

10          MR. COLES:  No, thank you, your Honor, nothing from my

11     end.

12          THE COURT:  Ms. Saint-Fort, is there anything that

13     remains open?

14          MS. SAINT-FORT:  Yes, your Honor.  I just want to

15     clarify basically repeating the limited scope of discovery that

16     your Honor is permitting in this case, that, one, the final

17     answer concerning what each individual agency will be

18     disclosing and the CCRB's response to the FOIL request.

19          THE COURT:  Yes.

20          Now, those are the two things that I've authorized.

21     What I did say at the end of that was that if Mr. Coles made an

22     argument that I accepted for additional discovery, I reserve

23     the right to expand it, but those -- in listening to you all

24     today, those were the two things I thought discovery was needed

25     on, and I didn't think it was needed on other things.

K7MKUFOC

 1          But --

 2          MS. SAINT-FORT:  Okay.

 3          THE COURT:  -- what I'm saying is, if he comes -- I

 4    imagine you've been given discovery requests.  If there is a

 5    meet-and-confer to say to him, well, Failla didn't list it in

 6    her two things that she allowed, that's true.  Never having

 7    seen the request, I'm allowing myself and reserving for myself

 8    the possibility of expanding and having a third or a fourth

 9    thing, but for now, based on what I heard today, it was only

10    those two things.

11          MS. SAINT-FORT:  Understood.  So if there's anything

12    that is requested beyond those two things, it must first be

13    addressed with your Honor, if I'm understanding correctly?

14          THE COURT:  No, no, no, then I'm not being clear.  So

15    let me be more clear.

16          MS. SAINT-FORT:  Okay.

17          THE COURT:  I have told you the two things that I want

18    discovery on.  I understand now that you have, and I don't

19    have, a list of discovery demands from plaintiffs' counsel.  Am

20    I correct in that regard?

21          MS. SAINT-FORT:  That is correct.

22          THE COURT:  Okay.

23          I'm asking you to meet with him in good faith to

24    discuss those requests, and to not reflexively say, Failla

25    didn't allow it, therefore, we cannot do it.  So, that might

K7MKUFOC

mean that the two sides agree that there may be something else

that is warranted.  If you do not feel that way, if there is a

dispute, I will hear the dispute.  I don't know that I will

agree with the plaintiffs, but I'm just leaving open the

possibility that I might allow slightly more discovery than I

just authorized in this order.

         Is that clearer?

         MS. SAINT-FORT:  That is clearer.

         I just want to note we have seen draft requests from

plaintiffs, but I'm not sure if they will amend those given

your directive.

         THE COURT:  It would be my hope -- and I know

Mr. Coles is listening, so he's a thoughtful gentleman -- that

discovery would be extremely limited, in light of everything

I've heard today, other than on the two topics that I've

mentioned, but perhaps there are other things I'm just not

thinking about.

         MS. SAINT-FORT:  Understood.  Thank you, your Honor.

         THE COURT:  Okay.  Thank you.

         And, Ms. Saint-Fort, with that, is there anything else

that I need to do today?

         MS. SAINT-FORT:  Nothing else from defendants.

         THE COURT:  Okay.

         All right.  Given that, I'm going to let everyone go.

I'm sure I'll be seeing things from the parties in the near

K7MKUFOC

1    term.  I thank you very much for your attention and for coming

2    back to a second call.

3              And we are adjourned.  Good evening, and be safe.

4    Thank you.

5              MS. SAINT-FORT:  Thank you, your Honor.

6              MS. QUINN:  Thank you, your Honor.

7                              * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit C



New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
www.nyclu.org

Christopher Dunn
Legal Director

VIA ECF

July 23, 2020

Honorable Katherine Polk Failla
United States District Judge
United States District Court Southern District of New York
40 Foley Square
New York, N.Y. 10007

Re: *Uniformed Fire Officers Assoc. v. de Blasio*, 20 Civ. 5441 (KPF)

Dear Judge Failla:

On behalf of the New York Civil Liberties Union, we write to request that the Court modify the temporary restraining order it issued last night to remove the provision that bars the NYCLU from publishing information about police misconduct it received from the New York City Civilian Complaint Review Board pursuant to a Freedom of Information Law request. The NYCLU submits that the July 22 Order is invalid for two independent reasons.

Most importantly, the Court's Order constitutes a prior restraint that violates the First Amendment. Consistent with its long history of releasing information obtained through open-records requests, the NYCLU had planned to make public the CCRB database today, along with a tool the public could use to search the database and the NYCLU's initial analysis of the contents of the database. This planned publication is of particular significance given the ongoing national controversy over police misconduct and the recent repeal of the state law that previously barred the release of this type of information. Under long-standing Supreme Court law, the First Amendment bars the prior restraint of the NYCLU's publication of this critically important information, no matter what concerns the Court may have about the speed with which the CCRB processed the NYCLU's FOIL request.

Beyond this grave First Amendment violation, the Court lacks authority under Rule 65 to extend its temporary restraining order to the non-party NYCLU. While Rule 65 does authorize issuance of temporary restraining orders against non-parties who are acting in concert with parties, that addresses enforcement only of extant orders and does not reach actions that occur before any judicial relief has been entered.

**1. The Order Is an Unconstitutional Prior Restraint on Speech.**

The July 22 Order is a prior restraint on the NYCLU's core First Amendment-protected speech. Prior restraints constitute "the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and are subject to a

"'heavy presumption'" against constitutional validity, *United States v. Quattrone*, 402 F.3d 304, 310 (2d Cir. 2005) (quoting *Bantam Books, Inc v. Sullivan*, 372 U.S. 58, 70 (1963)).[1] Such restraints are permitted only in "exceptional cases" and are subject to "exacting review." *Quattrone*, 402 F.3d at 310–11. "Even where questions of allegedly urgent national security, or competing constitutional interests are concerned, [the Supreme Court has] imposed this 'most extraordinary remed[y]' only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures." *CBS, Inc. v. Davis*, 510 U.S. 1315, 1317 (1994) (Blackmun, J., in chambers) (citing *New York Times Co. v. United States,* 403 U.S. 713 (1971) (*"Pentagon Papers"*) and *Nebraska Press Ass'n*, 427 U.S. at 559). And the Second Circuit has noted that "[w]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech . . . increases." *Met. Opera Ass'n v. Local 100*, 239 F.3d 172, 176-77 (2d Cir. 2001).

The NYCLU has a long history of obtaining important information from the government and making it public for purposes of public education and advocacy. Declaration of Christopher Dunn ¶¶ 3-4 (July 23, 2020) ("Dunn Decl."). The July 22 Order restrains the NYCLU, a non-party, from publishing information of deep public concern regarding the conduct of government officials at a moment when there is significant momentum for legislative reform and accountability and national attention to police misconduct. After obtaining the CCRB spreadsheet on July 14 through a FOIL request, NYCLU staff immediately started to work with the database to prepare the information for public release. *Id*. ¶ 8. This included creating a tool that would make it easy for members of the public to search the database. *Id.* ¶ 9. The NYCLU was ready to make the search tool available to the public at noon today, Thursday, July 23, 2020. In conjunction with that publication, the NYCLU intended to release information about initial analysis it had done of the database during the brief period it had needed to do the technical work to make the information available. *Id.* ¶ 10. The NYCLU also planned to provide to the public the ability to download the database itself so they could do whatever analysis they wished to. *Id.* The July 22 Order "deprives the public of specific news" that is "already known" to the NYCLU. *See In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir. 1988) (describing this deprivation of news as "[t]he most offensive aspect of a prior restraint").

*Pentagon Papers* squarely establishes that the restraining order imposed on the NYCLU violates the First Amendment. In *Pentagon Papers*, the Supreme Court upheld the right of the press to publish information of national concern obtained from documents stolen by a nonparty. *See* 403 U.S. at 714. As the Court recognized in *Bartnicki v. Vopper*, 532 U.S. 514 (2001), in denying an injunction against publication, *Pentagon Papers* "resolved a conflict between the basic rule against prior restraints on publication and the interest in preserving the secrecy of information that, if disclosed, might seriously impair the security of the Nation." *Id.* at 528. The concurring justices of the *Pentagon Papers* Court concluded that exceptions to the rule of prior restraints were exceedingly narrow and could rarely be justified. *See, e.g.*, 403 U.S. at 730 (Stewart J., concurring) (no prior restraint where disclosure not shown to "surely result in direct, immediate, and irreparable damage to our Nation or its people").

---

[1] Indeed, the Supreme Court has explained that this presumption has special force because the press "guards against the miscarriage of justice by subjecting *the police*, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Nebraska Press Ass'n*, 427 U.S. at 560 (citing *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966) (emphasis added).

By stark contrast in this case, the plaintiffs' claimed risk, *at most*, involves generalized concerns of the safety of police officers and this Court did not make any specific findings of concrete and immediate harm that will result. *See* TRO Hr'g Tr. at 82:9-1 (July 22, 2020) (finding "serious issues that transcend reputation, that affect employment, that affect safety," which the court accept[ed] . . . as not speculative and imminent for purposes of today's proceeding"). Such harms do not establish the "exceptional" circumstances justifying the extraordinary measure of a prior restraint. *See Quattrone*, 402 F.3d at 310. Accordingly, this prior restraint cannot overcome the "heavy presumption" of invalidity.

Furthermore, Supreme Court precedent makes clear that even if the CCRB acted unlawfully in disclosing information and even if the NYCLU knew or had reason to believe the action was unlawful (which it did not), the First Amendment prohibits the punishment—much less enjoining— of the NYCLU's publication of that information. *See Bartnicki*, 532 U.S. 514 (holding that knowing recipient of illegally intercepted recording on matter of public concern could not be held liable for its publication); *Pentagon Papers*, 403 U.S. 713 (upholding right of newspapers to publish leaked classified study related to Vietnam War); *see also Democratic Nat'l Comm. v. Russian Fed'n*, 392 F. Supp. 3d 410, 430–38 (S.D.N.Y. 2019) (recognizing that under *Bartnicki* the defendants were entitled to publish stolen documents requested from hackers provided they did not participate in hacking); *Republic of Kazakhstan v. Does 1-100*, No. 15-cv-1900 (ER), 2015 WL 6473016, at *2-*3 (S.D.N.Y. Oct. 27, 2015) (clarifying that injunction against hackers did not prohibit news organization from republishing hacked documents because there was no evidence organization was involved in hacking); *Jean v. Massachusetts State Police*, 492 F.3d 24 (1st Cir. 2007) (First Amendment prohibited state from interfering with activist's publication of illegally recorded video of state police where the activist had reason to know of illegality but did not make the recording).

Accordingly, the First Amendment requires that the Court modify its July 22 Order to not restrain the NYCLU from publishing to the public the CCRB information it obtained on July 14.

### 2. The Restraining Order Exceeds the Court's Authority Under Rule 65.

Rule 65 of the Federal Rules of Civil Procedure defines this Court's authority to issue temporary restraining orders, and it does allow for extending such order to nonparties "who are in active concert or participation with" a defendant. *See* Fed. R. Civ. Proc. 65(d)(2). In extending its restraining order to the NYCLU, the Court stated it had found that the NYCLU had acted in concert in with the defendants in light of the speed with which the CCRB processed the NYCLU's FOIL request.[2] While the NYCLU submits that no basis exists for concluding it acted in concert with the CCRB, Rule 65 does not reach actions that precede the entry of judicial relief, as is the undisputed situation here.[3]

---

[2] The NYCLU is non-government, not-for-profit advocacy organization, *see* Dunn Decl. ¶ 2, not affiliated with the defendants and is therefore not subject to any of the collective bargaining agreements, settlements, or constitutional provisions cited as the bases for plaintiffs' claims.

[3] A non-party acts in concert if the "third party 'aided and abetted' the party subject to the injunction," which requires showing "that the non-party had actual knowledge of the judicial decree and violated it, and that the challenged action was taken for the benefit of, or to assist, a party subject to the decree." *Spin Master Ltd. v. 158*, No. 18-CV-1774 (LJL), 2020 WL 2766104, at *20 (S.D.N.Y. May 28, 2020) (quoting *Arista Records, LLC v. Tkach*, 122 F. Supp. 3d 32, 36 (S.D.N.Y. 2015) (citation omitted)). The only evidence before this Court of *any* relationship between the

As the Supreme Court explained in *Regal Knitwear Co. v. N.L.R.B.*, 324 U.S. 9 (1945), Rule 65(d)(2) is meant to codify the common law doctrine that "defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* at 14. But this has no application to acts that occurred before any decree has been issued (much less before any proceeding was instituted). *See Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 833 (2d Cir. 1930) (Hand, L.) ("[T]he only occasion when a person not a party may be punished is when he has helped to bring about, not merely what the decree has forbidden, . . . but what it has the power to forbid, an act of a party."); *United Pharmacal Corp. v. United States*, 306 F.2d 515, 517 (1st Cir. 1962)(explaining that a past collaboration or contractual relationship prior to the preliminary injunction is not controlling).

The NYCLU submitted its FOIL request on July 9, 2020. Dunn Decl. ¶ 7. The City has informed the Court that the CCRB responded to the request on July 13, and the NYCLU received that response by email through the standard New York City portal for such requests at 12:33 p.m. on July 14. *Id.* ¶ 8. The initial state court order in this case, however, was not issued until July 15 (and as the NYCLU understands it, the case was not even filed until after the NYCLU had received the database). *See* ECF No. 12-1. Consequently, when the NYCLU received the documents, no judicial order was in place such that any interactions between the NYCLU and the CCRB could, under Rule 65, constitute active concert. *See ONE11 Imports Inc. v. NuOp LLC*, No. 16-CV-7197 (JPO), 2016 WL 7338422, at *2 (S.D.N.Y. Dec. 19, 2016); *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 375 (S.D.N.Y. 1998) (collecting cases).

In *One11 Imports Inc.*, Judge Oetken considered whether the preliminary injunction he had issued forbidding defendants from "advertising, promoting, marketing, selling, and/or distributing products that bear the name 'My Marquee Lightbox'" also enjoined nonparty resellers who had obtained the products prior to the injunction. *ONE11 Imports Inc*, 2016 WL 7338422, at *1-*2. He held that because the defendant's sale of the infringing to the nonparties took place before the entry of the injunction, the "Court's preliminary injunction Order does not, therefore, 'reach backwards in time to action taken prior to the time it was issued.'" *Id.* (quoting *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 375 (S.D.N.Y. 1998)); *see also Herrlein v. Kanakis*, 526 F.2d 252, 255 (7th Cir. 1975) (nonparties not bound by injunction because the transfer of assets "occurred before the lawsuit against [the defendants] was initiated and thus could not have been undertaken to defy the court's order."); *O & L Assocs. v. Del Conte*, 601 F. Supp. 1463, 1464 (S.D.N.Y. 1985) (Weinfeld, J.) (non-party Columbia Pictures not bound by injunction even where it had entered into licensing agreement after lawsuit had commenced and plaintiffs had filed their motion for preliminary injunctive relief but before the injunction was issued).

So too here, the NYCLU received the spreadsheet prior to the suit in this matter and the entry of the state supreme court's restraining order on July 15 and this Court's July 22 Order, and thus there was no party with which the NYCLU could be in active concert. This Court's restraining order

---

NYCLU and the defendants is that the NYCLU received a response to its July 9 records request from the CCRB on July 14. Dunn Decl. ¶ 8. Even assuming the timing of the response reflected undue speed by the CCRB, this does not suggest that the challenged action was taken for the benefit of or to assist a party to violate a court order.

therefore exceeds the authority that Rule 65 confers.

\* \* \*

For the foregoing reasons, the NYCLU respectfully requests that this Court modify its July 22 Order to the extent that the Order restrains the NYCLU from disclosing the information it received from the CCRB on July 14, 2020.

Respectfully submitted,

*/s/Christopher Dunn*
Christopher Dunn
Molly K. Biklen
Jordan Laris Cohen
NEW YORK CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300
cdunn@nyclu.org

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNIFORM FIRE OFFICERS ASSOC., et. al,     :
                            `               :
            Plaintiffs,           :
                                     :
     -versus-                  :       20 Civ. 5441 (KPF)
                                     :
BILL DE BLASIO, et. al,             :
                                   :
           Defendants.         :
-------------------------------------------------------------x

## <u>DECLARATION OF CHRISTOPHER DUNN</u>

     I, Christopher Dunn, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am the legal director of the New York Civil Liberties Union. I submit this declaration in support of the NYCLU's request that the Court remove the NYCLU from the temporary restraining order it issued in this matter on July 22, 2020.

2.     The NYCLU is a non-partisan, not-for-profit advocacy organization that is the New York State affiliate of the American Civil Liberties Union. Founded in 1951, the NYCLU now has about 120,000 members and supporters with nine offices around New York State.

3.     For decades the NYCLU has been involved in work to promote government accountability and transparency. An important part of that work has been directed at law-enforcement agencies, most notably the New York City Police Department. This work has included litigation, legislative advocacy, and public education.

4.     The NYCLU routinely files requests for documents and data sets under the New York Freedom of Information Law and the federal Freedom of Information Act. It also regularly releases to the public the information it obtains through its FOIL and FOIA

requests as part its advocacy and public-education. It also produces and makes public reports it prepares as the result of obtaining such information. To take one relevant example, the NYCLU filed a FOIL request in 2007 seeking the NYPD's database of stop-and-frisk activity; filed suit and prevailed when the NYPD refused to produce the database, *see NYCLU v. NYPD*, Index No. 115154/07 (May 29, 2008) (ordering production of database); and then published an extensive report based upon the database it obtained, *see* https://www.nyclu.org/sites/default/files/field_documents/20190314_nyclu_stopfrisk_singles.pdf

5. As part of its police-accountability work, the NYCLU has been deeply involved in civilian oversight of the NYPD. The NYCLU played a leading role in advocating for the passage of the 1993 legislation that created the Civilian Complaint Review Board (CCRB) as an independent agency and has committed substantial resources to monitoring the CCRB's work since then. We have issued many reports about the agency's work, and I have attended monthly meetings of the CCRB for nearly 20 years. As a result of this work, I have extensive knowledge of CCRB operations, including its data systems.

6. The NYCLU also has done substantial work concerning section 50-a of New York's Civil Rights Law. In its FOIL work the NYCLU frequently encountered government agencies invoking section 50-a, and the NYCLU has brought several cases challenging the application of section 50-a to its FOIL requests. The NYCLU also was centrally involved in the recent repeal of section 50-a by the New York State Legislature.

7. The repeal of section 50-a made publicly available vast amounts of records and data bearing on police accountability that previously had been secret, including large amounts

of information I have known to be in the possession of the CCRB. On July 9, 2020, I

submitted a FOIL request seeking the CCRB's database the contains information about

complaints filed by civilians about misconduct by NYPD officers. I attach a true copy of

the request as Exhibit A.

8.    At 12:33 p.m. on July 14, 2020, I received by email a response to my FOIL request, and

that email included a link to download an Excel spreadsheet. I attach a true copy of that

email as Exhibit B.

9.    After downloading and reviewing the spreadsheet, NYCLU staff immediately started to

work with the database to prepare the information for public release. This included

creating a tool that would make it easy for members of the public to search the database.

10.   The NYCLU was ready to make the search tool available to the public at noon today

(Thursday, July 23, 2020) so that searches could commence. In conjunction with that, the

NYCLU planned to release information about initial analyses it had done of the database

during the brief period it had needed to do the technical work to make the information

available to the public. The NYCLU also planned to provide to the public the ability to

download the database to do whatever analysis they wished to.

11.   As a result of the temporary restraining order the Court issued the evening of July 22, the

NYCLU is barred from making to the public the information it had been prepared to

release today. It intends to proceed with its plans to public this information as soon as the

order is lifted.

Christopher Dunn

Dated: July 23, 2020
       New York, N.Y.

3

# EXHIBIT A



New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
www.nyclu.org

Christopher Dunn
Legal Director

VIA ELECTRONIC MAIL

July 9, 2020

Jonathan Darche
Executive Director
New York City Civilian Complaint Review Board
100 Church Street
New York, N.Y. 10007

*Re:* Request for NYPD Officer Allegation Histories

Dear Mr. Darche:

On behalf of the New York Civil Liberties Union, I write to request, pursuant New York's Freedom of Information Law (FOIL), that the CCRB produce from the agency's case tracking system the complete allegation histories of every active and retired member of the New York City Police Department. Given the extraordinary importance of this information to current public debates about police misconduct, it is imperative this information be made available as quickly as possible, and we therefore ask the CCRB to respond to this request immediately. And because these records are maintained in readily-accessible electronic form, I assume they can be produced quickly and efficiently.

To the extent you have any questions about this request, please let me know. Otherwise, I ask that you assure that the CCRB responds to this request as soon as possible.

Sincerely,

Christopher Dunn

# EXHIBIT B

**From:** donotreply@records.nyc.gov <donotreply@records.nyc.gov>
**Sent:** Tuesday, July 14, 2020 12:33 PM
**To:** Chris Dunn <cdunn@nyclu.org>
**Subject:** [OpenRecords] Response Added to FOIL-2020-054-00281 - File

Chris Dunn,

Below is a link to a .csv file for all CCRB officer histories, as requested in your July 9, 2020 FOIL request. To facilitate the production of this file, I am sending it via the OpenRecords portal, as it is too large a file to email directly.

The file(s) listed below will not be publicly available on the OpenRecords portal.

- CCRB Officer Histories: OfficerHistories_2020-07-14.csv

Please visit FOIL-2020-054-00281 to view additional information and take any necessary action.

If you have trouble accessing the file, please let me know.

Sincerely,

Jacqueline Levy, Esq.

Records Access Officer

# Exhibit D



**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

Anthony Paul Coles
T (212) 335-4844
E anthony.coles@us.dlapiper.com

July 24, 2020

*VIA ECF*

Hon. Katherine Polk Failla
United States District Court, Southern District of New York
40 Foley Square
New York, NY 10007

**Re:** *Uniformed Fire Officers Association, et al. v. Bill DeBlasio, et al.*
**20-cv-05441 (KPF)(RWL)**

Dear Judge Failla:

We write in response to Christopher Dunn's letter to the Court of July 23, 2020, and to oppose the application of the New York Civil Liberties Union ("NYCLU") to modify the temporary restraining order Your Honor issued on July 22, 2020. (*See* ECF No. 16.)

The Court properly entered a TRO against the NYCLU because it was acting in concert with the Defendants to release Unfounded and Non-Final Allegations affecting 81,000 police officers, and to undermine the rights of those officers. It is immediately apparent that Mr. Dunn's letter omits any recitation of how the NYCLU obtained these Unfounded and Non-Final Allegations from the Civilian Complaint Review Board ("CCRB") at warp speed. In light of the Court's finding that the circumstances include "rather curious timing," and given that the production of the CCRB records occurred while the parties "were in discussion, hoping to forestall litigation," that omission by the NYCLU is glaring. (*See* Transcript of July 22, 2020 court conference ("Tr.") at 80:8-12.)

Further, Plaintiffs have outstanding discovery to the Defendants to obtain documents and other information relating to the release of the CCRB records to the NYCLU at a pace which "broke land speed records." (Tr. at 84:2-3.) As the Court already has determined, if the NYCLU carried out its threat to release the Unfounded and Non-Final Allegations, there would "be serious issues that transcend reputation, that affect employment, that affect safety" which are "not speculative and [are] imminent…." (Tr. at 82:9-11.) Even worse, as the Court is aware from Plaintiffs' letter filed earlier today, the Defendants are slow-rolling the production of the discovery in this matter, and have refused to even engage in a substantive "meet and confer" concerning when (or if) the demanded documents will be produced. (*See* ECF No. 21.) There is no reason to grant the NYCLU's application to set aside the TRO – which application the NYCLU ironically alleges is in the name of transparency – where the NYCLU and the Defendants seek to shroud their own conduct in secrecy, and have, by all appearances, schemed



Hon. Katherine Polk Failla
July 24, 2020
Page Two

together to try to undermine the collective bargaining rights, constitutional rights and contractual rights of the Plaintiffs. Contrary to Mr. Dunn's letter, this Court plainly had the authority to bind the NYCLU with its TRO ruling.

The relevant chronology also is devastating to any assertion that the NYCLU and Defendants were acting in good-faith. As confirmed by the Court at the July 22 Conference, the NYCLU propounded its FOIL request on Thursday, July 9, 2020. Defendants then admit that "as of" Monday July 13 the CCRB produced the records of 81,000 police officers to NYCLA. (*See* ECF No. 7 at 3.) By contrast, a preliminary review of the CCRB's own website shows that it has open FOIL requests dating from May 2019, and that since July 10, 2020, *50 of the 55 FOIL requests it received remain open*, none of which are of the magnitude of the wholesale, indiscriminate document release given to NYCLA. (City of New York, Open Records Requests, https://a860-openrecords.nyc.gov/request/view_all (last visited July 24, 2020)).

After speaking to Mr. Dunn on the record, this Court made a specific finding that a TRO against the NYCLU was necessary to prevent irreparable harm to plaintiffs. This finding was based on Mr. Dunn's own testimony regarding: (i) information within the NYCLU's control, received from the CCRB just last week; (ii) the NYCLU's intention to immediately that information; and (iii) an analysis of the potential impact of the release of that data on plaintiffs and on this litigation. This Court had the authority, as well as the responsibility, to temporarily restrain the NYCLU based upon its finding of potential harm to plaintiffs' members: the court's "power to enjoin extends to persons and organizations whose activities present a risk of irreparable harm to petitioner that cannot be alleviated by means other than injunction." *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 427 (E.D.N.Y. 2007), *aff'd Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010) (finding persons named in injunction, including those not joined as parties in underlying action, bound by its terms); *see also Hunt v. Enzo Biochem, Inc.*, 904 F. Supp. 2d 337, 347 (S.D.N.Y. 2012) (enjoining non-party to underlying action from using confidential documents obtained in violation of a protective order). The case law upon which the NYCLU relies (much of which considered whether an injunction or restraint encompassed a person or entity not named in the order, including in the context of contempt proceedings) is irrelevant here.[1]

---

[1] As the court in *Zyprexa* assessed, *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir.1930), which considered when a nonparty to injunction could be held in contempt, "does not bear on the question [of] who the court may enjoin in the first instance." *In re Zyprexa*, 474 F. Supp. 2d at 427. Importantly, the *Zyprexa* court highlighted that "[t]hose persons named in an injunction are considered 'parties' for the purpose of Rule 65(d)." *Id.* at 419 (citing *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 775 (1994)); *see also Havens v. James*, 435 F. Supp. 3d 494, 503 (W.D.N.Y. 2020) (Rule 65 binds "the parties to the injunction"). The remaining case law the NYCLU cites is also inapposite. *See, e.g., U.S. Pharmacal Corp. v. U.S.*, 306 F.2d 515, 517 (1st Cir. 1962) (nonparty could not be



Hon. Katherine Polk Failla
July 24, 2020
Page Three

Moreover, Rule 65 applies the scope of a restraining order to those with notice of the order and "other persons who are in active concert or participation with" the bound party, or any of its officers, agents, servants, employees, and attorneys.  Fed. R. Civ. P. 65(d)(2). This rule codifies the common-law doctrine that parties "'may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'"  *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195 (2d Cir. 2010) (quoting *Regal Knitwear Co. v. Nat'l Labor Relations Bd*., 324 U.S. 9, 14, 65 S. Ct. 478, 89 L. Ed. 661 (1945)). The NYCLU already has appeared and had its rights adjudged by this Court. And, as this Court found, the NYCLU and the CCRB were acting in concert to render this entire proceeding a nullity and an empty ritual. *See* Minute Entry, July 22, 2020; *see also* Tr. at 88:9-19.

With respect to the NYCLU's First Amendment argument, this Court's temporary restraining order prevents private parties from acting in concert with Defendants to enable the CCRB and other New York City Defendants to evade the law.  Upon the evidence presented during Wednesday evening's conference, this Court affirmatively found that the NYCLU was acting in concert with the CCRB.  "Did I make a finding that you are acting in concert with the defendants on disclosure of this information?  I did." (Tr. at 88:17-19; *see also* Tr. at 79:13-15 (". . . I am granting the [TRO], and I am enjoying the defendants and *anyone acting in concert with them* from publicly disclosing these materials").  The NYCLU fails to cite any case involving a restraint imposed by a court to prevent a party from acting in concert with a government entity to enable the government entity to violate the law, including violating Constitutional rights.

Even if the NYCLU may assert the right to free speech under these circumstances (which it cannot), the Court must balance this interest against Plaintiffs' rights under the Due Process Clause to notice of their inclusion in the database and an opportunity to contest it.  (See ECF No. 10-12 at 13-18 (explaining how dissemination will sufficiently impair the liberty interests of the identified officers so as to warrant due process protections).)  The Supreme Court has

---

held in contempt as aider or abettor of named party absent showing that it was identified with the named party); *Herrlein v. Kanakis*, 526 F.2d 252, 254 (7th Cir. 1975) (nonparty not named in injunction could not be held in contempt as aider or abettor of named parties absent evidence of named parties' violation);*O & L Assocs. v. Del Conte*, 601 F. Supp. 1463, 1464 (S.D.N.Y. 1985) (injunction did not bind unnamed nonparty absent showing of active concert or participation); *ONE11 Imports Inc. v. NuOp LLC*, No. 16-CV-7197 (JPO), 2016 WL 7338422, at *2 (S.D.N.Y. Dec. 19, 2016) (injunction did not encompass nonparty retailers or distributors not named in the original injunction); *Spin Master Ltd. v. 158*, No. 18-CV-1774 (LJL), 2020 WL 2766104, at *20 (S.D.N.Y. May 28, 2020) (declining to extend injunction to third parties not before the court and not in privity with the named party); *Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 25 F. Supp. 2d 372, 375 (S.D.N.Y. 1998) (injunction did not encompass nonparty retailers and distributers not shown to be in active concert or participation with restrained party).



Hon. Katherine Polk Failla
July 24, 2020
Page Four

expressly approved of balancing free speech rights against other individual rights in other contexts, such as the Sixth Amendment right to a fair trial, a similarly important constitutional interest. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *In re Application of Dow Jones & Co., Inc.*, 842 F.2d 603, 608 (2d Cir. 1988) (affirming order restraining trial participants from speaking with press in corruption case where defendants' right to a fair trial was threatened).  Plaintiffs are aware of no case allowing a party to act in concert with a government entity to enable the government entity to violate the law and the Constitutional rights of others. *Cf. Nebraska Press Ass'n*, 427 U.S. at 561 ("The authors of the Bill of Rights did not undertake to assign priorities as between the First Amendment and Sixth Amendment rights, ranking one as superior to the other.").  Here, there is no alternative to the TRO imposed by this Court, which is the only means for protecting and preserving Plaintiffs' Constitutional rights, which stand to be violated by the very act contemplated by the NYCLU in the wholesale dumping of the CCRB database in the public realm.  Any free speech right of the NYCLU must yield to Plaintiffs' fragile due process rights, which would be immediately and permanently extinguished by the planned publication. *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again.").

Moreover, as this Court acknowledged, the release of the CCRB database by the NYCLU implicates serious safety concerns for Plaintiffs' members.  Tr. at 82:8-12 ("I believe there to be serious issues that transcend reputation, that affect employment, that effect safety, and I am accepting those harms as not speculative and imminent for purposes of today's proceeding.")  Tellingly, the NYCLU does not suggest any alternatives to the injunction.

Accordingly, this Court's Order does not constitute an improper prior restraint on the NYCLU's First Amendment rights.

Respectfully submitted,

**DLA Piper LLP (US)**

/s/ *Anthony P. Coles*
Anthony P. Coles

cc:     All counsel of record (*via* ECF)
        Failla_NYSDChambers@nysd.uscourts.gov

# Exhibit E

K7SHUNIO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNIFORM FIRE OFFICERS
ASSOCIATION, et al.,

                    Plaintiffs,

            v.                          20 Civ. 5441 (KPF)

BILL DE BLASIO, et al.,

                                        Oral Argument
                                         (Telephonic)

                    Defendants.

------------------------------x
                                        New York, N.Y.
                                        July 28, 2020
                                        2:05 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                        District Judge

                         APPEARANCES

DLA PIPER LLP (US)
     Attorneys for Plaintiffs
BY:  ANTHONY PAUL COLES
     COURTNEY SALESKI

NEW YORK CITY LAW DEPARTMENT
     Attorneys for Defendants
BY:  DOMINIQUE F. SAINT-FORT
     REBECCA GIBSON QUINN

NEW YORK CIVIL LIBERTIES UNION
     Attorneys for Amicus
BY:  CHRISTOPHER THOMAS DUNN
     MOLLY BIKLEN

K7SHUNIO

1          (The Court and all parties present telephonically)

2          THE DEPUTY CLERK:  Your Honor, in the matter of

3    Uniform Fire Officers Association, et al. v. de Blasio, et al.

4    Counsel, please state your name for the record, beginning with

5    plaintiff.

6          MR. COLES:  Your Honor, Tony Coles.  Good afternoon.

7          THE COURT:  Sir, good afternoon.  Thank you.  And who

8    is assisting you this afternoon?

9          MR. COLES:  And Courtney Saleski is with me this

10   afternoon.

11         THE COURT:  All right.  Thank you.

12         MR. COLES:  We just wanted to point out, your Honor,

13   that Ms. Saleski's *pro hac* application is pending, but subject

14   to your discretion, we would allow her to talk subject also as

15   well to that pending application.

16         THE COURT:  Of course.  I am granting the *pro hac vice*

17   application for the purposes of this proceeding.  Presumably

18   the application itself will be resolved in due course, but for

19   today, that is fine.  Thank you very much for letting me know.

20         Ms. Saint-Fort, will I be hearing from you or from

21   Ms. Quinn today?

22         MS. SAINT-FORT:  You'll be hearing from both of us,

23   but primarily Ms. Quinn.

24         THE COURT:  OK.  Thank you.

25         I'm sorry.  I'll allow both -- not really sorry, but I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7SHUNIO

1   will allow both of you to introduce yourselves.  Thank you.

2           MS. SAINT-FORT:  Good afternoon, your Honor.

3   Dominique Saint-Fort for defendants.

4           MS. QUINN:  Good afternoon, your Honor.

5           THE COURT:  Ms. Quinn.

6           MS. QUINN:  Pardon me.  Good afternoon, your Honor.

7   Rebecca Quinn for the defendant.

8           THE COURT:  All right.  Thank you.

9           Mr. Dunn, I see you as well.  Thank you very much for

10  participating today, and I see you've graduated to video now,

11  for which I am appreciative.

12          MR. DUNN:  Yes.  Thank you.  I apologize for last week.

13  Christopher Dunn for the New York Civil Liberties Union as

14  amicus.  Your Honor, I have with me today Molly Biklen who is a

15  colleague of mine.  She will not be speaking, but she is also

16  an attorney at the NYCLU.

17          THE COURT:  She is welcome.  I'm seeing her name on my

18  list of participants, so certainly she is welcome.

19          What I'd like to do today, counsel, is I'd want to

20  begin, in the first instance, with Mr. Dunn's application and

21  the materials regarding it, and then I'd like to talk to the

22  parties about discovery.

23          So, Mr. Dunn, if I may just ask a point of order, and

24  you'll excuse me.  May I refer to your organization as NYCLU or

25  should I call it something else?  I'm not so cool that I know

K7SHUNIO

1    how you refer to yourselves.

2            MR. DUNN:  Well, your Honor, as with many things in

3    life, it gets referred to both ways in our organization, so

4    whichever you prefer is fine.

5            THE COURT:  All right.  Thank you.

6            Let me tell the parties, I have received a number of

7    submissions, including some submissions today.  I believe the

8    most recent one I received was Mr. Dunn's submission to me.

9    But I believe it's something -- we're into the early 30s right

10   now.  I believe I have something from Mr. Dunn that is docketed

11   at document No. 32.  Is there someone who has filed something

12   after that?  Hearing nothing --

13           MR. COLES:  Not on behalf of the plaintiffs.

14           THE COURT:  Thank you very much.  Then hearing

15   nothing, I shall proceed.

16           Mr. Dunn, I appreciate your application, and I'll turn

17   to you in a moment, but I do want to speak to Mr. Coles about

18   this.

19           Mr. Coles, the evidence that I have before me suggests

20   that the first court order in this case did not issue until the

21   15th of July, and that was in state court.  Am I correct so

22   far?

23           MR. COLES:  That is correct, your Honor.

24           THE COURT:  All right.  Mr. Dunn very gently reminded

25   me that, in looking at Rule 65, the idea of a party being in

K7SHUNIO

1    active concert is really viewed from the perspective of the

2    time that the order is issued, and he cited to me, and I am

3    reminded as well, of Judge Oetken's decision in the case *ONE11*

4    where he noted, and cited some Second Circuit cases to this

5    point, that one does not get to look backwards.

6          The record I have before me suggests that Mr. Dunn's

7    request and its grant and the access that he received to the

8    portal both took place before the lawsuit was filed in state

9    court and before the state court judge issued the injunction.

10         Have I misstated the procedural history, sir?

11         MR. COLES:  I have a comment on the context, but that

12   is the correct procedural history.

13         THE COURT:  OK.  OK.  Well, then let me hear your

14   comment on the context, please, sir.

15         MR. COLES:  OK.  As your Honor pointed out at our

16   hearing last week, it was a finding that the ACLU acted in

17   concert based on the fact that they received expedited and

18   special treatment from the city to get a FOIL of 81,000

19   officers in two business days.  As your Honor put it, setting

20   land speed records.  They were clearly -- at that time we were

21   in discussion with the Corporation Counsel as to whether or not

22   the CCRB had actually produced any documents, and we were told

23   that they were unaware of any production, but they could not

24   commit one way or another.  We asked them several times about

25   the CCRB production, and each time they said they were unaware

K7SHUNIO

1    of any.

2            The acting in concert finding that your Honor made

3    last week is an ongoing acting in concert that the city and

4    Mr. Dunn's organization were entering into in anticipation of a

5    court proceeding and a TRO.  The city was essentially trying to

6    evade and currently is now trying to evade its obligations

7    under the law by somehow off-loading these documents to

8    Mr. Dunn's organization, and that is completely improper.

9    Mr. Dunn's organization was given essentially VIP treatment

10   over the weekend of the 13th and 14th.  The purpose of that, as

11   your Honor found, was to allow them to have access that others

12   don't typically get, and the reason for that is because the

13   city knew that a TRO is coming.  I would --

14            THE COURT:  Let's pause for a moment there, sir.

15            A couple of things in that regard.  I do very much

16   appreciate when people cite things back to me that I myself

17   have done, although it hasn't been so long that I've forgotten

18   what happened when we were last together.

19            The issue is I did make factual findings that I was

20   surprised with the speed with which Mr. Dunn or NYCLU's

21   requests was granted, and it was indeed speedy.  But the fact

22   remains it was -- the grant was done prior to there being any

23   court order prohibiting it.  So I'm about to use an expression

24   that maybe, almost certainly, is in apposite.  Close doesn't

25   count except in horseshoes and hand grenades.  But the fact is

K7SHUNIO

1    there was no court order that he was violating when he received

2    the documents based on what I've been told.

3          Now, if your concern, sir, is that the documents that

4    were given to me reflecting an answer date of the 13th of July

5    or the 14th of July were somehow fabricated, then certainly

6    I'll speak to Mr. Dunn.  I don't have any reason to believe the

7    documents before me are fabricated.  Instead, I understand your

8    argument to be that having discussions with the defendants or

9    their representatives, their counsel, about possible litigation

10   acts as effectively a court order, and that's the part where

11   Mr. Dunn tells me I was wrong.  And the more research I do, the

12   more I agree with him.

13         We can talk about the -- whether something was a nice

14   thing to do or whether it was courteous, or whatnot, but really

15   what I'm focusing on, as I look at Rule 65, is whether he was

16   acting in concert where there was an existing court order.  Let

17   me hear from you on that, please.

18         MR. COLES:  I think the answer to that question is,

19   absolutely yes.  They anticipated the court order was coming

20   down, and they continued to work together after the court order

21   was entered.  And so --

22         THE COURT:  Well, now stop right there.

23         MR. COLES:  This is actually --

24         THE COURT:  Sir, I just want to make sure.  I want to

25   understand exactly what you just said to me.

K7SHUNIO

1      I don't know how they could have anticipated a court

2  order would come down, because they didn't know what the judge

3  was going to do because two judges have had occasion to look at

4  this, and they did come to the same conclusion, but I don't

5  know that you can assume that they would have come to the

6  conclusion.  And I certainly don't think Ms. Saint-Fort would

7  say that she rolled over and allowed for this particular

8  injunctive relief to happen.  In terms of what they did

9  afterwards, I'm really focused on what they did -- I'm not sure

10  what they did afterwards.

11      But I'm back to my original point, sir, the close

12  enough point.  There was no court order.  So does that not

13  matter?

14      MR. COLES:  The question, if I would frame it, is

15  whether or not they were acting in concert to violate a likely

16  court order and whether or not that conduct continued and

17  continues today in an ongoing manner since the entry of the

18  order.  They got information on an expedited basis in

19  anticipation of the court -- in anticipation of the court

20  proceeding in, essentially, a scheme to allow the city to evade

21  its legal obligations to keep this information private.  The

22  fact that the information was not released before the court

23  order was entered indicates that this scheme actually was

24  effectively blocked by Judge Edmead's TRO and it should

25  continue to be blocked because the effect of modifying the TRO

K7SHUNIO

1   would be simply to end the substance of this case in any real

2   way.  There is no alternative to protecting the rights of our

3   clients other than the TRO that was entered.  And as your Honor

4   found, I don't want to quote back to you, but it is very

5   significant to me that for purposes of the TRO, it was imminent

6   and irreparable harm that was caused to our clients.

7          So our view of this is that there was an ongoing

8   acting in concert by the city and Mr. Dunn's organization to

9   try and evade the consequences of the TRO and evade any

10  restraint that would be on the city.

11         I would also say that we don't have all the

12  information yet.  As we have served expedited discovery to find

13  the scope of the communications between Mr. Dunn's organization

14  and the city, none of that has been produced yet, and that

15  might be very relevant as evidence to show what we believe was

16  an ongoing effort to act in concert to undermine this lawsuit.

17         THE COURT:  Mr. Coles, when you approached Corporation

18  Counsel to discuss the possibility of a lawsuit, do you believe

19  at that moment they should have perceived that not only would

20  there be a lawsuit but that there would be an injunctive order

21  as well issued against them or their clients?

22         MR. COLES:  Yes, I believe they should have understood

23  that because we were telling them we were going into court in

24  order to prevent the disclosure of what we considered to be

25  documents that were subject to privacy, collective bargaining,

K7SHUNIO

1    and other due process rights.  So, yes, they absolutely

2    understood that litigation was around the corner.

3              THE COURT:  Mr. Coles, were your clients aware prior

4    to June 12 of this year that there might be an effort to repeal

5    Section 50-a?

6              MR. COLES:  Yes, that has been going on for several

7    years, your Honor.

8              THE COURT:  Let me ask the question more pointedly,

9    sir.

10             When it happened -- I understood from our

11   conversations last week that when there were discussions in

12   June, perhaps even in May, but I think it was more in June,

13   about the repeal of Section 50-a that your clients hoped to

14   prevail upon the legislature to recognize exceptions for safety

15   or other reasons to the repeal of that provision, which would

16   suggest to me that there was at least some advance notice, and

17   it wasn't just as though people woke up one morning and the

18   repeal had taken place.

19             So there was some notice, was there not?

20             MR. COLES:  Yes, there was some back and forth between

21   our clients and the legislature and then a number of people as

22   the June 12 date approached, that's correct.

23             THE COURT:  Was there anything, sir, that prevented

24   your clients from filing a litigation on June 12 or June 13 and

25   obtaining a restraining order on that day?

K7SHUNIO

1           MR. COLES:  I don't know that there was anything that

2     prevented them except for the fact that we were not told until

3     the week before we filed, July 8, that the city was going to

4     release publicly the documents that it is trying to release.

5     In other words, what generated the lawsuit was a statement by

6     the police department and by the mayor to my clients that they

7     were beginning to create a database and release unsubstantiated

8     documents to the public.  Before then we did not have any

9     advance knowledge as to when or what was going to be released.

10          In the Andrew Quinn emergency affirmation, which is

11    one of the affirmations that was submitted in the state court,

12    Mr. Quinn goes through the meetings that he had with the city

13    in the week before the TRO was entered.  Those meetings were

14    roughly the 6th, 7th and 8th of July.  And it was not until

15    then that the plaintiffs were told that the city was going to

16    do, essentially, an indiscriminate data dump of documents.  So

17    we learned it at that time.  Yes, it is true that the law

18    passed in June 12, but the communications between the city and

19    my clients indicated that the disclosure of documents was going

20    to happen at or around -- we were told at or around July 15,

21    and that's why we filed when we did.

22          THE COURT:  Sir, you've seen today's letter from

23    Ms. Quinn regarding disclosures -- in fact, it is addressed to

24    you -- disclosures made between June 12 of 2020 and July 24 of

25    2020.  Have you not seen it?

K7SHUNIO

1          MR. COLES:  I have seen it, your Honor.

2          THE COURT:  By my reckoning, it's four pages of

3     disclosures.

4          MR. COLES:  Yeah, I'm actually shocked that this was

5     not disclosed to the Court or to us at the hearing last week.

6     At the hearing last week, corp. counsel was specifically asked

7     by the Court:  What other FOIL requests have been responded to?

8     And they said:  I cannot say specifically.  I'm aware there

9     have been, but to who they've been made and to whom the

10    information was disclosed, we don't really know.  It now turns

11    out that there have been a number of FOIL requests, as you

12    said, three or four pages of FOIL requests.  None, by the way,

13    as extensive as Mr. Dunn's organization.  As the Corporation

14    Counsel pointed out in its July 25 letter, Mr. Dunn's

15    organization is the only organization to ask for the entire

16    CCRB database.  The FOILs that are listed in the letter are

17    just a very small subset of that entire database.  As you

18    recall, Mr. Dunn's database is 81,000 officers.  There's

19    nothing even approaching that.

20          THE COURT:  But, sir, sir, with respect to the

21    production on June 30 to Eric Umansky of ProPublica, that's

22    4,059 officers.  Are you seeking to put that particular genie

23    back in the bottle?

24          MR. COLES:  At the moment, your Honor, we don't have

25    any evidence, although it is an area for discovery, as to

whether or not ProPublica was acting in concert in some way

with the city.  So, no, we actually are shocked that on

Saturday the city told us for the first time that the

ProPublica FOIL had been responded to.  They actually told us

at or about the same time that ProPublica was downloading the

information to the Internet.

          And what's shocking to me, your Honor, whether it's

the ProPublica FOIL or any of the other FOILs that are listed,

we have not been provided any of those documents.  So 81,000

officers were provided to Mr. Dunn.  ProPublica has been

provided whatever has been provided too.  We have not gotten

one document that's been produced publicly.

          You can't possibly lift the TRO, in our view, at this

time because you wouldn't even know what was being produced by

the city.  I mean, it's outrageous that they have simply

ignored this Court's order for expedited discovery and not

given us the information that actually they say they've made

publicly -- made public previously.

          THE COURT:  Sir, to that point, sir, I will be dealing

with discovery in the near term, but I'm still back to

Mr. Dunn's application to modify the injunction as it pertains

to him, and his point is he got this before there was a court

order.  And I guess I think I understand your point, which is

he knew it was coming, and therefore he is in concert.

          I want to make sure I have your argument correctly.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7SHUNIO

1    He's acting in concert they were acting in concert to violate a

2    likely court order, and there was a scheme to allow the city,

3    by which I take to mean the defendants in this case, to evade

4    their obligations to your clients.  Am I correct?

5              MR. COLES:  That is correct, and that is also a

6    subject of our discovery.

7              THE COURT:  Yes, of course.

8              Mr. Dunn, I'll turn to you momentarily, but I just

9    want to clarify for myself a couple of factual issues.

10             So, Ms. Quinn, I'm going to turn to you.  Thank you.

11             Ms. Quinn, how did you not know that there were all of

12   these disclosures made when we had our last appearance?

13             MS. QUINN:  Thank you, your Honor.  This is Rebecca

14   Quinn speaking for the defendants.  Can everybody hear me OK?

15             THE COURT:  Yes.

16             MS. QUINN:  Your Honor, as you were present at the

17   hearing on the 22nd, we were getting information as the hearing

18   was playing out, and Ms. Saint-Fort had to correct the record a

19   number of times.  That is what we've been challenged with

20   throughout this period is reconstructing the events of the past

21   month beginning on June 12, 2020.  We began by sharing bits of

22   information as we got it.  Realized that that wasn't helpful to

23   plaintiffs or what they were looking for, which is why we

24   wanted to provide -- receive and provide formal discovery

25   responses where we could be precise.  And as soon as the

K7SHUNIO

1    information came in about ProPublica, for example, we made the

2    Court aware of it and we endeavored, as quickly as we could, to

3    collect all the evidence that we shared today.

4         THE COURT:  I understand.  It does seem that there

5    were an awful lot of disclosures made, though.

6         Ms. Quinn, were you yourself involved in the

7    discussions with either the plaintiffs in this case or their

8    counsel regarding what was going to be disclosed?  I'm

9    understanding, for example, that there were -- for example,

10   Mr. Quinn certainly -- it's the Quinn affidavit.  There's a

11   gentleman who met on the 6th, 7th, and 8th of July.  With whom

12   was he meeting?

13        MS. QUINN:  I believe he was meeting with NYPD.  We

14   were not involved in those conversations.

15        THE COURT:  OK.  So do you have any information to

16   share regarding how it is that disclosures were made to the

17   individuals on the list of your letter of today or to Mr. Dunn?

18        MS. QUINN:  Yes.  There's trunks -- different

19   categories of disclosures.  The long list are all FOIL

20   responses, all responses -- media requests or individuals who

21   requested information about their own cases.  The disclosure to

22   Mr. Dunn was, I believe, made through an open records request,

23   and the database was uploaded to the open records portal.  It

24   was also communicated to Mr. Dunn via email by CCRB, and there

25   are other references in the letter about meetings that were

K7SHUNIO

1    held by CCRB in which their database was presented.

2            THE COURT:  I'm going to try and ask a more precise

3    question.  Let me do that, please.

4            On page 6 of -- well, yes, it is page 6 of your letter

5    to Mr. Coles -- there's a reference to a production being made

6    on the 15th and a production being made or disclosure being

7    made on the 20th of July.  I'm not sure the one on the 20th is

8    so bad since it's the audio recording of their own interview,

9    but the one on July 15, it's a little bit of a cause for

10    concern to have things being produced, I fear, as there was a

11    court hearing on the matter.

12            Do you have any insight into that?

13            MS. QUINN:  I don't have insight as to the time that

14    that occurred, and I also don't know that those documents would

15    have been subject to the TRO, whether they were substantiated

16    allegations.  It doesn't say that, the redacted complaint

17    report.  So my information, as I have it now, is that that's

18    what was turned over, not an officer history.

19            THE COURT:  All right.  Mr. Dunn, I'll hear from you.

20    Let's start with the easy question.

21            Did you fabricate any of the materials that you gave

22    to me?

23            MR. DUNN:  I did not, your Honor.  No, I did not.

24            THE COURT:  All right.  OK.  Thank you.

25            Secondly, were you aware when you made the request on

K7SHUNIO

1    the 9th that there were discussions between plaintiffs or their

2    representatives and city representatives?

3            MR. DUNN:  I was not.

4            THE COURT:  Were you aware --

5            MR. DUNN:  No, I wasn't.

6            THE COURT:  OK.  That's fine.

7            Were you aware that there was a lawsuit contemplated?

8            MR. DUNN:  I was not.

9            THE COURT:  Do I understand correctly that you

10   received the access to the portal on the 13th of July?

11           MR. DUNN:  No, I received it on the 14th.

12           THE COURT:  OK.  I'm sorry.  Is it dated the 13th?

13           MR. DUNN:  Well, here's my understanding.  The

14   attachment to my clarification shows the email that I got on

15   the 14th.  As I understand the process --

16           THE COURT:  Yes.

17           MR. DUNN:  -- the CCRB may have uploaded the data on

18   the 13th, and it took a day to come through to me.

19           THE COURT:  I see.  But you received and viewed -- you

20   accessed the portal on the 14th of July?

21           MR. DUNN:  That's correct.

22           THE COURT:  All right.  Mr. Dunn, do you want to be

23   heard with respect to the arguments, by which I mean the

24   discussions I've been having with Mr. Coles this afternoon?

25           MR. DUNN:  Your Honor, I'll just say briefly, as you

K7SHUNIO

1    know, the law provides with respect to Rule 65 -- and we're not

2    even talking about the prior restraint issue -- on the Rule 65

3    issue, that pertains to protecting an existing court order, and

4    there was no court order in place when we submitted our FOIL

5    request.  There was no court order in place when the CCRB

6    responded to our FOIL request.

7            As you point out, the unions knew, the plaintiffs

8    knew, going into June 12 when the legislature repealed 50-a,

9    what was going to happen.  It's no surprise.  The unions were

10   deeply involved in the legislative process.  And if you or I,

11   your Honor, were representing the police officers here, we

12   would have filed a lawsuit on June 13.  Indeed, you see from

13   the CCRB submission earlier today the public recognized

14   immediately it was time to start getting these records, and you

15   see in the listing from the CCRB requests that are being made

16   right on June 12, June 13, and straightforward.  Everybody

17   recognized that we were living in a new day when it came to

18   police transparency in New York except, for whatever reason,

19   the unions chose -- and I do have to think they made a

20   strategic choice for whatever reason -- not to file a lawsuit.

21   And I'm not passing judgment on that.  What I am saying, as you

22   know, that under Rule 65, had they gotten an order on June 12

23   or June 13, we'd be having a different conversation.  We'd be

24   having a prior restraint conversation, but they did not do

25   that.  We had this information.  We had it lawfully.

K7SHUNIO

1      And I just have to say, I understand Mr. Coles wants

2  to make much of what he considers to be the land speed response

3  to the CCRB.  Setting aside that we praise government agency to

4  respond quickly to open records requests, if you look at this

5  listing the CCRB submitted today, you see something like 71, by

6  my count, FOIL requests they responded to.  Every one of which

7  they did in a matter of days.  So even though it doesn't make

8  any difference in terms of the Rule 65 issue or the prior

9  restraint issue, I just want to put to rest the notion that the

10  quickness with which the CCRB properly responded to our request

11  somehow bespeaks to some sort of grave misconduct.

12      Having said that, just to reiterate the point you were

13  making, we had this information before a lawsuit was filed,

14  before any order was issued.  Rule 65 simply does not speak to

15  this, and as you point out, it does not authorize the Court to

16  go backwards in time to retrieve things.  And if that were the

17  case, you'd have to be doing these things perhaps with all of

18  these.  And you asked the right question about the ProPublica

19  information, and there's just no authority under Rule 65 to do

20  that.

21          THE COURT:  All right.  Mr. Coles, last words.

22          MR. COLES:  Yes, I do have last words.  Thank you very

23  much, your Honor.

24          THE COURT:  Of course.

25          MR. COLES:  There is no question in my mind that

K7SHUNIO

1    Mr. Dunn's organization and the city have been working together

2    and are working together since the TRO in order to make private

3    information public.  That is acting in concert.  This is

4    information that is protected by the Constitution, by

5    collective bargaining rights, and by contract rights.  It is

6    information that we actually have been asking for, for over two

7    weeks now and have not received.  We have no idea what's in it.

8    The Court has asked for it as well.  It is that acting in

9    concert, that effort to take information, that will create

10   immediate and irreparable harm to our clients and to make that

11   public.  That is a proper enforcement of the TRO and a

12   proper -- and a proper decision to maintain the status quo so

13   this action can proceed to preliminary injunction where we can

14   put on our case in chief.

15             THE COURT:  Mr. Coles, thank you -- oh, go ahead.

16   I'll let you finish your thought.

17             MR. COLES:  That's fine.

18             THE COURT:  No, no, you've reminded me, and I'll just

19   take a note to myself that I actually need to go back to

20   Mr. Dunn and ask him about that very topic.  But I'll let you

21   finish your thought.  Go ahead, sir.

22             MR. COLES:  No, I'm just saying the privacy and safety

23   and reputation risks at stake here are so significant and so

24   severe that the conduct that has taken place over here should

25   continue to be enjoined.  It is the city's effort to try to

K7SHUNIO

1    evade its obligations to keep this information confidential

2    pending a full hearing.

3              THE COURT:  All right.  Mr. Dunn, I should have asked

4    you -- when I originally questioned you about activities that

5    led you to receiving materials through your FOIL request, I

6    focused on the dates of July 9 and July 13, and you've

7    correctly reminded me, July 14.  Since July 15, have you

8    received additional information in response to a FOIL request

9    of the city?

10             MR. DUNN:  No, I have not, your Honor.

11             THE COURT:  Sir, I'm saying "you," and perhaps I

12   should -- I'm sure you know what I mean, but your organization.

13             Has your organization received any additional material

14   in response to a FOIL request since July 15, if you know, sir?

15             MR. DUNN:  A FOIL request to the CCRB or within the

16   meaning of this action?

17             THE COURT:  Yes, sir, within the meaning of this

18   action as relevant to this action.

19             MR. DUNN:  Not that I know of, your Honor.

20             THE COURT:  Yes.  Would you know, sir?

21             MR. DUNN:  I believe I would.

22             THE COURT:  OK.  That wasn't meant to be glib.  I

23   assumed that --

24             MR. DUNN:  No, no.

25             THE COURT:  -- you're speaking from a position of the

K7SHUNIO

1    authority within the organization and you would know.

2              More pointedly, the materials that you wish to publish

3    that I am currently preventing you from publishing and that

4    you've set up in a way to be text searchable, those were all

5    received prior to July 15?

6              MR. DUNN:  That's correct, your Honor.

7              THE COURT:  All right.  May I understand, sir, that if

8    you received materials after July 15, you would let me know,

9    perhaps with, you know -- if after this call you were to find

10   out that, in fact, there were additional files that you

11   received on the 16th, you'd let me know just so that I'm not

12   proceeding with a -- on this information.

13             MR. DUNN:  Your Honor, I'm quite confident we have not

14   received any data files whatsoever pursuant to any FOIL

15   requests.  The only thing that I know that we have received is

16   a dictionary of sorts of the command codes that the CCRB uses.

17             THE COURT:  Could you explain that a little bit more.

18   Dictionary of command codes in terms of how -- the nomenclature

19   used in the complaints themselves?

20             MR. DUNN:  No, in the CCRB's database.  For instance,

21   the CCRB has -- or the department, the NYPD, has hundreds,

22   maybe 700 acronyms that they use as codes.  So, for instance,

23   "COD" stands for chief of department.  And a command is a term

24   the department uses to assign -- to describe a particular unit

25   where a member of the department is assigned.  So we did

K7SHUNIO

1    receive a file that has -- not pursuant to a FOIL request, a

2    file that just identifies the actual unit that is associated

3    with any acronym that is in the CCRB's database.

4              THE COURT:  When did you receive that, sir?

5              MR. DUNN:  I don't know as we sit here, but I will

6    inform the Court as soon as the conference is over and let you

7    know.

8              THE COURT:  All right.  Is that something that you

9    were planning on disclosing contemporaneously with the

10   database?

11             MR. DUNN:  It was something, yes, we wanted to provide

12   people so they had -- so they could understand.  It was a key,

13   essentially, for how a member of the public could construe a

14   command identifier in the CCRB's database.

15             THE COURT:  I see.  And it's your belief that you may

16   have received that -- well, you received it after you got the

17   database itself?

18             MR. DUNN:  Absolutely.  I know that we got it after

19   that.

20             THE COURT:  And then almost -- so almost certainly

21   when there was some injunctive order in place?

22             MR. DUNN:  Oh, yeah.  I'm sure it was after the 15th,

23   but I have no reason to think it was in any way affected by the

24   order that was in place.

25             THE COURT:  It is, as you understand it -- you've

K7SHUNIO

1   reviewed it, sir?

2          MR. DUNN:  Yes, I have personally seen it.

3          THE COURT:  In its totality?

4          MR. DUNN:  Well, it's got hundreds of entries in it.

5   I've looked at the document, and it is -- for instance, it's

6   probably got 700 three- or four-digit acronyms, like 01PCT,

7   which would be referring to the First Precinct.  For -- the

8   department has many, many acronyms --

9          THE COURT:  Yes.

10          MR. DUNN:  -- that identify commands.  That's the only

11  information that's on that document.

12          THE COURT:  Are there individuals in their

13  individual -- let me finish please, sir.  Are there individuals

14  in their individual capacity who are identified in these

15  acronyms?  I get your example "chief of department."  I imagine

16  the police commissioner has his own acronym or someday her own

17  acronym, but there are no proper names?

18          MR. DUNN:  Correct.  The only thing that's in there is

19  something like "COD," chief of department, which is a command.

20  "MS," Midtown South is a precinct.  You know, "intel," which is

21  a reference to the intelligence division.  "IAB," Internal

22  Affairs Bureau.

23          THE COURT:  All right.

24          MR. DUNN:  That's the sum total of the type of

25  information that's in there.  There's no identifiable

1    information whatsoever about a member of the department.

2                THE COURT:  OK.  All right.  Mr. Coles, do you want to

3    be heard on that point?

4                MR. COLES:  I do.  I think that underscores the point

5    that we have been making from this hearing is that the city and

6    Mr. Dunn's organization were acting in concert.  After the TRO

7    was entered, they actually sent him a key to help people

8    decipher the information that he received from them.  That is

9    damning evidence that they were actually working together to

10   release information that the city was required to keep

11   confidential because it violates collective bargain agreements,

12   constitutional rights, and contract rights.  It's extraordinary

13   to me that Mr. Dunn and the city could say that they didn't act

14   in concert at all when, in fact, they're actually trying, after

15   the injunction, to find a way to get this information out with

16   a key that would allow the public to access the information in

17   a different way.

18               It cries out as well, your Honor, for discovery as to

19   what happened over here.  The combination of the speed in which

20   this went out, the fact that Mr. Dunn's letter went to the head

21   of the CCRB, not to the record access officer, the fact that

22   after the TRO was entered, the city is still giving information

23   to Mr. Dunn in order to facilitate his release of the

24   information and its understanding by the public.  It is

25   extraordinary to me.  I add to that the fact that Corporation

K7SHUNIO

1   Counsel said it took a long time to get this information

2   together.  All they had to do was ask their client.  All they

3   had to do was ask the CCRB, what documents have you responded

4   to in FOIL for three weeks or two weeks that we've been talking

5   about?  They didn't do that, and I think the reason they didn't

6   do that is because they wanted to make sure that that

7   information got out.  The information that we got from the

8   police department was that no disclosure would be made until

9   July 15.

10            THE COURT:  But the --

11            MR. COLES:  The fact --

12            THE COURT:  Excuse me, sir.

13            MR. COLES:  I'm sorry.

14            THE COURT:  The dictionary of which Mr. Dunn speaks

15   does not, to me, seem to be something that would be covered by

16   all of the materials that we've been discussing for the past

17   two conferences.  I appreciate your point, which is that it

18   illuminates or it allows someone to understand, perhaps better

19   than they would otherwise, these materials.  But the glossary

20   itself, I don't think, is violative of anything.  If I asked

21   them today, I could get a copy of it.  One might need it just

22   to understand the particular nomenclature or the acronyms used

23   by the department.

24            So I'm having trouble understanding why that document,

25   in and of itself, is violative of anything.  I think -- and

K7SHUNIO

1    maybe that's your point, it's not, but it just indicates an

2    acting in concert.

3         MR. COLES:  Yes, it is evidence of acting in concert

4    to release to the public information that the city itself can't

5    release.  And it is -- our argument over here is there's an

6    ongoing acting in concert by the city and Mr. Dunn's

7    organization, and that is what is being enjoined.  And that TRO

8    should continue until we have a full hearing on the preliminary

9    injunction.

10         THE COURT:  OK.  Thank you.  I'm going to ask you all

11   to be patient for a moment.  Thank you.

12         Mr. Coles, I should ask, would there have been a basis

13   for the CCRB to deny Mr. Dunn the dictionary that we've been

14   referring to?

15         MR. COLES:  The question, the way I was looking at it,

16   is whether or not it was part of their ongoing scheme together

17   to get this document, to get the information out.  And so I

18   think, in that sense, they absolutely should not have produced

19   it because it was part of their effort to avoid the city's

20   obligations to keep this information confidential.

21         THE COURT:  OK.  I understand.  All right.  Let me

22   address this issue and then we'll proceed to the issue of

23   discovery.  I don't think the parties are in dispute that

24   Rule 65 is what governs here and that Rule 65 allows a court,

25   through its injunctive power to bind other persons, even

K7SHUNIO

nonparties to the litigation, who are in active concert or

participation with anyone described in the rule.

So while I have been told by no less an authority than

Judge Hand that I cannot lawfully enjoin the world at large, I

can enjoin individuals acting in concert or entities acting in

concert. When speaking about persons in active concert, it is

typically defined as someone who is aiding and abetting the

defendants or someone legally identified with the defendant.

I'll just give a couple of cases in which these issues are

addressed. I know the parties are aware of them, but I just

want to have them on the record. *Paramount Pictures*

*Corporation v. Carol Publishing Group,* a Southern District

decision from 1998, 25 F.Supp.2d 372; *Alemite Manufacturing*

*Corporation v. Staff*, 42 F.2d 832, a Second Circuit decision

from 1930; *People of the State of New York by Vacco v.*

*Operation Rescue National,* 80 F.3d 64, Second Circuit from

1996; and *United Pharmacal v. United States*. This is a First

Circuit decision often cite, 306 F.2d 515.

The point is my power to enjoin is limited to the

conduct of a party, and therefore the scope of the injunction

is defined by the relationship between the party enjoined and

the nonparty in question. I don't have the ability to reach

backwards in time. That is what Judge Oetken talked about in

his *ONE11* decision. That's what *United Pharmacal* speaks to and

other court decisions. So that's why I focused so much this

K7SHUNIO

1  afternoon on when things happened and what has happened,

2  because that governs the powers that I have.

3         Ultimately, on reading the parties' briefs and on

4  thanking them for their oral argument this afternoon, I am

5  finding my initial finding of acting in concert, while I was

6  correct to have the speculation that I had, the speculation

7  doesn't matter because the issue is were they acting in concert

8  in order to violate an existing court order, not a likely court

9  order, not a possible court order, but something that actually

10  existed.  And based on my very searching questions of Mr. Dunn,

11  I am confident that he was not at the time he made his request

12  and at the time that he received his request aware of either

13  the contemplated litigation or the fact that there would be, in

14  a couple of days, a lawsuit or an injunction.

15         I don't have the ability to reach retroactively and

16  enjoin him for the things that happened before there was an

17  order.  Nor do I have the ability to reach backwards for the

18  order imposed by the state court judge.  Therefore, while

19  recognizing Mr. Coles' concerns about the significance of this

20  information and the possibility of what might happen upon its

21  disclosure, I nonetheless realize that my power is limited, and

22  I don't have the ability to stop him when the deeds were

23  already done before the litigation was filed.

24         I'm not trying to blame anyone here, but the fact

25  remains that this lawsuit could have been filed on the 12th of

K7SHUNIO

1   June or the 13th of June, and it would be a much different

2   conversation, focusing much more on prior restraint.  I'm not

3   focusing on prior restraint, although I think the arguments

4   there are quite strong.  I am focusing on the powers that I

5   have and not those that I thought I had.

6        So I am modifying my order to remove the injunctive

7   relief that imposed on the New York Civil Liberties Union with

8   this exception, however.  I want to be clear.  I am staying my

9   own order for 24 hours in case Mr. Coles wishes to take it to

10  the Second Circuit, and if he wants to, he may, and that's

11  fine.  But from my perspective, I cannot enjoin Mr. Dunn and

12  his organization, and I am not going to do so through the prism

13  of Rule 65.

14        On the issue of the dictionary of acronyms, it is

15  interesting to me, but I don't think it's indicative of a

16  scheme, and I don't think it's actually impermissible for him

17  to have that.  The idea that if he's entitled, having received

18  these certain documents before there was an injunction in

19  place, then I do not think it inappropriate.  Therefore, I

20  think it appropriate for him to have the dictionary of command

21  codes.

22        So with that, that resolves that particular issue.

23  The plaintiffs have 24 hours to go to the circuit if they wish

24  to do so.

25        Mr. Dunn, do you understand my decision?

K7SHUNIO

1             MR. DUNN:  I do, your Honor.  Thank you.

2             THE COURT:  All right.  Mr. Coles, do you understand

3    my decision?

4             MR. COLES:  I understand your decision, your Honor.

5    Yes.

6             THE COURT:  All right.  Thank you.

7             I want to turn now to the questions of discovery, and

8    I have much to talk about there.

9             Mr. Dunn, do you wish to now exit the call or do you

10   want to stay on and observe?

11            MR. DUNN:  Your Honor, I'm perfectly happy to stay on

12   and observe, understanding that we are no longer part of this

13   discussion.

14            THE COURT:  That is correct, sir.  Thank you.

15            All right.  Ms. Quinn, again, am I speaking to you on

16   the issues of discovery?  Ms. Quinn, yes.  Unmute yourself,

17   Ms. Quinn.

18            MS. QUINN:  Sorry, your Honor.  Thank you.  I'm sorry,

19   your Honor.  Ms. Saint-Fort is actually going to speak about

20   discovery.

21            THE COURT:  Oh, OK.  Ms. Saint-Fort, welcome back.

22   Thank you very much.

23            Ms. Saint-Fort, Mr. Coles raises a very thoughtful

24   point with which I agree, which is particularly given the

25   amount of stuff that has been given to all of these other

K7SHUNIO

1   entities and individuals since June 12, I assume it should be

2   easy to gather all of that together and give it to Mr. Coles

3   and his clients, and yet nothing has been given to Mr. Coles or

4   his clients.

5          MS. SAINT-FORT:  Your Honor, the request that we have

6   just -- that we received from Mr. Coles, we did not receive

7   formal requests until Friday.  So we informed Mr. Coles that we

8   are preparing a response to his request, and we will provide

9   responsive relevant information, we said, early this week, and

10  we are in the process of putting all that together so that we

11  can produce a formal response.

12         THE COURT:  You'll let me -- you'll give me this

13  indulgence, please.  I want to review the request with you so

14  that I understand what's going on, because there do seem to be

15  disputes, and there are some requests where I would like to

16  resolve the disputes if it's possible to do so, even if

17  resolution is simply me picking a side.

18         Beginning with request No. 1, I guess what I'd like to

19  understand for requests No. 1 and 2 is today there was a

20  production that identified the dates on which materials were

21  produced.  By saying "production," I should have -- I should be

22  more precise.

23         Ms. Quinn, I believe, issued the letter of today's

24  date indicating what productions had been made.  I am assuming,

25  and I don't want to be mistaken in my assumption, that it is

K7SHUNIO

1    also your contemplation that all of the actual materials that

2    were produced would also be produced to plaintiffs' counsel.

3    Is that correct?

4            MS. SAINT-FORT:  We were hoping to provide when we

5    provided the list and we're hoping to provide additional

6    documentation responsive to the request when we get a formal

7    request -- when we make a formal response that would include

8    the materials that were produced.

9            THE COURT:  OK.  It's that last part that I actually

10   care about, because there are four pages of productions that

11   were made.  It is, I would think, only fair for Mr. Coles to

12   see what, in fact, with as produced.

13           So you fully expect to do just that, correct?

14           MS. SAINT-FORT:  We are in the process of putting

15   together the information, your Honor.

16           THE COURT:  Is that a yes?

17           MS. SAINT-FORT:  Yes, we are in the process of putting

18   together that information.

19           THE COURT:  No, let me ask the question again.

20           Looking at the letter of today's date from Ms. Quinn,

21   you've seen it, you see that there are pages and pages of

22   bullet points announcing particular disclosures that were made

23   beginning on June 16 of 2020 and ending on July 20 of 2020.

24           Are you familiar with the letter?

25           MS. SAINT-FORT:  Yes, your Honor.

K7SHUNIO

1           THE COURT:  And you're familiar with the bullet points

2      in which these disclosures are listed?

3           MS. SAINT-FORT:  Yes.

4           THE COURT:  OK.  Ms. Saint-Fort, everything that is

5      identified as having been produced during this period is also

6      going to be produced to Mr. Coles, yes?

7           MS. SAINT-FORT:  Yes.

8           THE COURT:  OK.  That was easier than I thought.

9      Great.  Then I'm not going to worry about that.

10          I understand that you are producing materials

11     responsive to request No. 2.  You're not objecting to request

12     No. 2 or request No. 3, am I correct?

13          MS. SAINT-FORT:  We have objections, but we are

14     providing responsive information.

15          THE COURT:  Yes.

16          MS. SAINT-FORT:  Yes.

17          THE COURT:  Thank you.  I appreciate the

18     clarification.  Thank you.  I was misspeaking, so thank you.

19          All right.  Let me understand, then, your concerns

20     about request No. 4.  I guess I'm trying to understand how many

21     documents responsive to request No. 4 wouldn't also be

22     responsive to requests 1, 2, or 3?

23          MS. SAINT-FORT:  Well, I think the difference between

24     those -- requests of one, two, and three as compared to four is

25     those -- one, two, and three are looking at specific documents

K7SHUNIO

1    that had already been produced, whereas four is focusing on the

2    information, the disciplinary records that the city and its

3    various agencies that are involved in this case will be

4    posting, the format and the manner of release of those

5    disciplinary records, in terms of a plan of what they intended

6    to do and what they intended to post.  That is different than

7    the records themselves.

8          So when plaintiff is requesting all documents

9    concerning the release of the public -- to the public of

10   disciplinary records by the city, we view that to be quite

11   broad because there are -- there have been discussions since

12   the repeal of 50-a on June 12, 2020, about what each agency

13   would be doing in order to provide this information to the

14   public.  What we think -- and there, obviously, have been

15   interim plans and different discussions to consider what might

16   be posted and what might not be posted.  So what we believe is

17   most relevant and actually most helpful to the plaintiff is the

18   format, manner of release, the type of disciplinary records

19   that would be released as of the day that the stay was entered

20   by state court, July 15, 2020, rather than all the documents

21   which would include potentially back-and-forth communications

22   of what to include, what not to include, certainly would

23   infringe potentially upon attorney-client privilege,

24   deliberative process of trying to figure out why some things

25   should be included, should not be included.

K7SHUNIO

1          So I think the most clearest information we can

2     provide that's responsive to this request and within the scope

3     of your Honor's limited discovery is what exactly the plan was

4     as of July 15, 2020.

5          THE COURT:  OK.  Thank you.

6          I'm just going to ask you to speak a little bit slower

7     for court reporter and judge.  Thank you so much.

8          MS. SAINT-FORT:  Sure.  Absolutely.

9          THE COURT:  Thank you.

10         MS. SAINT-FORT:  My apologies.

11         THE COURT:  No problem.

12         Mr. Coles, is it you or Ms. Saleski who will be

13    responding?

14         MR. COLES:  I'll respond on this one, your Honor.

15         THE COURT:  Thank you, sir.

16         MR. COLES:  At the hearing last week, Ms. Saint-Fort

17    said that there were still discussions as to what was going to

18    be produced.  That's on paragraph 16 -- page 16 and 17 of the

19    transcript.  We are entitled to explore the city's internal

20    communications as to what it believes should be produced, what

21    shouldn't be produced, what is private, what is confidential,

22    and the decision process they went through in reaching whatever

23    final determination they are going to reach.  That is directly

24    probative of our clients -- that these documents may be

25    protected by collective bargaining agreement, constitutional,

K7SHUNIO

1    and contract rights.

2              So it is not enough for them to say we're just going

3    to give you the final the result of what we've decided when we

4    decide it.  We're entitled to the deliberative process by which

5    they arrived at the final result and produce it to you at

6    court.  There is no deliberative process under the federal

7    rules.  There's no privilege of deliberative privilege that

8    Ms. Saint-Fort can assert here.  And if there are

9    attorney-client documents, they can issue a privilege log.  I

10   don't know why there would be attorney-client documents, but if

11   there are, that happens in every case.  But we are certainly

12   entitled to explore how the city is arriving at the conclusions

13   of what documents it views as private, which ones as

14   confidential, which ones it actually is going to produce, and

15   the thinking that went into that.

16             THE COURT:  Mr. Coles, on that point, one of the

17   things that I was struck with in looking at the requests was I

18   appreciate their breadth and I appreciate the care with which

19   they were constructed, and yet what we have coming up is a

20   hearing on a preliminary injunction motion as distinguished

21   from, for example, a final injunction or a summary judgment

22   motion.  And I'm trying to understand better what you need to

23   make your case at the PI hearing and what you need to win your

24   case later on if, indeed, you do.

25             So I'm just wondering why you need this, and this will

K7SHUNIO

1    come up later when we start talking about requests that go back

2    to January of 2016.  I would also have thought, sir -- and this

3    is just perhaps a rumination on my part -- that if they didn't

4    produce these documents, you'd still have the ability to argue

5    at a PI hearing that these documents exist, or at least we need

6    to run down whether they do exist, and I almost think sometimes

7    you do better by not having discovery than with discovery.  So

8    I guess I'd just like to understand how you need this and why

9    you need this in connection with the PI hearing.

10           I'm sorry.  Someone's -- there are a few folks who

11   have very loud background noises.  If you know it's you, if you

12   could do something to mute that, I would appreciate it.  Thank

13   you.

14           Mr. Coles, please continue.

15           MR. COLES:  Yes.  It will give us direct insight into

16   the city's views as to why it views certain documents as

17   private or confidential and others not.  In other words, the

18   process that the city went through to determine what to produce

19   when it ultimately arrives at that conclusion is critical for

20   us to testing the city's final decision.  If they just tell us

21   the final decision, we're going to be left without a raft of

22   information as to the debate within the city as to what should

23   be produced and what shouldn't be produced, the weighing in of

24   the different agencies, all facts and evidence that your Honor

25   would want to see at a preliminary injunction hearing so you

K7SHUNIO

1    understand what the city is doing and why they're doing it.

2          THE COURT:  Again, I'm understanding why I'd want to

3    know before the end of this case why they were doing what they

4    were doing, but my question remains, we only have so many days

5    before the preliminary injunction hearing.  And I guess I'm

6    trying to understand why you need to have these materials as

7    opposed to simply arguing that I could -- or at least making a

8    nonspeculative argument that the city was thinking about these

9    other issues and that discovery will show that and, at the very

10   least, it hasn't been ruled out.

11         So that's why I'm asking why you need it back so far,

12   but perhaps this is just -- you and I will just be talking past

13   each other repeatedly.  I'll give you one more chance to add to

14   your answer, and then we'll go from there.

15         MR. COLES:  I was giving you my answer, your Honor.  I

16   believe it will give us -- it will give you, the Court, in the

17   hearing the ability to test the merits and the validity of the

18   final conclusions that the city draws as to what it's going to

19   produce and why, and it will give us insights into what the

20   city has viewed historically as private and personal

21   information.

22         THE COURT:  All right.  Thank you.

23         Ms. Saint-Fort, anything in reply, or are you done

24   with your arguments?  Please excuse me.  You have to unmute

25   yourself.

K7SHUNIO

1          MS. SAINT-FORT:  Excuse me.  My apologies.

2          I would again state that what -- whatever discussions

3   may have happened prior to coming to a final conclusion, or at

4   least as final as it could have been on the day that the state

5   court stay was entered, is not relevant for purposes of the

6   preliminary injunction hearing.  The question is whether what

7   was intended to be posted at that time and whether

8   plaintiffs' arguments as to what it believes should not be

9   posted would have been posted by these individual agencies.  So

10  if there were any sort of discussion back and forth as to what

11  to include, what not to include, that would be irrelevant.

12          And I would disagree with Mr. Coles that these

13  communications would not be protected by attorney-client

14  privilege or deliberative process privilege.  As your Honor

15  points out, we do have a limited time here, and I think we are

16  fashioning a way to respond to this request that is the most

17  efficient given the time that we have and the purposes of the

18  preliminary injunction hearing.

19          THE COURT:  All right.  Thank you.

20          Mr. Coles, anything else?

21          MR. COLES:  No, your Honor.

22          THE COURT:  OK.  Thank you.

23          On request No. 4, I am accepting for now the

24  defendants' proposed modification of that response.  I will

25  allow the smaller -- the narrowed time period.  I thank you for

K7SHUNIO

1    your arguments, but at this stage, and given the other things

2    that we have to do, I will accept that for this category the

3    shorter time frame is appropriate.

4              I want to turn, please, to requests 5 and 6, because I

5    tend to view them somewhat together.

6              One moment, please.  I am advised by my deputy that

7    the background noise that perhaps you're hearing, I'm certainly

8    hearing it -- it's actually interfering with my ability to hear

9    what's going on -- is coming from someone on one of the Skype

10   lines.  So if you're not talking, please mute yourself because

11   we really don't want to hear the background noise.

12             With that proviso, let me continue.

13             With Ms. Saint-Fort, with respect to request No. 5 and

14   request No. 6, is there a clearinghouse or is there a place

15   where requests for disciplinary records are stored and their

16   responses stored?  Now, perhaps there are several places, but

17   I'm assuming that as requests for disciplinary records are

18   submitted, someone catalogs them and someone responds to them,

19   and I'm trying to figure out where that information would be

20   maintained.

21             MS. SAINT-FORT:  My understanding, your Honor, it

22   could be done differently by all these agencies.  But to the

23   extent that the requests are coming in via FOIL, I don't know

24   that they would be distinguished based on whether it's a

25   request for disciplinary records or not.  They would simply be

K7SHUNIO

1    FOIL requests that are responded to by the agency, which

2    certainly keeps a log of the FOIL requests it receives and the

3    responses it provides.

4            THE COURT:  With respect to non-FOIL requests, is

5    there a clearinghouse at each agency, at each department?

6            MS. SAINT-FORT:  I'm sorry, your Honor.  I'm hearing

7    background noise.  I couldn't hear the whole question.

8            THE COURT:  Yes, we all are hearing background noise,

9    unfortunately.

10           What I'm saying is for each agency, for each

11   department -- the fire department, the police department, the

12   correction officers, or Department of Corrections, excuse me --

13   is there a centralized location where requests for information

14   about disciplinary records go?

15           MS. SAINT-FORT:  There is a FOIL office for every

16   single agency, but I don't know that it's distinguished -- that

17   the request for disciplinary records via FOIL is a separate

18   office.

19           THE COURT:  Fair enough.

20           MS. SAINT-FORT:  I believe they're all handled by the

21   FOIL.

22           THE COURT:  If I were to email the fire department

23   requesting a disciplinary record for a particular firefighter,

24   would it go to the same place where FOIL requests go?  I'm not

25   making a FOIL request.  I'm simply asking for this information

K7SHUNIO

1   or filing a complaint.

2            MS. SAINT-FORT:  Well, that would certainly depend on

3   the reason why you're asking for the information.  If it's in

4   connection potentially with the litigation, that's obviously

5   dealing with the general counsel's office.  If it's just -- I

6   don't know how one -- a member of the public would make that

7   kind of request without it being a FOIL request.

8            THE COURT:  OK.

9            MS. SAINT-FORT:  So each agency has a FOIL officer and

10  a FOIL appeal officer who would handle those kinds of requests.

11           THE COURT:  Let me ask the question a little bit more

12  pointedly.  I'm not sure that it would be practicable -- and

13  you're probably going to tell me it's not, and Mr. Coles will

14  tell me it's still necessary -- to find every document, every

15  communication relating to the denial of a public records

16  request for disciplinary records on grounds other than the

17  application of New York Civil Rights Law Section 50-a, but I

18  would imagine that you could -- that somebody somewhere could

19  identify all requests that were made and how they were

20  responded to.  That's what I'm trying to figure out.

21           MS. SAINT-FORT:  Well, it would be very difficult,

22  certainly, to --

23           THE COURT:  I'll let you continue, Ms. Saint-Fort.

24           MS. SAINT-FORT:  Thank you.

25           It would be certainly very difficult to determine --

K7SHUNIO

1   to go through and determine any FOIL request that was responded

2   to for a reason outside of 50-a, which is what plaintiffs are

3   seeking in this request.  That would require going through all

4   of the FOIL requests that the FOIL officer at the agency has

5   received which, as I said before, is not clearly --

6            THE COURT:  Excuse me.  One moment, please.  Someone

7   wants to have a conversation which is --

8            (Discussion off the record)

9            THE COURT:  I'll note, just as an observation, that

10   yesterday in a bench trial, I had a bench trial interrupted

11   twice by cats, and now I am having my hearing interrupted by

12   someone wishing a corn dog.  So I'm not really sure who it is,

13   and we are unable at this time to mute that particular perhaps

14   inconsiderate person, but we are where we are.  So we'll see

15   what happens.

16            Ms. Saint-Fort, let me ask my question a little bit

17   differently, please.  I understand what you're saying, which is

18   it would probably be very difficult to comb through every

19   single request and look at the denial and then categorize

20   denials as 50-a or something other than 50-a.  So what I'm

21   asking is can you just produce the requests and the denials?

22            MS. SAINT-FORT:  The requests for disciplinary records

23   and their denials?

24            THE COURT:  Yes.

25            MS. SAINT-FORT:  Is that what you're --

1          THE COURT:  That is what I'm asking.

2          MS. SAINT-FORT:  Going back -- well, even going,

3    certainly, within the time frame that plaintiff is seeking

4    within this request, that's quite burdensome because there are

5    constantly requests for disciplinary records.  There could be

6    hundreds, if not thousands, for agencies for this

7    three-and-a-half-year period.  So while it's theoretically

8    possible to do so within the time period that we have for

9    discovery in this case, it's near impossible.  That's a

10   significant amount of records that we believe is not relevant

11   for this case and certainly not the preliminary injunction

12   hearing.

13         THE COURT:  Well, I think it is relevant because I

14   think the argument that plaintiffs are making, or one of the

15   arguments, is that separate and apart from 50-a, there are

16   reasons why a city may decline to produce certain documents,

17   even in response to a request for those documents, in this case

18   the disciplinary records.  So I suppose -- and I'm just sort of

19   thinking out loud for a moment -- I suppose you could concede

20   that indeed there are times in the past, before and after the

21   repeal of 50-a, where city agencies denied requests for

22   disciplinary records on bases other than 50-a.  I'm imagining

23   that they do exist.  And I think, similarly, I imagine there

24   were instances in which someone made a request for disciplinary

25   records and the city declined not merely for 50-a reasons but

K7SHUNIO

1   because they were unsubstantiated or nonfinal allegations.

2           I'm just trying to figure out how -- I hear what

3   you're saying, which is that producing these documents would be

4   burdensome, but they're trying to prove that point.

5           Do you concede that at times before and after the

6   repeal of 50-a city agencies, including those that are

7   defendants here, denied requests for disciplinary records on

8   grounds other than 50-a?

9           MS. SAINT-FORT:  I am aware that that has occurred, as

10  is highlighted by the, I believe, two cases that are cited by

11  plaintiffs in their request.

12          THE COURT:  Yes.

13          MS. SAINT-FORT:  OK.  I'm aware that has occurred.

14          THE COURT:  That was for request 5.  I'm also asking

15  for request 6, which it speaks to unsubstantiated and nonfinal

16  allegations.  Do you believe those exist?

17          MS. SAINT-FORT:  I do not have any personal knowledge

18  of that, but without -- I don't want to assume that that is the

19  case, but I don't have any personal knowledge of those

20  particular types.  I just haven't seen it, but I'm not -- so I

21  can't clearly speak to that.

22          THE COURT:  OK.  Mr. Coles, why did you pick January 1

23  of 2016?

24          MR. COLES:  As we told the Law Department, that is

25  because the *Hughes Hubbard Reed* case, which is the first case

K7SHUNIO

1    that we identified to have the denial for reasons other than

2    50-a, was decided in 2016.

3                THE COURT:  It was decided in August of 2016, sir.

4                MR. COLES:  It was decided in 2016, yes.

5                THE COURT:  No, my point is you're asking for

6    January 1.  So I first thought that the *Hughes Hubbard* case was

7    somehow related to -- decided on January 1, but it was, in

8    fact, decided in August.  So that's why I'm trying to figure

9    out why the January date, please, sir?

10               MR. COLES:  OK.  Because we thought that was a

11   reasonable time frame to show a practice and a policy by the

12   city to deny requests for disciplinary records for reasons

13   other than 50-a.  We thought that was a reasonable time frame

14   in which to prove their practice and policy to your Honor.

15               I also have the question as to whether or not there

16   were actually that many FOIL requests for disciplinary records.

17   I don't know that there are.  I heard what Ms. Saint-Fort said,

18   but I don't have any evidence that there are thousands of FOIL

19   requests for disciplinary records.  And that seems to me to be

20   unlikely.

21               THE COURT:  Well, what about the fact that I've got 71

22   for a one-month period in Ms. Quinn's letter to me -- letter to

23   you of today?

24               MR. COLES:  Yes, but those are post the repeal of

25   50-a.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K7SHUNIO

1          THE COURT:  Yes.  Sir.

2          MR. COLES:  Yes.

3          THE COURT:  Let me finish.  Thank you.

4          Your request is through the present, which would

5   include this period of time.

6          MR. COLES:  Yes.

7          THE COURT:  All right.  So right then and there we've

8   got an awful lot of them.  I'm being told that there may be

9   hundreds, if not thousands, of requests.

10          Again, Mr. Coles, I understand what you're trying to

11  do.  I hope you see that from the questions I'm asking of your

12  adversary, but I'm trying to figure out what you need for this

13  PI hearing.  You don't need all of this stuff.  Tell me what

14  you need and why you need it.  Thank you.

15          MR. COLES:  OK.  I need two years of responses to FOIL

16  requests where the city has denied requests for disciplinary

17  records for reasons other than 50-a, because that will show

18  that the city has a long-standing practice of maintaining the

19  confidentiality of certain records for police and for nonpolice

20  separate and apart from 50-a.  It would be arbitrary and

21  capricious for the city simply to close its eyes to that

22  practice and to that policy.

23          THE COURT:  I understand, and I'm going to sound like

24  I'm talking out of both sides of my mouth, sir.  But two years

25  is not going to establish a long-standing practice, or is it?

K7SHUNIO

1    Maybe you --

2            MR. COLES:  Actually, I mean, your Honor, it's why we

3    chose 2016.  It's the reason we chose 2016 is because we

4    thought -- one, it was the *Hughes Hubbard Reed* case, and we

5    thought that gave us and would give you a reasonable amount of

6    time for us to show the existence of a policy and practice that

7    the city has withheld documents for reasons other than 50-a,

8    and it has done that consistently not just in the police

9    department but in other agencies as well.

10           We actually think five years is a reasonable time

11   frame.  We actually cut it back a little bit in terms of

12   showing a policy and practice.  But we do feel that a

13   reasonable time to get these documents from the city to show

14   the policy and practice is important.

15           THE COURT:  Sir, I, as you saw in my questioning of

16   Ms. Saint-Fort, combined requests 5 and 6.  When you're

17   responding to me now, are you also combining your answers, or

18   do you want to speak more specifically to each of the requests?

19           MR. COLES:  No, I'm combining my answers.  I think

20   it's relevant to both 5 and 6.

21           THE COURT:  OK.  Thank you.

22           Ms. Saint-Fort, anything in reply?

23           MS. SAINT-FORT:  Yes, your Honor.

24           I would again say that the requested time frame from

25   plaintiff is extremely overbroad.  That is a number of

K7SHUNIO

1    documents that we're going to have to go through which are not

2    specifically segregated as to dismissals for unsubstantiated --

3    dismissals because the complaints or the records sought were

4    unsubstantiated or nonfinal or records that were -- the

5    requests for records were denied for reasons other than 50-a.

6    That is to require the FOIL officers and FOIL appeal officers

7    of the agencies that are involved in this case to go through

8    all the FOIL records -- FOIL responses that they have made

9    since the time period that it would appear that your Honor

10   would set as to how far back we're going.

11          Additionally, I would want to be clear that there

12   should be a limitation as to the types of disciplinary records

13   that we're looking at here; that they would only be members of

14   service -- members who are individuals who would be members of

15   the plaintiffs' union organization and not all employees of the

16   various agencies that are involved.

17          THE COURT:  All right.  One moment, please.

18          I'm advised that an audio bridge that we had through

19   AT&T may have cut out, so I think we're going to try and

20   reinstate it.  And perhaps it was the gentleman with the corn

21   dog who is responsible for it.  But I'm now told it's on.  So

22   all right.  Let me proceed.

23          Thank you to both of you for your arguments.

24          Here's what I am directing with respect to requests 5

25   and 6.  I want the disclosure of all denials of requests for

K7SHUNIO

1    disciplinary records for members of service for the one-year

2    period from July 12 of 2019 to July 12 -- no, 11th of 2020, up

3    until the date of the repeal, because I think what we're seeing

4    is disclosures that have been made since then, but really the

5    issue is what was done prior to the repeal.  So it's a one-year

6    period, it's for members of service, and it is the denials.  I

7    think it would be impracticable at this stage, for a

8    preliminary injunction hearing, to do all of the ancillary

9    communications.  So I just want the denials to be produced.

10              That would cover requests -- yes?  Someone speaking.

11              MS. SAINT-FORT:  Can I make one clarification?

12              THE COURT:  Please.

13              MS. SAINT-FORT:  The repeal was June 12 --

14              THE COURT:  Did I say --

15              MS. SAINT-FORT:  -- 2020.

16              THE COURT:  Did I say something --

17              MS. SAINT-FORT:  You said July.

18              THE COURT:  I'm sorry.  Thank you so much.  I have

19    July on the brain because that is the month we're in right now.

20              The one year prior to June 12 of 2020.  Thank you for

21    reminding me what month the repeal took place in.

22              Otherwise, Ms. Saint-Fort, you understand my

23    directive?

24              MS. SAINT-FORT:  I do.  I just want to clarify

25    because just the request itself is for the city.  We are

K7SHUNIO

1    talking about the fire department, NYPD, and the Department of

2    Corrections?

3              THE COURT:  That is correct.

4              MS. SAINT-FORT:  OK.  Thank you.

5              THE COURT:  Thank you.  Very much.

6              All right.  Mr. Coles, let me please hear from you on

7    request 7.

8              MR. COLES:  OK.  On request No. 6, your Honor, I'm

9    sorry, I just want to have clarity on that.  Are they not

10   required to produce documents for the same time period for

11   request No. 6 as well?

12             THE COURT:  It is the same time period.  That would

13   be -- oh, excuse me, that's right, because the request No. 5

14   were the denials, and request No. 6 is for the actual

15   documents.  Is that your point, Mr. Coles?

16             MR. COLES:  No.  Request No. 5 is for police officers,

17   and request No. 6 is for city employees other than law

18   enforcement officers.

19             THE COURT:  Excuse me.  Sir, it was my understanding,

20   and it's perhaps my misapprehension, that with request No. 5,

21   would those records only pertain to police officers?  I was

22   holding out the theoretical possibility that they might apply

23   to someone else.

24             MR. COLES:  Yes.  We use the defined term

25   "disciplinary records," which refers to law enforcement

K7SHUNIO

1    officers.  So five deals with denials relating to law

2    enforcement officers, and six deals with denials relating to

3    other city employees.  The argument being that you can't or

4    that it would be arbitrary and capricious to treat the law

5    enforcement officers entirely different from other city

6    employees.  So accepting the one-year time frame, that should

7    apply to both requests No. 5 and request No. 6.

8            THE COURT:  The one-year time frame does apply to

9    request No. 5 and to request No. 6.

10           MR. COLES:  Thank you, your Honor.

11           MS. SAINT-FORT:  If I may, your Honor, on that point,

12   given that that is a far broader group of individuals, all city

13   employees, the city has multiple agencies that we would have to

14   go through to get these FOIL requests for disciplinary records.

15   Even a one-year time frame for all of these agencies is quite

16   significant and overly broad for this -- for the purposes of

17   this case.

18           THE COURT:  One moment, please.

19           Ms. Saint-Fort, for request No. 6, it is 6b, it's the

20   denial, it's not the release.  So it's the denial for other

21   city employees, and I am ordering it.

22           MS. SAINT-FORT:  The denial for all other city

23   employees?

24           THE COURT:  That is correct.

25           MS. SAINT-FORT:  If I just may, your Honor, there are

K7SHUNIO

1    over a quarter million employees of the city of New York.  That

2    is a significant amount of requests.

3            THE COURT:  I don't have a sense of the quantum of

4    requests coming in for non-law enforcement officers.  If you

5    want to caucus with your team and move for reconsideration

6    based on -- I just don't know.  For all I know, there could be

7    a quarter million city employees as to whom only two get such

8    requests.  So I think you need to help me identify better or

9    understand better the record requests.

10           MS. SAINT-FORT:  We can certainly follow up in

11   writing, your Honor.

12           THE COURT:  Thank you very much.

13           MS. SAINT-FORT:  Thank you for the opportunity.

14           THE COURT:  No, thank you.

15           Request No. 7, Mr. Coles.

16           MR. COLES:  We are looking for the city's written

17   policies regarding the privacy of personnel records.

18           THE COURT:  For, again, I think Ms. Saint-Fort is

19   going to tell me, for the entirety of the city, all city

20   employees?

21           MR. COLES:  Yes.  If there are any protocols,

22   policies, or other guidance developed by the defendants

23   regarding the privacy of personnel records, we would like to

24   see those.

25           THE COURT:  All right.  Ms. Saint-Fort.

K7SHUNIO

1          MS. SAINT-FORT:  Again, your Honor, this is an overly

2     broad request for the reasons that I just stated.  There are

3     multiple city agencies who have varying policies and

4     guidelines.  Additionally, plaintiffs have not put in any sort

5     of time limitation on the request, and they're seeking all

6     documents.  So it would be extremely burdensome and not

7     proportional to the needs of this case to pull all these

8     policies and guidelines for the various multiple city agencies

9     as to how they presumably protect the privacy of personnel

10    records for city employees.

11         Additionally, by seeking all documents would certainly

12    potentially infringe on attorney-client privilege to the extent

13    that there are communications and discussions about -- between

14    counsel and these agencies on how to protect privacy.  So for

15    those reasons as well, this request is simply overbroad.

16         THE COURT:  Ms. Saint-Fort, let's put aside documents

17    or the communications about what would be a great policy.  Are

18    there not written policies on the privacy of personnel records

19    for each of these agencies?  Again.  I'm going to be clear --

20    and I've lost Ms. Saleski.  I hope she returns at some point.

21    I've lost her video at least.

22         Ms. Saint-Fort, let me say that perhaps more

23    coherently.

24         I understand what you're saying if the issue is -- if

25    it's just communications, and "all documents" is quite broad by

K7SHUNIO

1    its terms.  But I guess what I'm asking is for each agency in

2    the city of New York, is there not a policy, a written policy,

3    regarding personnel records and their privacy?

4          MS. SAINT-FORT:  I'm sure there's a policy regarding

5    personnel records.  As to their privacy specifically, I cannot

6    say that I know that 100 percent to make that representation to

7    you, your Honor.

8          THE COURT:  All right.  Mr. Coles.

9          MR. COLES:  I would like to see those policies

10   regarding personnel records, and I'd like to see what, if

11   anything, they say with regard to privacy.  I don't know

12   that -- I think some will be citywide rather than agency

13   specific.  But receiving -- or producing documents relating to

14   the city's view of what is private seems to be the core of this

15   case and the core of the interests we're trying to protect.

16         THE COURT:  Ms. Saint-Fort, would there be a city

17   agency that would implement or propose policies that were used

18   by multiple agencies?

19         MS. SAINT-FORT:  There are policies that are citywide,

20   and there is -- the Department of Citywide Administrative

21   Services is kind of the human resources entity for the city.

22   However, in my experience and through many cases that I've

23   dealt with, even though those citywide policies exist, there

24   are also policies that are specific to each individual agency,

25   and there may -- so it's not clear that in every instance that

K7SHUNIO

whatever -- to the extent that there is a citywide policy

that's applicable, that that would be the policy that is being

used by a specific agency.

            THE COURT:  Well, why is that?  Is it because DCAS

allows agencies to implement their own policies even if they

are in derogation of the ones that are proposed by that agency?

            MS. SAINT-FORT:  I don't -- they wouldn't -- to the

extent that there is a citywide policy, whatever an agency does

cannot be in derogation of what the citywide policy is.

However, an agency may have a policy that is also working in

conjunction with the citywide policy, to the extent that it

exists, in the topic of whatever area we're talking about.

            THE COURT:  All right.  Mr. Coles, the concern

articulated by Ms. Saint-Fort is that if she were to produce

these citywide policies, she would not be able to represent

that those were the be-all and end-all for each respective

agency, and that to do that latter, to make that latter

representation, would be unduly burdensome at this stage in the

matter.  May I hear from you in response.

            MR. COLES:  Yes.  I think having agency manuals,

employee manuals, as to what's private or not, should be

something that they have to produce and does not seem to be

very significant to assemble those.  If there are citywide

documents, citywide manuals, those should be produced.  And I

actually have spent some time in the city, and I'm not aware

K7SHUNIO

1    that agencies actually have privacy rules that are separate

2    from the citywide rules, but if they do that's certainly what

3    we would want to explore at the preliminary injunction hearing.

4         So what we're asking for are the city manuals that

5    define how they treat the privacy of personnel records.  If

6    they're citywide at the agency that she mentioned, that's fine.

7    If there are other agencies that have different protocols,

8    which I imagine is possible but seems to me unlikely, then we

9    should have an opportunity to look at those as well.

10        THE COURT:  My concern here is that whatever I order,

11   I cannot win.  Here's what I mean by that.  If I order just the

12   disclosure of the citywide privacy policies that DCAS puts

13   forward, then I am almost certainly excluding individual

14   agencies.  But if I require the agencies to produce this

15   material in the foreshortened time frame of the PI hearing, I

16   think it would be impracticable.  So I am denying request No. 7

17   at this time.

18        I want to move now -- sir?

19        MR. COLES:  I'm sorry, your Honor.  I was going to

20   suggest that perhaps we limit the agencies to those that are

21   named as defendants in the case.

22        THE COURT:  Ms. Saint-Fort --

23        MR. COLES:  And that way we would solve

24   Ms. Saint-Fort's problem.

25        THE COURT:  Ms. Saint-Fort, is that practicable?  I

K7SHUNIO

1    think the answer is yes.

2              MS. SAINT-FORT:  As to FDNY, NYPD, and DOC?

3              THE COURT:  That's correct.

4              MS. SAINT-FORT:  I just want to be clear that does not

5    include CCRB.  They're not an employer.

6              THE COURT:  They don't have a policy -- they don't

7    have policies of this type, correct?

8              MS. SAINT-FORT:  I don't know whether they do or do

9    not, but they're not an employer that would be giving out this

10   kind of disciplinary information that's the subject of this

11   lawsuit.

12             THE COURT:  Fair enough.  All right.  As to the fire

13   department, the police department, and DOCs, yes.

14             All right.  Request 8, Mr. Coles, with respect to

15   request 8, perhaps you want this dictionary that I heard

16   Mr. Dunn speak about a few moments ago and that ought to be

17   produced.  But I'm just not sure -- this idea of all documents

18   explaining the terminology, it seems to me that that's better

19   done by having someone, if such a person exists, who works for

20   the city or one of these constituent agencies explain to you

21   what the terminology is.  To me it's better done with a witness

22   than with documents, but I'll hear from you on that point and

23   then I'll hear from Ms. Saint-Fort.

24             MR. COLES:  OK.  I believe there are documents in the

25   police department and in the other defendant agencies that

K7SHUNIO

1    actually seek to explain how the respective departments define

2    the various terms they use:  What is an unsubstantiated claim?

3    What is a charge and specification?  What is a not guilty

4    finding?

5              At the hearing we had last week, there was

6    significant, I thought, confusion, about what a substantiated

7    claim is.  A substantiated claim is not a final claim.  It is

8    not substantiated in sort of the sense that people normally

9    think of that.  It is simply a case that at the moment, at that

10   moment, is unproven.  I believe that each of the defendant

11   agencies do have guidelines that provide how they define each

12   of those terms and what each of those terms means.

13             THE COURT:  It's your belief, Mr. Coles, that the

14   guidelines of each of these agencies are not identical?  That

15   what the fire department might consider substantiated is

16   something different than what the NYPD would consider

17   substantiated?

18             MR. COLES:  I think it's possible.

19             THE COURT:  All right.  Why -- if I may, sir, why does

20   that matter for the PI hearing?

21             MR. COLES:  Because I believe at the PI hearing that

22   the city is going to make arguments about what each of these

23   terms mean in terms of whether or not there is a due process

24   consequence, and I think it is important to be able to show to

25   your Honor, for instance, that something that the police

K7SHUNIO

1    department may call substantiated is actually very far from

2    being substantiated.

3         It is a significant problem with the ProPublica

4    document release that was made over the weekend.  The

5    ProPublica document release talked about substantiated CCRB

6    complaints, which creates a terrible misapprehension that those

7    were actually final determinations.  Many of those

8    substantiated CCRB determinations actually resulted in not

9    guilty findings when they were reviewed by the police

10   department.  So how each of these agencies defines these terms

11   seems to me to be very, very significant.

12        THE COURT:  Let's talk about what the terms are.  Is

13   it "substantiated" and its converse "unsubstantiated,"

14   "founded" and "unfounded," "final" and "nonfinal"?  What are

15   the words?

16        MR. COLES:  It's the words that are used in the

17   allegations that are made in the department.  So it actually

18   does vary from department to department.  They have similar

19   characterizations, but they're not identical from department to

20   department.  But each department will have a guide of some

21   sort, and the police department it will be patrol guide.  In

22   the fire department, it will be some sort of patrol guide as

23   well that actually explains what they mean when they use these

24   terms that are included in the allegations.

25        THE COURT:  Ms. Saint-Fort, may I hear from you,

K7SHUNIO

1     please.

2              MS. SAINT-FORT:  Yes, your Honor.  I think what you

3     were just trying to get at with plaintiffs' counsel is what's

4     principal here, what specific terms are we talking about?

5     Plaintiffs have advanced this case claiming that

6     unsubstantiated, nonfinal, and unfounded disciplinary records

7     should not be released.  To the extent that an agency defines

8     their -- an agency determines that the charges that are against

9     an officer, the disciplinary records they have, fit into one of

10    those categories, that's what we're talking about.  So I don't

11    know why the definition of all these other terms would be

12    relevant.  If plaintiffs -- I think plaintiffs, in the first

13    instance, certainly needs to let us know what specific terms

14    should be defined.

15             THE COURT:  Well, I've just given you six, right:

16    substantiated, founded, final, and their negatives.

17             Mr. Coles, what else?

18             MR. COLES:  Well, in our papers we seek to enjoin

19    unsubstantiated, unfounded, exonerated, or not guilty.

20             THE COURT:  All right.  So exonerated and not guilty.

21             MR. COLES:  And not guilty.  Substantiated and

22    unsubstantiated.

23             THE COURT:  I understand.  That's why I've said the

24    negatives which each of these.

25             MR. COLES:  Yes, yes, yes, yes.

K7SHUNIO

1    THE COURT:  Those are the terms, Ms. Saint-Fort.  Can
2    I get a definition for them?
3    MS. SAINT-FORT:  We can provide a definition for those
4    terms.
5    I do also just want to note the difference in agency
6    position when it comes to finality of decisions.  That while --
7    for CCRB, once they make a determination that is considered
8    final.  Whether it's substantiated or unsubstantiated for
9    purposes of that agency, it is considered final.  That it goes
10   on to the NYPD to do -- to take the case forward or do with it
11   what the NYPD decides to do, for CCRB it is final.  I do just
12   want to note that for the record.
13   THE COURT:  Ms. Saint-Fort, the point that Mr. Coles
14   is making is he was hopeful that there would be at least a
15   common understanding among the agencies as to what these terms
16   meant.  I appreciate what you're saying to me now, which is
17   that CCRB may have an idiosyncratic definition of some of these
18   terms.  Rather than require you to produce all documents
19   explaining or defining this terminology, I would like each
20   agency's definition of these terms, and however you get them to
21   Mr. Coles is how we want them.
22   But I appreciate what you've just now said about the
23   distinction -- the fact that CCRB may have its own view of
24   something, and you'll have to let -- that's something that I
25   would need to know and Mr. Coles would need to know.

K7SHUNIO

1          MS. SAINT-FORT:  Understood, your Honor.

2          THE COURT:  All right.  Mr. Coles, we're down to

3     requests No. 9 and 10, to the extent that these are not covered

4     by, for example, the responses to requests 1, 2, and 3, or

5     something else.  I'm not sure why you need these.  These seem

6     to be an awful lot of documents, and that's what I need to

7     know.

8          So tell me why, because I'm inclined to deny these,

9     and I think I've given you even more than I hinted I was giving

10    you at last week's proceeding.  So you really have to make a

11    case as to why you need any subset of nine and ten.

12         Let me just please also note, if we think we're going

13    on for a whole lot longer, I myself don't need a break, I'm

14    sure you guys are hard core and you don't need one either, but

15    I have a court reporter who's been taking this down for the

16    last hour and 40 minutes, and she deserves a break.  So

17    Mr. Coles, if you think you can quickly respond to nine and ten

18    and then we'll take a break and deal with the deposition issue,

19    that's great.  Otherwise, tell me now, and we'll take the break

20    right now.

21         MR. COLES:  It's really your call, your Honor.  I

22    mean, I can tell you what I think about nine and ten, which is

23    these are actually the documents that we believe violate the

24    collective bargaining and due process and contract rights of

25    our plaintiffs.  These are the ones that the city is saying

K7SHUNIO

1    they want to produce, and they absolutely have to show them to

2    us so we can explain to you how those rights are violated.  To

3    me it's extraordinary that the city would actually come to this

4    courtroom and say, we want to produce all of these document,

5    all the documents included in nine and ten, and we have a

6    lawsuit saying that that is going to violate, as a very

7    significant matter, basic rights of our clients.  It's going to

8    violate their reputation, it's going to violate their safety,

9    it's going to violate their collective bargain, and you can't

10   look at them.

11        Now, the question that your Honor is raising is, is

12   January 1, 2016, too long a time frame?  I understand for

13   motions for preliminary injunction that we may have a shorter

14   time frame that could work, but it seems to me absolutely

15   critical for us to be able to look at the documents that we're

16   saying shouldn't be released.  To me it's extraordinary that

17   the city would say, no, we're going to release those to the

18   public, but you can't have an opportunity to look at it

19   beforehand.

20        I would add to that, your Honor, that typically these

21   are released by FOIL, and typically FOIL requires an

22   individualized, particularized determination as to whether or

23   not a document should be -- whether or not a document should be

24   released.  What the city is proposing here is an indiscriminate

25   release of all of these document.  They're not going to look at

K7SHUNIO

1  them.  They're not going to make a particularized

2  determination.  We need to see these in advance so we can prove

3  our case to you as to why the release of these documents will

4  violate our clients' rights.

5          THE COURT:  Ms. Saint-Fort.

6          MS. SAINT-FORT:  Thank you, your Honor.

7          I would disagree with plaintiff that these particular

8  documents are necessary to prove their case, but I do agree

9  with your Honor's statement that they're covered by prior

10  requests that you granted, specifically, No. 1.  So I don't see

11  how requests No. 9 and 10 would be necessary in light of your

12  Honor's order on request No. 1.

13          THE COURT:  Well, Mr. Coles' point is for request

14  No. 1, those particular cats are out of their respective bags.

15  His concern is that there are other documents that would be

16  produced that just had not been the subject of a request that

17  has come in yet.  That's his issue.  I understand that better.

18  I didn't understand that as initially phrased.  I understand

19  that now, having spoken with him about that.

20          So his point is he does not want the city to produce

21  these materials and only then get a chance to look at them.

22  This, I understand.  At this exact moment, there is an

23  injunction in place that I'm not modifying as to the city, so

24  nothing else is getting produced before the hearing.  But his

25  concern is he'd like to see what it is you plan to produce if I

1    dissolve the injunction.

2              MS. SAINT-FORT:  In response to that, it bears little

3    relevance, I think, to the case to know that Officer A had an

4    unsubstantiated claim against him or her or that there was a

5    nonfinal allegation against Officer B.  Plaintiffs' argument is

6    that none of this information should come out.  So the

7    specifics as to which officer has an unsubstantiated or

8    nonfinal allegation against them is truly not relevant for

9    purpose of discovery in this case because their argument is

10   unsubstantiated and nonfinal allegations in full should not

11   come out, whether it's as to the -- the documents would only

12   show whether it's as to a specific officer or not, which really

13   doesn't impact their argument.

14             THE COURT:  All right.  Mr. Coles.

15             MR. COLES:  I couldn't disagree more.  These are the

16   documents that we are claiming are going to damage the

17   reputation, the privacy, and the other rights of our clients.

18   We actually are entitled to see those in advance for a

19   reasonable period of time and explain how our clients' rights

20   are going to be impaired with the actual documents that the

21   city wants to produce.  I mean, presumably the city at some

22   point is going to tell us the documents that it's going to

23   produce because they said they would do that, they're going to

24   reach a final determination.  We ought to be able to see a

25   subset of those so we can clarify and present the issues to you

K7SHUNIO

1    at the preliminary injunction hearing.

2              It's absurd to me that they will say we're going to

3    produce these document.  You don't have to look at them.  You

4    can't see them.  We absolutely need to see them and analyze

5    them and present them to you in order to make our causes of

6    action.

7              THE COURT:  All right.  Thank you.

8              I am not going to order that these documents be

9    produced prior to the preliminary injunction hearing.  As

10   Ms. Saint-Fort is aware and Ms. Quinn is aware as well, there

11   is an injunction in place, and nothing is being to be produced

12   except for those things that have already been produced that

13   were done before the injunction was in place.  I think that

14   Mr. Coles and Ms. Saleski will be able to look at the things

15   that have produced in response to request No. 1, and they will

16   see there perhaps unsubstantiated or nonfinal allegations, and

17   they'll be able to make this argument to me.

18             But I also accept Mr. Coles' argument to me, and

19   actually Ms. Saint-Fort's argument about it, that it's the

20   plaintiffs' perspective that none of these should be produced.

21   So I'm not sure we need to see just how bad an individual one

22   is.  I think generalizations can be made about them without

23   seeing the specifics of them in order to make the arguments to

24   me that are necessary for the PI hearing.  Again, I haven't

25   done anything with respect to dissolving the injunction, so

K7SHUNIO

1   nothing's getting produced before then.  And depending on how

2   things go, we may be able to address at the hearing prospective

3   productions about which the plaintiffs are concerned.  So I am

4   denying those requests for this time.

5             MR. COLES:  May I be heard on that for one second --

6             THE COURT:  Of course.

7             MR. COLES:  -- just before the break?

8             THE COURT:  Of course, sir.

9             MR. COLES:  Request No. 1 is directed only to the

10   CCRB.  I think request No. 1 should also include the police

11   department.  The police department takes allegations of a

12   different structure and a different type than the CCRB, and it

13   actually is the final arbiter of CCRB determinations.  So by

14   limiting ourselves to the CCRB, I think you would be excluding

15   our ability to show you the damage that some of these claims

16   can cause to our plaintiffs.  So I would ask that we add the

17   police department for this period to request No. 1.

18             THE COURT:  All right.  So in fact what you're doing

19   is proposing a friendly amendment to your requests 9 and 10 to

20   be disciplinary records publicly released by the NYPD for the

21   period June 12, 2020, to the present.

22             Ms. Saint-Fort, I am accepting that friendly

23   amendment.  He did it to request No. 1.  I'm doing it to

24   request No. 9 and request No. 10.  Please add to your request

25   No. 1 those disciplinary records that have been publicly

K7SHUNIO

1  released by the NYPD for the period June 12, 2020, to the
2  present.

3           Do you understand?

4           MS. SAINT-FORT:  Yes, your Honor.

5           THE COURT:  All right.  Then that has been done.
6  We've added that.  However you -- whatever request you'd like
7  it to be added to, it is now there.  That has been done.

8           All right.  We will talk about depositions, and my
9  hope is that our discussion of depositions will be shorter than
10 our discussion of documents.  Let's take ten minutes, because I
11 want to make sure the reporter recovers from the nearly two
12 hours of discussion we've just had.  So what I'm going to do is
13 I'm going to remain on Skype.  I'm just going to turn off my
14 video and my microphone.  I invite you to do the same, and I
15 will see you in ten minutes.  And I thank you very much.  See
16 you then.

17          (Recess)

18          THE COURT:  As between Ms. Saint-Fort and Ms. Quinn,
19 to whom should I be discussing the issue of depositions?

20          MS. SAINT-FORT:  To me, your Honor, Dominique
21 Saint-Fort.

22          THE COURT:  You truly have drawn the short straw
23 today.  OK.  Thank you.

24          Ms. Saint-Fort, let me speak before I solicit views
25 from Mr. Coles.  I can understand a visceral reaction to having

K7SHUNIO

1    a whole bunch of 30(b)(6) depositions.  My concern is -- and

2    this is something that's just being borne out in some other

3    cases that I have -- one of the things that I wanted most from

4    you all in connection with this case is what I called a final

5    answer as to what was going to be produced, and I don't know

6    how to get it.  So a possibility, I suppose, is 30(b)(6)

7    depositions for everyone, and that's what I think is Mr. Coles'

8    animating principle.

9            But how else can I get a representation from someone

10   sufficiently senior and sufficiently knowledgeable at each of

11   the affected defendants, organizational defendants, to know

12   what it is they plan to do?

13           MS. SAINT-FORT:  We could provide a declaration that

14   outlines the information.

15           THE COURT:  All right.  And that would be someone of

16   appropriate seniority in each of the NYPD, the FDNY, the

17   Department of Corrections, and the CCRB?

18           MS. SAINT-FORT:  Absolutely.

19           THE COURT:  OK.  Mr. Coles, why is that not

20   sufficient?

21           MS. SALESKI:  Your Honor, if I may, this is Courtney

22   Saleski.

23           THE COURT:  Oh, Ms. Saleski, thank you.  I'm happy to

24   have you take over the reins.  Thank you very much.

25           MS. SALESKI:  Thank you so much.

1          Just as recently as Friday we heard from the corp.

2     counsel that there were no final answers, and we're having a

3     lot of trouble understanding how we understand the contours of

4     what's going on without hearing directly from the leadership

5     who are making those decisions.  While I understand there's a

6     proposal on the table for the declaration, what we have found,

7     or at least what Mr. Coles and I have found in our practice, is

8     that declarations and interrogatory responses and even

9     admissions wind up being very lawyered up in a way that don't

10    get to the truth as we see it or need it.  So it's our hope

11    that we could do a 30(b)(6) that would allow us to ask the

12    questions necessary to get the final answers from the agencies.

13         THE COURT:  Well, let me understand that a little bit

14    more.  I appreciate and I will accept your nomenclature, very

15    lawyered up, but I want to understand what that means.  I'm OK

16    if it's lawyered up as long as I understand what it means and

17    you understand what it means.  So if there is a declaration

18    where someone says:  I am so-and-so of sufficient seniority in

19    the FDNY, and I understand that you, Failla, have asked me to

20    explain what we intend to do with respect to requests for the

21    disclosure of these materials.  Here's what we plan to do.

22    What else -- tell me, please, what else is there?

23         MS. SALESKI:  So, for instance, we've heard different

24    things at different times, but in order to clearly and fully

25    understand what each of the agencies are saying, I would think

K7SHUNIO

1    we would need to be able to ask follow-up questions of the

2    individual who makes the final statement.  So, for instance,

3    the NYPD may say we're going to release -- we're not going to

4    release pending claims, which they have said historically to

5    our clients in this case, and then they've turned around and

6    said that they are going to release pending claims, and now

7    we're totally unclear on what they're going to do.

8            But let's even say they give us a final answer on

9    that.  We would want to be able to follow up and say:  Now,

10   sir, can you please -- or ma'am, can you please tell us what

11   you mean by "pending claim" so that we can just -- I think what

12   you've heard from my partner, Tony, in this -- Mr. Coles, in

13   this and at other times is in all of this some of the problems

14   can be lost in semantics of the way that the different agencies

15   approach things, and I'm not sure the definitions of six words,

16   even though we're trying here, will allow us to have final

17   answers that we will be able to protect our clients.

18           THE COURT:  Ms. Saleski, just pause, please, for one

19   moment.

20           Ms. Saint-Fort, may I please add to the list of

21   definitions "pending," which I don't think is contained on it?

22           MS. SAINT-FORT:  OK, your Honor.

23           THE COURT:  Thank you so much.

24           All right.  Ms. Saleski, returning to you, I

25   understand how you see the utility of a deposition in trying to

K7SHUNIO

1    get to the bottom of what a particular policy is from one of

2    the organizational defendants.  Were there any other topics

3    that you planned to cover in these depositions other than their

4    disclosure -- their contemplated disclosure policy, should I

5    lift the injunction, and the follow-up questions that would

6    flow from that?

7            MS. SALESKI:  We have other topics listed in the

8    notice, your Honor.  They included the timing and circumstances

9    of the CCRB's response to the FOIL requests from NYCLU.  It

10    includes the terminology used to describe the allegations of

11    misconduct.  That was the topic No. 3.  That may be mooted out

12    if they can be properly and fully described through writing.

13    I'm just not sure that the related standards of proof may also

14    be a topic of conversation.

15            Topic No. 4 that we listed was we wanted to ask about

16    the -- for each organizational defendant policies and practices

17    for handling FOIL requests and the privacy of personnel

18    records.  There are a few more I can continue to go through

19    them, but I believe your Honor has them in front of you.

20            THE COURT:  Yes, I'm reading them alongside you.

21    Thank you.

22            MS. SALESKI:  So we have topic No. 5, for each

23    organizational defendant, how unsubstantiated and nonfinal

24    allegations are currently tracked or maintained.

25            No. 6, for each of the organizational defendants,

K7SHUNIO

1   policies regarding the consideration of past allegations of

2   misconduct or disciplinary actions in employment decisions.

3          And for No. -- topic No. 7 is the final one for the

4   city, policies and practices related to the handling of FOIL

5   requests encompassing unsubstantiated or nonfinal allegations

6   against city employees other than firefighters, correction

7   officers, and police officers.

8          THE COURT:  Well, that would seem -- that seems to

9   be -- that topic No. 7 would seem to perhaps be broader than

10  the six that precede it inasmuch as you're looking for other

11  city employees.  And I'm not sure, wouldn't that seem to

12  presuppose -- well, is there a person who could be a 30(b)(6)

13  deponent or designee for topic No. 7?  I think that's a tough

14  issue, but all right.

15         Ms. Saleski, I don't want you -- no, let me say that

16  differently.

17         I could understand that you would be reluctant to

18  negotiate against yourself, but Mr. Coles has very ably in the

19  last few hours given me sort of his bare minimum, what he

20  absolutely -- what he absolutely needs.  And I want to

21  understand from you, of these seven topics, if hypothetically

22  you couldn't get all seven, what do you need for this PI

23  hearing?

24         MS. SALESKI:  Topic No. 1.

25         THE COURT:  Yes.

K7SHUNIO

1      MS. SALESKI:  I think we would really like to see

2  topic No. 2 but understand your Honor's rulings earlier on

3  those.  I don't think we need topic No. 3 as long as it's

4  encompassed in the responses by the city -- I mean, I'm sorry,

5  by corp. counsel.

6      Your Honor, if I may, may I stop for a second?  I

7  don't want to get out ahead of Mr. Coles if there are things

8  that he believes that we still continue to need in here.

9      So, Mr. Coles, if there's something that you want to

10  say contrary to what I'm saying, please feel free.

11      THE COURT:  Ms. Saleski, I'll hear from you on all

12  seven, and then Mr. Coles can follow up if he wants to add

13  something to it, but I'd rather just have one of you speak at a

14  time.  So let me hear your thoughts.

15      So far I'm hearing one is something you believe you

16  need.

17      MS. SALESKI:  Yes.

18      THE COURT:  OK.

19      MS. SALESKI:  One and four and five, six, and seven.

20  I believe we need all of those to be able to prove at the

21  preliminary injunction hearing a likelihood of success here.

22      THE COURT:  Yes, but the likelihood of success is an

23  interesting way to go, and I do understand it.  But I suppose

24  you would also -- you might try the substantial question issue,

25  and I'm not sure that these would be needed.

K7SHUNIO

 1          Mr. Coles, I will hear from you, but since your

 2     colleague has basically asked for almost everything, I'm not

 3     sure that there is anything for you to supplement.

 4          MR. COLES:  Thank you, your Honor.  I'm very

 5     comfortable having Ms. Saleski continue with the argument.

 6          THE COURT:  Thank you.

 7          Ms. Saleski, that wasn't helpful, I have to say.  I

 8     appreciate it.  Maybe the answer is you just can't -- these

 9     have been winnowed down so significantly from what you

10     initially wanted that you can cut down no more, but know that

11     I've given you the opportunity to do so.

12          Ms. Saint-Fort, let me please hear from you.

13          MS. SAINT-FORT:  Thank you, your Honor.

14          As to topic No. 1, which we'd already essentially

15     discussed, defendants believe that we can certainly accomplish

16     this through a declaration.  And to the extent that plaintiffs

17     are concerned about not having the opportunity to follow up on

18     what the use of a particular term such as "unsubstantiated" or

19     "substantiated" or the other terms that we have discussed mean,

20     that would certainly be accomplished by referring to our

21     response to document request No. 8 as your Honor has ordered

22     it.  Therefore, we can clearly -- obviously, the use of those

23     terms by the declarant will be consistent with how the agency

24     uses those terms, so there shouldn't be any confusion on

25     plaintiffs' part as to what they mean by those terms.

K7SHUNIO

1        Additionally, with regard to the timing and

2    circumstances of CCRB's response to the FOIL request, that's

3    also covered by a document request which defendants have

4    already agreed to provide responsive documents.  And

5    essentially, going through the remainder, as we pointed out,

6    all of these are covered by other document requests that your

7    Honor has already dealt with.  Clearly, topic No. 3, the

8    terminology that is used, will be covered by document request

9    No. 8.  The policies and practices for handling FOIL requests

10   and the privacy of personnel records, we've already discussed

11   how defendants will respond to the equivalent document requests

12   made by plaintiff.

13        THE COURT:  Well, wait.  Please pause there.  Because

14   topic No. 4, I don't know -- it was interesting for you to use

15   the term "equivalent" because I think I substantially narrowed

16   their document request in this regard.  So I'm not sure that

17   they will get what they want without a deponent on topic No. 4.

18   It doesn't necessarily mean I'm going to order it.  Perhaps you

19   want to speak to that a little bit differently.

20        MS. SAINT-FORT:  Sure.  Just give me one second, your

21   Honor.

22        THE COURT:  Of course.

23        MS. SAINT-FORT:  As to document request No. 7, it was

24   limited as to the privacy policies for personnel records for

25   FDNY, DOC, and NYPD.

K7SHUNIO

1          THE COURT:  Yes.

2          MS. SAINT-FORT:  The document -- or, excuse me, the

3    30(b)(6) topic here is as to the organizational defendants --

4    which are FDNY, DOC, NYPD -- the policies and practices for

5    handling FOIL requests, and the privacy of personnel documents.

6    So it's essentially, in my view, the same because we're looking

7    for those policies or guidelines as to the organizational

8    defendants.

9          THE COURT:  Yes, I would --

10          MS. SAINT-FORT:  We --

11          THE COURT:  Excuse me.  I would have thought topic 4,

12    talks and the practices for handling FOIL requests.  That was

13    that's what I thought was the addition.

14          MS. SAINT-FORT:  We can provide that information

15    through response to a document.  I don't think that a

16    deposition on that point is necessary if that is an area of

17    inquiry that plaintiffs are interested in.

18          THE COURT:  May I hear that again, please.

19          MS. SAINT-FORT:  As to the FOIL request --

20          THE COURT:  Yes, yes.

21          MS. SAINT-FORT:  I don't believe that a deposition is

22    necessary to explore the policies and practices for handling a

23    FOIL request.  To the extent that there is guidance that NYPD,

24    DOC, CCRB, and FDNY have as to how they respond to FOIL

25    requests, that can be responded to through a production of

K7SHUNIO

1   documents, not necessarily a 30(b)(6) deposition.

2          THE COURT:  OK.  Thank you.

3          MS. SALESKI:  Your Honor, may I just respond to that

4   one?

5          THE COURT:  Ms. Saleski, yes, you may.

6          MS. SALESKI:  Thank you.

7          I think that is one of the particular ones that would

8   benefit from live testimony, and that's because it was similar

9   to what you all were speaking about earlier that there are

10  these FOIL requests for which the city and the different city

11  agencies recognize that 50-a was not the end-all, be-all of

12  disciplinary records and recognized some right to privacy

13  outside of that and denied requests.  And that, I think, is

14  going to really show the arbitrary and capriciousness of

15  turning around and just dumping everything now that 50-a has

16  been repealed, and I don't think that that's going to be

17  captured in sort of written policies in the way that it could

18  be captured in communications with someone who has knowledge

19  about it relating to practices.  So I would just ask your Honor

20  to consider that one specially, if possible.

21         THE COURT:  OK.  Ms. Saint-Fort, I'll hear from you in

22  reply, and then I'll let you go down through the remainder of

23  the topics.  Thank you.

24         MS. SAINT-FORT:  Thank you.

25         If I may on this point, to Ms. Saleski's point,

K7SHUNIO

1    through document request No. 5, the city will already be

2    providing one year of records for the denial of requests for

3    disciplinary records for members of service.  So plaintiffs

4    will be able to see that there are -- what these other reasons

5    are for which an agency may deny a request for records outside

6    of 50-a.  By having that information, I don't see why a

7    30(b)(6) deposition will be necessary.

8             THE COURT:  OK.  Thank you.  Please proceed to your

9    topic No. 5.

10            MS. SAINT-FORT:  Thank you.

11            For each organizational defendant, how unsubstantiated

12   and nonfinal allegations are currently tracked or maintained,

13   that was encompassed in defendants' request -- excuse me,

14   plaintiffs' document requests 9 and 10, which your Honor

15   denied, and therefore, I would -- it would seem that such a

16   request and inquiry through a 30(b)(6) deposition would equally

17   be unnecessary here.

18            As to topic No. 6, for each organizational defendant,

19   policies regarding the consideration of past allegations of

20   misconduct or disciplinary actions in employment decisions,

21   this seems wholly irrelevant to what we're dealing with here.

22   Plaintiffs are asking that certain records not be produced to

23   the public because of the arguments that they advance as to why

24   they believe they should not be produced.  Any information as

25   to how the organizational defendants view that information in

K7SHUNIO

1   making employment decisions does not seem to be a relevant area

2   of discovery in this case.  This case is wholly about the

3   production of information to the public and not necessarily

4   what the agency itself is doing with the information that it

5   has.  For that reason, it's irrelevant, in defendant's view, to

6   this case, and therefore shouldn't be a topic for a 30(b)(6)

7   deposition.

8           Finally --

9           MS. SALESKI:  Your Honor, may I respond to No. 6?

10          THE COURT:  Yes, Ms. Saleski, you may.

11          MS. SALESKI:  Thank you.

12          This goes to the stigma plus, your Honor.  In our last

13  hearing you had heard from the lawyers for the defendants that

14  there is no plus, that there was no liberty interest and that

15  there was no plus in these cases.  Your Honor, I'm sure, is

16  familiar with the cases.  The plus factor in the due process

17  analysis in these is where your employment prospects are

18  affected by reputational damage information published against

19  you.  And so we were hoping to explore this topic of how the

20  city uses this information itself in order to prove up, at

21  least in the city's view, the plus factor.

22          THE COURT:  All right.  Ms. Saint-Fort, as further

23  explained, I'll hear your response.

24          MS. SAINT-FORT:  I again don't feel that that's

25  relevant for that portion of plaintiffs' argument.  This

K7SHUNIO

1    information is already maintained by the city.  And it's, in

2    fact, the city who's making -- and these individual agencies

3    who are making the determinations as to whether an allegation

4    is substantiated, unsubstantiated, otherwise.  And what it does

5    with that information is not a relevant subject for this case.

6    It's whether legally these agencies and the city are able to

7    produce this information to the public.  That is the focus of

8    this case, and therefore, this topic is irrelevant.

9              If I may go to topic No. 7?

10             THE COURT:  You may.

11             MS. SAINT-FORT:  The request is that -- is for the

12   city policies and practices related to the handling of FOIL

13   requests encompassing unsubstantiated and nonfinal allegations

14   against city employees other than firefighters, correction

15   officers, and police officers.

16             As we discussed as we were going through certain

17   document requests, this is as to the entire city, the quarter

18   million of employees that the city has, the multitude of

19   agencies the city has.  It's extremely overbroad and

20   essentially would require us to bring in an individual from

21   every city agency to testify as to this, which is extremely

22   overbroad given the limited scope of discovery we have in this

23   case.  But arguably almost any case could have someone testify

24   from every single city agency.  It's extremely overbroad, and I

25   think that there's -- we are being given the opportunity to

1   provide further information as to a document request that is

2   similar to this in terms of the unsubstantiated, nonfinal

3   allegations as to other city employees, and we'll provide your

4   Honor with that information in due course.  But as I've already

5   stated, in terms of certainly for a 30(b)(6) deposition, this

6   would certainly encompass multiple witnesses who would have to

7   each be from each individual city agency, which I think is

8   extremely burdensome given the limited scope of discovery that

9   we have in this case and the limited time that we have to

10  accomplish it.

11          THE COURT:  All right.  Ms. Saleski.

12          MS. SALESKI:  Your Honor, thank you so much, and thank

13  you for going through each of the topics with both me and

14  Ms. Saint-Fort.  I think it's made it clearer, and I understood

15  the Court's request about how -- what do we really need.  So I

16  wanted to think that through and respond after hearing

17  Ms. Saint-Fort as well.

18          I believe we need No. 1.  I believe we need No. 4.

19  And I do believe we need No. 7, and that's the only one I'll

20  expand on because we've talked about all those other ones.

21          No. 7 is really about the equal protection and

22  arbitrary and capricious claims.  It's about how the city is

23  determining to handle our clients' members' unsubstantiated and

24  nonfinal allegations versus how it handles others.  I

25  understand there may be logistical problems, but with 30(b)(6)s

K7SHUNIO

1    usually you can find some way to come up to speed on

2    information necessary to be able to testify to certain topics.

3    And we would ask your Honor to consider this in the context of

4    our claims that we would like to be able to show the

5    substantial questions of law relating to the equal protection

6    claim as well as the arbitrary and capricious claim as it

7    relates to the treatment of our clients, its members versus the

8    other city employees.

9         THE COURT:  Excuse me.  Let me just take down my notes

10   on what you've been saying.  Thank you.

11        All right.  Again, thank you for your patience.  This

12   would be the time I'll step off the bench, but instead you're

13   just stuck watching me as I review these things.

14        What I'm going to do is I am denying as to all topics

15   but topic No. 4.  I will permit brief 30(b)(6) depositions for

16   the organizational defendants on policies and practices for

17   handling FOIL requests.

18        I do understand and acknowledge that there's some

19   merit to Ms. Saint-Fort's argument that this can be done

20   through document production, but I think that there are nuances

21   that may not be clear from the documents.  And I also

22   understood, and here I agree with Ms. Saleski the most, about

23   the need for a deposition to capture what they believe is an

24   inconsistency in practice.  So on that topic alone I'm allowing

25   a 30(b)(6) deposition.  If it ends up being four agency

K7SHUNIO

1  representatives or one who just knows everything, doesn't

2  matter to me.  It's topic 4 only and not the other topics.

3  Thank you.

4          All right.  Mr. Coles --

5          MS. SAINT-FORT:  If I may?

6          THE COURT:  You may, Ms. Saint-Fort.  Thank you.

7          MS. SAINT-FORT:  Thank you, your Honor.

8          I have just a brief follow-up on that point.  When you

9  say "brief depositions," will your Honor be instituting a time

10  limitation?

11          THE COURT:  I can't imagine each deposition would

12  exceed 90 minutes.  So if you want, I will give you a 90-minute

13  limit on each deposition, which I'd love if you came in earlier

14  than 90 minutes, but I don't think it takes longer than that.

15  You can really truncate the stuff at the front end.  So, yes,

16  90-minute limits.  Thank you.  Thank you, Ms. Saint-Fort.

17          Ms. Saint-Fort, was there something else you wanted to

18  add?

19          MS. SAINT-FORT:  Not on that point, your Honor, no.

20          THE COURT:  OK.  Thank you.

21          Ms. Saint-Fort, is there something on another point

22  that you'd like to discuss?

23          MS. SAINT-FORT:  There is another issue that Ms. Quinn

24  will be addressing.  I don't know if now is the proper time.  I

25  don't know.  I'm not sure where your Honor was going.

K7SHUNIO

1          THE COURT:  OK.  I actually thought we were nearing

2     conclusion, but hold on a second.

3          Ms. Saleski, I'm going to turn to you because I've

4     been dealing with you most recently.  I believe that addresses

5     the discovery disputes that you brought to my attention.  Am I

6     correct?

7          MS. SALESKI:  You are correct.  May I just ask your

8     Honor, so that all the parties are clear, even though we're not

9     doing a 30(b)(6) on topic No. 1, we can expect declarations

10    sufficient to cover topic No. 1?

11         THE COURT:  Yes, we can.

12         MS. SALESKI:  Thank you, your Honor.

13         THE COURT:  OK.

14         MS. SALESKI:  That concludes our discovery complaint.

15    Thank you.

16         THE COURT:  All right.  No, I appreciate it.  I

17    appreciate your patience as we went through all of these.

18         Ms. Quinn, there's something else you want to bring to

19    my attention?

20         MS. QUINN:  Excuse me.  Yes, your Honor.  Thank you

21    very much.  This is Rebecca Quinn speaking, for the court

22    reporter.

23         I just wanted to raise a concern about the TRO.

24    Depending on whether or not the plaintiffs do go in the next 24

25    hours to the Second Circuit and depending on what the Second

K7SHUNIO

1   Circuit does, if the TRO is lifted and not extended as to

2   NYCLU, NYCLU is free to share whatever they have, and so too we

3   will be, under document request No. 1, producing all the

4   documents that we have -- that CCRB and NYPD have provided as a

5   result of document requests since June 12, 2020, and that

6   includes the database that went to NYCLU.

7           So NYCLU and plaintiff will not be restrained from

8   sharing, discussing, contextualizing, talking to whoever may

9   ask about what these documents are, what they mean, and the

10  city and CCRB will be restrained from doing so.  I just wanted

11  to raise that that's not -- we're being treated unequally in

12  that regard.

13          THE COURT:  All right.  With respect to NYCLU,

14  obviously, you are different from they in that there is now, at

15  least for now, an injunctive order.

16          I guess I want to understand what your concern is.  Is

17  your concern that the plaintiffs will publicly disclose this

18  information or comment on it or what?

19          MS. QUINN:  I think both.  I mean, I don't know that

20  plaintiffs are going to be -- obviously, they're seeking to

21  withhold this information, so I'm not saying that they're going

22  to go and publish the database.  But they will certainly be

23  able to discuss it, contextualize it, and share whatever

24  information and viewpoints that they may choose to from that,

25  and we will be restrained.

K7SHUNIO

1          THE COURT:  Mr. Coles, is it you or Ms. Saleski who's

2     responding to this?

3          MR. COLES:  I'm happy to respond to it.  I'm not sure

4     I actually understand the concern.

5          THE COURT:  Well, let me ask this question, Mr. Coles:

6     The materials that are being produced -- was it your plan, sir,

7     to enter into a protective order with the defendants?

8          MR. COLES:  Yes, yes.

9          THE COURT:  OK.

10          MR. COLES:  We had agreed to that.

11          THE COURT:  OK.  I'm assuming whatever you get from

12     them in response to document request No. 1, you will not be

13     thereafter publishing or publicizing?

14          MR. COLES:  That is correct, your Honor.

15          THE COURT:  OK.  Ms. Quinn, when you speak about

16     contextualizing, I distinguish efforts to address this

17     information in the papers that are submitted to me from other

18     context.  What context are you thinking of, please?

19          MS. QUINN:  I mean, I was thinking of media outlets,

20     for example.

21          THE COURT:  Mr. Coles, you're not -- are you going to

22     be speaking to the media about these materials?  Because that

23     would seem to be in violation of the protective order you

24     haven't yet signed.

25          MR. COLES:  No, we don't plan to be doing that, your

90

K7SHUNIO

1  Honor.

2          THE COURT:  All right.  Ms. Quinn, I appreciate your

3  concern.  I didn't have it because I thought, as you do, that

4  Mr. Coles and his clients would like to limit this material.

5          I hear you, and I guess I would need a little bit more

6  of a showing.  And if you want to think about it and write to

7  me on this or if you want to have discussions offline with

8  Mr. Coles and Ms. Saleski about what your concerns are, I'd

9  rather do that than sort of give you an advisory opinion or

10  sort of an opinion on half of a record.  Is that all right?

11          MS. QUINN:  Yes, I understand.  I would just say that

12  plaintiffs have already been contextualizing the documents in

13  the press, and we haven't been.

14          THE COURT:  All right.  I will be looking at that with

15  greater concern.  Thank you.

16          Something else, Ms. Quinn?

17          MS. QUINN:  No.  That's it, your Honor.  Thank you.

18          THE COURT:  All right.  Ms. Saint-Fort, anything else

19  today?

20          MS. SAINT-FORT:  No, your Honor.  Thank you.

21          THE COURT:  All right.  If you want to go into a

22  third -- finish the third hour, we can, but I figured you all

23  had other things to do.

24          I'm letting you go with my thanks for your

25  preparedness and for your willingness to engage in these issues

K7SHUNIO

1    with me.  We are adjourned, and I'll await to hear from you if

2    I need to hear from you on anything else.

3                 Be well.  Thank you very much.

4                 (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit F

From: Quinn, Rebecca Jo (Law) <rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>>
Sent: Tuesday, July 14, 2020 9:48 AM
To: Coles, Anthony P. <anthony.coles@us.dlapiper.com<mailto:anthony.coles@us.dlapiper.com>>;
Saint-Fort, Dominique (Law) <dosaint@law.nyc.gov<mailto:dosaint@law.nyc.gov>>; Saleski, Courtney
<Courtney.Saleski@us.dlapiper.com<mailto:Courtney.Saleski@us.dlapiper.com>>
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

[EXTERNAL]
_____
Thanks for the call in number.

In advance of our call we want you to know that we are inclined to agree to a delay, however we still
need confirmation from NYPD. In order to gauge the amount of time we think is appropriate for briefing,
we'd like to review your papers. Are you willing to send us a copy today?

Thank you,
Rebecca

Rebecca Quinn
Assistant Corporation Counsel
Labor & Employment Law Division
New York City Law Department
100 Church Street
New York, NY 10007
(w) 212-356-4382
(c) 646-357-0802
rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>


From: Quinn, Rebecca Jo (Law)
Sent: Tuesday, July 14, 2020 9:26 AM
To: 'Coles, Anthony P.'; Saint-Fort, Dominique (Law); Saleski, Courtney
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

Good morning, sounds good. We will look out for the call in number.

From: Coles, Anthony P. [mailto:anthony.coles@dlapiper.com]
Sent: Tuesday, July 14, 2020 9:15 AM
To: Quinn, Rebecca Jo (Law); Saint-Fort, Dominique (Law); Saleski, Courtney
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

Rebecca, let's have a check in call at 10:15 am— I can send around a call in # to make sure we are
communicating smoothly. OK --Tony

1

Anthony Coles
Partner

T +1 212.335.4844
F +1 212.884.8644
M +1 917.952.9567
E anthony.coles@us.dlapiper.com <mailto:anthony.coles@us.dlapiper.com%20>

<image001.jpg>

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
United States
www.dlapiper.com <http://www.dlapiper.com/>

From: Quinn, Rebecca Jo (Law) <rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>>
Sent: Monday, July 13, 2020 8:00 PM
To: Coles, Anthony P. <anthony.coles@us.dlapiper.com<mailto:anthony.coles@us.dlapiper.com>>;
Saint-Fort, Dominique (Law) <dosaint@law.nyc.gov<mailto:dosaint@law.nyc.gov>>
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

[EXTERNAL]
_____

Hi Tony, we don't have an answer yet to your request that NYPD delay the release of records pending
our discussions regarding briefing. There are a few different decision-makers that need to coordinate. It
does not appear that we will have an answer tonight, but we will certainly get in touch as soon as we
hear anything.

Thanks,
Rebecca


Rebecca Quinn
Assistant Corporation Counsel
Labor & Employment Law Division
New York City Law Department
100 Church Street
New York, NY 10007
(w) 212-356-4382
(c) 646-357-0802
rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>

From: Quinn, Rebecca Jo (Law)
Sent: Monday, July 13, 2020 5:16 PM
To: 'Coles, Anthony P.'; Saint-Fort, Dominique (Law)
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

Hi Tony, We want to be clear that we did not yet agree that our clients wouldn't release anything. We
are reaching out to them right now to confirm and will get back to you as soon as we can.

Thank you again for reaching out and we will be in touch shortly.

Rebecca

Rebecca Quinn
Assistant Corporation Counsel
Labor & Employment Law Division
New York City Law Department
100 Church Street
New York, NY 10007
(w) 212-356-4382
(c) 646-357-0802
rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>

From: Coles, Anthony P. [mailto:anthony.coles@dlapiper.com]
Sent: Monday, July 13, 2020 5:09 PM
To: Saint-Fort, Dominique (Law)
Cc: Quinn, Rebecca Jo (Law)
Subject: FW: Repeal of section 50a of NYS Civil Rights Law

Thank you – I appreciate the follow up. I now have your correct address, and mis-addressed the below.
Best, Tony

Anthony Coles
Partner

T +1 212.335.4844
F +1 212.884.8644
M +1 917.952.9567
E anthony.coles@us.dlapiper.com <mailto:anthony.coles@us.dlapiper.com%20>

<image001.jpg>

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
United States
www.dlapiper.com <http://www.dlapiper.com/>

From: Coles, Anthony P.
Sent: Monday, July 13, 2020 5:01 PM
To: rquinn@law.nyc.gov<mailto:rquinn@law.nyc.gov>; dsaint-fort@law.nyc.gov<mailto:dsaint-fort@law.nyc.gov>
Cc: gpestana@law.nyc.gov<mailto:gpestana@law.nyc.gov>;
scushman@law.nyc.gov<mailto:scushman@law.nyc.gov>; Andrew C. Quinn - Quinn Law Firm
(aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>)
<aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>>; Mike Murray
<MMurray@NYCPBA.org<mailto:MMurray@NYCPBA.org>>; Andrew C. Quinn - Quinn Law Firm
(aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>)

<aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>>; Mike Murray
<MMurray@NYCPBA.org<mailto:MMurray@NYCPBA.org>>; Saleski, Courtney
<Courtney.Saleski@us.dlapiper.com<mailto:Courtney.Saleski@us.dlapiper.com>>;
jjohnson@law.nyc.gov<mailto:jjohnson@law.nyc.gov>
Subject: RE: Repeal of section 50a of NYS Civil Rights Law

Dominique and Rebecca:

Thank you for your follow up today on the above.

I look forward to discussing scheduling and any other matters related to a potential claim by my clients,
and also am confirming my understanding that, until we have a further communication, our clients will
not commence action, and your client will not proceed with a release.

We also are available to describe our specific concerns about post-50a repeal issues.

Respectfully, Tony

Anthony Coles
Partner

T +1 212.335.4844
F +1 212.884.8644
M +1 917.952.9567
E anthony.coles@us.dlapiper.com <mailto:anthony.coles@us.dlapiper.com%20>

<image001.jpg>

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
United States
www.dlapiper.com <http://www.dlapiper.com/>

From: Coles, Anthony P.
Sent: Monday, July 13, 2020 2:03 PM
To: jjohnson@law.nyc.gov<mailto:jjohnson@law.nyc.gov>
Cc: gpestana@law.nyc.gov<mailto:gpestana@law.nyc.gov>;
scushman@law.nyc.gov<mailto:scushman@law.nyc.gov>; Andrew C. Quinn - Quinn Law Firm
(aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>)
<aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>>; Mike Murray
<MMurray@NYCPBA.org<mailto:MMurray@NYCPBA.org>>; Andrew C. Quinn - Quinn Law Firm
(aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>)
<aquinn@quinnlawny.com<mailto:aquinn@quinnlawny.com>>; Mike Murray
<MMurray@NYCPBA.org<mailto:MMurray@NYCPBA.org>>; Saleski, Courtney
<Courtney.Saleski@us.dlapiper.com<mailto:Courtney.Saleski@us.dlapiper.com>>
Subject: Repeal of section 50a of NYS Civil Rights Law

Dear Corporation Counsel Johnson,

I am writing on behalf of the five city police associations, the two city firefighters associations and the
corrections officers association. As you know, each of these associations has expressed concern about

the city's potential release of certain law enforcement files that should be protected regardless of the repeal of section 50a. A number of them have had meetings with their respective agencies to discuss their concerns.

The associations' concerns raise substantial legal issues that may have to be resolved judicially before any release. If that is the case, I would like to proceed in an orderly fashion to make sure that the city has adequate notice of our concerns, as well as any legal filing that seeks provisional relief, and that we try to work out briefing schedules, if necessary, during this unusual time for the courts.

Please let me know of times that you may be available to discuss these issues today, or at your earliest convenience.

Respectfully, Tony Coles

Anthony Coles
Partner

T +1 212.335.4844
F +1 212.884.8644
M +1 917.952.9567
E anthony.coles@us.dlapiper.com <mailto:anthony.coles@us.dlapiper.com%20>

<image001.jpg>

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020-1104
United States
www.dlapiper.com <http://www.dlapiper.com/>

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com<mailto:postmaster@dlapiper.com>. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com<mailto:postmaster@dlapiper.com>. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or

copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com<mailto:postmaster@dlapiper.com>). Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# Exhibit G



**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

Anthony Paul Coles
T  (212) 335-4844
E  anthony.coles@us.dlapiper.com

July 20, 2020

Hon. Katherine Polk Failla
United States District Court
    for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:    *Uniformed Fire Officers Association, et al. v. Bill de Blasio, et al.*
      **No. 20-cv-05441 (KPF) (RWL)**

 Dear Judge Failla:

    As counsel to Plaintiffs, we write in response to the letter from Defendants' counsel, filed July 17, 2020.  (*See* ECF No. 7 ("Defs.' July 17 Letter"); *see also* ECF No. 9 ("Pls.' July 17 Letter").)  Plaintiffs represent approximately 60,000 New York City firefighters, police officers, and corrections officers.

    By this letter, we request that the Court direct the parties to meet and confer to propose a schedule for a Preliminary Injunction hearing on the matters raised by Plaintiffs' Verified Petition/Complaint ("Complaint") (ECF No. 10-2), which was removed to this Court, and to meet and confer on the scope of discovery in anticipation of the hearing.  There also should be no question that the TRO entered on July 15 by the Hon. Carol Edmead, JSC, should remain in effect.

    In the wake of the repeal of New York Civil Rights Law § 50-a, which had kept law enforcement personnel records confidential for more than four decades, Defendants have indicated an immediate intent to disclose and promote on the internet thousands of records relating to discipline of firefighters, corrections officers, and police officers, as well as confidential settlement agreements.  But the repeal of § 50-a did not also repeal well-settled law regarding collective bargaining, due process, and contract law.  At issue in this lawsuit is how the repeal of § 50-a can be administered in light of existing legal protections that are independent of § 50-a.  Without the protections of a TRO, the indiscriminate disclosures contemplated by Defendants would cause irreparable harm to Plaintiffs—which Justice Edmead identified as a "critical" concern when she issued her order.  (A copy of Justice Edmead's July 15 order is attached as Exhibit A.)

    As set forth in the Complaint, the release of unsubstantiated, unfounded, exonerated (or not guilty), or pending disciplinary matters ("Unsubstantiated and Non-Final Allegations") and confidential settlement agreements would, among other harms:



Hon. Katherine Polk Failla
July 20, 2020
Page 2

- Violate Plaintiffs' Collective Bargaining Agreements ("CBAs") with the Defendants because Plaintiffs have in place CBAs with terms and conditions that protect against the release of Unsubstantiated and Non-Final Allegations, in various forms, and four of the police association Plaintiffs and the corrections association have pending grievances that are proceeding to arbitration. The Defendants have no right to unilaterally render those terms null and void without following the provisions of the N.Y. Collective Bargaining Law, including those that mandate arbitration of grievances. Pending final determination by arbitration of those grievances, Defendants' imminent release of Unsubstantiated and Non-Final Allegations must be enjoined.

- Violate the Due Process and Equal Protection Clauses of the United States and New York State Constitutions, and irrevocably and unfairly stigmatize Petitioners' members. The proposed indiscriminate disclosure on the internet of unproven allegations is functionally irreversible, and would create unfair (and eternal) reputational and other damage to Plaintiffs;

- Breach thousands of settlement agreements entered into in good faith with the Respondents before the repeal of § 50-a with the legal expectation of confidentiality; and

- Arbitrarily and capriciously reverse longstanding City and State practice of deeming Unsubstantiated and Non-Final Allegations to be protected from disclosure, separate and apart from the provisions of § 50-a.

In further response to Defendants' July 17 Letter, we address Defendants' misstatements of fact and law, including regarding the validity of a TRO issued by Justice Edmead (N.Y. Supreme Court) before the case was removed.

     1.     <u>The State Court's TRO Was Validly Issued and Remains in Effect.</u>

Justice Edmead properly entered a TRO. The order provides that Defendants, "and those acting in concert with them, are ***Stayed*** from publicly disclosing any records concerning Unsubstantiated and Non-Final Allegations or settlement agreements as defined in [Plaintiffs' Petition], entered into prior to June 12, 2020, relating to the repeal of" CPLR § 50-a(1)." (ECF No. 7-1 at 2 (emphasis and capitalization in original).) As Justice Edmead's order makes clear, she not only entered the order timely, but also denied a subsequent application by the Defendants to set the order aside. As the order reflects, Defendants had neither served a notice of removal on Plaintiffs nor filed a copy of the notice with the clerk of the state court before it went into effect. (ECF No. 7-1 at 3.)

Defendants now try again to relitigate Justice Edmead's order because, they argue, it was "issued by the state court following the removal of this matter to federal court." (Defendants' July 17 Letter at 1.) Justice Edmead already correctly rejected this argument. (ECF No. 7-1 at



Hon. Katherine Polk Failla
July 20, 2020
Page 3

3.)  That conclusion was correct and is law of the case, and because it was made before removal was effective, it is as valid as an order of this Court would be today.  *See Nasso v. Seagal*, 263 F. Supp. 2d 596, 608 (E.D.N.Y. 2003) (stating that, on "removal, the orders entered by the state court are treated as though they had been entered by the federal court"); *Riveredge Owners' Ass'n v. Town of Cortlandt, Inc.*, No. 16-CV-5665, 2016 WL 6462387, at *7 (S.D.N.Y. Nov. 1, 2016) (report and recommendation) ("A federal district court has jurisdiction on the day that a notice of removal is filed with the Clerk of that court . . .  A State court, on the other hand, loses jurisdiction on the date the notice of removal is filed in State court."), *R. & R. adopted*, 2016 WL 7392218 (S.D.N.Y. Dec. 21, 2016); *see also* 28 U.S.C. § 1450 ("All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court.").

Defendants' contention that they "have been, in effect, subject to a restraint without having had an opportunity to be heard on the merits of Plaintiffs' application" is nonsense.  (ECF No. 7 at 2.)  Defendants, in a highly unusual move, initiated removal of this action *in the middle of the TRO hearing* before Justice Edmead, where counsel for all parties were present and had already begun to present argument to the state court.

2.    Plaintiffs Are Entitled to a Temporary Restraining Order and Preliminary Injunction.

Plaintiffs docketed a copy of their Complaint, Memorandum of Law, and supporting papers on Friday, July 17 for the Court's reference.  (*See* ECF No. 10 and exhibits thereto.)  We will nonetheless address a few of the matters raised in Defendants' Letter, which were made in shotgun fashion, and without citation to authority.

*First*, Defendants' contention that this action is an "attempt[] to subvert the clear intent" of the repeal § 50-a and to "contravene the legislature's purpose … through this litigation" is meritless.  (Defs.' July 17 Letter at 1-2.)  As Plaintiffs explain in the Complaint, "§ 50-a was never the only source of [Defendants'] obligation to protect the privacy and safety of [Plaintiffs'] members."  (ECF No. 10-2 ¶ 67; *see also, generally, id.* ¶¶ 66-76.)  The repeal of § 50-a did not alter Plaintiffs' collective bargaining rights, which include the right to seek expungement of some of the very information Defendants intend to release on the internet.  It also did not affect the constitutional guarantees of due process and equal protection, or the right to privacy and legal entitlement to reasoned decision-making by government agencies.  Disclosures following the repeal of § 50-a must continue to account for these continuing (and indeed pre-existing) sources of legal protections.

*Second*, Defendants' imminent release of confidential information is a classic manifestation of irreparable injury.  (*See* ECF No. 10-12 at 6-9.)  These Unsubstantiated and Non-Final



Hon. Katherine Polk Failla
July 20, 2020
Page 4

Allegations will be promoted and published by Defendants on the internet, potentially violating the rights of thousands of law enforcement officers. (*Id.*) Once inflicted, this harm could never be reversed. *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again."); *Doe v. Greco*, 62 A.D.2d 498, 501 (3d Dep't 1978) ("Public disclosure of what is now confidential and should remain confidential would lead to an irreversible breach of that confidentiality. The harms which would naturally flow from disclosure could not be redressed nor could the parties ever be returned to the *status quo ante*."). The records at issue have been confidential since 1976, and there is no pressing need to indiscriminately release them.

Defendants callously ignore the threat of physical harm alleged in the Complaint, including targeting of police officers with violence. (ECF No. 10-2 at ¶ 75.) And to the extent recent examples of harassment and threats of violence against police shed light on the threatened harms in this case, one need only look to the local papers.[1] And Defendants' contention that because "[t]he types of records Plaintiffs seek to prevent from disclosure … have, for years, already been released for other public employees," and because Plaintiffs have failed "to point to even one instance where the public disclosure [of disciplinary files] resulted in harm," any disclosure of Unsubstantiated and Non-Final Allegations "will not cause irreparable harm" is meritless and beside the point. (Defs.' July 17 Letter at 3.) Plaintiffs' Memorandum of Law illustrates why past disclosure of similar records in response to specific records requests cannot reasonably be compared to the wholesale global publication and promotion of Unsubstantiated and Non-Final Allegations at issue in this case and the widespread harm this approach will cause. (ECF No. 10-12 at 6-10; *cf. U.S. Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 764 (1989) ("Plainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country and a computerized summary located in a single clearinghouse of information.").) That is precisely why, under similar circumstances less than two weeks ago, the Appellate Division of the Superior Court of New Jersey temporarily enjoined that state's attorney general from ordering public disclosure of the identities of officers who have been sanctioned for serious disciplinary violations—*i.e.*, officers with records of proven misconduct. *See* Order on Motion, No. A-003950-19T4 (N.J. Super., App. Div. July 8, 2020) (attached as Exhibit C). That court applied "well-settled law to preserve the officers' challenge by staying implementation of the [attorney

---

[1] *See, e.g.*, Thomas Tracy and John Annese, *Queens NYPD lieutenant gets phone threats after protester's arrest: sources*, N.Y. Daily News (July 14, 2020), https://www.nydailynews.com/new-york/nyc-crime/ny-queens-cop-threatened-after-protester-arrest-20200714-uau5dt4aq5ftzefjn7q7mbpyvy-story.html (describing NYPD lieutenant who received "about 30 phone calls and 40 texts on his department phone, including photos of severed legs and limbs, and messages like … "We have all of your personal info" and "Watch you back, we will blast you….").



Hon. Katherine Polk Failla
July 20, 2020
Page 5

general's orders] pending [its] disposition of the appeal." *Id.* at 2. Here, Plaintiffs similarly seek nothing more than to preserve the status quo and prevent the specific irreparable harms described in the Complaint and Memorandum of Law. (*See* ECF No. 10-2 ¶¶ 3, 9; ECF No. 10-12 at 6-11.)

*Third*, Defendants' purported justiciability concerns are without merit. Defendants begin by contending that "Plaintiffs have not actually identified a dispute with each of the City agencies named in this matter." (ECF No. 7 at 3.) For example, they argue that "Plaintiffs are seeking to enjoin NYPD from taking an action it does not plan to take" because NYPD "intends to publish only Charges and Specifications, dispositions and penalties." (*Id.*) As the Complaint alleges, the NYPD has clearly threatened the immediate release of unproven claims. (*See* ECF No. 10-2 ¶¶ 1-9.) And as explained in Plaintiffs' Affirmation in Support of Emergency Relief, NYPD told Plaintiffs' counsel it intended to disclose records of unsubstantiated, unfounded, exonerated, and pending disciplinary matters by or before July 15, 2020. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982))). On July 13 and 14, we asked counsel for Defendants whether any release could be delayed beyond July 15, and they refused to commit then, or at the subsequent hearing before Justice Edmead.

Plaintiffs also adequately address the role of Defendants Fire Department of New York and the Department of Corrections, alleging that "the Mayor, NYPD, and CCRB have indicated that they intend to release all disciplinary records of firefighters, corrections officers, and police officers, including Unsubstantiated and Non-Final Allegations." (ECF No. 10-2 ¶ 50.) And, at any rate, public statements made by Mayor de Blasio about the imminent release of records for police officers, firefighters, and correction officers contradict Defendants' assertions before the Court.[2] Plaintiffs have sufficiently alleged that publication on the internet of disciplinary records from each of the Defendant agencies is imminent. (*See, e.g.*, ECF No. 10-2 ¶ 1 (alleging that Defendants will begin the release of records "concerning disciplinary matters against retired and active individual New York City police officers, firefighters and corrections officers")).

Defendants also contend there is no case or controversy against Defendant Civilian Complaint Review Board ("CCRB") because – although their explanation is vague and ambiguous – the CCRB has already indiscriminately released many of the documents in question since the June repeal of § 50-a, including some documents "as of" July 13, the same day

---

[2] *See, e.g.*, *NYC mayor wants disciplinary records for firefighters and correction officers posted online, just like police*, N.Y. Daily News (June 29, 2020), https://www.nydailynews.com/new-york/nyc-crime/ny-50-a-de-blasio-fndy-correction-department-20200629-az6br44mcbbclbg2rbcf24x6ii-story.html.



Hon. Katherine Polk Failla
July 20, 2020
Page 6

Defendants received notice of Plaintiffs' intention to file this lawsuit. (Defs.' July 17 Letter at 3.) Plaintiffs, however, are not aware of any such release, which in any event would raise concerns about the CCRB's actions.

On July 8, 2020, Plaintiff, Police Benevolent Association of the City of New York, Inc. ("PBA"), wrote to Defendant Frederick Davie, Chair of the CCRB, reminding him that "the CCRB has previously refused to produce" Unsubstantiated and Non-Final Allegations in response to individual requests "on the ground that doing so would constitute an 'unreasonable invasion of privacy[.]'" (Letter from Patrick J. Lynch to Rev. Fred Davie (July 8, 2020).) The letter also sought Mr. Davie's "assurances that the CCRB will properly apply all FOIL exemptions to safeguard police officers and families" notwithstanding the repeal of § 50-a, as Mr. Davie suggested the CCRB would do in October 2019. (Attached as Exhibit B is Mr. Lynch's letter and an accompanying letter, also dated July 8, 2020, from Michael Murray to Jonathan Darche.)

It now may appear that, as of the date of the PBA's letter, the CCRB had already released some of these documents to requestors, and it did so again less than a week later. Plaintiffs have a live claim for injunctive relief to prevent further dissemination of Unsubstantiated and Non-Final Allegations, including pending cases that have not yet been released. (*See* Defs.' July 17 Letter at 3 (noting that disclosure did not include pending or open cases).) Separately, these representations demonstrate Plaintiffs' urgent need to take limited discovery in advance of the preliminary injunction hearing. Plaintiffs seek expedited discovery of (i) any release of Unsubstantiated and Non-Final Allegations by the CCRB, (ii) the recipients of any such release, (iii) any communications concerning the release, among other things. Plaintiffs are entitled to know what, if anything, the CCRB has produced, to whom, when, and why, and to fashion any appropriate remedies or safeguards. Far from mooting the point, as Defendants allege, the CCRB's conduct emphasizes the importance of the TRO, which stays and binds Defendants and those "acting in concert" with them. It also highlights the importance of Plaintiffs' request for expedited discovery.

*Fourth*, Defendants' cursory, four-paragraph discussion of the merits of Plaintiffs' 33-page Complaint, including nine claims for relief, hardly requires a response. However, their brief assessment of the claims belies several fundamental misunderstandings that bear mentioning:

- Each of the Plaintiff Unions has entered into a CBA with their respective agencies and the City governing the terms and conditions of their employment. Multiple Plaintiffs have filed grievances and initiated the arbitration process outlined in their CBAs because the release of Unsubstantiated and Non-Final Allegations would violate the CBAs and unilaterally render certain provisions null and void. In requesting an injunction in aid of arbitration (Count 1), Plaintiffs seek to prohibit



Hon. Katherine Polk Failla
July 20, 2020
Page 7

Defendants from undermining their arbitrations by irreversibly publishing the very information that would be at issue in those tribunals. The law is well settled that courts have authority to order provisional injunctive relief to "protect the viability of an award" in arbitration and prevent that process from becoming an empty ritual. *Saferstein v. Wendy*, 137 Misc. 2d 1032, 1034 (Sup. Ct., N.Y. Cnty. 1987) ("[CPLR § 7502(c)] was intended to maintain the status quo pending arbitration in order to protect the viability of an award in favor of the applicant."); *see also Espiritu Santo Holdings, LP v. L1bero Partners, LP*, No. 19-cv-3930, 2019 WL 2240204, at \*16 (S.D.N.Y. May 14, 2019) ("This Court also has authority to issue the requested injunctive relief pursuant to Fed. R. Civ. P. 64, which incorporates state-law provisional remedies, including injunctions in aid of arbitration under C.P.L.R. § 7502(c)."), *aff'd*, 789 F. App'x 288 (2d Cir. 2020). Defendants' argument that "the court does not have jurisdiction over any breach of the collective bargaining agreements" misunderstands both the nature of the relief requested in Count 1 and this Court's authority. (Defs.' July 17 Letter at 4.)

- The Due Process Clauses of the U.S. and N.Y. Constitutions prohibit government employers from inflicting reputational harm on individuals and depriving them of a protected liberty interest without adequate procedures. Here, Plaintiffs' members will face reputational harm (stigma) from the worldwide publication of Unsubstantiated and Non-Final Allegations, and this harm will implicate their liberty interest in pursuing future employment opportunities (plus). (ECF No. 10-12 at 13-18.) This liberty interest is well recognized, particularly in the context of websites created and promoted by the government that potential employers are likely to access. *See Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994) (stating that "the dissemination of information from [a state registry of child abuse offenders] to potential child care employers, coupled with the defamatory nature of inclusion on the list, does implicate a liberty interest"); *Bursac v. Suozzi*, 22 Misc. 3d 328, 340 (Sup. Ct., Nassau Cnty. 2008) (stating that county executive's public posting of identifying information about DWI arrestees "on an Internet Web site with unlimited access to the public" could "affect a legal status and impose specific harm by being available to, *inter alia*, search engines, credit agencies, landlords and potential employers, for a lifetime, regardless of the underlying outcome of the case"). Separately, Defendants are mistaken that the due process claims involve the disclosure of settlement agreements. (Defs.' July 17 Letter at 4.) They seem to be referencing Plaintiffs' allegation that the release of these records "would doubly violate due process because, in deciding how to respond to allegations, officers relied on the City's guarantee that such allegations would remain confidential." (ECF No. 10-12 at 17.) This application of the repeal of § 50-a would have an impermissibly retroactive effect by upsetting reliance interests and



Hon. Katherine Polk Failla
July 20, 2020
Page 8

triggering fundamental fairness concerns.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 278-80 (1994).

- The Defendants' imminent disclosures will also breach disciplinary settlement agreements entered into prior to the repeal of § 50-a (Count 6).  Because § 50-a was in effect when the agreements were executed, the law's protections "form a part of the contract *as fully as if expressly incorporated in the contract*."  (ECF No. 10-12 at 22 (quoting 11 Williston on Contracts § 30:19).)  Defendants provide no contrary authority on this point.

- The Equal Protection Clauses of the U.S. and N.Y. Constitutions prohibit the government from treating similarly situated individuals differently.  The planned disclosures violate this principle insofar as firefighters, corrections officers, and police officers will receive "different treatment from that received by other individuals similarly situated."  (ECF No. 10-12 at 19-21.)  Defendants' contention that "Plaintiffs are in fact now treated similarly to other City employees" because OATH, the agency that "adjudicates disciplinary charges for the majority of City employees," "publishes its Reports and Recommendations online, including for charges that "are ultimately adjudicated as not-guilty" fails to account for the full spectrum of allegations that Defendants have indicated they will publish and promote online.  (ECF No. 7 at 4.)  (ECF No. 1-1 ¶ 51.)  Defendants do not contend that OATH publishes all pending and unsubstantiated accusations against, for example, sanitation workers or City Council members that do not lead to charges.  But that is the type of disclosure the City has indicated it will make against firefighters and officers in light of the repeal of § 50-a.

- As to Plaintiffs' Article 78 claims (Counts 7 and 8), Defendants again misapprehend the practical significance of the repeal of § 50-a, which merely repealed the law barring disclosure: it did not *require* disclosure, and it certainly did not require disclosure without consideration of the consequences of other laws, and in violation of Plaintiffs' legal, contractual and constitutional rights.  Defendants' data dump ignores their past practice, well-settled expectations, and the independent sources of law cited in the Memorandum of Law that would make any decision to release Unsubstantiated and Non-Final Allegations an arbitrary and capricious one.  (ECF No. 10-12 at 23-29.)  This is especially so because the documents were not individually analyzed.  It is bedrock administrative law that the agency must not consider things categorically when a more focused review is possible.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 45 (1983).  Finally, Defendants' purported ripeness issue is circular: they claim that an agency determination to release the records "is speculative" and unreviewable until



Hon. Katherine Polk Failla
July 20, 2020
Page 9

the records are actually released, (Defs.' July 17 Letter at 5), while simultaneously claiming that no action lies once the records are released, (*id.* at 3). Such circular logic cannot stand.

3.   Plaintiffs Request Expedited Discovery and a Briefing Schedule.

Finally, Plaintiffs respectfully request the Court order the parties to meet and confer on a briefing schedule to address the motion for a preliminary injunction and the scope of discovery, and the continuation of the TRO pending the hearing and determination of that motion. The need for discovery in advance of the preliminary injunction hearing is particularly acute here. Defendants contend they have released some but not all of the records Plaintiffs contend are protected from disclosure by law. It is important to understand exactly what records were disclosed, by which Defendants, and when. Plaintiffs also are entitled to discovery on the contours of the terms Defendants use, including their use of words like "unsubstantiated," and Plaintiffs must explore relevant information concerning Defendants longstanding practice, separate and apart from § 50-a, of deeming certain unproven allegations against city employees and officers as confidential, and related matters.

The rights Plaintiffs seek to redress are important and fundamental. Plaintiffs appreciate the Court's consideration and are available at the Court's convenience, and also available to engage in a meet and confer with counsel for Defendants on these matters at the Court's direction. We would expect to reach out to counsel for Defendants promptly on these matters.

As this letter was being filed, we received correspondence from counsel for Defendants proposing a briefing schedule for a preliminary injunction motion that is unreasonably short and fails to provide for necessary discovery. In addition, under Fed. R. Civ. P. 65(b), the TRO entered by Judge Edmead remains in effect.

Respectfully submitted,

Anthony P. Coles

cc:   All counsel of record (*via* ECF)
        failla_NYSDChambers@nysd.uscourts.gov

Uniformed Fire Officers Association; Uniformed
Firefighters Association of Greater New York;
Correction Officers' Benevolent Association of the
City of New York; Police Benevolent Association of
the City of New York, Inc.; Sergeants' Benevolent
Association; Lieutenants' Benevolent Association;
Captains' Endowment Association; and Detectives'
Endowment Association,

                Petitioners/Plaintiffs,

    -against-

Bill de Blasio, in his official capacity as Mayor of the
City of New York; the City of New York;
Fire Department of the City of New York; Daniel A.
Nigro, in his official capacity as the Commissioner of
the Fire Department of the City of New York;
New York City Department of Correction; Cynthia
Brann, in her official capacity as the Commissioner
of the New York City Department of Correction;
Dermot F. Shea, in his official capacity as the
Commissioner of the New York City Police
Department; the New York City Police Department;
Frederick Davie, in his official capacity as the Chair
of the Civilian Complaint Review Board; and the
Civilian Complaint Review Board,

                Respondents/Defendants.

Case No. 1:20-CV-05441

**NOTICE OF ENTRY OF STATE
COURT ORDER**

**TO:   CLERK OF COURT AND ALL PARTIES OF RECORD**

     **PLEASE TAKE NOTICE** in connection with the Notice of Removal filed by

Respondents/Defendants in this action (ECF No. 1), that attached hereto is a true and correct copy

of an Order issued prior to removal that was entered and filed in the office of the Clerk of the

Supreme Court of the State of New York, New York County on July 15, 2020.

Dated: July 15, 2020
      New York, New York

**DLA PIPER LLP (US)**

By: /s/ *Anthony P. Coles*        
Anthony P. Coles
Michael R. Hepworth
1251 6th Avenue
New York, NY 10020
Telephone: (212) 335-4844
Facsimile: (212) 884-8644
Email: anthony.coles@dlapiper.com
Email: michael.hepworth@dlapiper.com

Courtney G. Saleski
   (*pro hac vice* to be filed)
1650 Market Street, Suite 5000
Philadelphia, PA 19103-7300
Telephone: (215) 656-2431
Facsimile: (215) 606-2046
Email: courtney.saleski@dlapiper.com

*Attorneys for Petitioners*

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON.  C. Edmead**                             PART  35

                                               *Justice*

-------------------------------------------------------------------------------X

UNIFORMED FIRE OFFICERS ASSOCIATION,
UNIFORMED FIREFIGHTERS ASSOCIATION OF
GREATER NEW YORK, CORRECTION OFFICERS'
BENEVOLENT ASSOCIATION OF THE CITY OF NEW
YORK, INC.,POLICE BENEVOLENT ASSOCIATION OF
THE CITY OF NEW YORK, INC.,SERGEANTS
BENEVOLENT ASSOCIATION, LIEUTENANTS
BENEVOLENT ASSOCIATION, CAPTAINS' ENDOWMENT
ASSOCIATION, DETECTIVES' ENDOWMENT
ASSOCIATION,

|  |  |
|---|---|
| INDEX NO. | 154982/2020 |
| MOTION DATE | 07/15/2020 |
| MOTION SEQ. NO. | 001 |

                                               Plaintiff,

                                      - v -

BILL DE BLASIO, IN HIS OFFICIAL CAPACITY AS MAYOR
OF THE CITY OF NEW YORK, THE CITY OF NEW YORK,
DANIEL A. NIGRO, IN HIS OFFICIAL CAPACITY AS THE
COMMISSIONER OF THE FIRE DEPARTMENT OF THE
CITY OF NEW YORK, CYNTHIA BRANN, IN HER
OFFICIAL CAPACITY AS THE COMMISSIONER OF THE
NEW YORK CITY DEPARTMENT OF CORRECTION,
DERMOT F. SHEA, IN HIS OFFICIAL CAPACITY AS THE
COMMISSIONER OF THE NEW YORK CITY POLICE
DEPARTMENT, THE FIRE DEPARTMENT OF THE CITY
OF NEW YORK, THE NEW YORK CITY DEPARTMENT OF
CORRECTION, THE NEW YORK CITY POLICE
DEPARTMENT, FREDERICK DAVIE, IN HIS OFFICIAL
CAPACITY AS THE CHAIR OF THE CIVILIAN COMPLAINT
REVIEW BOARD, THE CIVILIAN COMPLAINT REVIEW
BOARD

                                               **ORDER**

                                               Defendant.

-------------------------------------------------------------------------------X

The application of Petitioners/Plaintiffs Uniformed Fire Officers Association; Uniformed

Firefighters Association of Greater New York; Correction Officers' Benevolent Association of

the City of New York, Inc.; Police Benevolent Association of the City of New York, Inc.;

Sergeants Benevolent Association; Lieutenants Benevolent 75, Association; Captains

Endowment Association; and Detectives' Endowment Association for an Order

pursuanttoCPLR§6301, on behalf of Petitioners/Plaintiffs("Petitioners") Uniformed Fire Officers

Association, Uniformed Firefighters Association of Greater New York, Correction Officers

Benevolent Association of the City of New York, Police Benevolent Association of the City of

New York ,Inc., Sergeants Benevolent Association, Lieutenant Benevolent Association, Captains

Endowment Association, and Detectives' Endowment Association, preliminarily restraining

Respondents, and those acting in concert with them, from publicly disclosing any records

concerning disciplinary matters against individual New York City police officers, firefighters,

and correction officers that are non-final, unsubstantiated, unfounded, exonerated or resulted in a

finding of not guilty ("Unsubstantiated and Non-Final Allegations"), or that regard settlement

agreements entered into prior to June 12, 2020, is decided in accordance with the "So Ordered"

transcript (Laura Ludovico, Sr.Ct.Rptr.)

During the court's first oral argument on this application, Counsel for Defendants/Respondents

advised the court that this matter was being **Removed** from the Supreme Court of the State of

New York, County of New York, to the United States District Court for the Southern District of

New York. Initially counsel for Defendants/Respondents consented to this court issuing the

following which was "So Ordered" by the Court:

It is hereby

**ORDERED** that pending the issue of an Interim Stay before the United States

District Court for the Southern District of New York, the Defendants/Respondents,

and those acting in concert with them, are *Stayed* from publicly disclosing any

records concerning Unsubstantiated and Non-Final Allegations or settlement

agreements as defined in the instant Petition, entered into prior to June 12, 2020,

relating to the repeal of N.Y.C. Civ. Rights Law §50-a(1).

Thereafter, the court received an e-mail from counsel for Defendants/Respondents

**154982/2020   vs.**                                                    **Page 2 of 4**

advising as follows:

> Since the case has been removed it is our position, respectfully, that it is not appropriate for the Court to issue an order, including a stay pending the Federal Court hearing the TRO.
>
> Per 28 USC 1446(d):
>
> (d)Notice to Adverse Parties and State Court. —
>
> Promptly after the filing of such notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the notice with the clerk of such State court, which shall effect the removal **and the State court shall proceed no further unless and until the case is remanded.**

A second Skype conference was held (Laura Ludovico, Sr. Ct.Rptr.) to address the issue of this court's authority to issue a Stay.  Firstly, the above e-mail from counsel for Defendants/Respondents was not copied to counsel for Plaintiffs/Petitioners**.** Secondly uploading the Removal notice to NYCEF apparently does not constitute filing of a copy of the notice with the clerk of the court.[1] Thirdly, counsel for Plaintiffs/Petitioners were not provided a written notice of removal. And finally, and most importantly, the court's stay Order was in effect. For the foregoing reasons, the following Order of this Court is in full force and effect.

It is hereby

---

[1] .  From the Protocol on Courthouse and County Clerk Procedures for Electronically Filed Cases -Subsection J Paragraph 1-" If an order in a NYSCEF case directs that the County Clerk take action, a copy of the order must be served on the County Clerk (CPLR § 8019 (c)), as the order will usually expressly provide. This shall be done by filing with NYSCEF a completed Notice to the County Clerk - CPLR § 8019 (c) (NYSCEF Form EF-22, available on the NYSCEF site)."

**154982/2020    vs.**                                                          **Page 3 of 4**

**ORDERED** that pending the issue of an Interim Stay before the United States District Court for the Southern District of New York, the Defendants/Respondents, and those acting in concert with them, are *Stayed* from publicly disclosing any records concerning Unsubstantiated and Non-Final Allegations or settlement agreements as defined in the instant Petition, entered into prior to June 12, 2020, relating to the repeal of N.Y.C. Civ .Rights Law §50-a(1).

_____7/15/2020_____
**DATE**

HON. CAROL R. EDMEAD
J.S.C.
J.S.C.

| CHECK ONE: | X | CASE DISPOSED | | | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

154982/2020    vs.

**Page 4 of 4**



**Of The City Of New York, Inc.**

OFFICE OF THE PRESIDENT

July 8, 2020

**VIA E-MAIL & HAND DELIVERY**

Rev. Fred Davie, Chair
Civilian Complaint Review Board
100 Church Street, 10th Floor
New York, NY 10007

Re: **Applicability of FOIL Exemptions to Police Disciplinary Records, Including Unsubstantiated Complaints**

Dear Chair Davie:

I write to call your attention to a matter of urgent importance to the safety of every single police officer and our families, as described in the attached letter from PBA General Counsel Michael T. Murray to CCRB Executive Director Jonathan Darche.

As you know, the PBA strenuously opposed the recent repeal of Civil Rights Law § 50-a ("CRL § 50-a") based in large part on the serious safety concerns arising from the widespread dissemination of police officers' personnel records. Even with the protection of CRL § 50-a, we have seen police officers and their families targeted with threats and harassment – or, in one recent case, a mail bomb – based on mere accusations of misconduct. These concerns, however, were routinely dismissed by both repeal proponents and lawmakers on the grounds that New York State's existing Freedom of Information Law ("FOIL") exemptions provided adequate protection for police officers' privacy and safety.

As you will read in Mr. Murray's attached letter, the PBA believes that documents related to unsubstantiated allegations and unadjudicated claims are properly withheld under several different FOIL exemptions. Indeed, the CCRB has previously refused to produce such materials, on the ground that doing so would constitute "an unreasonable invasion of privacy" under FOIL. Moreover, as recently as October 2019 you referenced the FOIL exemptions and confirmed the important role they would play following the repeal of CRL § 50-a, stating that "transparency does not have to come at the expense of privacy, safety, or other public interests."

In our current environment, with the daily demonization of police officers in the media and the almost-nightly physical assaults we are enduring on the streets, our safety concerns are far from abstract: It is a matter of when, not if, an unstable individual is inspired by newly-public police records to target and bring harm to one of our sisters or brothers. We therefore seek your assurances that the CCRB will properly apply all FOIL exemptions to safeguard police officers and our families.

I look forward to discussing this matter with you at your earliest convenience.

Sincerely,

Patrick J. Lynch
President

125 Broad Street, 11th Floor, New York, N.Y. 10004-2400 | 212-233-5531 | www.nycpba.org



### *Police Benevolent Association*
#### Of The City Of New York, Inc.

OFFICE OF THE GENERAL COUNSEL

July 8, 2020

**VIA E-MAIL & HAND**

Mr. Jonathan Darche, Executive Director
Civilian Complaint Review Board
100 Church Street, 10th Floor
New York, NY 10007

**Re:** **Applicability of FOIL Exemptions to Police Disciplinary Records, Including Unsubstantiated Complaints**

Dear Executive Director Darche:

We write on behalf of all active and retired New York City police officers to confirm that the Civilian Complaint Review Board ("CCRB") will apply Freedom of Information Law ("FOIL") exemptions to requests for police disciplinary records and will withhold, *inter alia*, documents relating to unsubstantiated complaints of police misconduct ("Unsubstantiated Documents"), in light of the repeal of Civil Rights Law § 50-a ("CRL § 50-a").[1] As discussed below, New York State Senate and Assembly memoranda, the New York Committee on Open Government (the "FOIL Committee"), advocates for police reform and, indeed, black letter New York law make absolutely clear that—notwithstanding the repeal of CRL § 50-a—existing FOIL exemptions should continue to be used to protect the privacy, safety, and reputations of New York City police officers. Indeed, as recently as October 2019 Chair Davie echoed the FOIL exemptions and indicated the important role they would play following the repeal of CRL § 50-a, stating that "transparency does not have to come at the expense of privacy, safety, or other public interests."

Importantly, numerous government agencies and advocates have long confirmed that Unsubstantiated Documents are properly withheld under FOIL. Indeed, the CCRB itself has repeatedly refused to produce Unsubstantiated Documents based on the FOIL exemption for documents that, if disclosed, would constitute "an unwarranted invasion of personal privacy." Public Officers Law § 87(2)(b). That this approach is appropriate is further underscored by numerous FOIL Committee Advisory Opinions and even by those who strongly advocated for the repeal of CRL § 50-a. It is also consistent with how unsubstantiated complaints against countless other professionals are treated in New York State. Finally, we call your attention to

---

[1] For purposes of this letter, Unsubstantiated Documents also includes materials related to unfounded, exonerated, and abandoned complaints, as well as complaints that have yet to be adjudicated or are outside of CCRB's jurisdiction.

other applicable FOIL exemptions—including for where disclosure "could endanger the life or safety of any person"—and ask that, prior to disclosing any records, you seriously consider the potential safety risks to New York City police officers, their families, and all New Yorkers.

### *Brief FOIL Background*

Originally enacted in 1974, FOIL governs the public's right to gain access to government records. However, this right of access is not absolute, as the law provides numerous important exemptions that allow government agencies to keep records confidential. Specifically, FOIL expressly states that documents are appropriately withheld where (1) disclosure "would constitute an unwarranted invasion of personal privacy" (the "Privacy Exemption"); (2) disclosure "could endanger the life or safety of any person" (the "Safety Exemption"); (3) such documents were "compiled for law enforcement purposes" and if disclosed would, *inter alia*, "interfere with law enforcement investigations or judicial proceedings" (the "Law Enforcement Exemption"); or (4) such documents are "inter-agency or intra-agency materials" (subject to some exceptions) (the "Inter/Intra-Agency Exemption").[2] These exemptions have long been applied to withhold many categories of police disciplinary records including, but not limited to, documents related to unsubstantiated and unadjudicated complaints and/or allegations of misconduct.

### *The FOIL Exemptions Are Plainly Still Applicable*

On June 12, 2020, New York State repealed CRL § 50-a, which had kept police personnel records largely confidential for the last four decades. However, elected officials and government agencies *specifically cited* the continuing availability of safeguards provided by existing FOIL exemptions in explaining why the repeal of CRL § 50-a was appropriate. In other words, while repeal removed the *blanket* exemption for all police personnel records, it left the FOIL exemptions for *specific categories* of police records—like Unsubstantiated Documents— entirely intact. Indeed, the Legislature's amendment to FOIL was to provide *additional* protections to law enforcement officers, given the uniquely dangerous nature of the job.

For example, the "Justification" section of the Sponsor Memorandum for the enacted Senate bill stated:

> FOIL already provides that agencies may redact or withhold information whose disclosure would constitute an unwarranted invasion of privacy [the Privacy Exemption]. . . . Furthermore, this bill adds *additional safeguards* in the FOIL statute…. The broad prohibition on disclosure created by § 50-a is therefore unnecessary, and can be repealed.[3]

---

[2] Public Officers Law §§ 87(2)(b)(e-g).

[3] Sponsor Memo, Senate Bill S8496, *available at* https://www.nysenate.gov/legislation/bills/2019/s8496.

2

Thus, far from removing existing FOIL exemptions, the Senate recognized not only that they would continue to apply, but also that further protections were needed. Recent repeal efforts in the New York State Assembly reached a similar conclusion:

> FOIL already provides all public employees, including those protected under § 50-a, the protections necessary to guard against unwarranted invasions of privacy [the Privacy Exemption] and from disclosures that could jeopardize their security or safety [the Safety Exemption].... The general rules and statutory exceptions of FOIL – for example in instances that disclosure would constitute an unwarranted invasion of privacy – are sufficient in protecting police.[4]

Moreover, this is completely consistent with the view of the FOIL Committee—the entity *"responsible for overseeing and advising with regard to the Freedom of Information Law"*— which recently stated:

> In urging the repeal or revision of §50-a, the Committee is not suggesting that police officers should be subject to greater disclosure than other public employees, but rather that they should be subject to the same level of public disclosure and protection as required for all other public employees. FOIL provides all public employees with the protections necessary to guard against unwarranted invasions of privacy and from disclosures that could jeopardize their security or safety. *While police officers have a particular need for such protections, the generally applicable FOIL exemptions are sufficient to safeguard their legitimate privacy and safety concerns.*[5]

And, even the most vocal advocates for repeal have confirmed that existing FOIL exemptions continue to protect police officers. For example, a recent New York City Bar Association Report—authored by attorneys from the Legal Aid Society and the NYCLU—notes:

> CRL 50-a should be repealed because the concerns of the law's original sponsors over the privacy of police officers are adequately addressed by way of other FOIL exceptions. For example, New York's Public Officers Law already prevents records from being disclosed when they would constitute an unwarranted invasion of personal privacy, are compiled for law enforcement purposes or endanger the life or safety of any person, in addition to other circumstances.[6]

---

[4] Sponsor Memo, Assembly Bill A9332, *available at* https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=A09332&term=2015&Memo=Y.

[5] 2018 Annual Report, New York State Committee on Open Government, *available at* https://www.dos.ny.gov/coog/pdfs/2018%20Annual%20Report.pdf ("2018 Annual Report") (emphasis added).

[6] NYC Bar Association Report, *Promote Police Transparency with the Repeal of CRL 50-a* (reissued June 9, 2020), *available at* https://s3.amazonaws.com/documents.nycbar.org/files/2017285-50aPoliceRecordsTransparency.pdf ("City Bar Report").

Finally, and importantly, even putting aside the statements of the legislators, FOIL experts, and repeal advocates, New York law plainly mandates that the FOIL exemptions continue to be applicable to police disciplinary records. Indeed, the Court of Appeals has expressly held that statutory language explicitly providing that certain documents are public records "does not negate . . . [the] right to assert that some information [subject to disclosure under the law in question] . . . is exempt from disclosure under FOIL." *Matter of Markowitz v. Serio*, 11 N.Y.3d 43, 49 (2008); *see also Xerox Corp. v. Webster*, 65 N.Y.2d 131, 132 (1985) (holding that appellant's argument that a statute "establishing general principles for access to public records requires disclosure of the requested documents notwithstanding the exemptions specified under FOIL . . . would nullify the FOIL exemptions, which the Legislature . . . could not have intended"). Similarly, a recent appellate decision found that a statute providing that the names and addresses of pistol permit holders "shall be a public record," when read in conjunction with the FOIL statute, did not render all such information automatically disclosable, but rather rendered it "subject to FOIL disclosure, *unless an exemption to disclosure contained in the Public Officers Law applies*." *Matter of Gannett Satellite Info. Network v County of Putnam*, 142 A.D.3d 1012, 1016 (2d Dep't 2016) (emphasis added). In so holding, the court noted that "FOIL exemptions must be read as having engrafted, as a matter of public policy, certain limitations on the disclosure of otherwise accessible records," and held that "a statutory mandate that certain documents or information contained therein are public record 'suggests that . . . they are subject to public disclosure unless the [agency] asserts that a FOIL exemption applies.'"[7]

In light of all of the foregoing, it is abundantly clear that the CCRB must continue to apply FOIL exemptions to police disciplinary records. And, as discussed below, it is well-settled that Unsubstantiated Documents, among others, are properly withheld under FOIL.

### *The Privacy Exemption*

As you are aware, the CCRB has previously taken the position that FOIL requests for Unsubstantiated Documents are properly rejected, as disclosure would constitute "an unwarranted invasion of personal privacy."[8] This position is supported by numerous Advisory Opinions from the FOIL Committee—which has further confirmed that documents relating to pending or unadjudicated matters are appropriately withheld—and even by those who strongly advocated for the repeal of CRL § 50-a. It is also consistent with how unsubstantiated complaints against countless other professionals are treated in New York State.

---

[7] At the risk of stating the obvious, if the Legislature intended to make police officers a special group not entitled to the safety and privacy protections of FOIL, it would have expressly done so.

[8] Public Officers Law § 87(2)(b).

4

**CCRB Applies the Privacy Exemption to Withhold Unsubstantiated Documents**

As an initial matter, the CCRB has already recognized that the Privacy Exemption is properly applied to withhold Unsubstantiated Documents. For example, in response to a 2015 FOIL request for various materials relating to a retired detective, the CCRB stated:

> To the extent your request seeks records concerning any matters that were not substantiated, any such requests would also represent an unreasonable invasion of privacy.[9]

Similarly, with respect to a separate request for documents relating to an active police officer:

> CCRB noted that the request for records relating to unsubstantiated matters would constitute 'an unreasonable invasion of privacy.'[10]

There is no rational justification for the CCRB to take the position that the FOIL production of Unsubstantiated Documents was inappropriate in 2015, but it is somehow appropriate in 2020. Any deviation from this prior precedent would plainly be arbitrary, capricious, and an abuse of discretion.

**The FOIL Committee Has Repeatedly Confirmed that Unsubstantiated Documents are Properly Withheld**

This approach is consistent with how numerous authorities agree Unsubstantiated Documents should be treated after the repeal of CRL § 50-a. For example, the FOIL Committee recently made clear:

> Even without §50-a, FOIL provides broad protection to law enforcement personnel. One of FOIL's express exceptions authorizes an agency to withhold records where disclosure would constitute an unwarranted invasion of personal privacy, §87(2)(b), and this provision has long been held to allow "unsubstantiated allegations" against an employee to be withheld.[11]

Indeed, the FOIL Committee has for decades taken the position that Unsubstantiated Documents (including unadjudicated complaints) are properly withheld under the Privacy Exemption. Thus, with respect to a 2008 FOIL request, the Committee advised that certain findings related to firefighter misconduct could be released, "except to the extent that it includes

---

[9] *See Hughes Hubbard & Reed v. CCRB*, 41 N.Y.S.3d 369 (Sup. Ct., Kings Cnty. 2016) (June 5, 2015 CCRB letter); *id.* (July 23, 2015 CCRB letter, reiterating that "disclosure of the records you seek would constitute an acute and unreasonable invasion of privacy").

[10] *See Luongo v. Records Access Officer, CCRB*, 51 N.Y.S.3d 46 (1st Dep't 2017).

[11] 2018 Annual Report.

charges that were dismissed or that could not be substantiated, or information relating to those charges." It further stated:

> When allegations or charges of misconduct have not yet been determined or did not result in disciplinary action, the records relating to such allegations may . . . be withheld, for disclosure would result in an unwarranted invasion of personal privacy [*see, e.g., Herald Company v. School District of City of Syracuse*, 430 N.Y.S.2d 460 (1980)]. Further, to the extent that charges are dismissed or allegations are found to be without merit . . . they may be withheld based on considerations of privacy.[12]

This conclusion has been reiterated time-and-time-again by the Committee. *See, e.g.*, FOIL-AO-12005 ("In numerous contexts, it has been advised that records relating to unsubstantiated charges, complaints or allegations may be withheld to protect the privacy of the accused."); FOIL-AO-17301 ("Our opinion concerning a report indicating that allegations of sexual harassment could not be substantiated is that such a record may be withheld on the ground that disclosure would constitute an unwarranted invasion of personal privacy."); FOIL-AO-10399 (misconduct complaints properly withheld because at the time such documents are prepared "there would be neither any indication nor any finding that the claims made are more than unsubstantiated allegations").[13]

For the avoidance of any doubt, the above and other Advisory Opinions make clear that documents and materials related to pending complaints that have yet to be fully adjudicated are appropriately withheld under the Privacy Exemption. In the current climate, and with mere allegations of misconduct amplified incessantly by the media and on platforms like Twitter, the release of this information will undoubtedly result in cases being prejudged. Put simply, if the CCRB releases such materials before final disposition, it will be impossible for police officers to receive a fair proceeding.

Finally, it is well-established that these Advisory Opinions, "written by the Committee empowered to address such issues, [are] entitled to great weight and, if not irrational or unreasonable, should be upheld." *See, e.g., Whitehead v. Morgenthau*, 552 N.Y.S.2d 518 (Sup. Ct., N.Y. Cnty. 1990). Accordingly, the CCRB should follow the Committee's Advisory Opinions and withhold Unsubstantiated Documents.

### Prior to Repeal of CRL § 50-A, Supporters Argued Unsubstantiated Documents Would Remain Confidential

---

[12] FOIL-AO-17195, *available at* https://docs.dos.ny.gov/coog/ftext/f17195.html.

[13] These Advisory Opinions are available at https://docs.dos.ny.gov/coog/ftext/f12005.htm, https://docs.dos.ny.gov/coog/ftext/f17301.html, and https://docs.dos.ny.gov/coog/ftext/f10399.htm.

Importantly, in advocating for the repeal of CRL § 50-a, supporters not only conceded, but in fact strenuously contended that the Privacy Exemption would prevent the release of Unsubstantiated Documents. A recent article authored by the Director of the Citizens Union Foundation—an entity "committed to reforming New York City and State government by fostering accountability, accessibility, and transparency"—is instructive. There, he stated:

> It has also been argued in support of 'reform' of Section 50-a, as opposed to repeal, that it is unfair to police officers for there to be public disclosure of records pertaining to unsubstantiated complaints or charges against them. However, police officers, like other public officials and employees, already enjoy significant (if not absolute) protection against such disclosure. FOIL exempts from its requirements records the disclosure of which would constitute an unwarranted invasion of personal privacy (see Public Officers Law §§ 87(2)(b) and 89(2)(b)).

> The Committee on Open Government has issued two advisory opinions stating that the personal privacy exemption is applicable when allegations or charges of misconduct have not yet been determined or did not result in disciplinary action (see FOIL AO-10399 (Oct. 31, 1997) (police officers)) or when allegations of misconduct were not substantiated (see FOIL AO-12005 (Mar. 21, 2000) (prison inmates)).[14]

Indeed, Citizens Union publicly endorsed the FOIL Committee's analysis, stating that the "reasoning of the advisory opinions cited above appears correct at least with respect to documents that reveal the identity of the individuals against whom the unsubstantiated complaints were made." *Id.* It went on to note the very limited circumstances where FOIL disclosure of Unsubstantiated Documents might be appropriate, such as through "statistical tabulations and other data that do not reveal the identity of the police officer." *Id.*

As the above example makes clear, it would simply be wrong to invoke the Privacy Exemption—and a promise that Unsubstantiated Documents would still be confidential—to obtain support for repeal, and then abandon that approach once repeal was achieved. For years, repeal advocates championed the "FOIL has adequate protections" argument. Now, CCRB must apply those protections to prevent disclosure of Unsubstantiated Documents.

### Other Professions Do Not Make Unsubstantiated Documents Public

Withholding Unsubstantiated Documents would assure that police officers are treated the same as other public employees and licensed professionals throughout New York State. In light of the fact that—unlike massage therapists, speech pathologists, interior designers, and

---

[14] Frederick Schaffer, *The Time Has Come to Repeal Section 50-A of New York's Civil Rights Law*, Gotham Gazette (June 5, 2020), *available at* https://www.gothamgazette.com/opinion/153-citizens-union-speakers/9466-repeal-section-50-a-new-york-civil-rights-law.

geologists—police officers have been targeted for assassination on numerous occasions simply because of their uniform, the safeguards in place to protect them must at least be as robust as those of other professionals.

For example, the New York State Education Department—tasked with investigating misconduct related to virtually all licensed professions—states that unsubstantiated claims it receives are not public and even many substantiated claims are in fact kept confidential. Specifically, "complaints are accusations of professional misconduct; those that do not result in disciplinary action are confidential."[15] Moreover, "minor forms of misconduct may be handled through advisory letters or administrative warnings . . . these administrative actions are confidential."[16]

Similarly, the FOIL Committee recently issued an Advisory Opinion noting that whenever a teacher is acquitted of misconduct claims the "charges must be expunged from the employment record" in order "to preclude unsubstantiated charges from being used unfairly against or in relation to a tenured teacher." Again, there is no valid justification for police officers to receive less privacy protection than teachers and other professionals throughout the State, yet that would be the reality if Unsubstantiated Documents relating to police officers are disclosed.

### *The Safety Exemption*

Moreover, and crucially, FOIL allows the CCRB to withhold any document that "if disclosed could endanger the life or safety of any person." Public Officers Law § 87(2)(f). An agency "need not demonstrate the existence of a specific threat or intimidation," as only the "possibility of endangerment [is needed] to invoke the exemption."[17] The FOIL Committee has confirmed that this exemption should be applied notwithstanding the repeal of CRL § 50-a:

---

[15] http://www.op.nysed.gov/opd/opdfaq.htm (FAQ, "How can I find out if there have been any disciplinary actions against a licensee?").

[16] *Id.* The list of state-licensed professionals who have unsubstantiated complaints kept confidential includes: Acupuncturists, Architects, Athletic Trainers, Behavior Analysts, Certified Public Accountants, Chiropractors, Dentists, Dental Hygienists, Dietitian-Nutritionists, Engineers, Geologists, Interior Designers, Laboratory Technicians, Land Surveyors, Landscape Architects, Massage Therapists, Medical Physicists, Mental Health Practitioners, Midwives, Nurses, Occupational Therapists, Opticians, Optometrists, Perfusionists, Pharmacists, Physical Therapists, Podiatrists, Polysomnographic Technologists, Psychologists, Respiratory Therapists, Social Workers, Shorthand Reporters, Speech Pathologists, and Veterinarians. *See* http://www.op.nysed.gov/prof/.

[17] *Matter of Luongo v. Records Access Officer, Civilian Complaint Review Bd.*, 150 A.D.3d 13 (1st Dep't 2017); *Matter of Connolly v. New York Guard*, 175 A.D.2d 372, 373 (3d Dep't 1991) (agency need only demonstrate "a possibility of endanger[ment]" in order to invoke the Safety Exemption).

Even without §50-a, FOIL provides broad protection to law enforcement personnel . . . §87(2)(f) permits an agency to deny access when disclosure "could endanger the life or safety of any person."[18]

The appropriate application of the Safety Exemption is critical, given that New York City police officers have recently been murdered simply for being police officers. In 2014, Police Officers Wenjian Liu and Rafael Ramos were assassinated because of the uniform they wore. In 2017, Police Officer Miosotis Familia was assassinated because of the uniform she wore, by a man who had ranted on social media about unspecified allegations of police misconduct. Recent days have seen multiple instances of police officers being shot at, because of the uniform they wore. The unfortunate fact is that unstable individuals use information in the public domain—often misrepresented and twisted—to "justify" attacks on innocent police officers.

Indeed, it is indisputable that specific New York City police officers have already been targeted for murder using publicly-available information. For example, according to the Department of Justice, a man recently attempted to send a mail bomb to the New York City police officers who arrested him. He had methodically "conducted internet searches and made telephone calls to determine the locations of the officers' residences." The bomb, however, was sent to the wrong address and the New Yorker who received the package was murdered when the bomb detonated.[19]

Similarly, courts have warned about the ease with which unstable individuals can use publicly-disclosed identifying information to inflict physical harm. In *Matter of Bellamy v. NYPD*, the First Department found that unredacted documents providing the identities of persons who spoke with police during a homicide investigation were exempt from disclosure under FOIL. 87 A.D.3d 874, 875-76 (1st Dep't 2011).[20] The court reasoned that "after learning the names, all one would need is an internet connection to determine where they live and work." *Id.* The same logic applies here, where the addresses and family members of police officers involved can easily be found on the internet.[21]

---

[18] 2018 Annual Report.

[19] Press Release, *Brooklyn Man Arrested for Using a Weapon of Mass Destruction*, United States Department of Justice (Feb. 28, 2018).

[20] Courts have shown a strong interest in ensuring that disclosure does not "endanger the life and safety of witnesses or have a chilling effect on future witness cooperation." *Johnson v. NYPD*, 257 A.D.2d 343 (1st Dep't 1999) ("DD5" reports containing witness information may be withheld).

[21] During New York State Senate hearings regarding the repeal of CRL § 50-a, one local activist even stated on the record: "Name a cop and I'll find their address, phone number & relatives, I'll find them all on Google." https://www.nysenate.gov/calendar/public-hearings/october-24-2019/public-hearing-policing-s3695-repeals-provisions-relating (beginning at the 2:53:39 mark).

Finally, courts have identified numerous documents properly withheld under the Safety Exemption where disclosure would reveal confidential strategic information regarding an agency's tactical responses and deployments of personnel. For example, in *Ruberti, Girvin & Ferlazzo P.C. v. New York State Division of State Police*, the court found that documents disclosing the troop, zone, and station assignments of police officers could endanger their safety. 218 A.D.2d 494 (3d Dep't 1996). Suffice it to say that police disciplinary records undoubtedly contain information on NYPD strategy (not to mention witnesses and complainants), and it would be nonsensical to conclude that all of this information must be disclosed simply because CRL § 50-a was repealed.

In short, the CCRB has both the power and the obligation to keep New York City police officers—who are mothers and fathers, sisters and brothers, sons and daughters— and all New Yorkers safe. It MUST NOT release any document that may raise potential safety ramifications to police officers, their families, and the public at large.

### *The Law Enforcement Exemption*

Public Officers Law § 87(2)(e) provides, in pertinent part, that an agency "may deny access to records or portions thereof that . . . are compiled for law enforcement purposes and which, if disclosed would: (i) interfere with law enforcement investigations or judicial proceedings; [or] (ii) deprive a person of a right to a fair trial or impartial adjudication...." Advocates for repeal (as well as the FOIL Committee) have repeatedly conceded that this exemption continues to apply:

> CRL 50-a should be repealed because the concerns of the law's original sponsors over the privacy of police officers are adequately addressed by way of other FOIL exceptions. For example, New York's Public Officers Law already prevents records from being disclosed when they . . . are compiled for law enforcement purposes . . . in addition to other circumstances.[22]

The Court of Appeals has confirmed that "the purpose of the Freedom of Information Law is not to enable persons to use agency records to frustrate pending or threatened investigations, nor to use that information to construct a defense to impede a prosecution." *Matter of Fink v. Lefkowitz*, 47 N.Y.2d 567, 572 (1979). Thus, for example, courts have held that the Law Enforcement Exemption is applicable to prevent the disclosure of records prior to the completion of a law enforcement investigation. *DeLuca v. New York City Police Department*, 689 N.Y.S.2d 487 (1999). Moreover, one of the main purposes of the exemption "is to encourage private citizens to furnish controversial information to government agencies by assuring confidentiality under certain circumstances," an interest that all New Yorkers presumably share. *See, e.g.*, FOIL-AO-f9673 (finding that any right of access would be narrow with respect to "tapes of interviews, transcripts, notes, correspondence, logs and any and all

---

[22] City Bar Report.

information found and produced during an investigation by the Office of the Inspector General").[23]

Importantly, New York courts have already held that complaints against police officers are properly withheld pursuant to the Law Enforcement Exemption. In *Gannett Co. v James*, reporters sought various complaints and other documents on the basis that "[t]he information contained in the records sought . . . is essential to public awareness of the conduct of law enforcement personnel." 86 A.D.2d 744, 745 (4th Dep't 1982).[24]  The court held that such documents were properly withheld pursuant to the Law Enforcement Exemption, because "the confidentiality afforded to those who wish it in reporting abuses is an important element in encouraging reports of possible misconduct which might not otherwise be made.  Thus, these complaints are exempt from disclosure which might interfere with law enforcement investigations and identify a confidential source or disclose confidential information." *Id.*  Thereafter, the Court of Appeals expressly approved the application of the Law Enforcement Exemption to complaints against police officers.  *Capital Newspapers Div. of Hearst Corp. v. Burns*, 67 N.Y.2d 562, 569 (1986) (finding that police records were properly withheld under FOIL exemptions); *see also Scaccia v. New York State Div. of State Police*, 138 A.D.2d 50 (3d Dep't 1988) (holding that written report regarding misconduct accusations made in connection with state police investigator's disciplinary proceeding was properly withheld under both the Law Enforcement and Inter/Intra-Agency Exemptions).

In the current climate, there can be little question that disclosure of police personnel records will interfere with ongoing disciplinary proceedings, including by potentially frustrating or threatening pending investigations.  Indeed, the release of police personnel records in such instances would clearly result in cases being tried in the court of public opinion.  To maintain the integrity of these and other proceedings, the CCRB must continue to apply the Law Enforcement Exemption.

*The Inter/Intra-Agency Exemption*

FOIL further allows government agencies to withhold "inter-agency or intra-agency materials which are not (1) statistical or factual tabulations or data; (2) instructions to staff that affect the public; (3) final agency policy or determinations; or (4) external audits, including but

---

[23] *Available at* https://docs.dos.ny.gov/coog/ftext/f9673.htm.

[24] The categories of documents sought included: "(1) complaints made to the Internal Affairs Division of the Rochester Police Department alleging harassment or use of force by police officers for the past two years; (2) copies of "Use of Force" forms filed by Rochester police officers for the years 1976-1979; (3) complaints to the Internal Affairs Division of the Monroe County Sheriff's Department alleging harassment or use of force; (4) documents forwarded to the Monroe County Civil Service Commission by the Rochester Police Department concerning disciplinary action taken against its police officers; (5) documents reflecting the final disposition of civil service hearings concerning Rochester Police Department personnel with the names of officers for the years 1976-1980; and (6) documents reflecting the final disposition of civil service hearings concerning Rochester Police Department personnel for the years 1976-1980, without the names of the officers." *Id.* at 744.

not limited to audits performed by the comptroller and the federal government." Public Officers Law § 87(2)(g). Like other exemptions, the FOIL Committee has confirmed that the Intra/Inter-Agency Exemption is properly applied to withhold police disciplinary records following the repeal of CRL § 50-a:

> A performance evaluation may also be withheld pursuant to §87(2)(g), concerning "intra-agency materials," insofar as it includes the opinions of agency officials concerning a public employee's performance.[25]

In addition to performance evaluations, the Inter/Intra-Agency Exemption has been used to withhold countless police records. For example, the First Department has held that "police reports and records, including DD5s, are interagency material and not final agency policy or determinations, and are exempted from disclosure under FOIL."[26] Similarly, in a case related to NYPD surveillance, New York courts determined that "responsive records seeking information regarding any 'joint NYPD–CIA unit engaged in counterterrorism surveillance or information gathering' and the 'NYPD's sharing of information about informants with the CIA or other agencies' fell squarely within FOIL's inter and intra-agency exemption." [27] Other potentially relevant documents that have been withheld include supervisors' opinions regarding performance;[28] subjective comments, opinions, and recommendations;[29] rating sheets used for evaluation purposes;[30] recommendations regarding candidates;[31] names and charges related to

---

[25] 2018 Annual Report.

[26] *Scott v. Chief Med. Exam'r, City of New York*, 179 A.D.2d 443 (1st Dep't 1992).

[27] *Asian Am. Legal Def. & Educ. Fund v. New York City Police Dep't*, 964 N.Y.S.2d 888, 897 (Sup. Ct., N.Y. Cnty. 2013). The court further noted that the FOIL request was "not reasonably described."

[28] FOIL-AO-17902, *available at* https://docs.dos.ny.gov/coog/ftext/f17902.html (noting that "[i]f a supervisor expressed an opinion concerning your performance in writing to another City official, that portion of such a record may be withheld under §87(2)(g)").

[29] *Professional Standards Review Council of America Inc. v. New York State Dept. of Health*, 597 N.Y.S.2d 829, 831 (3d Dep't 1993) ("subjective comments, opinions and recommendations written in by committee members are not required to be disclosed").

[30] *Shaw v. Lerer*, 446 N.Y.S.2d 855 (Sup. Ct. Westchester Cnty. 1981) (rating sheets used to evaluate coaches exempted as inter/intra-agency material).

[31] *Rothenberg v. City University of New York*, 594 N.Y.S.2d 219 (1st Dep't 1993) (recommendations of committees concerning promotional candidates exempt).

unproven allegations;[32] hearing panel documents;[33] investigative reports;[34] and many other pre-decisional documents prepared as part of an investigation.[35] Given the significant authority holding that many types of inter-agency and intra-agency materials are exempt from disclosure under FOIL, this exemption should continue to be applied to police personnel records.

*    *    *

As noted above, during his testimony at the October 24, 2019 Senate Hearing regarding the repeal of CRL § 50-a, Chair Davie confirmed that "transparency does not have to come at the expense of privacy, safety, or other public interests." The CCRB now must show that those words have meaning, by applying FOIL's exemptions to withhold Unsubstantiated Documents and other materials that put the privacy and safety of police officers at risk. In the event that the CCRB intends to reject its prior position with respect to Unsubstantiated Documents, well-settled New York law, the statements of New York legislators, the guidance of the FOIL Committee, and the assertions of numerous repeal advocates (among others) and NOT invoke FOIL exemptions to protect New York City police officers, we respectfully request that you notify us immediately and, in all events, provide affected active and retired police officers notice of at least ten business days prior to any disclosure.

Sincerely,

Michael T. Murray

cc:
Patrick J. Lynch
Matthew Kadushin, Esq., General Counsel (*via hand*)
CCRB Records Access Officer (*via hand*)
CCRB Records Access Appeals Officer (*via hand*)

---

[32] *Herald Co. v. School Dist. of City of Syracuse*, 430 N.Y.S.2d 460 (Sup. Ct. Onondaga Cnty. 1980) (finding "the name and charges constitute a material part of the unproved allegation before the hearing panel and are pre-determination materials exempt from disclosure under subparagraph (2)(g) of Section 87 of the Public Officers Law").

[33] *McAulay v. Bd. of Ed. of City of New York*, 403 N.Y.S,2d 116, 117 (1978) ("The hearing panel documents or report sought are not final agency determinations or policy. Rather, they are pre-decisional material, prepared to assist an agency decision maker (here, the Chancellor) in arriving at his decision.").

[34] *Goodstein & West v. O'Rourke*, 608 N.Y.S.2d 306 (2d Dept. 1994) (investigative report exempt as pre-decisional interagency material).

[35] FOIL-AO-9673, *available at* https://docs.dos.ny.gov/coog/ftext/f9673.htm; *Sell v. New York City Dept. of Educ.*, 24 N.Y.S.3d 41 (1st Dept. 2016) ("Parts of the witness statements, email correspondence, and other materials consist of 'opinions, ideas, or advice exchanged as part of the consultative or deliberative process of government decision making,' rather than 'factual account[s] of the witness's observations.'").

FILED: NEW YORK COUNTY CLERK 07/14/2020 09:50 PM          INDEX NO. 154982/2020
NYSCEF DOC. NO. 13                                        RECEIVED NYSCEF: 07/14/2020

ORDER ON MOTION
---------------

                                    SUPERIOR COURT OF NEW JERSEY
STATE TROOPERS FRATERNAL            APPELLATE DIVISION
ASSOCIATION OF NEW JERSEY,          DOCKET NO.  A-003950-19T4
V.                                  MOTION NO.  M-007532-19
STATE OF NEW JERSEY; GURBIR         BEFORE      PART K
S. GREWAL, IN HIS CAPACITY          JUDGES:     ALLISON E. ACCURSO
AS ATTORNEY GENERAL;                            PATRICK DEALMEIDA
COLONEL PATRICK J.
CALLAHAN, IN HIS CAPACITY
AS SUPERINTENDENT OF THE
DIVISION OF STATE POLICE;
AND THE DIVISION OF STATE
POLICE,


MOTION FILED:    07/02/2020     BY:  STATE TROOPERS FRATERNAL
                                     ASSOCIATION OF NEW JERSEY


ANSWER FILED:    07/07/2020     BY:  GURBIR S. GREWAL


SUBMITTED TO COURT: July 07, 2020

                              ORDER
                              -----

     THIS MATTER HAVING BEEN DULY PRESENTED TO THE COURT, IT IS, ON THIS
8th day of July, 2020, HEREBY ORDERED AS FOLLOWS:

MOTION BY    APPELLANT

MOTION FOR EMERGENT RELIEF        GRANTED AND OTHER


SUPPLEMENTAL:  Police unions representing State and municipal officers in
these five appeals challenging Attorney General Directives 2020-5 and
2020-6 ordering public disclosure of the identities of officers who have
been sanctioned for serious disciplinary violations, defined as
"termination of employment, reduction in rank or grade, and/or suspension
greater than five days," seek a stay of their implementation pending
appeal.  They contend the directives "voided decades of settled
expectation," that the disciplinary records of law enforcement personnel
are confidential and privileged, that the directives are contrary to
protections afforded them by statute and regulation as well as the State
and federal constitutions, and that they will be irreparably harmed, and
their appeal effectively mooted, if implementation is not stayed while we

                                   1

consider their challenge.  The unions note that a significant number of
their members entered into voluntary settlements over the past twenty
years accepting major discipline in reliance on the Department's assurance
that those records would remain confidential.

The Attorney General candidly acknowledges both the sea change in his
Department's position on the confidentiality of internal affairs records
the Directives represent, and that appellants would ordinarily be entitled
to a stay to maintain the status quo pending appeal under settled law.  He
asserts, however, that appellants have little likelihood of prevailing
given the powers the Legislature has vested in the Attorney General as New
Jersey's chief law enforcement officer under the Criminal Justice Act.
Moreover, he contends that at this "critical juncture in the State's and
the Nation's history," when our citizens have joined their fellow
Americans across the country "demanding reforms and accountability of law
enforcement," and "the ties between many law enforcement agencies and the
communities they serve are straining," that he must act quickly and
decisively on behalf of the public and "[t]he vast majority of law
enforcement officers in New Jersey [who] serve with honor and astonishing
courage" and have never incurred major discipline, "to promote trust,
transparency and accountability," by implementing the Directives
immediately, notwithstanding appellants' challenge to their legitimacy.
The Attorney General reminds us that "sometimes the status quo is
unacceptable and should not be preserved."

Having considered the positions of the officers affected by these
dramatic changes and the Attorney General, and aware of the enormous
public interest in this issue, illustrated by the applications of the
twenty-five organizations that have already petitioned to participate as
amicus, we apply well-settled law to preserve the officers' challenge by
staying implementation of the Directives pending our disposition of the
appeal.  In light of the importance of the issues and the compelling need
for prompt resolution, we accelerate the appeal in accordance with the
following schedule:

              Statement of Items           July 15, 2020
              Appellant's Briefs           August 5, 2020
              Respondent/Amicus Briefs     August 19, 2020
              Reply Briefs, if any         August 26, 2020

The appeal will be calendared for oral argument before Part C on October
15, 2020.  All dates are peremptory.

The Attorney General has expressed the intention to provide to each trooper and officer in the Department of Law and Public Safety whose identities were to be made public on July 15 in accordance with Directive 2020-6 notice of that fact by July 8, 2020, "whenever possible." This order does not stay that notice.

FOR THE COURT:

*Allison E. Accurso*

ALLISON E. ACCURSO, J.A.D.

MER-L-1140-20    MERCER
ORDER - REGULAR MOTION
CLD

# Exhibit H



**JAMES E. JOHNSON**
*Corporation Counsel*

**The City of New York**
**LAW DEPARTMENT**
LABOR & EMPLOYMENT LAW
DIVISION
100 Church Street, 2nd Floor
NEW YORK, NEW YORK 10007

**Rebecca G. Quinn**
Phone: (212) 356-4382
Fax: (212) 356-2439
Email: rquinn@law.nyc.gov

July 25, 2020

**BY ECF**
Hon. Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

        Re:    <u>Uniformed Fire Officers Association, et al. v. Bill DeBlasio, et al.</u>
              20-cv-05441 (KPF) (RWL)

Dear Judge Failla:

    We write today in response to the letter filed last night by plaintiffs concerning the Court's authority to enjoin the New York Civil Liberties Union ("NYCLU"). While the letter purports to address the NYCLU's letter, there are so many legal and factual misstatements regarding the City's conduct and the law governing this case that we feel compelled to submit a response, lest the Court be mislead by plaintiffs' empty and unsupported rhetoric.

    First, we wish to dispel the false notion – once and for all – that the timing of the disclosure of Civilian Complaint Review Board ("CCRB") data to the NYCLU was the result of some untoward conspiracy between the City of New York, CCRB and the NYCLU. The only thing untoward here is the sleight of hand in plaintiffs' recapitulation of the timeline to the Court. Following the death of George Floyd, a nationwide protest and advocacy effort arose to demand greater accountability in matters of police misconduct. In New York state, one of the key barriers identified by government officials was the protections New York State Civil Rights Law Section 50-a provided against public disclosure of police disciplinary records under the New York State Freedom of Information Law ("FOIL"). In order to ensure greater transparency and accountability, the New York State legislature passed a law repealing the protections of Civil

Rights Law Section 50-a, which Governor Cuomo signed into law, requiring these records to be disclosable under FOIL absent a FOIL exception.

It was unambiguously the intent of the Legislature and the Governor to allow for immediate public access into past records of police misconduct, as well as allow for greater public access to unsubstantiated allegations or pending proceedings.[1] Indeed, the repeal represented a mandate by the state to the City and other municipalities to allow public access to this information without any further obstacle and delay, given the identified importance of such access to police reform efforts.

The repeal was signed on June 12, 2020 and the City agencies that had applicable records, including the CCRB, all separately began to determine ways that they could provide the public the information and data within their possession, which included unsubstantiated, exonerated, and unfounded cases, that would be subject to FOIL. The CCRB immediately began efforts to provide the information that would now be disclosable under FOIL to the public, to fulfill the legislature's mandate. These agencies immediately began receiving FOIL requests. Indeed, CCRB received more FOIL requests in the weeks following the repeal then they had almost the entire previous year. They understood there would continue to be heavy immediate demand for this information on a large scale by individuals and organizations and that prompt compliance with such requests was critical.

The CCRB worked, over the course of several weeks, with its own staff reviewing applicable legal and technical issues to create its database. Upon completion of this work the CCRB **publicly** announced at this Board meeting that the data would be available shortly. Following this announcement, various individuals and organizations inquired about how to gain access to the data. The NYCLU is the only organization that submitted a FOIL request for the entire database. Prior to that, the CCRB had provided subsets of the database to various organizations, including ProPublica, which received information about 4,059 NYPD officers.[2] The CCRB was able to respond quickly because it had been working for weeks following the repeal of 50-a to figure out how best to efficiently provide access to this information.

None of this is even remotely unlawful or conspiratorial. Plaintiffs' reliance on some prior FOIL requests not answered for an extended period is completely misplaced. As can be seen above, the CCRB had been preparing for weeks for a request such as the NYCLU's because the June 12, 2020 repeal of 50-a created a legislative mandate for these sorts of requests to be

---

[1] In his press release upon signing the repeal of 50-a, Governor Cuomo noted "The current law prevents access to both records of the disciplinary proceedings themselves and the recommendations or outcomes of those proceedings, leading to records of complaints or findings of law enforcement misconduct that did not result in criminal charges against an officer almost entirely inaccessible to the public. Repealing 50-a will allow for the disclosure of law enforcement disciplinary records, increasing transparency and helping the public regain trust that law enforcement officers and agencies may be held accountable for misconduct." See https://www.governor.ny.gov/news/governor-cuomo-signs-say-their-name-reform-agenda-package (last visited July 25, 2020). Both unsubstantiated and pending cases were included amongst the information to be made available.

[2] The ProPublica request was for the entire CCRB officer history for every officer with at least one substantiated case. The officer histories included unsubstantiated, exonerated, and unfounded allegations. This data was sent by the CCRB on June 30, 2020.

honored. References to unexpected requests when Civil Rights Law Section 50-a was in existence are utterly irrelevant and, indeed, misleading.

Plaintiffs' ridiculous conspiracy theory is also undermined by the fact that the City is not at all breaking the law or in any way violating its employees' rights. Indeed, the City has been acting to **comply** with the law, namely FOIL, in light of the repeal of Civil Rights Law Section 50-a. Much like their factual assertions, each and every one of the supposed "rights" invoked by plaintiffs to claim that they "outweigh" the First Amendment rights invoked by NYCLU are, in fact, weak and often contradicted by binding prior cases directly on point:

- **Sixth Amendment Rights** – it is well-settled law that the Sixth Amendment, which provides a right attendant to criminal proceedings, does not apply to administrative proceedings such as disciplinary investigations by the City, as employer, against its employees. See e.g. Madera v. Board of Education, 386 F.2d 778, 780 (2d Cir. 1967); Nonnenmann v. City of New York, Docket No. 02 Civ. 10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966, *80 (S.D.N.Y. 2004) ("NYPD disciplinary proceedings [are] not criminal prosecutions.")

- **Fourteenth Amendment Due Process** – In this case, plaintiffs claim disclosure of unfounded or pending disciplinary claims would violate their constitutionally protected liberty interest by damaging their reputation. However, the disciplinary process in place satisfies those due process concerns. See generally. Segal v. City of New York, 459 F.3d 207 (2d. Cir. 2006). Moreover, plaintiffs' analysis completely ignores the important "government interest . . . to execute and explain its personnel decisions", both positive and negative. Id. Moreover, with respect to unsubstantiated, unfounded or pending allegations, there is no "stigma plus" present that would allow for a due process claim. Martz v. Valley Stream, 22 F.3d 26, 32 (2d Cir. 1994). The absurdity of plaintiffs' positon here is evident. Saying the City is acting unlawfully by publishing disciplinary trial calendars is akin to saying that the Court publishing is criminal dockets is unconstitutional. It is absurd to suggest that there should be greater protection against dissemination of disciplinary trials than if the employee were indicted in a federal case, in which the details of the allegations would be publicly available via the Court. Thus, it is clear plaintiffs' members' due process rights are not implicated in the release of data pursuant to FOIL.

- **Contractual and Collective Bargaining Rights** – Plaintiffs' arguments that dissemination of information may impair their collective bargaining rights ignore the fact that police discipline and the dissemination of information related to that discipline is ___not___ a subject of collective bargaining. See Patrolmen's Benevolent Assn. of City of N.Y., Inc. v. New York State Pub. Empl. Relations Bd., 6 N . Y . 3d 563 (2006). Even if the repeal of FOIL and the statutory mandate to disclose that came with it changed a matter that was covered under collective bargaining, the City is obligation would be to bargain with the union over the impact of that change, not to refuse to comply with the law until the Union gives its say-so. Thus, dissemination pursuant to FOIL does not impair collective bargaining rights, as the Union maintains its ability to demand impact bargaining.

Plaintiffs, as the parties seeking injunctive relief here, have the burden of showing a strong likelihood of success on their legal claims and providing their factual claims with clear and convincing evidence. At the very least, however, one would expect plaintiffs to be honest with the Court about the underlying facts and do diligent enough legal research to adequately address the binding law on point with this Court. In their letter, plaintiffs did neither, leaving defendants with no choice but to respond in order to bring these facts and legal points to the Court's attention.

We thank the Court for its consideration of these issues.

Respectfully submitted,

_____/s/_____
Rebecca G. Quinn
Assistant Corporation Counsel

_____/s/_____
Dominique Saint-Fort
Assistant Corporation Counsel

cc:     <u>BY ECF</u>
        Anthony Coles
        Courtney Saleski
        Michael Hepworth
        DLA Piper
        *Attorney for Plaintiffs*

        Christopher Dunn
        New York Civil Liberties Union

# Exhibit I



New York Civil Liberties Union
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
www.nyclu.org

VIA ECF

July 28, 2020

Honorable Katherine Polk Failla
United States District Judge
United States District Court Southern District of New York
40 Foley Square
New York, N.Y. 10007

Re: *Uniformed Fire Officers Assoc. v. de Blasio*, 20 Civ. 5441 (KPF)

Dear Judge Failla:

On behalf of the New York Civil Liberties Union, we write in response to the City's filing this morning disclosing that voluminous CCRB records, including what appears to be the very database the NYCLU is enjoined from releasing, already are in the public domain, ECF No. 31-1, and to the plaintiffs' July 26 letter informing the Court that the news organization Pro Publica has uploaded to the internet CCRB data regarding complaints, including unsubstantiated ones, against approximately 4,000 police officials, again seemingly drawn from the same database at issue here, ECF No. 25. That others have the information the NYCLU is enjoined from publishing further supports the NYCLU's request that the order against it be lifted. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 722 n.3 (1971) ("*Pentagon Papers*") (Douglas, J., concurring) (noting "numerous sets of this material in existence" such that the "material . . . is destined for publicity," which weighed against enjoining publication). Not only is the restraining order unconstitutional, it will do little or nothing to keep the CCRB information at issue here from the public.

In light of our original arguments, these subsequent developments, and the need to address prior restraints as quickly as possible, *see, e.g.*, *Pentagon Papers*, 403 U.S. at 714–15 (Black, J., concurring) (noting "every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment"), the NYCLU will ask at this afternoon's conference that the Court grant the NYCLU's request to lift the restraining order.

Respectfully submitted,

*/s/Christopher Dunn*
Christopher Dunn
Molly K. Biklen
Jordan Laris Cohen

c: All counsel (via ECF)

# Exhibit J



**T**HE **C**ITY OF **N**EW **Y**ORK
# LAW DEPARTMENT
100 CHURCH STREET
NEW YORK, NY 10007-2601

**JAMES E. JOHNSON**
*Corporation Counsel*

KAMI Z. BARKER
Mobile: (216) 903-3610
kbarker@law.nyc.gov

July 29, 2020

**BY ECF**
Hon. Katherine Polk Failla
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Re:     Uniformed Fire Officers Association, et al. v. Bill DeBlasio, et al.
20-cv-05441 (KPF) (RWL)

Dear Judge Failla:

We write to respectfully request that the Court lift the portion of the temporary restraining order ("TRO") that prohibits defendants from publishing the CCRB database that the New York Civil Liberties Union ("NYCLU") received on or about July 14, 2020.[1] Now that the Court has permitted NYCLU to disseminate this database, plaintiffs can no longer claim that they would be irreparably harmed by the defendants publishing that very same data. Thus, it is only proper, then, for the Court to also grant defendants the ability to publish this database and allow the public direct access to this critical information.

On July 28, this Court lifted the TRO against NYCLU and permitted the organization to use, without restriction, the database it received from the CCRB (hereinafter "database" or "CCRB database") on or about July 14, pursuant to their July 9 FOIL request. The Court also stayed its decision for twenty-four hours to provide the plaintiffs with sufficient time to appeal before the order went into effect. However, the Court, nonetheless, maintained the TRO against defendants, including the restriction on disclosing the very same database.

"[I]rreparable harm is the 'single most important prerequisite for the issuance of a preliminary injunction.'" Impax Media Inc. v. Northeast Adver. Corp., 2018 U.S. Dist. LEXIS 4940 at *10 (S.D.N.Y. Jan. 10, 2018) quoting Faiveley Transp. Malmo AB v. Wabtec Corp., 559

---

[1] CCRB sent the database to NYCLU on July 14, which it admits receiving electronically by July 15.

F.3d 110, 118 (2d Cir. 2009). And as plaintiffs themselves stated in their memorandum of law, "once information is public, it can never be made private again." Citing Gambale v. Deutsche Bank AG, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private again."). Therefore, once NYCLU is free to disseminate the CCRB database, they can publish it on the Internet for the world to see.[2] And once it's published, as Your Honor aptly stated during the July 22 conference, "the cat is out of the bag." What is public can never be made private again, and whatever irreparable harm plaintiffs might suffer from the publication of said database could not be avoided by restricting defendants from publishing the very same data.[3] Thus, the entire purpose for maintaining this portion of the TRO is now moot, and that portion should, therefore, be lifted.

Additionally, any harm that plaintiffs might suffer from the publication of this database would be the result of plaintiffs' own delay in bringing this petition. Plaintiffs claim that they were flabbergasted to learn on July 12 that defendants would be releasing pending, unsubstantiated, and unfounded CCRB records "carte blanche" as a result of the repeal of 50-a. However, this claim does not comport with the open record. As early as June 9, groups representing over 200,000 law enforcement officers in New York State, including plaintiffs, submitted a memorandum to the New York State Assembly opposing the then-proposed repeal of 50-a.[4] In this memo, plaintiffs argue that disciplinary complaints that "have not been fully investigated or substantiated are not reliable or fair indicators of an officer's conduct…and release of such records [] would expose the accused officer of serious safety concerns as well as unavoidable and irreparable harm to reputation and livelihood." See Exhibit "A," at 3. The representatives of the people of New York rejected these arguments and repealed 50-a on June 12, 2020. Yet, plaintiffs delayed *for over a month* in challenging this repeal and waited to bring the underlying petition until July 14. Therefore, any harm plaintiffs' members might suffer as a result of the publication of the CCRB database is due to plaintiffs' actions – or rather inactions – and plaintiffs' alone.

Moreover, NYCLU's publication of the data significantly alters the balance of equities. To succeed on the merits, plaintiffs must show that the harm they would suffer, absent a TRO, is substantially greater than the harm defendants would suffer if a preliminary injunction is granted. See Clemente Global Growth Fund, Inc. v. Pickens, 705 F. Supp. 958, 971 (S.D.N.Y. 1989) (citing Buffalo Forge Co. v. Ampco Pittsburgh Corp., 638 F.2d 568, 569 (2d Cir. 1981).

Here, unless the Circuit reverses the Court's decision to lift the TRO, NYCLU will soon disseminate the CCRB database however they see fit and according to their interests alone.

---

[2] Indeed, ProPublica already published a version of the CCRB database, which can be found on the Internet at https://www.propublica.org/datastore/dataset/civilian-complaints-against-new-york-city-police-officers.

[3] ProPublica's internet publication of CCRB materials on July 25 should not prevent the lifting of the TRO, as it relates to the database. ProPublica's publication provided narrower search parameters than NYCLU's FOIL request. Because NYCLU's FOIL request included the entire database, their ability to publish it should necessitate defendants' ability do so as well.

[4] A copy of this memorandum can be found in a tweet by NYCPBA Legal at https://twitter.com/NYCPBA_GC/status/1270430606942515200?s=20 and attached hereto as "Exhibit A."

Therefore, plaintiffs would not suffer a greater harm absent the TRO against defendants concerning the database. In fact, they would actually suffer a substantially greater harm if the Court were to maintain that portion of the TRO against defendants. Moreover, this substantially greater harm would also come, no doubt, to the defendants and greater public. By forbidding defendants from publishing the CCRB database, the Court has granted third parties, who have no responsibility for accuracy or completeness, the sole right to distribute this data. This increases the probable spread of misinformation and decreases the public's ever-eroding trust in government – the very thing the 50-a repeal sought to repair. However, by lifting this portion of the TRO, the Court can guarantee the public's direct access to the database and ensure the data's accuracy and validity, which the parties and the public so greatly deserve.

Indeed, if a third-party publisher were to mischaracterize, misstate or miscalculate the data, the TRO would actually prevent defendants[5] from correcting the record, providing accurate data, or challenging the validity of the information provided. Additionally, it would prevent the parties, should they be contacted by the media, from providing members of the press with the historical, political or situational context necessary to understanding and accurately interpreting the data. Certainly, plaintiffs would agree that the parties do not benefit from a situation where third parties control the dissemination and publication of the CCRB database, while we remain powerless to prevent its misinterpretation and misuse.

Ensuring proper access and context to accurate data is key to allowing public confidence in the City and its police force. The "supervision of law enforcement personnel sworn to protect and serve the public unquestionably involves an interest of vital importance to state (or, in this case, municipal) government." Murphy v. City of Manchester, 70 F. Supp. 2d 62, 68 (D.N.H. 1999); see also Gilbert v. Homar, 520 U.S. 924, 932 (1997) (weighty interest in securing public confidence in police department); McDonald v. Metro-North Commuter R.R. Div. of Metro. Transit Auth., 565 F. Supp. 37, 40 (S.D.N.Y. 1983) ("New York State's interest in disciplining police officers . . . is the sort of important state interest which precludes federal interference..."); Karins v. City of Atlantic City, 152 N.J. 532, 706 A.2d 706, 715-716 (1998) (holding that municipality has a strong interest in the off-duty conduct of members of its uniformed forces).

With no rational basis for maintaining the existing TRO, there are only two purposes for maintaining the portion that restricts defendants' disclosure of the database: 1) to gag the defendants and prevent them from discussing, disseminating, or publishing their own data, and 2) to further deprive the City's residents of the civic trust they are desperate to achieve. Therefore, for the foregoing reasons, defendants respectfully request that the TRO be lifted against defendants with respect to the CCRB database, as it was for NYCLU, and permit

---

[5] And, for that matter, plaintiffs since they agreed in the July 28 conference not to reveal any information provided in discovery or otherwise related to this dispute.

defendants to publish the database as they see fit.  We thank the Court for its consideration of this request.

Respectfully submitted,

By:  **ECF**:  _____/s/_____
Kami Z. Barker
Assistant Corporation Counsel


_____/s/_____
Rebecca G. Quinn
Assistant Corporation Counsel

_____/s/_____
Dominique Saint-Fort
Assistant Corporation Counsel


cc:    Anthony Coles (by ECF)
DLA Piper
*Attorney for Plaintiffs*



June 5, 2020

## MEMORANDUM OF OPPOSITION

New York State is in crisis. For the past week, we have witnessed a level of civil unrest — too often accompanied by violence and destruction — that our state has not seen in a generation. As law enforcement professionals, we share the universal desire for healing and positive change. At this time, however, the first priority of government must be to restore peace and stability. No rational policy discussion can take place against a backdrop of burning police vehicles and looted store fronts.

We understand that some will leverage the current turmoil to push for passage of legislation and the adoption of policies that reflect only one perspective. This approach to lawmaking is inconsistent with democratic values and results in policies that are neither fair nor reasonable, and we believe will result in unintended outcomes and severe and lasting damage to the public interest, particularly to the safety of all New Yorkers.

**Flawed Process**: The Senate and Assembly majorities are rumored to be negotiating a list of bills that would directly affect law enforcement - its thousands of members, the people we serve, and public safety, and yet they have not engaged nor sought input from us. While we and other

law enforcement organizations may have opposed some of the bills now being considered for passage next week, others we have not had the opportunity to review and provide our concerns and our expertise. In either case, the majorities are rushing legislation through their process, during a pandemic and while law enforcement is focused on protecting people and property, knowing that we and the public are not able to provide meaningful input.

This is reminiscent of the legislative process in 2019 that resulted in passage of significant changes to the bail and discovery statutes. Those amendments were infamously drafted with little to no input or discussion with law enforcement and district attorneys and were included in the State budget. The resulting public outrage regarding the circumstances in which these amendments were enacted and the impact of these changes upon the public and public safety forced the Legislature and Governor Cuomo to significantly amend the law earlier this year - after only being in effect for three months.

The Senate and Assembly majorities can avoid a similar outcome if they will engage in an open and deliberative process where all of the parties impacted by the bills under consideration have a voice and their positions and concerns can be heard and addressed.

**Attack on Law Enforcement.** We are further concerned that the intent behind the purported legislative agenda appears to be to destroy the morale of law enforcement, to subvert our rights and standing in the community, and to expose us to increased risk. Law enforcement officers are first and foremost like other New Yorkers: we have a job which enables us to provide for our families; we reflect the people in our communities and the neighborhoods we patrol; and we are proud to serve and to come home to our families at the end of the day. We are different, however, in that we are asked to do the difficult job of enforcing our laws – the laws that you, the Legislature, pass – and putting ourselves in harms' way to keep our fellow New Yorkers safe.

Law enforcement officers in New York State are already held to a higher standard of conduct and scrutiny — and rightfully so. But the current package of bills pushes beyond that elevated standard into a disturbing new realm: a second class of citizenship for members of law enforcement, one that does not include rights and protections afforded to other public servants, or even some of the basic rights that we defend on the public's behalf every single day.

Beyond any specific policy changes, the overall impact of this legislative effort is to foster a view of law enforcement officers as alien agents of hostile power, whose authority can be disregarded or actively opposed at will. The consequences of this viewpoint are not abstract: we currently have several law enforcement officers laying in hospital beds because of it.

**§50-A.** The Legislature's answer to these violent attacks on law enforcement officers should not be removing protections that keep us and the public safe, and to compromise rights that exist for others. For instance, we understand the majorities intend to quickly repeal or reform Civil Rights Law §50-A. That statute provides a statutory framework that has been in effect for more than 40 years to balance the safety and privacy interests of law enforcement officers with the public's

interest in transparency. Under §50-A, law enforcement officers' personnel records are kept confidential, but after all interested parties have had the opportunity to be heard, a judge may order the release of the records upon a finding that they are relevant and material to the requesting party. Opponents of these protections favor release of *all* complaints, even those that have not been fully investigated and substantiated and where the law enforcement officer has not had a chance to be heard. These types of claims are not reliable or fair indicators of an officer's conduct, and would not be used to impugn any other person. The release of such records, however, would expose the accused officer to serious safety concerns as well as unavoidable and irreparable harm to reputation and livelihood. Indeed, complaints of misconduct that have not been substantiated are kept confidential for public employees in New York state generally, including teachers and elected officials, as well as all State-licensed professionals. The majorities seemingly wish to establish a set of diminished rights for law enforcement officers, compared to the rights for everyone else.

For these reasons, we urge the Senate and the Assembly to establish an open and deliberative process in which all of the parties impacted by the bills being considered for next week can participate and provide their perspectives, concerns and expertise. Any process short of that modest threshold will result in legislation that is ill-conceived, unfair, and destined to diminish public safety and the public's confidence in the legislative process.

Sincerely,

Police Benevolent Association of the City of New York
New York State Association of PBAs
The Police Conference of New York, Inc.
Detectives' Endowment Association, Inc.
Police Benevolent Association of New York State
Corrections Officers' Benevolent Association, Inc.
New York State Sheriffs' Association
New York State Association of Chiefs of Police
New York State Union of Police Associations, Inc.
Police Benevolent Association of the New York State Troopers
New York State Correctional Officers and Police Benevolent
 Association, Inc.

# Exhibit K

**From:** Tara Schwartz <Tara_Schwartz@nysd.uscourts.gov>
**Sent:** Wednesday, July 29, 2020 10:51 AM
**To:** Coles, Anthony P. <anthony.coles@us.dlapiper.com>; Saleski, Courtney <Courtney.Saleski@us.dlapiper.com>; dosaint@law.nyc.gov; rquinn@law.nyc.gov; cdunn@nyclu.org; Jordan Laris Cohen <jlariscohen@nyclu.org>; Molly Biklen <mbiklen@nyclu.org>
**Subject:** Re: Uniformed Fire Officers Association et al v. DeBlasio et al, 20 Civ. 5441 (KPF)

[EXTERNAL]

The 24 hours begins from the time of my email to you with the order.

Tara Schwartz

Law Clerk to the Honorable Katherine Polk Failla
United Sates District Court for the Southern District of New York
40 Foley Square
New York, New York 10007

(201) 421-7732 (Cell)
(212) 805-0290 (Chambers)

(212) 805-4573 (Direct)

**From:** Coles, Anthony P. <anthony.coles@dlapiper.com>
**Sent:** Wednesday, July 29, 2020 10:43 AM
**To:** Tara Schwartz <Tara_Schwartz@nysd.uscourts.gov>; courtney.saleski_dlapiper.com <Courtney.Saleski@dlapiper.com>; dosaint@law.nyc.gov <dosaint@law.nyc.gov>; rquinn@law.nyc.gov

1

<rquinn@law.nyc.gov>; cdunn@nyclu.org <cdunn@nyclu.org>; Jordan Laris Cohen <jlariscohen@nyclu.org>; Molly Biklen <mbiklen@nyclu.org>
**Subject:** RE: Uniformed Fire Officers Association et al v. DeBlasio et al, 20 Civ. 5441 (KPF)

Tara, thank you, received. We also would like to confirm that Plaintiffs have 24 hours from the time that the order is docketed to appeal to the Second Circuit per the Hearing yesterday. Regards, Tony Coles

---

**From:** Tara Schwartz <Tara_Schwartz@nysd.uscourts.gov>
**Sent:** Wednesday, July 29, 2020 10:34 AM
**To:** Coles, Anthony P. <anthony.coles@us.dlapiper.com>; Saleski, Courtney <Courtney.Saleski@us.dlapiper.com>; dosaint@law.nyc.gov; rquinn@law.nyc.gov; cdunn@nyclu.org; Jordan Laris Cohen <jlariscohen@nyclu.org>; Molly Biklen <mbiklen@nyclu.org>
**Subject:** Uniformed Fire Officers Association et al v. DeBlasio et al, 20 Civ. 5441 (KPF)

[EXTERNAL]

Counsel,

Here is an order from the Court that will be posted on the docket shortly.

Tara


Tara Schwartz

Law Clerk to the Honorable Katherine Polk Failla
United Sates District Court for the Southern District of New York
40 Foley Square
New York, New York 10007

(201) 421-7732 (Cell)
(212) 805-0290 (Chambers)

(212) 805-4573 (Direct)


The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# Exhibit L

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNIFORMED FIRE OFFICERS
ASSOCIATION, *et al*,

                              Plaintiff,

                    -v.-

DEBLASIO, *et al*,

                              Defendants.

20 Civ. 5441 (KPF)

ORDER

KATHERINE POLK FAILLA, District Judge:

For the reasons stated in open court during the hearing on July 28,

2020, the temporary restraining order entered by the Court on July 22, 2020 is

modified such that it no longer applies to non-party New York Civil Liberties

Union.

        SO ORDERED.

Dated:      July 29, 2020
            New York, New York

                                    _____
                                        KATHERINE POLK FAILLA
                                        United States District Judge

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

### No. 20-2400

_____

### UNIFORMED FIRE OFFICERS ASSOCIATION, *et al.*,

*Plaintiffs-Appellants*,

v.

### BILL DE BLASIO, in his official capacity
### as Mayor of the City of New York, *et al.*,

*Defendants-Appellees.*

_____

### MEMORANDUM OF LAW IN SUPPORT OF APPELLANTS'
### EMERGENCY MOTION FOR A STAY PENDING APPEAL

_____

### On Appeal from the United States District Court for the
### Southern District of New York, No. 20-cv-05441-KPF

_____

### Date by which a Court ruling is requested on
### request for administrative stay: July 30, 2020 at 10:34 a.m.

Anthony P. Coles
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

Courtney G. Saleski
DLA Piper LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
(215) 656-3300

*Attorneys for Uniformed Fire Officers Association, Uniformed Firefighters
Association of Greater New York, Police Benevolent Association of the City of New
York, Inc., Correction Officers' Benevolent Association of the City of New York,
Sergeants Benevolent Association, Lieutenants Benevolent Association Inc.,
Captains Endowment Association, Detectives' Endowment Association*

July 29, 2019

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ............................................................................................1

JURISDICTIONAL STATEMENT .................................................................4

RELEVANT FACTUAL AND PROCEDURAL HISTORY ...................................5

ARGUMENT ...............................................................................................10

   I.   A STAY IS NECESSARY TO PRESERVE THE STATUS QUO AND
PREVENT IRREPARABLE HARM ...........................................................13

     A.  The Unions will be irreparably injured without a stay................................13

     B.  The Unions are likely to succeed on the merits .........................................16

     D.  The public interest supports a stay ...........................................................20

CONCLUSION.............................................................................................21

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alemite Manufacturing Corp. v. Staff*,
  42 F. 2d 832 (2d Cir. 1930) ...............................................................17

*Bouveng v. NYG Capital LLC*,
  175 F. Supp. 3d 280 (S.D.N.Y. 2016) ................................................14

*Carson v. Am. Brands, Inc.*,
  450 U.S. 79 (1981) ...............................................................................5

*Chafin v. Chafin*,
  568 U.S. 165 (2013) ...........................................................................12

*Cohoes City Sch. Dist. v Cohoes Teachers Ass'n*,
  40 N.Y.2d 774 (1976) .........................................................................14

*Doe v. Greco*,
  62 A.D.2d 498 (N.Y. App. Div. 3d Dep't 1978) ................................14

*Eli Lilly & Co. v. Gottstein*,
  617 F.3d at 195 .....................................................................................3

*Gambale v. Deutsche Bank AG*,
  377 F.3d 133 (2d Cir. 2004) ...............................................................13

*Grant v. United States*,
  282 F.2d 165 (2d Cir. 1960) .................................................................5

*Jackson Hewitt Inc. v. H.E.A.T. Enters., LLC*,
  No. 10-CV-5108, 2011 WL 6347883 (D.N.J. Dec. 15, 2011) ...........18

*Paramount Pictures Corp. v. Carol Pub. Group, Inc.*, 25 F. Supp. 2d
  372 (S.D.N.Y. 1998) ...........................................................................18

*Pyro Spectaculars North, Inc. v. Souza*,
    861 F. Supp. 2d 1079 (E.D. Cal. 2016) ............................................................18

*In re World Trade Ctr. Disaster Site Litig.*,
    503 F.3d 167 (2d Cir. 2007) ............................................................13

*In re Zyprexa Injunction*,
    474 F. Supp. 2d 385 (E.D.N.Y. 2007), *aff'd*, *Eli Lilly & Co. v.*
    *Gottstein*, 617 F.3d 186 (2d Cir. 2010).........................................3, 17

**Statutes**

28 U.S.C. § 1292(a) ............................................................4

New York Civil Rights Law § 50-a .........................................5, 6, 7, 11

**Other Authorities**

Benjamin Mueller & Al Baker, *Police Officer Is 'Murdered for Her*
    *Uniform' in the Bronx*, N.Y. Times (July 5, 2017), *available at*
    https://tinyurl.com/y7ngmdth ............................................................20

City of New York, Open Records Requests, https://a860-
    openrecords.nyc.gov/request/view_all (last visited July 24, 2020)......................2

Fed. R. Civ. P. 65(d)(2)............................................................3

Fed. R. Civ. P. 65(d)(2)(C) ............................................................7

FRAP 27(d)(2) ............................................................1

Local Rule 27.1 ............................................................1

Rule 62(c)............................................................20

Rule 65 ............................................................3, 8

Rule 65(b)............................................................5, 10

11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2904 (3d ed. Aug. 2019
    update)............................................................20

**INTRODUCTION**

Plaintiffs-Appellants[1] respectfully request that the Court rule on their administrative stay request before July 30, 2020 at 10:34 a.m., when the District Court's 24-hour stay of its July 28 Order expires. (*See* Ex. K). If not, the District Court's July 28 Order will allow third-party New York Civil Liberties Union ("NYCLU") to publicly release a copy of the Civilian Complaint Review Board ("CCRB") database containing police disciplinary records, including those that are non-final, unsubstantiated, unfounded, exonerated, or resulted in a finding of not guilty ("Unsubstantiated and Non-Final Allegations"), regarding 81,000 former and current police officers.

The District Court, on July 22, properly entered a TRO against NYCLU because it was acting in concert with the Defendants to release Unfounded and Non-Final Allegations affecting 81,000 police officers, and to undermine the rights of those officers. The District Court found that it was "rather curious timing" that the production of the CCRB records occurred while the parties "were in discussion, hoping to forestall litigation." (*See* Transcript of July 22, 2020 court conference ("Tr.") at 80:8–12.) The District Court noted that the pace of the release of the CCRB records to NYCLU "broke land speed records." (Tr. at 84:2–3.) And the

---

[1] Plaintiffs-Appellants, collectively referred to in this brief as the "Unions," are associations that represent active-duty and retired police officers, corrections officers, and firefighters.

District Court found that, if NYCLU carried out its threat to release the Unfounded and Non-Final Allegations, there would "be serious issues that transcend reputation, that affect employment, that affect safety" which are "not speculative and [are] imminent[.]" (Tr. at 82:9–11.) The District Court made a specific finding that its Order against NYCLU was necessary to prevent irreparable harm to the Unions. Not a single one of these facts has changed since those findings.

The CCRB and NYCLU have schemed together to try to undermine the collective bargaining rights, constitutional rights, and contractual rights of the Plaintiffs. The CCRB did not make individualized determinations regarding the subject officers' rights and safety, as it had historically done, when it dumped this data into NYCLU's hands. And the relevant chronology is devastating to any assertion that NYCLU and Defendants were acting in good faith. As confirmed by the District Court at the July 22 Conference, NYCLU propounded its FOIL request on Thursday, July 9, 2020. The CCRB then produced the records of 81,000 police officers to NYCLA on July 14. (*See* ECF No. 7, at 3.) By contrast, a preliminary review of the CCRB's own website shows that it has open FOIL requests dating from May 2019, and that since July 10, 2020, 50 of the 55 FOIL requests it received remain open, none of which are of the magnitude of the wholesale, indiscriminate document release given to NYCLU. (City of New York, Open Records Requests, https://a860-openrecords.nyc.gov/request/view_all (last visited July 24, 2020)).

The District Court had the authority, as well as the responsibility, to enjoin NYCLU based upon its finding of potential harm to plaintiffs' members: the court's "power to enjoin extends to persons and organizations whose activities present a risk of irreparable harm to petitioner that cannot be alleviated by means other than injunction." *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 427 (E.D.N.Y. 2007), *aff'd*, *Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010) (finding persons named in injunction, including those not joined as parties in underlying action, bound by its terms).

Moreover, Rule 65 applies the scope of a restraining order to those with notice of the order and "other persons who are in active concert or participation with" the bound party, or any of its officers, agents, servants, employees, and attorneys. Fed. R. Civ. P. 65(d)(2). This rule codifies the common-law doctrine that parties "'may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding.'" *Eli Lilly & Co. v. Gottstein*, 617 F.3d at 195 (quoting *Regal Knitwear Co. v. Nat'l Labor Rel. Bd.*, 324 U.S. 9, 14 (1945)). As the District Court found, NYCLU and the CCRB were acting in concert to render this entire proceeding a nullity and an empty ritual. (*See* Minute Entry, July 22, 2020; *see also* Tr. at 88:9–19.)

Despite this authority and evidence of concert, the District Court, on July 29, modified the injunction to remove NYCLU on the erroneous grounds that it lacked

authority.  The District Court granted a stay for 24 hours for Plaintiffs-Appellants to seek a stay in this Court.  The administrative stay is urgently needed because of the public safety ramifications and other irreparable harm if NYCLU releases and promotes these records to the public in an online database.  These disciplinary files have not been redacted to protect confidential information concerning Unsubstantiated and Non-final Allegations that risk the safety, reputational, and employment interests of 81,000 former and current New York police officers.

## JURISDICTIONAL STATEMENT

The Unions appeal from an order modifying a preliminary injunction. *See* 28 U.S.C. § 1292(a). Although the District Court's July 28 Order was styled a modification of its previous Temporary Restraining Order ("TRO"), it has the practical effect of denying the preliminary injunction sought by the Unions and is therefore appealable under § 1292(a).  The District Court stated that it sought to "remove the injunctive relief that [it] imposed on the New York Civil Liberties Union." (Ex. E, July 28, 2020 Tr. 30.)

Orders that have the practical effect of granting or denying a preliminary injunction qualify for interlocutory appeal.  "[T]he label put on the order by the trial court is not decisive; instead the courts look to such factors as the duration of the order, whether it was issued after notice and hearing, and the type of showing made

4

in obtaining the order." *Grant v. United States*, 282 F.2d 165, 167 (2d Cir. 1960) (internal quotation marks omitted).

An order becomes injunctive when issued after notice and an opportunity to respond, where the district court hears evidence, and where it issues an order that extends past the temporal limits of Rule 65(b). *Id.* Those criteria are all met here. The District Court's July 28 Order was entered after briefing, a hearing, and was extended past the 14-day time limit for a TRO issued under Rule 65(b). Thus, the District Court's July 28 Order is appealable. *See Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83–84, 86–90 (1981).

## RELEVANT FACTUAL AND PROCEDURAL HISTORY

For years, police disciplinary records were categorically shielded from public view under New York Civil Rights Law § 50-a. The New York legislature repealed the law on June 12, 2020, meaning that certain disciplinary records were no longer protected from disclosure by § 50-a. But, as even the most vocal advocates for the repeal of § 50-a recognized, other laws protected against the indiscriminate release of all disciplinary records. Indeed, these protections were expressly cited by the sponsor of the § 50-a repeal as a reason that law was "unnecessary."

Starting in July, the Mayor and City authorities began vocalizing intentions to voluntarily release disciplinary records in wholesale manner. In particular, the CCRB had indicated that it was going to release a database at the end of July. This

5

was a striking turn of events because lawmakers and policymakers had publicly recognized that many of these records were protected by laws apart from the repealed § 50-a. The Unions sought to delay the release of non-final and unsubstantiated allegations until they could be reviewed on an individualized basis in accordance with pre-existing contractual and constitutional strictures. On July 13, counsel for the Unions emailed the defendants (represented by the New York City Corporation Counsel), explaining that they planned to bring suit if the parties could not jointly develop a solution. Over the next 24 hours, Corporation Counsel represented that they were "inclined to agree to a delay," but explained that they needed to confirm with their clients. (*See* Ex. F.)

Meanwhile, just days earlier and after the Unions had expressed concern about potential violation of their members rights, NYCLU had filed a request for "the complete allegation histories of every active and retired member of the New York City Police Department" under the New York Freedom of Information Law ("FOIL"). *See* Declaration of Christopher Dunn ¶ 7 (July 23, 2020) (Dist. Ct. Dkt. No. 16-1). In what the District Court described as a response "breaking land speed records," July 22, 2020 Tr. 84, Defendant CCRB released the entire database of approximately 81,000 officer records in under three business days, producing the documents at 12:33 p.m. on July 14, 2020—less than 3 hours after Corporation Counsel had explained that they were "inclined to agree to a delay" of the records

6

release. (*See* Ex. F.) The CCRB fulfilled this request despite dozens of older outstanding FOIL requests that pale in comparison in both size and scope. These disciplinary records appear to contain sensitive police officer information. <u>But the Unions have not been provided a copy of these records</u> that are proposed to be publicly released.

The present case was filed in state court on July 14, 2020. The Unions' Complaint explained that, although the repeal of Civil Rights Law § 50-a eliminates a categorical prohibition to the public review of law enforcement records, it does not obliterate pre-existing contractual rights or constitutional and common law protections forbidding Respondents from promoting unproven, defamatory allegations to the world at large. Those rights include collective bargaining rights, due process and equal protection rights, contract rights. Moreover, Defendants acted arbitrarily and capriciously by categorically releasing these documents without any reasoned analysis for changing their position. *See* Dist. Ct. Dkt. No. 5-1 (complaint).

On July 15, the state court granted a TRO against Defendants, prohibiting them and those acting in concert with them from releasing the subject records. After the City removed this case to federal court, the District Court enjoined the same and made a finding that NYCLU and Defendants were "acting in concert" to coordinate this last-minute distribution of the documents. *See* Fed. R. Civ. P. 65(d)(2)(C) (authorizing a district court to enter an injunction binding the parties and "other

7

persons who are in active concert or participation" with a party). Thus, on July 22, as part of the TRO against the City, the Honorable Katherine Polk Failla also enjoined NYCLU from disseminating the documents.[2] Judge Failla found that NYCLU was acting in concert with the Defendants to release Unfounded and Non-Final Allegations affecting 81,000 police officers, and to undermine the rights of those officers. The District Court found that it was "rather curious timing" that the production occurred while the parties "were in discussion, hoping to forestall litigation." (*See* Ex. B, July 22 Tr. at 80:8–12.) The District Court noted that the CCRB "broke land speed records" to release records to NYCLU. (Ex. B 84:2-3.) And the District Court found that, if NYCLU carried out its threat to release the Unfounded and Non-Final Allegations, there would "be serious issues that transcend reputation, that affect employment, that affect safety" which are "not speculative and [are] imminent…." (Ex. B 82:9–11). The District Court made a specific finding that its Order against NYCLU was necessary to prevent irreparable harm to plaintiffs.

Given that the disclosure of documents to NYCLU was not disclosed until the July 22 hearing, Judge Failla invited briefing and oral argument on the question of whether Rule 65 gave her the power to enjoin a third party under the circumstances.

---

[2] NYCLU vehemently protested this during the hearing, and later admitted that it "had planned to make public the CCRB database" the next morning. Letter from NYCLU to the Hon. Katherine Polk Failla, at 1 (July 23, 2020) (Dist. Ct. Dkt. No. 16)

(*See* Ex. B 87.)  Following expedited briefing on the question, and without the discovery requested by the Unions, the District Court held a hearing.  The District Court held that it lacked the power to enjoin NYCLU because the concerted effort occurred prior to any court order.  As Judge Failla put it, "I don't have the ability to reach back in time."  (Ex. E, July 28, 2020 Tr. 28.)  The District Court concluded that, although the parties were acting in concert regarding production of the records to NYCLU, they were not acting in concert following the issuance of the TRO.  (*See* Ex. E 27–30.)  Thus, the District Court concluded that its "power is limited," and it lacked the "ability to stop [NYCLU] when the deeds were already done before the litigation was filed."  (Ex. E 29.)  Thus, the Court modified its July 22 Order "to remove the injunctive relief imposed on" NYCLU.  (Ex. E 30.)

Judge Failla stayed her July 28 Order for 24 hours to allow this emergency application for a stay pending appeal of the injunction modification.  That stay is due to expire on July 30 at 10:34 a.m.  As more recent evidence of concert, on July 29, the City requested that, in light of the ruling regarding NYCLU, the Court lift the restraints relating to the CCRB's dissemination of Unfounded and Non-Final Allegations. This act would finally accomplish what the concerted behavior was ultimately designed to accomplish:  the ability to release documents that violate the Unions' members' rights. All this was possible because of a disclosure to NYCLU

that occurred at warp speed, without individualized review, and for the purposes of avoiding the reach of the law.

## **ARGUMENT**

On July 28, 2020 the District Court modified its July 22 Order that barred NYCLU from releasing a CCRB database containing records of 81,000 former and current NYPD officers.  The Order was filed on the docket on July 29.  The District Court granted a 24-hour stay of the Order (until July 30 at 10:34 a.m.) so the Unions could seek a stay in this Court.  The District Court found that it did not have the power to enjoin the conduct of NYCLU because NYCLU had acted in concert with the City *before* a New York state judge issued a temporary restraining order. However, the District Court does indeed have the power under Federal Rule of Civil Procedure 65(b) to issue an order enjoining the publication of a copy of the CCRB database containing 81,000 records.  Even though the City and NYCLU acted in concert before the TRO order, NYCLU has not yet published the personnel files online—part of the core relief the Unions seek in this appeal.  Because the District Court erred in its legal analysis, the stay requested by the Unions should be granted to preserve the status quo and avoid the risk of irreparable harm to the Unions' members. An administrative stay and a stay on appeal are critically important for two reasons.

*First*, the rights of tens of thousands of police officers are at issue. NYCLU is threatening disclosure of private, confidential records that contain Unsubstantiated and Non-Final Allegations of misconduct that may even be frivolous, and other pieces of confidential and identifying information. (Despite vigorous requests for discovery, the Unions do not know whether the disciplinary records contain other sensitive information.) Such indiscriminate release would, among other harms: violate the Collective Bargaining Agreements; violate the Due Process Clauses of the United States and New York State Constitutions, and irrevocably and unfairly stigmatize the Unions' members; potentially breach settlement agreements entered into in good faith with the promise and expectation of confidentiality; and arbitrarily and capriciously reverse longstanding city and State practice of deeming unsubstantiated allegations to be protected from disclosure, separate and apart from the provisions of § 50-a.

*Second*, the District Court had previously found that NYCLU, a third-party and amicus in this litigation, and the City were acting in concert with one another (in effect, NYCLU was aiding and abetting the City by providing substantial assistance). NYCLU filed a FOIL request on a Thursday and received 81,000 personnel files *the following Tuesday*, the day after the Unions' counsel informed the parties of their intention to sue—an unusual and suspicious response time that warranted a finding of coordinated action between the City and NYCLU. Indeed,

11

the District Court noted that the pace of the release of the CCRB records to NYCLU "broke land speed records." (Ex. B at 84:2–3.) That effort represented a concerted effort that disregarded and, if the public disclosure were accomplished, violate fundamental rights of the Unions members. Again, it is the Unions' present understanding that no FOIL redactions or exclusions were made by the City to these files in advance of production to NYCLU, much less an analysis of the City's responsibilities under the governing law. The City was not in a position to publish these disciplinary files for myriad legal and political reasons, so the City sent the files to a private third party. A stay is required so that the status quo is preserved while the Court hears this appeal, and necessary so that the publication of these documents by NYCLU does not moot the main equitable remedies the Unions seek in this litigation. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (case moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party" (internal quotation marks omitted)).

The equitable stay factors weigh heavily in favor of granting an administrative stay to allow the parties to file briefs on the stay issue. And, once the briefs have been filed, a stay pending appeal is needed to prevent irreparable harm. Thus, the Unions request that this Court stay the July 28 Order modifying the preliminary injunction so that the parties can maintain the status quo while this matter is heard on appeal.

12

## I.   A STAY IS NECESSARY TO PRESERVE THE STATUS QUO AND PREVENT IRREPARABLE HARM

A stay pending appeal is necessary in this case.  "The four factors to be considered in issuing a stay pending appeal are well known: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"  *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (footnote omitted) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).  Here, each factor weighs in favor of staying the District Court's July 28 Order.  The July 28 Order eliminates any restraint on NYCLU.  An administrative stay would allow for more fulsome briefing by the parties and third-party NYCLU.  And a stay of the July 28 Order should remain in effect pending final resolution of this interlocutory appeal because it would preserve the status quo and protect the safety of New York City's finest.

### A.   The Unions will be irreparably injured without a stay

If confidential information about unsubstantiated and non-final misconduct allegations that have been lodged against police officers is made public, it could never be corrected: the harm is irreparable.  *See, e.g.*, *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004) ("We simply do not have the power, even were we of the mind to use it if we had, to make what has thus become public private

13

again."). "Public disclosure of what is now confidential and should remain confidential would lead to an irreversible breach of that confidentiality. The harms which would naturally flow from disclosure could not be redressed nor could the parties ever be returned to the status quo ante." *Doe v. Greco*, 62 A.D.2d 498, 501 (N.Y. App. Div. 3d Dep't 1978).

As the District Court found during its July 22 hearing, the release of the CCRB database by NYCLU implicates serious safety concerns for the Unions' members. The District Court found "there to be serious issues that transcend reputation, that affect employment, that effect safety," and concluded that it was "accepting those harms as not speculative and imminent for purposes of today's proceeding." (Ex. B, July 22, 2020 Tr. 82:8-12.) New York state law is in accord that the protection of personnel records, as required by collective bargaining agreements, is an important contractual right. The Court of Appeals has emphasized the "strong and sweeping policy of the State to support collective bargaining under the Taylor Law." *Cohoes City Sch. Dist. v Cohoes Teachers Ass'n*, 40 N.Y.2d 774, 778 (1976).

The data to be released include unsubstantiated allegations lodged against police officers related to misconduct. These accusations are false or non-final, yet NYCLU intends to include them without regard for their veracity. Once officers are identified in this publicly available and searchable database, and associated with this conduct, their injuries cannot be adequately remedied with damages. *See Bouveng*

14

*v. NYG Capital LLC*, 175 F. Supp. 3d 280 (S.D.N.Y. 2016) (in considering a jury award in favor of terminated employee defamed online by prior employer, the court noted that "in the internet age in which we live, an individual's online presence is as important . . . [as] her physical presence," and that "[w]e live in a highly competitive, information-driven world, and most employers will not have the time or inclination to investigate whether such disturbing allegations are true. They will simply move on to the next candidate").

Moreover, the safety of each and every police officer is in jeopardy in this time of national discord, police reform, and a pandemic. Release of the data not only will irreparably injure important reputational interests, non-reputational interests (such as future employment or promotion prospects), liberty, and privacy interests of the officers, but also will destroy valuable collectively bargained-for rights.

Nearly all the CBAs relevant to this dispute give each individual officer the contractual right to have investigative reports that are classified "exonerated" and/or "unfounded" removed from his or her personnel file. For example, section 7(c) of Article XV of the Sergeants Benevolent Association CBA gives employees, on request, the right to "remove from the Personnel Folder investigative reports which, upon completion of the investigation are classified 'exonerated' and/or 'unfounded.'" (Dist. Ct. Dkt. No. 10 (SBA CBA, Art. XV, § 7(c))). If these personnel records are released publicly, then this contractual right will be nullified.

15

No officer would be able to have "exonerated" or "unfounded" reports removed from his or her file, even though the City is contractually obligated to remove such reports upon request.

Without a stay of the District Court's recent order modifying the preliminary injunction, NYCLU—which has been aiding and abetting and acting in concert with the City—will inflict irreparable injury on the officers' contractual rights. The planned release also would irreparably harm the officers' broader right to engage in collective bargaining over the terms and conditions of their employment.[3]

### B.      The Unions are likely to succeed on the merits

When the District Court explained its ruling modifying its ruling on NYCLU, the District Court mistakenly applied the law on contempt claims to conclude that it was powerless to enjoin NYCLU from acting in concert with CCRB to release information that would not, and should not, otherwise be released. (Ex. E 28:3-18.) In the July 28 hearing the District Court stated that NYCLU's representative could not have acted in concert with the City because "there was no court order that he was violating when he received the documents based on what I've been told." (Ex. E 7:1-2.) But the basis for enjoining NYCLU from acting in concert going forward is not a contempt of any court order or injunction: the basis is its past acting in concert

---

[3] The City's release of the records would also render meaningless the officers' contractual right to arbitrate grievances that have been or are about to be filed under the CBAs to prevent the release of the records. (Dist. Ct. Dkt. No. 10 (SBA CBA, Article XX)).

with the City as part of an effort to publish information that, if successful, would violate the rights of the Unions' members based on collective bargaining agreements, settlement agreements, and constitutional and privacy rights. The District Court erred in treating the current situation as an alleged contempt of a court order. It is fundamentally different.

The District Court explained that it was relying on *Alemite Manufacturing Corp. v. Staff*, 42 F. 2d 832 (2d Cir. 1930), and other cases, for the conclusion that it could not enjoin future activity based on past activity. But *Alemite* concerned the alleged violation of an existing court order, which is not at issue here. As one district court has explained:

> Unlike *Alemite*, this is not a contempt proceeding, and the court is not now punishing anyone for any alleged violation of court orders. Rather, this proceeding seeks to prevent irreparable harm to [petitioner] by enjoining those persons whose actions threaten such harm. The relief granted is not punitive, but preventative . . . The power to enjoin extends to persons and organizations whose activities present a risk of irreparable harm to petitioner that can not be alleviated by means other than injunction.

*In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 427 (E.D.N.Y. 2007), *aff'd Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010).

*Zyprexa* involved an alleged conspiracy to publicize documents previously under seal and subject to a protective order by a lawyer not involved in the principal litigation and a reporter from The New York Times. Under those circumstances, the district court correctly used its inherent equitable authority to order the return of the

17

documents, stolen pursuant to the conspiracy, in violation of a protective order issued in a products liability action against the manufacturer of a drug used to treat schizophrenia. *See also Pyro Spectaculars North, Inc. v. Souza*, 861 F. Supp. 2d 1079 (E.D. Cal. 2016) (where non-parties received confidential information prior to the issuance of an injunction, court enjoined non-parties from "possessing, using, disclosing or transmitting" information where evidence reflected they had acted in concert with defendant); *cf. Jackson Hewitt Inc. v. H.E.A.T. Enters., LLC*, No. 10-CV-5108, 2011 WL 6347883, at *2 (D.N.J. Dec. 15, 2011) ("It makes no difference that the active participation [in the enjoined tax preparation work] began before the franchise was terminated and injunction was issued since it is clear that [the non-parties] have continued their tax preparation business in the [enjoined] locations.")[4]

Here, the facts strongly suggest that NYCLU and Defendants were acting in concert in an effort to release the unsubstantiated and non-final allegations against police officers, which the Unions contend would evade or violate privacy and

---

[4] The other cases cited by the District Court also do not bar issuing an injunction against persons acting in concert. Each of the cases the District Court relied on concern alleged or anticipated acts in contempt of an existing court order (and some also do not allege any action in concert). Those cases do not address the situation here, or the basis for issuing a restraining order now to prevent fulfillment of the concerted efforts of the City and NYCLU to publicly release information whose release violates the rights of the Unions' members.

For example, n *Paramount Pictures Corp.*, 25 F. Supp. 2d at 376, the district court considered a motion by the plaintiff to clarify the scope of a preliminary injunction prohibiting the defendant publisher from shipping or selling any copies of a book, where the evidence reflected that many non-party retailers and distributers were already in possession of the book, which had begun to be shipped out *six months before* the entry of the injunction. In the absence of any evidence that the third-party distributors were acting in concert with the publisher at that point, the court found that the injunction did not encompass the nonparty retailers and distributers of book.

18

confidentiality laws, and violate the rights of plaintiffs' members provided by their CBA contracts and due process.  The District Court had originally found on July 22 that it was evident that NYCLU had acted in concert with CCRB.  *See* Ex. B, July 22 Tr. at 82.

When the District Court changed its mind on July 28, it did so on the basis of only a few conclusory questions to NYCLU at the hearing, without allowing any opportunity to cross-examine what was said, to have discovery on documents on that issue, or to look at anything accept NYCLU's conclusory answers.  It was in effect summary judgment.  Summary judgment on critical fact issues, without any of the normal evidentiary tests, is not proper.  It is particularly improper to reach factual findings on the issue of acting in concert when significant rights are at issue, and the rights will be permanently lost based on such abbreviated factual inquiry.  At a minimum, the Unions should be allowed limited expedited discovery on this particular issue.

## C.    The requested stay will not injure other parties or NYCLU

In contrast to the irreparable harm to the Unions' members, the issuance of a stay will not injure the City or NYCLU—it would merely preserve the status quo, and NYCLU would remain in the same position that it was in before it received these disciplinary records.  Nor would the stay injure the Defendants, who are already enjoined from publishing the documents pending an upcoming hearing on the

19

preliminary injunction. The only thing a stay would accomplish would be to ensure that the police officers' rights are adjudicated fairly. These disciplinary records have been shielded from public access for decades; pausing their release by mere days or weeks would constitute a *de minimis* injury, if any at all.

### D.  The public interest supports a stay

Rule 62(c) "codifies the inherent power of courts to make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment." 11 Wright & Miller, Fed. Prac. & Proc. Civ. § 2904 (3d ed. Aug. 2019 update). Here, the status quo is that unsubstantiated and non-final disciplinary records are not available for public searches and consumption. An orderly disclosure would do nothing to hurt the public generally. In contrast, many of these allegations are unsubstantiated and potentially untrue. Disclosing them now would do nothing but harm the police officers—and, by extension, the public they serve—by undermining their credibility in the community and subjecting them to retaliation and potentially violence for unproven wrongs. This harm is not speculative: it already happens, even without these records being publicized. *See, e.g.*, Benjamin Mueller & Al Baker, *Police Officer Is 'Murdered for Her Uniform' in the Bronx*, N.Y. Times (July 5, 2017), *available at* https://tinyurl.com/y7ngmdth. The public interest is served by having a reasonable release of appropriate documents—not a slipshod data dump that puts NYPD's finest at risk.

## <u>CONCLUSION</u>

For all the reasons above, the Unions respectfully request that this Court enter an administrative stay by July 30, 2020 at 10:34 a.m., and an order staying the District Court's July 22 Order pending appeal.

Dated:      New York, New York
             July 29, 2020

Respectfully submitted,

*/s/ Anthony P. Coles*
Anthony P. Coles
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500

Courtney G. Saleski
DLA Piper LLP (US)
1650 Market St., Suite 5000
Philadelphia, PA 19103
(215) 656-3300

*Attorneys for Uniformed Fire Officers Association, Uniformed Firefighters Association of Greater New York, Police Benevolent Association of the City of New York, Inc., Correction Officers' Benevolent Association of the City of New York, Sergeants Benevolent Association, Lieutenants Benevolent Association Inc., Captains Endowment Association, Detectives' Endowment Association*

21

## **WORD COUNT CERTIFICATION**

I certify that this Memorandum of Law complies with the word limit requirements in Second Circuit Local Rule 27.1 and Federal Rule of Appellate Procedure 27(d)(2) because this Memorandum of Law contains less than 5,200 words.

*/s/ Anthony P. Coles*
Anthony P. Coles